# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

BRYCE MARTINEZ
                    Plaintiff,

v.

KRAFT HEINZ COMPANY, INC.,
MONDELEZ INTERNATIONAL, INC.,
POST HOLDINGS, INC., THE COCA-
COLA COMPANY, PEPSICO, INC.,
GENERAL MILLS, INC. NESTLE USA,
INC., KELLANOVA, WK KELLOGG CO
MARS INCORPORATED, INC.,
CONAGRA BRANDS, INC.
                    Defendants.

Case No. 2:25-cv-00377

Hon. Mia Roberts Perez

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OMNIBUS MOTION TO DISMISS PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

Introduction.............................................................................................................1

Statement of Pleaded Facts ....................................................................................4

Legal Standard .......................................................................................................7

Argument ...............................................................................................................8

I.      The Complaint Engages in Improper Group Pleading...................................8

II.    All of Plaintiff's Claims Fail for Lack of Causation....................................11

     A.    Plaintiff Does Not Identify Any Specific Products That Allegedly Caused His Injuries....................................................................................12

     B.    Plaintiff Does Not Plausibly Plead Either General or Specific Causation.............15

III.   Preemption Bars Plaintiff's Claims. ...........................................................21

     A.    USDA Preemption Bars Claims Regarding Meat and Poultry Products.................22

     B.    Plaintiff's Vague Pleading Attempts to Skirt FDA Preemption. ...........................25

IV.   Plaintiff's Claims Are Barred by the First Amendment. ............................26

V.    The Limited Individual Allegations Against Each Defendant Are Insufficient. ..............27

VI.   Each of Plaintiff's Claims Fails for Additional Reasons. ...........................32

     A.    Plaintiff Does Not Plead Any Breach of Duty to Support His Negligence Claim (Count I)....................................................................32

     B.    Plaintiff's Failure to Warn Claim Fails for Lack of Duty to Warn and Failure to Plead Causation (Count II). ...................................................33

     C.    Plaintiff's Warranty Claims Fail for Multiple Reasons (Counts III–IV)..............36

          1.    All of Plaintiff's warranty claims fail for failure to plead pre-suit notice....................................................................36

          2.    Plaintiff fails to plead any breach of an implied warranty of fitness for a particular purpose. ...........................................37

          3.    Plaintiff does not adequately plead breach of the implied warranty of merchantability. .......................................................37

          4.    Plaintiff fails to plead any express warranty.............................38

     D.    All Fraud and Deception-Based Claims Fail for Multiple Reasons (Counts V–VIII). ..................................................................39

          1.    Plaintiff does not adequately allege any false statement or reliance. ........39

          2.    Plaintiff's concealment claim fails for additional reasons (Count VI). ..............................................................42

     E.    Plaintiff Does Not Allege Any Defendant Was Unjustly Enriched (Count IX). ..................................................................43

F.      Plaintiff's Conspiracy (Count X) and Concerted Action (Count XI) Claims Are Not Adequately Pled. .......................................................................................44

      1.     Plaintiff has not alleged an underlying tort. ..............................................45

      2.     Plaintiff has not alleged actual malice. ....................................................45

      3.     Plaintiff does not plausibly allege an agreement. .....................................46

Conclusion ..............................................................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmed v. Wells Fargo Bank, NA,*
   432 F. Supp. 3d 556 (E.D. Pa. 2020) ...............................................................40, 42

*Albertson v. Wyeth Inc.,*
   63 Pa. D. & C.4th 514 (Pa. Ct. C.P. 2003) ...............................................................43

*Am. Beverage Ass'n v. City & Cnty. of San Francisco,*
   916 F.3d 749 (9th Cir. 2019) ...............................................................26

*Andrade-Heymsfield v. NextFoods, Inc.,*
   2022 WL 1772262 (S.D. Cal. Apr. 27, 2022) ...............................................................38

*Animal Legal Def. Fund Bos., Inc. v. Provimi Veal Corp.,*
   626 F. Supp. 278 (D. Mass. 1986) ...............................................................24

*Armour & Co. v. Ball,*
   468 F.2d 76 (6th Cir. 1972) ...............................................................24

*In re Asbestos Prod. Liab. Litig. (No. VI),*
   801 F. Supp. 2d 342 (E.D. Pa. 2011) ...............................................................12

*In re Asbestos Sch. Litig.,*
   46 F.3d 1284 (3d Cir. 1994)...............................................................47, 48

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)............................................................... *passim*

*Atlantic Richfield Co. v. Cnty. of Montgomery,*
   294 A.3d 1274 (Pa. Commw. Ct. 2023) ...............................................................12

*In re Avandia Mktg., Sales Prac. & Prod. Liab. Litig.,*
   2011 WL 4007908 (E.D. Pa. Sept. 7, 2011) ...............................................................44

*Bartol v. Barrowclough,*
   251 F. Supp. 3d 855 (E.D. Pa. 2017) ...............................................................8

*Becerra v. Coca-Cola Co.,*
   2018 WL 1070823 (N.D. Cal. Feb. 27, 2018) ...............................................................16

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................... *passim*

iv

*Betz v. Pneumo Abex, LLC*,
  44 A.3d 27 (Pa. 2012) ................................................................................18

*Brower v. Campbell Soup Co.*,
  243 F. Supp. 3d 1124 (S.D. Cal. 2017) ......................................................24

*Bruner v. Anheuser-Busch, Inc.*,
  153 F. Supp. 2d 1358 (S.D. Fla. 2001) ......................................................21

*Burnside v. Abbott Lab'ys*,
  505 A.2d 973 (Pa. Super. Ct. 1985).....................................................45, 47

*Butakis v. NVR, Inc.*,
  668 F. Supp. 3d 349 (E.D. Pa. 2023) ...........................................................8

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022) .......................................................................26

*City of Phila. v. Beretta U.S.A. Corp.*,
  277 F.3d 415 (3d Cir. 2002)........................................................................32

*City of Phila. v. Lead Indus. Ass'n*,
  1992 WL 98482 (E.D. Pa. Apr. 23, 1992) ..................................................11

*City of Phila. v. Lead Indus. Ass'n, Inc.*,
  994 F.2d 112 (3d Cir. 1993)........................................................................12

*Conley v. St. Jude Med., LLC*,
  482 F. Supp. 3d 268 (M.D. Pa. 2020) .........................................................39

*Conquest v. WMC Mortg. Corp.*,
  247 F. Supp. 3d 618 (E.D. Pa. 2017) ..........................................................40

*Cook v. MillerCoors, LLC*,
  872 F. Supp. 2d 1346 (M.D. Fla. 2012).......................................................21

*Corrigan v. Methodist Hosp.*,
  853 F. Supp. 832 (E.D. Pa. 1994) ...............................................................46

*Cummins v. Firestone Tire & Rubber Co.*,
  495 A.2d 963 (Pa. Super. Ct. 1985).......................................................12, 13

*Dauphin Deposit Bank & Tr. Co. v. Toyota Motor Corp.*,
  596 A.2d 845 (Pa. Super. Ct. 1991).......................................................34, 35

*Doe v. City of Phila.*,
  2024 WL 2218897 (E.D. Pa. May 15, 2024) ...........................................8, 11

*Drumheller v. Johnson & Johnson,*
  2021 WL 1853407 (E.D. Pa. May 10, 2021) .........................................................................43

*Howard ex rel. Estate of Ravert v. A.W. Chesterton Co.,*
  78 A.3d 605 (Pa. 2013) .....................................................................................................18

*Flanagan v. martFIVE, LLC,*
  259 F. Supp. 3d 316 (W.D. Pa. 2017) ................................................................................39

*Foge, McKeever LLC v. Zoetis Inc.,*
  565 F. Supp. 3d 647 (W.D. Pa. 2021) ................................................................................40

*Garrison v. Heublein, Inc.,*
  673 F.2d 189 (7th Cir. 1982) .............................................................................................21

*Gen. Refractories Co. v. Fireman's Fund Ins. Co.,*
  337 F.3d 297 (3d Cir. 2003)...............................................................................................44

*Gorran v. Atkins Nutritionals Inc.,*
  464 F. Supp. 2d 315 (S.D.N.Y. 2006).................................................................................35

*Gregg v. Ameriprise Fin., Inc.,*
  664 Pa. 567 (Pa. 2021)......................................................................................................40

*Gregg v. V-J Auto Parts, Co.,*
  943 A.2d 216 (Pa. 2007)....................................................................................................18

*Grocery Mfrs. of Am., Inc. v. Gerace,*
  755 F.2d 993 (2d Cir. 1985)...............................................................................................22

*Gross v. Stryker Corp.,*
  858 F. Supp. 2d 466 (W.D. Pa. 2012) ................................................................................38

*Gupta v. Wipro Ltd.,*
  749 F. App'x 94 (3d Cir. 2018) ............................................................................................7

*Hahn v. Richter,*
  673 A.2d 888 (Pa. 1996) ...................................................................................................34

*Hart v. Univ. of Scranton,*
  838 F. Supp. 2d 324 (M.D. Pa. 2011) ................................................................................40

*Hoyte v. Yum! Brands, Inc.,*
  489 F. Supp. 2d 24 (D.D.C. 2007).....................................................................................38

*Ieradi v. Mylan Lab'ys, Inc.,*
  230 F.3d 594 (3d Cir. 2000)...............................................................................................24

*KDH Elec. Sys., Inc. v. Curtis Tech. Ltd.*,
    826 F. Supp. 2d 782 (E.D. Pa. 2011) ....................................................................41

*Kee v. Zimmer, Inc.*,
    871 F. Supp. 2d 405 (E.D. Pa. 2012) ....................................................................37

*Kester v. Zimmer Holdings, Inc.*,
    2010 WL 2696467 (W.D. Pa. June 16, 2010) ...............................................38, 39

*Klein v. Council of Chem. Ass'ns*,
    587 F. Supp. 213 (E.D. Pa. 1984) ...........................................................11, 13, 15

*Kovalev v. Lidl US, LLC*,
    647 F. Supp. 3d 319 (E.D. Pa. 2022) ....................................................................37

*Krebs v. New Kensington-Arnold Sch. Dist.*,
    2016 WL 6820402 (W.D. Pa. Nov. 17, 2016) ...................................................8, 10

*Leake v. United States*,
    843 F. Supp. 2d 554 (E.D. Pa. 2011) ....................................................................15

*Liberty Mut. Grp., Inc. v. 700 Pharmacy, LLC*,
    270 A.3d 537 (Pa. Super. Ct. 2022) .....................................................................44

*Shouey ex. rel. Litz v. Duck Head Apparel Co., Inc.*,
    49 F.Supp. 2d 413 (M.D. Pa. 1999) ......................................................................38

*Lux v. Gerald E. Ort Trucking, Inc.*,
    887 A.2d 1281 (Pa. Super. Ct. 2005) ....................................................................16

*A.G. ex rel. Maddox v. Elsevier, Inc.*,
    732 F.3d 77 (1st Cir. 2013) ...................................................................................11

*Mandala v. NTT Data, Inc.*,
    988 F.3d 664 (2d Cir. 2021) ..................................................................................17

*Manuel v. Pepsi-Cola Co.*,
    2018 WL 2269247 (S.D.N.Y. May 17, 2018) ..................................................16, 17

*Manuel v. Pepsi-Cola Co.*,
    763 F. App'x 108 (2d Cir. 2019) ...........................................................................17

*Marcum v. Columbia Gas Transmission, LLC*,
    423 F. Supp. 3d 115 (E.D. Pa. 2019) ..............................................................40, 42

*Mazur v. Milo's Kitchen, LLC*,
    2013 WL 3245203 (W.D. Pa. June 25, 2013) .......................................................43

*McGrain v. C.R. Bard, Inc.*,
551 F. Supp. 3d 529 (E.D. Pa. 2021) .......................................................33, 43

*McGrath v. Bayer HealthCare Pharms. Inc.*,
393 F. Supp. 3d 161 (E.D.N.Y. 2019) .............................................................16

*Meaunrit v. ConAgra Foods Inc.*,
2010 WL 2867393 (N.D. Cal. July 20, 2010) ...............................................24

*Mills v. Giant of Md., LLC*,
508 F.3d 11 (D.C. Cir. 2007) ...........................................................................35

*N. Penn Towns, LP v. Concert Golf Partners, LLC*,
554 F. Supp. 3d 665 (E.D. Pa. 2021) .............................................................42

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) ..........................................................................26

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012) ..........................................................................................22

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ...............................................................43

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
1996 WL 482977 (E.D. Pa. Aug. 22, 1996) ...............................................45, 47

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) ..........................................................................15, 18

*Pelman v. McDonald's*,
2003 WL 22052778 (S.D.N.Y. Sept. 3, 2003) ...............................................20

*Pelman v. McDonald's Corp.*,
237 F. Supp. 2d 512 (S.D.N.Y. 2003) .........................................2, 19, 20, 21, 34

*Pelman ex rel. Pelman v. McDonald's Corp.*,
396 F.3d 508 (2d Cir. 2005) .............................................................................20

*Petula v. Mellody*,
588 A.2d 103 (Pa. Commw. Ct. 1991) .............................................................46

*In re Philips Recalled CPAP, Bi-Level PAP, & Ventilator Prods. Litig.*,
2023 WL 7019287 (W.D. Pa. Sept. 28, 2023) ...............................................43

*Phillips v. A-Best Prods. Co.*,
665 A.2d 1167 (Pa. 1995) ............................................................................34, 36

*Plumbers' Local Union No. 690 Health Plan v. Apotex Corp.*,
   2017 WL 4235773 (E.D. Pa. Sept. 25, 2017) ........................................................44

*Prater v. Am. Heritage Fed. Credit Union*,
   351 F. Supp. 3d 912 (E.D. Pa. 2019) .................................................................13

*Precision Imaging of N.Y., P.C. v. Allstate Ins. Co.*,
   263 F. Supp. 3d 471 (S.D.N.Y. 2017)..................................................................20

*In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*,
   311 F.3d 198 (3d Cir. 2002)....................................................................................8

*S.F. v. Archer-Daniels-Midland Co.*,
   2014 WL 1600414 (W.D.N.Y. Apr. 21, 2014) ...............................................19, 20

*Salyers v. A.J. Blosenski, Inc.*,
   731 F. Supp. 3d 670 (E.D. Pa. 2024) .....................................................................8

*Santiago v. Warminster Twp.*,
   629 F.3d 121 (3d Cir. 2010)....................................................................................7

*Sarpolis v. Tereshko*,
   625 F. App'x 594 (3d Cir. 2016) ...........................................................................45

*Seagram & Sons, Inc. v. McGuire*,
   814 S.W.2d 385 (Tex. 1991)..................................................................................35

*Skipworth by Williams v. Lead Indus. Ass'n, Inc.*,
   690 A.2d 169 (Pa. 1997) .......................................................................................12

*Smith v. Howmedica Osteonics Corp.*,
   251 F. Supp. 3d 844 (E.D. Pa. 2017) ...................................................................33

*Starks v. Coloplast Corp.*,
   2014 WL 617130 (E.D. Pa. Feb. 18, 2014) ..........................................................39

*Summers v. Certainteed Corp.*,
   997 A.2d 1152 (Pa. 2010) .....................................................................................16

*Swartzbauer v. Lead Indus. Ass'n Inc.*,
   794 F. Supp. 142 (E.D. Pa. 1992) .........................................................................46

*Tatum v. Takeda Pharms. N. Am., Inc.*,
   2012 WL 5182895 (E.D. Pa. Oct. 19, 2012)..........................................................44

*Thornton v. Tyson Foods, Inc.*,
   482 F. Supp. 3d 1147 (D.N.M. 2020) ...................................................................24

*Thornton v. Tyson Foods, Inc.*,
  28 F.4th 1016 (10th Cir. 2022) .........................................................22, 24

*Vey v. Amazon.com*,
  2024 WL 2396840 (W.D. Pa. May 23, 2024) .........................................44

*Wartluft v. Milton Hershey Sch.*,
  354 F. Supp. 3d 584 (M.D. Pa. 2018) .............................................40, 41

*Webb v. Trader Joe's Co.*,
  2019 WL 5578225 (S.D. Cal. Oct. 29, 2019) .........................................24

*Webb v. Volvo Cars of N.A., LLC*,
  2018 WL 1470470 (E.D. Pa. Mar. 26, 2018) .........................................41

*Whitson v. Safeskin Corp.*,
  313 F. Supp. 2d 473 (M.D. Pa. 2004) ..................................................38

*Williams v. Amazon, Inc.*,
  573 F. Supp. 3d 971 (E.D. Pa. 2021) ..................................................37

*Woodward v. Nudy*,
  2025 WL 662802 (E.D. Pa. Feb. 28, 2025) .........................................45

*WSFS Fin. Corp. v. Cobb*,
  2023 WL 4552110 (E.D. Pa. July 14, 2023) .....................................45, 46

*Zafarana v. Pfizer, Inc.*,
  724 F. Supp. 2d 545 (E.D. Pa. 2010) ..................................................44

*Zuzel v. Cardinal Health, Inc.*,
  565 F. Supp. 3d 623 (E.D. Pa. 2021) ..................................................34

**Statutes**

13 Pa. C.S.A. § 2314 ...................................................................37

13 Pa. C.S.A. § 2607 ...................................................................37

21 U.S.C. § 343-1 ......................................................................25

21 U.S.C. § 393 ........................................................................25

21 U.S.C. § 451 ........................................................................23

21 U.S.C. § 467 .....................................................................22, 25

21 U.S.C. § 606 ........................................................................23

21 U.S.C. § 678 .................................................................................................22, 25

**Other Authorities**

9 C.F.R. § 317 ...................................................................................................22, 23

9 C.F.R. § 318 .........................................................................................................22

9 C.F.R. § 319 .........................................................................................................22

9 C.F.R. § 381 ...................................................................................................22, 24

9 C.F.R. § 412 .............................................................................................22, 23, 24

9 C.F.R. § 424 .........................................................................................................22

9 C.F.R. § 607 .........................................................................................................23

21 C.F.R. § 172 .......................................................................................................15

21 C.F.R. § 173 .......................................................................................................15

Bernard Srour, et al., *Ultraprocessed Food Consumption and Risk of Type 2
      Diabetes Among Participants of the NutriNet-Santé Prospective Cohort*, 180
      JAMA Intern Med. 283 (2019) ......................................................................17

Carlos A. Monteiro, et al., *Ultra-processed foods: what they are and how to
      identify them*, 22 Public Health Nutrition 936 (2019).....................................5

FSIS Directive 7120.1, Safe and Suitable Ingredients Used in the Production of
      Meat, Poultry, and Egg Products (2024).......................................................22

Restatement (Second) of Torts § 388...........................................................................36

Restatement (Second) of Torts § 402A...................................................................34, 35

**INTRODUCTION**

Plaintiff Bryce Martinez alleges that "ultra-processed foods"—an ill-defined and seemingly vast range of fundamentally different foods and drinks—led to his development of type 2 diabetes and non-alcoholic fatty liver disease.[1] But Plaintiff's sweeping attack on the packaged food and beverage industry fails to satisfy even the most basic pleading standards and is not cognizable under federal law or Pennsylvania tort law. Plaintiff does not actually allege which specific foods and beverages he consumed, when he consumed them, or in what quantities or frequency. He also fails to articulate any plausible causal connection between any particular product and his alleged injuries. Instead, Plaintiff's Complaint singles out Defendants, eleven of the country's most popular food and beverage manufacturers that are dedicated to making safe products enjoyed by generations of consumers, and essentially asks the Court to hold this select contingent of an entire industry liable for nothing more than making and advertising federally regulated and legally compliant products. The Complaint does not come close to providing Defendants with sufficient notice to prepare a defense, fails to set forth sufficient information for this Court to manage the case, and presses an incoherent and legally unviable theory of liability. The fundamental deficiencies in the Complaint are numerous and striking, and the Complaint should be dismissed in its entirety.

*First*, the Complaint is the paradigmatic example of a shotgun pleading. It lacks allegations setting forth *each* Defendant's alleged conduct under each count, much less specifying how such

---

[1] "Ultra-processed foods" or "UPFs" are not defined or recognized under any applicable law. Plaintiff's definition is so vague and overbroad that it purports to sweep in 73% of the food in the national food supply. Compl. ¶¶ 2, 292. Defendants do not agree that it is an objective or valid method of categorizing food and beverages (much less appropriately describes their products), and the term "UPFs" is used herein only because it is used in the Complaint. Plaintiff's lawsuit is legally deficient for a host of other fundamental reasons, regardless of how Plaintiff defines this amorphous concept.

purported conduct could have caused Plaintiff's alleged injuries. Instead, Plaintiff impermissibly lumps all Defendants together, alleging, for example, that "Plaintiff was chronically exposed to . . . Defendants' UPF," Compl. ¶ 507; that all "Defendants incorporated colorings, flavorants, and other additives" in their unspecified products, *id.* ¶ 295; and that all "Defendants targeted Plaintiff with" as-yet-unidentified "marketing campaigns," *id.* ¶ 29. Such undifferentiated allegations against Defendants collectively violate basic pleading principles and alone warrant dismissal.

*Second*, all of Plaintiff's claims fail for lack of causation—an essential element of Pennsylvania tort law. Most fundamentally, Plaintiff has not identified any specific food or beverage produced by any Defendant that supposedly caused his injuries. Instead, he offers a laundry list of *110 brand names*, encompassing thousands of products ranging from chewing gum to baby food, and from condiments to candies, that in some unidentified combination over some unspecified period of time allegedly caused his type 2 diabetes and non-alcoholic fatty liver disease. Beyond the failure to identify any specific products, the Complaint also fails to plausibly plead either general causation (i.e., that each of Defendants' products is capable of causing the two diseases) or specific causation (i.e., that each of Defendants' products actually did so here). Indeed, when other courts have confronted theories that purportedly unhealthy foods caused a consumer's obesity or diabetes, they have dismissed them at the pleading stage as "wild speculation." *See Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 538 (S.D.N.Y. 2003) (dismissing lawsuit alleging that various McDonald's products caused minors to become obese and develop diabetes because "[n]o reasonable person could find [proximate] cause . . . without resorting to 'wild speculation'"). This Court should do the same.

*Third*, Plaintiff's claims regarding products containing meat or poultry are expressly preempted. Congress has passed comprehensive legislation, implemented by the U.S. Department

of Agriculture ("USDA"), that regulates every aspect of foods with meat or poultry from inspection, manufacturing, processing, and labeling. Plaintiff cannot substitute his own judgment about how these foods should be regulated or labeled for that of Congress. Beyond that, the allegations in the Complaint are too vague—along every dimension—for Defendants to understand what other products, labeling, or ingredients Plaintiff challenges that could be preempted by other federal laws and regulations, including those promulgated by the Food & Drug Administration ("FDA").

*Fourth*, Plaintiff's attempt to compel controversial warnings about so-called "UPFs" through litigation runs afoul of the First Amendment's protections against compelled commercial speech, especially where there is no scientific consensus on any alleged risks.

*Fifth*, to the extent Plaintiff alleged any conduct by specific Defendants in the Complaint, those allegations are lacking and do not plausibly allege liability on the part of any Defendant.

*Sixth*, Plaintiff's lawsuit fails for a variety of other claim-specific reasons. Counts I and II (negligence and failure to warn) cannot proceed because the Complaint does not sufficiently plead a breach of any duty in Defendants' designing, manufacturing, or labeling of their products. Plaintiff's warranty claims (Counts III and IV) also fail because: (a) Plaintiff has not pled that he provided Defendants with the requisite pre-suit notice; (b) Plaintiff has not pled that Defendants' products were not fit for their ordinary purpose of human consumption, much less were unsuitable for any particular purpose of Plaintiff; and (c) Plaintiff has not identified any specific promise by any Defendant that constitutes an express warranty. Counts V through VIII separately fail because Plaintiff has not alleged any particular misrepresentation by any Defendant (much less any reliance on such a statement) that could support his claims for fraud, negligent misrepresentation, fraudulent concealment, and violation of Pennsylvania's Unfair Trade Practices & Consumer

3

Protection Law ("CPL").  Plaintiff's claim for unjust enrichment (Count IX) fails because Plaintiff received the food and beverage products he bargained for.  Finally, Plaintiff's conspiracy and concerted action claims (Counts X and XI) against six of the eleven defendants (collectively, the "Subgroup"),[2] fail because they are derivative of the underlying claims, which are deficient for the reasons just discussed, and Plaintiff does not plausibly plead that these Defendants acted with actual malice or entered into any agreement.  In short, despite its length, the Complaint does not sufficiently plead the substantive elements of any claim.

In essence, Plaintiff's Complaint asks the Court to create an entirely new category of liability based on a theory that has never been sanctioned by any court in the country.  The law does not permit such a dramatic departure from established principles of causation and liability, particularly where, as here, the products at issue are safely consumed by millions of Americans every day and are subject to extensive federal regulation.  The Court should dismiss the Complaint in its entirety.

## STATEMENT OF PLEADED FACTS

Plaintiff sued eleven popular food and beverage companies:  Kraft Heinz, Mondelēz, Post, Coca-Cola, PepsiCo, General Mills, Nestlé USA, Kellanova, WK Kellogg Co, Mars, and Conagra. Plaintiff seeks to hold all Defendants liable for negligence (Count I), failure to warn (Count II), breach of warranty (Counts III and IV), negligent and fraudulent misrepresentation (Counts V and VI), fraudulent concealment (Count VII), consumer fraud (Count VIII), and unjust enrichment (Count IX).  He also asserts two conspiracy counts (Counts X and XI) against the Subgroup. Plaintiff alleges that this group of companies is liable to him because Defendants sell processed foods that Plaintiff summarily categorizes as so-called "UPFs."  Compl. ¶ 2.

---

[2] The Defendants named in the Subgroup are: The Kraft Heinz Company, Mondelēz International, Inc., Post Holdings, Inc., The Coca-Cola Company, General Mills, Inc., and Mars, Incorporated.

Defendants' products encompass a huge array of items, including breads, cereal, rice, sports drinks, chocolate, yogurt, sauces, burgers, baby food, chewing gum, and soups. Many of these products—like numerous foods that consumers find in their local supermarket—undergo some form of processing which, among other benefits, can extend shelf life and lower costs for consumers.

The Complaint does not explain what supposedly makes Defendants' thousands of diverse foods and beverages "UPFs." Instead, the Complaint proposes an incredibly broad and shifting definition of what constitutes an "ultra processed food," or "UPF," and insists that Defendants' products fit within it for varying reasons. *See* Compl. ¶¶ 53–63. In one place, the Complaint bases this categorization "on the extensiveness of processing" and the inclusion of "industrially produced edible substances that are imitations of food" (*id.* ¶¶ 53, 57), while in another place, it provides a non-exclusive list of processes ("hydrolysis, hydrogenation, or other chemical modifications" as well as other "industrial processes"), more than a dozen "ingredients" (including "whey protein"), and more than a dozen vague "additives" (*id.* ¶¶ 57–59) that apparently can render a product a "UPF" (whether individually or together, the Complaint does not say). Indeed, the term "UPF" as used in the Complaint is boundless because, as the studies cited by Plaintiff make clear, "[a]lmost *all foods* are processed to some extent."[3] Plaintiff's limitless definition of "UPF" has enabled Plaintiff to commence suit against the eleven Defendants named in this Complaint without any regard to the numerous other foods and beverages Plaintiff undoubtedly consumed, the different products Defendants manufacture, or the different processes employed in their production.

Meanwhile, the Complaint provides no meaningful information about Plaintiff Bryce

---

[3] Carlos A. Monteiro, et al., *Ultra-processed foods: what they are and how to identify them*, 22 Public Health Nutrition 936, 937 (2019) (cited at Compl. ¶ 1 n.1) (emphasis added).

Martinez, with only nine paragraphs constituting "Plaintiff Specific Allegations." Compl. ¶¶ 503–511. Those paragraphs do not actually identify any specific food or beverages Plaintiff consumed. Instead, in a single paragraph, Plaintiff lists 110 different *brand* names and alleges that Plaintiff consumed unidentified "UPFs" from those brands. *Id.* ¶ 508(a–j). Together, these 110 brands make up a huge variety of more than a thousand different products. Yet Plaintiff does not identify any *specific products* that he allegedly consumed.

Likewise, Plaintiff alleges only that he "regularly ingested" unidentified food and beverages from this list of brands. Compl. ¶ 508(a–j). The Complaint lacks information about when any of these items were purchased, from where, when he consumed them, how much he consumed on any occasion, or how often. Further, the Complaint provides no information about Plaintiff's food consumption more generally, including what other foods and other so-called "UPFs" he allegedly consumed (for example, from other manufacturers or vendors), from what sources, and how often. And outside of the generic umbrella label "UPF," he does not allege what specific ingredients or processes he thinks caused him harm.

Plaintiff's advertising-related allegations are similarly sparse and generic. Plaintiff does not allege any specific advertisements or statements that he encountered, when he saw them, what purchases these statements induced, if any, or how he was injured as a result. Although the Complaint references a few select advertisements as examples, *see, e.g.*, Compl. ¶¶ 262–64, 277, 280–84, Plaintiff fails to allege that he actually saw any of these messages prior to purchasing or consuming the products in question. He also makes allegations related to several advertisements from brands where he does not claim that he ever consumed any of their products. *Compare id.* ¶¶ 262, 277 (highlighting Doritos, Cheetos, and Lunchables advertisements), *with id.* ¶ 508 (listing brands Plaintiff claims he consumed, and not listing Doritos, Cheetos, or Lunchables).

Plaintiff asserts that consuming Defendants' food and beverages led to his injuries, yet the Complaint contains minimal factual allegations regarding his health. While Plaintiff baldly alleges that "UPFs" are "addictive," Compl. ¶ 62, he does not allege he ever became "addicted" to any of Defendants' food or beverages. He alleges that he was diagnosed with type 2 diabetes and non-alcoholic fatty liver disease at age 16. *Id*. ¶ 504. But Plaintiff does not state his current age or any details about his health, symptoms, or alleged illnesses. The Complaint also lacks any information about Plaintiff's physical activity, his genetics, his family history, or the myriad other factors relevant to his diagnoses. And though Plaintiff alleges generally that he suffered economic losses from his illnesses and from paying for unidentified products, he provides zero factual allegations as to those purported losses. *Id.* ¶¶ 525, 527, 541, 559, 572, 586, 601, 615, 618, 627.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[4] While a court generally accepts the allegations in a complaint as true, it need not accept as true allegations that are contradicted by attachments to the complaint or by material subject to judicial notice. *See, e.g.*, *Gupta v. Wipro Ltd.*, 749 F. App'x 94, 97 (3d Cir. 2018).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010). That is, the plaintiff must plead facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A pleading offering only "labels and conclusions" or "naked assertions devoid of further factual enhancement" is insufficient. *Id.* When a plaintiff has not pled facts sufficient to

---

[4] Unless otherwise noted, internal quotation marks and citations are omitted from quotations.

"nudge[] [his] claims across the line from conceivable to plausible," his "complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Additionally, Plaintiff's fraud-based claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which demand that Plaintiff "state with particularity the circumstances constituting fraud or mistake." *Butakis v. NVR, Inc.*, 668 F. Supp. 3d 349, 359 (E.D. Pa. 2023) (quoting Fed. R. Civ. P. 9(b)). Accordingly, a plaintiff must support his allegations of fraud "with all of the essential factual background that would accompany the first paragraph of any newspaper story"—that is, "the who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002).

## ARGUMENT

## I.    THE COMPLAINT ENGAGES IN IMPROPER GROUP PLEADING.

The Complaint "fails to identify which . . . Defendants committed which alleged wrongful acts with sufficient specificity to survive dismissal." *Doe v. City of Phila.*, 2024 WL 2218897, at *3–4 (E.D. Pa. May 15, 2024). Instead, the Complaint lumps all Defendants, their products, and their alleged conduct together, which is impermissible group pleading.

"[A] complaint is insufficient where there is genuine uncertainty regarding who is responsible for what." *Salyers v. A.J. Blosenski, Inc.*, 731 F. Supp. 3d 670, 683 (E.D. Pa. 2024). "To survive a motion to dismiss, then, a complaint must plead sufficient facts to show that the plaintiff is entitled to relief from a *particular* defendant." *Id.* at 684 (emphasis added). "Without separately alleging the conduct of each Defendant, Defendants are not on notice of their conduct." *Krebs v. New Kensington-Arnold Sch. Dist.*, 2016 WL 6820402, at *8 (W.D. Pa. Nov. 17, 2016). Put simply, federal courts do not tolerate "shotgun pleadings" that assert "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions," and fail to provide "defendant[s] with sufficient notice of the claims asserted." *Bartol*

*v. Barrowclough*, 251 F. Supp. 3d 855, 859 (E.D. Pa. 2017).

Plaintiff's Complaint violates these basic pleading principles by impermissibly lumping Defendants together without specifying particular facts as to any Defendant. Plaintiff's claims sweep across thousands of products potentially involved, eleven defendants currently named, and a highly complex federal regulatory regime—all of which underscores that Plaintiff has no coherent theory of what harmed him or how. Defendants—and the Court—cannot respond to or manage a case where such expansive claims are jumbled together without any clarity as to who allegedly did what and with respect to which products.

The Complaint is replete with examples of improper group pleading that do not put Defendants on notice of their conduct at issue. For instance, Plaintiff alleges, "[a]s a result of Defendants' conduct, Plaintiff was chronically exposed to harmful levels of Defendants' UPF," without identifying what those products are or the specific "harmful levels" to which he was exposed (and from which products). Compl. ¶ 507. Further, his allegation that "Defendants incorporated colorings, flavorants, and other additives initially created for cigarettes into their products," fails to identify what "their products" refers to, let alone what those supposed additives are. *Id.* ¶ 295.

Group pleading also infects Plaintiff's allegations about marketing. For example, Plaintiff's allegation that "Defendants targeted Plaintiff with marketing campaigns" fails to identify any specific marketing campaigns from any specific Defendant. Compl. ¶ 29. Instead, Plaintiff pasted screenshots of disparate food advertisements that some (but not all) Defendants allegedly used to market their products to consumers, *see, e.g.*, *id.* ¶¶ 277–84, without any assertion that Plaintiff (or his caregivers during childhood) actually saw any of them or were influenced by them to make any specific purchases. Particularly striking is the Complaint's claim that "some

(*but not all*) Defendants have [falsely] claimed to take voluntary action" related to marketing to children. *Id.* ¶ 382 (emphasis added). The Complaint does not say which Defendants allegedly made such claims. These allegations leave Defendants entirely without notice as to which allegations pertain to them, what advertisements Plaintiff allegedly saw, what he claims they represented, and why he takes issue with them.

Plaintiff engages in the same improper group pleading when challenging the safety monitoring and testing of products. Plaintiff alleges:

> [I]nstead of adequately testing the effects of consuming their UPF, Defendants have actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm. *Alternatively*, Defendants' internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and Defendants had actual knowledge that their UPF would cause incurable and life-changing illnesses.

Compl. ¶¶ 355–56 (emphasis added). But again, Plaintiff does not specify which Defendants allegedly "refused to conduct" safety testing and which Defendants conducted safety testing that revealed safety concerns. These indeterminate, either/or allegations exacerbate the lack of specificity and do not allege "the conduct of each Defendant." *Krebs*, 2016 WL 6820402, at *8.

Plaintiff's allegations of intent adopt the same undifferentiated approach. Every claim (except Plaintiff's claims for unjust enrichment) includes the vague allegation that "Defendants' conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent." Compl. ¶¶ 528,[5] 543, 560, 573, 587, 602, 616, 628, 656, 665. This is a textbook example of an inadequate pleading, as Plaintiff's shotgun approach makes it impossible for each Defendant to determine what conduct, design, promotion, sale, or product Plaintiff is referring to, or whether that Defendant acted with requisite intent or should even be included in the claim.

_____

[5] The negligence claim also adds "including their negligent marketing" to this list. Compl. ¶ 528.

10

Plaintiff cannot use broad allegations against all "Defendants" to sidestep his obligation to plausibly plead that *each* Defendant is liable to him.  He must give Defendants—and the Court— proper notice of the allegations with respect to each of them.  Because it is not clear which Defendants allegedly "committed which alleged wrongful acts," the Complaint should be dismissed.  *See Doe*, 2024 WL 2218897, at *3–4.

## II.    ALL OF PLAINTIFF'S CLAIMS FAIL FOR LACK OF CAUSATION.

Substantively, the Complaint fails in its entirety on the most fundamental issue:  Plaintiff has not pled facts to plausibly show that any of Defendants' products caused his alleged injuries.

Causation is an essential element for claims based on harms allegedly caused by products. *Klein v. Council of Chem. Ass'ns*, 587 F. Supp. 213, 220–22 (E.D. Pa. 1984) (dismissing claims against product manufacturers for failure to appropriately plead causation); *City of Phila. v. Lead Indus. Ass'n*, 1992 WL 98482, at *14 (E.D. Pa. Apr. 23, 1992) (dismissing claims, including for design defect, failure to warn, breach of warranty, and fraud, where plaintiff "cannot satisfy the traditional requirement of proximate causation").  When, as here, allegations of causation depend "entirely upon speculation and surmise," a complaint must be dismissed.  *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81–83 (1st Cir. 2013).

Plaintiff's failure to plead causation is twofold.  *First*, Plaintiff fails to identify the specific products that allegedly caused him harm, as required under Pennsylvania law.  Instead, he lists a collection of over 110 brand names, each encompassing a variety of different products, ingredients, and processes.  *Second*, even if he had identified certain products, Plaintiff has not plausibly alleged that any of Defendants' products can actually cause type 2 diabetes and non-alcoholic fatty liver disease (general causation), much less that those products actually did so here (specific causation).  Because Plaintiff has not plausibly alleged causation, and cannot plausibly allege causation on his theory of the case, the Complaint should be dismissed with prejudice.

11

**A. Plaintiff Does Not Identify Any Specific Products That Allegedly Caused His Injuries.**

Plaintiff has not sufficiently pled the threshold causation requirement of product identification—i.e., that he was actually exposed to and harmed by any Defendant's particular product. To state a claim under Pennsylvania law that a product caused harm, a plaintiff first "must establish that *a particular product* of a defendant manufacturer caused [his] injuries." *City of Phila. v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993) (emphasis added) (affirming dismissal of complaint); *see also In re Asbestos Prod. Liab. Litig. (No. VI)*, 801 F. Supp. 2d 342, 345 (E.D. Pa. 2011) ("Under Pennsylvania law, a plaintiff must establish, as a threshold matter, 'that [his] injuries were caused by a product of the particular manufacturer or supplier.'"). There can be no liability—and "no allegations of duty, breach of duty or legal causation"—unless the plaintiff can identify the manufacturer or seller "*of the particular offending product*." *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 967 (Pa. Super. Ct. 1985) (emphasis added) (holding plaintiff failed to state a claim because he did not identify a specific product and manufacturer).

This requirement is firm, and Pennsylvania courts have rejected attempts to loosen it. For example, the Pennsylvania Supreme Court declined to recognize "market-share liability," which would have relieved a plaintiff of the obligation to name the particular defendant that caused the injury as long as the plaintiff was unable to identify the at-fault defendant *and* substantially all manufacturers within the relevant industry were named as defendants. *Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 172 (Pa. 1997). The court explained that such a theory would "result in a significant departure from" Pennsylvania's proximate-cause requirements and "lead to a distortion of liability which would be so gross as to make determinations of culpability arbitrary and unfair." *Id.*; *see also Atl. Richfield Co. v. Cnty. of Montgomery*, 294 A.3d 1274, 1277 & n.10 (Pa. Commw. Ct. 2023) (remanding, at motion-to-dismiss stage, for dismissal of all claims

after rejecting market-share liability theory).[6] Thus, Pennsylvania law is clear and consistent that complaints must identify the product and manufacturer that allegedly caused harm.

Courts applying Pennsylvania law have repeatedly dismissed claims on the pleadings where a plaintiff has failed to tie his injury to a particular defendant's product. In *Cummins*, for example, the plaintiff was injured by a tire and rim assembly that exploded, but he could not identify whether it was the tire or the rim that exploded, or both. 495 A.2d at 966. The Pennsylvania Superior Court affirmed dismissal of plaintiff's negligence and strict liability claims because the plaintiff could not identify which of the two products caused his injury. *Id.* at 967–69. Similarly, in *Klein*, the Court dismissed claims against product manufacturers because the plaintiffs failed to identify any specific product that caused the alleged injuries. 587 F. Supp. at 220–22. The Court found that "[p]laintiffs in effect s[ought] to put an industry on trial from the conviction that if [the plaintiff] has been injured, it must be their fault," which misapprehended Pennsylvania tort law and basic pleading principles. *Id.* at 221.

The Complaint here suffers from the same deficiencies. By pleading only the brands—as opposed to any specific products—that Plaintiff allegedly consumed, the Complaint does not allege any actual foods, ingredients, or processes that he believes caused him harm. *Prater v. Am. Heritage Fed. Credit Union*, 351 F. Supp. 3d 912, 916 (E.D. Pa. 2019) (a complaint must "provide enough information to put a defendant on sufficient notice to prepare their defense and also ensure that the Court is sufficiently informed to determine the issue").

This omission is particularly glaring because, as the Complaint recognizes, the thousands of products within the 110 brands contain different ingredients, undergo different processes, and

---

[6] Nor, for that matter, would it even help Plaintiff if Pennsylvania courts recognized market-share liability, given (among other issues) that Plaintiff has made no attempt to name substantially all manufacturers of so-called "UPFs."

are consumed differently by consumers. Compl. ¶¶ 53–63. For example, Plaintiff claims that he consumed products sold under the Gerber brand, *id.* ¶ 508(d), but that brand encompasses over 200 different foods and beverages with different ingredients and different manufacturing processes—from baby foods, to cereals, to fruit and vegetable purees, to chicken and meat products, to yogurts, to 100% fruit juices.[7] The Complaint provides no clues as to which of those products Plaintiff believes caused him harm. Similarly, Plaintiff identifies the brand Old El Paso (*id.* ¶ 508(h)), but that brand encompasses at least 112 different products, including soups, tortillas, seasonings, sauces, and canned beans.[8] Even brands that consumers may associate with a specific product—e.g., Coke or Pepsi—almost always come in multiple variations with different flavors, ingredients, and "processing." Plus, as every consumer knows, products change over time, and the lack of any temporal information in the Complaint precludes the identification of the right iteration of any specific product. It is Plaintiff's burden to plead which products he thinks harmed him, but he has not done so here, and he cannot challenge products he did not consume.

Plaintiff cannot evade his obligation to satisfy Pennsylvania's fundamental product identification requirement by claiming that he is challenging "UPFs" generally—all the more so, since he has obviously not named every company that has produced products falling into Plaintiff's subjectively defined category of "UPFs." Plaintiff lists 28 different *categories* of ingredients and additives that he alleges are used in supposed "UPF" products, Compl. ¶ 57, as well as multiple different types of processing that such products can undergo, *id.* ¶ 59. He does not claim that this list is exclusive. Some of the ingredients he references are specifically approved additives,

---

[7] *See* Gerber, https://www.gerber.com/shop-by-product (last visited Mar. 31, 2025) (listing 235 products in several different product categories).
[8] *See* Old El Paso, https://www.oldelpaso.com/products (last visited Mar. 31, 2025) (listing 112 products within the Old El Paso brand).

governed by FDA and USDA requirements for food ingredients, or otherwise classified under federal law. *See* 21 C.F.R. §§ 172–73. Most importantly, Plaintiff *does not allege* which of those ingredients, additives, or processes are used in the products Plaintiff allegedly consumed, let alone which could have possibly caused any injury. Without this detail, Plaintiff has put forth no coherent theory of *what* he believes caused his alleged injuries.

The law is clear that plaintiffs may not weaponize litigation to "search for defective products in order to find something to which to attribute liability for their injuries." *Klein*, 587 F. Supp. at 222. Yet here, Plaintiff has substituted general objections to so-called "UPFs" for specific allegations of causation. Because that is not how Pennsylvania tort law works—and because Plaintiff has not *identified* any of Defendants' specific products that could have caused his alleged injuries—his claims should be dismissed.

### B. Plaintiff Does Not Plausibly Plead Either General or Specific Causation.

Even if Plaintiff had identified any of Defendants' specific foods or beverages in the Complaint, he would still fail to allege a plausible theory of causation. Given the number of Defendants, potential products, exposures, and alternative causes at issue, Plaintiff relies on nothing more than wild speculation to assert that each implicated product of each Defendant somehow caused his type 2 diabetes and non-alcoholic fatty liver disease.

To plead causation, Plaintiff must allege facts establishing that specific products are "capable of causing the observed harm (general causation), and that the [specific products] actually caused the harm suffered by the plaintiff (specific causation)." *Leake v. United States*, 843 F. Supp. 2d 554, 558 (E.D. Pa. 2011); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 752 (3d Cir. 1994) (plaintiffs must show "that they were exposed to the chemicals . . . , that these chemicals can cause the types of harm they suffered, and that the chemicals in fact did cause them harm"). Further, Plaintiff must plausibly allege proximate causation, including that Defendants'

conduct was a substantial factual cause of his harm. *See Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286 (Pa. Super. Ct. 2005); *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1164 (Pa. 2010). Here, the Complaint fails to plead both general and specific causation.

*First,* Plaintiff fails to allege that any product produced by any Defendant is capable of causing the alleged harm (general causation). Where the studies on which a plaintiff relies to establish general causation only suggest (at best) an association between exposure and injury, the allegations fail the plausibility requirement because "[i]n law, as in science, [c]orrelation is not causation." *Manuel v. Pepsi-Cola Co.*, 2018 WL 2269247, at *11 (S.D.N.Y. May 17, 2018); *see also Becerra v. Coca-Cola Co.*, 2018 WL 1070823, at *4 (N.D. Cal. Feb. 27, 2018) (dismissing complaint because, "[w]ith a conclusory wave of counsel's hand, [plaintiff] ha[d] overstated the actual science set forth in the citations"); *McGrath v. Bayer HealthCare Pharms. Inc.*, 393 F. Supp. 3d 161, 166, 171–72 (E.D.N.Y. 2019) (dismissing failure-to-warn claims because the complaint's "allegations regarding the causal association between [the product] *and* a significant adverse reaction . . . are conclusory and grounded in hypothesis rather than scientific evidence").

*Manuel* is particularly instructive on the distinction between citing studies and stating a plausible claim. There, plaintiffs brought consumer-fraud claims, alleging that the use of the word "diet" in Diet Pepsi was deceptive because artificial sweeteners in Diet Pepsi allegedly impeded weight loss and led to weight gain. 2018 WL 2269247, at *10. The district court dismissed the complaint, noting that none of the various studies cited in the complaint concluded that sweeteners caused weight gain, as they at most observed a *correlation* between sweeteners and weight gain, not a *causal* relationship. *Id.* at *10–12. As the court put it, the plaintiffs "ha[d] outrun the science." *Id.* at *12. The Second Circuit affirmed, reiterating that "[n]one of the studies purports to establish a causal relationship between non-nutritive sweeteners and weight gain to a degree

that is sufficiently strong." *Manuel v. Pepsi-Cola Co.*, 763 F. App'x 108, 109 (2d Cir. 2019).

Plaintiff's claims here likewise "outrun the science." *Manuel*, 2018 WL 2269247, at *10. Plaintiff does not and cannot allege that any study finds that any of *Defendants' products* cause type 2 diabetes or non-alcoholic fatty liver disease. Instead, Plaintiff cites a handful of articles that, at most, reflect a potential association (i.e., correlation) between a vague category of "UPFs" and certain health outcomes. *See, e.g.*, Compl. ¶ 65. And the single source that Plaintiff cites as purportedly supporting his allegation that "UPF is the cause of childhood type 2 diabetes and childhood fatty liver disease" is a self-proclaimed advocacy piece that merely recommends making so-called "UPFs" the "target[] for regulation." *Id.* ¶ 321 (citing Robert H. Lustig, *Ultraprocessed Food: Addictive, Toxic, and Ready for Regulation*, 12 Nutrients 1, 2 (2020)). But that source does not even claim to cite any study connecting "UPFs" to non-alcoholic fatty liver disease, and the only one it cites to support its theory that "UPFs" can cause type 2 diabetes in fact *admitted* that "a causal link between UPF and chronic diseases cannot be established so far." Bernard Srour, et al., *Ultraprocessed Food Consumption and Risk of Type 2 Diabetes Among Participants of the NutriNet-Santé Prospective Cohort*, 180 JAMA Intern Med. 283, 291 (2019).[9] In other words, Plaintiff's cited sources do not support the notion that "UPFs" (much less any of Defendants' specific products) are even capable of causing either of Plaintiff's two alleged conditions. Accordingly, Plaintiff has failed to plead a plausible theory of general causation.

*Second*, Plaintiff does not plausibly allege that each (or any) of Defendants' products caused his specific injuries (specific causation). He alleges only that he was exposed to

---

[9] Moreover, where (as here) a plaintiff relies on literature at the pleading stage to support the plausibility of his allegations, the Court need not "take as true every inference that a plaintiff asks [the Court] to draw from those [studies,] no matter how attenuated." *Mandala v. NTT Data, Inc.*, 988 F.3d 664, 666–67 (2d Cir. 2021) (Sullivan, J., concurring in denial of rehearing en banc).

Defendants' unspecified products at unspecified times and in unspecified amounts. But Pennsylvania has rejected the notion that "each and every exposure, no matter how small" is sufficient to prove causation and instead requires plaintiffs to show meaningful exposure. *Howard ex rel. Estate of Ravert v. A.W. Chesterton Co.*, 78 A.3d 605, 608 (Pa. 2013); *Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 574 (Pa. 2012) (differentiating mere exposure from the "substantial factor" requirement); *Gregg v. V-J Auto Parts, Co.*, 943 A.2d 216, 226–27 (Pa. 2007) (declining to "indulge in a fiction that each and every exposure to asbestos, no matter how minimal in relation to other exposures, implicates a fact issue concerning substantial-factor causation").

Because Plaintiff does not allege what products he consumed, when, and in what quantities, he has not plausibly pled that any purported consumption of any Defendant's products was substantial enough to cause his conditions. The Complaint also does not allege any temporal connection between Plaintiff's consumption of any product and his symptoms and diagnoses, what other food he consumed (including other so-called "UPFs" manufactured by companies that for whatever reason have not been named in this lawsuit), his overall physical condition, or whether he has a family history of his alleged illnesses. And although Plaintiff baldly alleges that "UPFs" are "addictive," *id.* ¶ 62, he does not allege that he himself ever became "addicted" to any of Defendants' products. Plaintiff's factual omissions are not simply matters for discovery; they are necessary to plead a cognizable claim under Pennsylvania law. It is Plaintiff's burden to plausibly plead and then prove a causal connection between Defendants' products and Plaintiff's alleged injuries. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 752. And yet Plaintiff's Complaint consists of nothing more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 556 U.S. at 678.

These allegations are especially deficient here because, as the studies cited in the

Complaint acknowledge, the health conditions over which Plaintiff is suing are multifactorial diseases with many causes.[10]  Yet aside from "listing various common [brands] [he] has eaten, Plaintiff offers limited facts that might lead this Court to believe that [he] could ultimately show that it was [his] consumption of these foods . . . that led to [his] disease[s]." *S.F. v. Archer-Daniels-Midland Co.*, 2014 WL 1600414, at *4 (W.D.N.Y. Apr. 21, 2014), *aff'd* 594 F. App'x 11 (2d Cir. 2014) (dismissing claims that certain foods caused a minor's type 2 diabetes).

Courts have routinely dismissed claims that require the same inferential leap from food products to health conditions that Plaintiff asks this Court to make.  For example, in *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512 (S.D.N.Y. 2003), the plaintiffs alleged that McDonald's caused minors who consumed McDonald's products to become obese and develop health conditions, including diabetes. *Id.* at 516, 519.  Like Plaintiff here, the plaintiffs in *Pelman* alleged that McDonald's negligently marketed foods "that were physically and psychologically addictive." *Id.* at 520.  The court granted McDonald's motion to dismiss, in part because "[n]o reasonable person could find [proximate] cause based on the facts in the [c]omplaint without resorting to 'wild speculation.'"  *Id.* at 538.  The court emphasized that, among other shortcomings, the complaint

---

[10] *See, e.g.*, Compl. ¶¶ 310, 312 (citing CDC, *New Research Uncovers Concerning Increases in Youth Living with Diabetes in the U.S.* (Aug. 24, 2021), *available at* https://archive.cdc.gov/www_cdc_gov/media/releases/2021/p0824-youth-diabetes.html#:~:text=Diagnosed ("Increasing prevalence of type 2 diabetes could be caused by rising rates of childhood obesity, in-utero exposure to maternal obesity and diabetes, or increased diabetes screenings," with no mention of processed foods)); Compl. ¶ 311 (citing Milena Cioana, et al., *The Prevalence of Obesity Among Children with Type 2 Diabetes, Systematic Review and Meta-Analysis*, 5 JAMA Network Open (2022) (acknowledging "the complex weave of factors driving the pathogenesis of pediatric" type 2 diabetes)); Compl. ¶ 314 (citing Haley Bush, et al., *Pediatric Non-Alcoholic Fatty Liver Disease*, 4 Children (Basel) 1, 2 (2017) ("The pathogenesis of [non-alcoholic fatty liver disease] is complex and not fully understood because of the combination of environmental and genetic factors that contribute to the development of [non-alcoholic fatty liver disease].")); Compl. ¶¶ 331, 511 (citing Cleveland Clinic, *Steatotic (Fatty) Liver Disease: Symptoms & Treatment*, https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease (last reviewed Sept. 27, 2023) (recognizing fatty liver disease "has multiple causes")).

failed to "specify how often the plaintiffs ate at McDonalds," and that "any number of other factors" could potentially have "affected the plaintiffs' weight and health." *Id.*[11]

Similarly, in *S.F.*, the plaintiff sued five manufacturers of high-fructose corn syrup, alleging that high-fructose corn syrup in foods was a substantial factor in causing her daughter to develop type 2 diabetes and that the defendants failed to warn of its purported "dangerousness." 2014 WL 1600414, at \*1, \*3. The court dismissed all claims. *Id.* at \*9. The court "dr[e]w on its judicial experience and common sense," as permitted under *Iqbal*, to recognize that "Type 2 diabetes is a multifactorial disease" caused by various factors, including "a lack of exercise, genetics, or poor diet." *Id.* at \*4. The court then explained, "aside from idly listing various common foods she has eaten," the plaintiff alleged very few facts that could "ultimately show that it was her consumption of these foods, and specifically the [high-fructose corn syrup] found within these foods (manufactured by these defendants) that led to her disease." *Id.*

Here, too, any number of factors could have caused Plaintiff's alleged type 2 diabetes and non-alcoholic fatty liver disease, and the "wild speculation" that was rejected in *Pelman* and *S.F.* would also be required here to infer that Defendants' (unspecified) products are the reason Plaintiff developed the two alleged conditions. If anything, Plaintiff's claims require even greater

---

[11] In *Pelman*, the plaintiffs amended their complaint to include facts on how often the plaintiffs ate at McDonald's, but the district court again dismissed the complaint in part based on failure to adequately plead causation due to the significant, unaddressed alternative causes of plaintiffs' alleged injuries. *Pelman v. McDonald's*, 2003 WL 22052778, at \*11 (S.D.N.Y. Sept. 3, 2003). The Second Circuit reversed on that issue, relying on pre-*Twombly/Iqbal* pleading standards and explaining these issues could be addressed during discovery. *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511–12 (2d Cir. 2005). *Twombly/Iqbal* have since clarified, however, that "only a complaint that states a plausible claim for relief" can "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678–79; *accord Precision Imaging of N.Y., P.C. v. Allstate Ins. Co.*, 263 F. Supp. 3d 471, 476 n.4 (S.D.N.Y. 2017) ("[T]he 'bare-bones notice-pleading requirements' . . . described in *Pelman* have been superseded by the more rigorous plausibility standards set forth in" *Iqbal* and *Twombly*).

speculation to guess which of the *thousands* of products manufactured by the eleven Defendants he chose to name here were actually consumed, much less *caused* Plaintiff's alleged illnesses.

Finally, Plaintiff's conclusory allegation that "UPFs" are addictive does not make up for his failure to plead causation. Courts have repeatedly rejected claims for injury based on the sale of an allegedly addictive food or beverage. *See Pelman*, 237 F. Supp. 2d at 542 ("[T]o allow a complaint to survive merely because it alleges product liability on the basis of addiction would be to allow any complaint that alleges product liability based on the addictive nature of the products to survive dismissal, even where such addiction is likely never to be proven."); *Garrison v. Heublein, Inc.*, 673 F.2d 189, 189 n.2, 190–91 (7th Cir. 1982) (affirming dismissal of complaint alleging that plaintiffs suffered injuries after 20 years of vodka consumption and that vodka has propensities "to be addictive"); *Bruner v. Anheuser-Busch, Inc.*, 153 F. Supp. 2d 1358, 1359–60 (S.D. Fla. 2001) (dismissing claim that consumers were "lured to and consumed large quantities" of beer and misled by advertising that it "was safe, to consume and was not addictive"). Consequently, unless the product is contaminated, its sale alone cannot be the proximate cause of a plaintiff's injury. *See, e.g.*, *Cook v. MillerCoors, LLC*, 872 F. Supp. 2d 1346, 1350 (M.D. Fla. 2012) ("[T]he proximate cause of an alcohol-related injury is the consumption of the intoxicating beverage not the sale of the beverage."). That is all the more true here given that Plaintiff does not even allege that he was "addicted" to any of Defendants' products.

No court has ever permitted a lawsuit to proceed on the same allegations or causation theory here. This Court should not be the first. It should dismiss Plaintiff's speculative and incurable claims with prejudice.

## III.    PREEMPTION BARS PLAINTIFF'S CLAIMS.

Plaintiff's claims independently fail because he cannot substitute his personal views on "UPFs" for the judgments of Congress and the federal regulatory system Congress created.

### A.  USDA Preemption Bars Claims Regarding Meat and Poultry Products.

Plaintiff fails to identify any specific product he consumed, but many brands he identifies (Compl. ¶ 508) include products that contain meat or poultry, such as Conagra's Slim Jim, Hebrew National, Healthy Choice, and Chef Boyardee brands; Nestlé USA's Stouffer's, Hot Pockets and Gerber brands; Kraft Heinz's Oscar Mayer brand; and General Mills' Old El Paso and Pillsbury brands.  Any claims with respect to such meat and poultry products are preempted by the Federal Meat Inspection Act ("FMIA") and the Poultry Products Inspection Act ("PPIA"), both of which broadly prohibit states from imposing any requirements "with respect to . . . operations" of a meat- or poultry-product facility inspected per federal law or "[m]arking, labeling, packaging, or ingredient requirements" that are "in addition to, or different than," those mandated by federal law. 21 U.S.C. § 678 (FMIA), 21 U.S.C. § 467e (PPIA).  This express preemption language "sweeps widely," *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1024 (10th Cir. 2022), and requires dismissal of Plaintiff's state law claims with respect to meat and poultry products, as each claim necessarily relates to what is—or is not—on food labeling or packaging, or incorporated into the manufacturing process or as an ingredient.  *See Grocery Mfrs. of Am., Inc. v. Gerace*, 755 F.2d 993, 997 (2d Cir. 1985); *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459 (2012).

Comprehensive federal regulations cover virtually every aspect of products containing meat and poultry, from inspection of livestock (pre-and-post slaughter), to manufacturing, processing, and labeling.  *See Nat'l Meat Ass'n*, 565 U.S. at 45–56 (federal law "regulates a broad range of activities" related to meat processing); 21 U.S.C. §§ 603–07; *see, e.g.*, 9 C.F.R. § 424.21(a); FSIS Directive 7120.1, Safe and Suitable Ingredients Used in the Production of Meat, Poultry, and Egg Products (2024) (ingredients); 9 C.F.R. Pts. 318, 381, 424 (preparation and processing); 9 C.F.R. Pts. 317, 319, 381, 412 (labeling).  The FMIA permits beef products to be sold only under "labeling and containers which are not false or misleading and which are approved

by the Secretary [of Agriculture]."  21 U.S.C. § 607(d).  Similarly, the PPIA regulates labels on

poultry-containing products.  *Id.* § 451 ("It is essential in the public interest that the health and

welfare of consumers be protected by assuring that poultry products distributed to them are . . .

properly marked, labeled, and packaged.").

USDA's Food Safety and Inspection Service ("FSIS") exercises this authority and ensures

that no meat or poultry products "bear any false or misleading marking, label, or other labeling"

through a comprehensive label approval program.  9 C.F.R. § 317.8(a).  All meat or poultry product

labels—with exceptions not relevant here—must be submitted to and approved for use by FSIS

before entering the marketplace.  9 C.F.R. § 412.1(a).  FSIS thus conveys its approval (in most

cases) directly on the product label via an official legend or seal that declares the labeling was

"U.S. Inspected and Passed by Department of Agriculture."  *See* 21 U.S.C. § 606(a).  *Every* single

meat and poultry product that Plaintiff could conceivably allege he ingested has had its label

deemed approved by USDA and bears some form of this seal:



There is no suggestion otherwise in the Complaint.  Compl. ¶ 508(g).

If the Complaint had identified particular meat or poultry products, Defendants would have

presented and the Court could have considered taking judicial notice of the fact that such products

bear the official inspection legend of the USDA,[12] confirming that their labels have been pre-approved by FSIS.  9 C.F.R. §§ 381.96; 412.1–412.2.  Any claim that such labels were misleading or should have included additional information would impermissibly seek to impose a state labeling requirement "in addition to, or different than" the labeling mandated by USDA.  The overwhelming weight of authority holds that when, as here, a plaintiff challenges a USDA-approved meat or poultry product label, the FMIA and PPIA expressly preempt those claims.[13]

Plaintiff cannot evade federal law's preemptive reach by recasting his claim as a challenge to any meat product's ingredients or processing.  USDA's authority to "prescribe 'definitions and standards of identity or compositions'" for meat and poultry products necessarily includes "the authority to prescribe their 'ingredients,'" which "is essential to determine the 'identity' of the finished product."  *See Armour & Co. v. Ball*, 468 F.2d 76, 81 (6th Cir. 1972).

For example, in *Animal Legal Defense Fund Boston v. Provimi Veal Corporation*, the plaintiff argued that a manufacturer should warn that its "veal might be unhealthful because it comes from calves that are fed antibiotics subtherapeutically."  626 F. Supp. 278, 279, 285–86 (D. Mass. 1986).  The court explained that plaintiff's claims were preempted, because federal law

---

[12] Product labels and USDA seals like the example above are judicially noticeable pursuant to Federal Rule of Evidence 201(b)(2), as their accuracy cannot reasonably be questioned.  *Ieradi v. Mylan Lab'ys, Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000) ("Under Federal Rule of Evidence 201, we may take judicial notice at any stage of the proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned."); *see, e.g.*, *Thornton v. Tyson Foods, Inc.*, 482 F. Supp. 3d 1147, 1155, 1157 (D.N.M. 2020) (finding that courts "may take judicial notice of FSIS's approval of product labels because they are matters of public record" and of the "fact that the beef labels have been approved by the USDA").

[13] *See Thornton v. Tyson Foods, Inc*., 28 F.4th 1016 (10th Cir. 2022); *Kuenzig v. Hormel Foods Corp*., 505 F. App'x 937 (11th Cir. 2013); *Webb v. Trader Joe's Co*., 2019 WL 5578225, at *3–4 (S.D. Cal. Oct. 29, 2019); *Phelps v. Hormel Foods Corp*., 244 F. Supp. 3d 1312, 1316–18 (S.D. Fla. 2017); *Brower v. Campbell Soup Co.*, 243 F. Supp. 3d 1124, 1128–29 (S.D. Cal. 2017); *Meaunrit v. ConAgra Foods Inc*., 2010 WL 2867393, at *6–7 (N.D. Cal. July 20, 2010); *Animal Legal Def. Fund Bos., Inc. v. Provimi Veal Corp.*, 626 F. Supp. 278, 279, 285–86 (D. Mass. 1986).

"does not require meat and meat food product labels to carry a warning or an explanation" about that issue, so plaintiff's claims would "impose requirements in addition to or different than the federal requirements." *Id.* at 285–86.

Plaintiff cannot evade preemption through vague pleading. Plaintiff's state-law claims challenging the ingredients in, processing of, and labeling of any USDA-regulated products are expressly preempted and must be dismissed. 21 U.S.C. §§ 467, 678. Amendment of claims regarding those products would be futile.

### B. Plaintiff's Vague Pleading Attempts to Skirt FDA Preemption.

FDA preemption also presents an obstacle to Plaintiff's claims. Congress vested FDA with regulatory authority over food products other than meat and poultry, and tasked it with "promot[ing] the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products." 21 U.S.C. § 393(b)(1). FDA regulates food safety, including by regulating food ingredients and labels under the Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Nutrition Labeling and Education Act ("NLEA"). NLEA creates a nation-wide labeling system, and broadly and expressly preempts state action "not identical" to various federal requirements. 21 U.S.C. § 343-1.

The allegations of the Complaint are too vague to permit Defendants or the Court to determine exactly what Plaintiff contends Defendants should have done differently with respect to labeling, disclosures, warnings, or other product changes regarding any particular product or ingredient, making it difficult to conduct a complete FDA preemption analysis. Defendants reserve all rights to raise such preemption arguments in the event this lawsuit is allowed to proceed and Plaintiff identifies what he claims was required under state law with respect to any particular product or ingredient.

## IV.     PLAINTIFF'S CLAIMS ARE BARRED BY THE FIRST AMENDMENT.

Each of Plaintiff's claims are premised on his allegation that Defendants should "warn" or "disclose" to consumers the alleged health effects of "UPFs." *E.g.*, Compl. ¶¶ 514, 534, 557, 569, 575, 582, 591, 604, 622, 632, 651, 660, 668(a). And he seeks a punitive damages award "sufficient to . . . deter similar conduct" and force disclosures about the alleged health effects of "UPFs" moving forward. Compl. Prayer for Relief. This tactic—using litigation to force Defendants to make statements not supported by science—is barred by the First Amendment.

Controversial speech cannot be constitutionally compelled absent a showing of a substantial government interest and a restriction tailored to that interest, neither of which Plaintiff can allege here. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (enjoining required health warnings related to a chemical created through food processing); *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018). The kinds of disclosures Plaintiff seeks to force through this lawsuit—warning of an alleged causal connection between food processing and some indeterminate list of health effects—would be controversial because there is no scientific support that any such connection exists. As the same materials Plaintiff relies upon in the Complaint make clear, any causal link between "UPFs" and chronic diseases is purely speculative, and not based on current science. *See supra* Section II(B). Plaintiff cannot use this private personal injury case to "compel[] sellers to warn consumers of a potential 'risk' never confirmed by any regulatory body" or the scientific community. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283 (9th Cir. 2023); *see also Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 753 (9th Cir. 2019) (enjoining compelled disclosure advising that "[d]rinking beverages with added sugar(s) contributes to obesity, diabetes, and tooth decay").

## V.   THE LIMITED INDIVIDUAL ALLEGATIONS AGAINST EACH DEFENDANT ARE INSUFFICIENT.

Even if the Court could look past the group pleading, causation, preemption, and other issues that make this Complaint unsustainable as a matter of law with respect to all Defendants, the substantive allegations against *each* Defendant are also insufficient.  The minimal references to specific Defendants are vague and irrelevant, and do not come close to supporting a reasonable inference that "defendant[s] ha[ve] acted unlawfully."  *Iqbal*, 556 U.S. at 678.  These meager allegations do not satisfy Rule 8, much less the particularity requirement of Rule 9(b) that governs Plaintiff's fraud-based claims.

*Kraft Heinz*:   The Complaint misnames Kraft Heinz and mislocates its corporate headquarters.  *Compare* ECF No. 1 at 1, 5–8, *with* Compl. ¶ 33.  And it conflates Kraft Heinz's actions not only with the actions of other Defendants but also of alleged corporate predecessors—without articulating a proper basis for doing so or linking those actions to Plaintiff.  *See, e.g.*, Compl. ¶¶ 33–34, 102, 130, 132, 207, 258, 290, 447.  While Plaintiff alleges that Kraft Heinz advertised using Paw Patrol characters, *id.* ¶ 262, he does not allege that any such advertisements were false or that he viewed them.

*Mondelēz*:  The few Mondelēz-specific allegations, Compl. ¶¶ 102, 130, 132, 207, 258, 261, 263, 265, 290, 447, center on broad claims that Mondelēz, along with other food companies, incorporated marketing and product formulation strategies from tobacco companies.  These allegations are overly vague and general in nature, failing to causally link any specific alleged Mondelēz action to the alleged harm suffered by Plaintiff.  Furthermore, while Plaintiff alleges that Mondelēz used Super Mario characters in advertising aimed at children, he does not specify what (if anything) is false about that advertising; nor does he allege that he viewed it (much less did so when he was a child).  *Id.* ¶ 263.  Plaintiff's conspiracy allegations merely claim that

unspecified "[e]xecutives from" the Subgroup Defendants "or their predecessors" attended one meeting more than 25 years ago. *E.g., id.* ¶¶ 447, 465–66. Plaintiff acknowledges that meeting did not lead to any agreement among the attendees. *Id.* ¶ 467.

*Post Holdings, Inc.*: Only ten paragraphs specifically reference Post Holdings, *id.* ¶¶ 37–38, 102, 130, 132, 258, 261, 264–65, 290, and the majority of them merely repeat the refrain that Post Holdings and two other Defendants are "descendants" of Philip Morris. The Complaint also cites three Post Holdings television ads that it alleges are aimed at children, *id.* ¶ 264, but does not allege that Plaintiff viewed any of these ads (or any other Post Holdings ads, for that matter).

*The Coca-Cola Company*: Only a few paragraphs in the Complaint mention The Coca-Cola Company, and those allegations fail to plausibly allege a link between products manufactured by The Coca-Cola Company and Plaintiff's alleged injuries. At most, Plaintiff alleges that the company engages in research & development to produce enjoyable beverages (Compl. ¶¶ 137, 144) which it then markets and advertises to consumers (although it is unclear if Plaintiff ever viewed any particular marketing statements or advertisements). *Id.* ¶¶ 272–78. Plaintiff also broadly identifies six brand portfolios rather than specific products and makes no allegations that an ingredient or processing technique associated with any products sold under these brand names caused him harm. *Id.* ¶ 508(f).

*PepsiCo*: There are only nine paragraphs specifically mentioning PepsiCo, Compl. ¶¶ 40, 94, 136, 144, 276–79, 508(e), and none of them plausibly alleges that any PepsiCo product is even associated with Plaintiff's alleged injuries, let alone caused them. The allegations against PepsiCo amount only to claims that PepsiCo operates a robust research-and-development center to improve its products, *id.* ¶ 136, and markets products to families and children, *id.* ¶¶ 276–79. This alleged conduct is neither unlawful nor improper. Moreover, Plaintiff never alleges that he viewed or

relied on any of the specified advertisements included in the Complaint. In fact, the PepsiCo ads that Plaintiff mentions, *id.* ¶ 277, are for Doritos and Cheetos, brands he does not allege he ever consumed. *See id.* ¶ 508(e). The Complaint also improperly lists various brand names that are not manufactured by PepsiCo. For example, the Complaint incorrectly alleges that PepsiCo produces Crush, Ocean Spray, and Jack Link's. Finally, while Plaintiff's allegations fall short across the board, he also does not allege that PepsiCo worked with any tobacco companies to create "addictive" products or attended any industry meeting. *Id.* ¶¶ 447–67. In short, there are no plausible allegations that PepsiCo displayed any allegedly tortious conduct or intent.

*General Mills, Inc.*: Only four of the Complaint's 668 paragraphs substantively refer to General Mills. Besides its citizenship, Plaintiff states the company operates a research center, that it published a few ads, and that he may have eaten some foods from 14 *brands*. Compl. ¶¶ 41, 139, 282, 508(h). As to those 14 brands, the Complaint wrongly attributes to General Mills a brand it is not responsible for (General Mills does not make, market, or sell Häagen-Dazs in North America), and fails to specify which of the almost 900 discrete food products, within the 14 brands identified in the Complaint, Plaintiff ate, or when he ate them.[14] And despite having been a minor, the Complaint also does not identify who purchased the foods he ate and specific ads, labels, or other materials those purchasers relied on in making those purchases. Beyond this, Plaintiff's digressive conspiracy allegations note only that a former General Mills executive attended one meeting more than 25 years ago with representatives of certain competitors. *E.g.*, *id.* ¶¶ 447, 465–66. Plaintiff acknowledges that meeting did not lead to any agreement among the attendees. *Id.* ¶ 467.

---

[14] For example, General Mills makes, markets, and sells, some but not all food products sold under the Pillsbury brand.

*Nestlé USA*:  Nestlé USA is only mentioned in the Complaint a handful of times, *see* Compl. ¶¶ 42, 134–35, 144, 280, 447, 508(d), and none of those allegations plausibly suggests that any Nestlé USA conduct or product caused or contributed to Plaintiff's purported injuries.  Plaintiff generically asserts the unproven allegation that Nestlé USA conducted research on "sensory perception" and "stud[ied] issues relating to brain activity," *id.* ¶¶ 134–35, but does not allege that Nestlé USA did so to make its products "addictive" or for any other purportedly unlawful purpose.  He also claims Nestlé USA "markets to children," *id.* ¶ 280, but again does not provide any detail or allege any wrongful marketing conduct by Nestlé USA.  And, as with the other Defendants, Plaintiff does not identify a single specific Nestlé USA product he consumed or a single Nestlé USA advertisement he saw before making a purchase.[15]

*Kellanova*:  Rather than pleading individual facts about Kellanova, the Complaint improperly lumps together two distinct companies with separate products, WK Kellogg Co and Kellanova, and defines them collectively as "Kellogg."  Compl. ¶ 45.  Kellanova is not WK Kellogg Co, and the separate companies and their different products cannot be merged for pleading purposes.  The Complaint alleges no basis for disregarding corporate separateness, and it does not (because it cannot) allege Kellanova assumed liability for WK Kellogg Co products.  In one of the few allegations where the Complaint mentions "Kellogg's," it focuses on WK Kellogg Co product lines—like Froot Loops, Frosted Flakes, and Rice Krispies—not Kellanova products.[16]  Indeed,

---

[15] Plaintiff also inaccurately attributes to Nestlé USA several brands that it is not responsible for.  Compl. ¶ 508(d).  For example, Nestlé USA does not make, market or sell Kit Kat in the United States.  Nor does it currently own Edy's; that brand was sold to another company in 2019.  Without identifying the specific products Plaintiff alleges to have consumed and when, the Complaint fails to state a plausible claim against Nestlé USA with respect to those brands.

[16] *See* Compl. ¶ 283 (alleging advertising for cereals Froot Loops, Frosted Flakes, and Rice Krispies); https://www.wkkellogg.com/our-foods/our-brands (Froot Loops, Frosted Flakes and Rice Krispies cereals are all WK Kellogg Co products).

the Complaint mentions Kellanova only four times: (i) the case caption, (ii) the list of defendants, (iii) Kellanova's headquarters, and (iv) its relationship to Kellogg Company. *Id.* ¶¶ 4, 43, 45. That's it. There are zero allegations about any Kellanova marketing or labeling, or ingredients in Kellanova products.

*WK Kellogg Co*: WK Kellogg Co, too, is referenced in only three substantive allegations. This is particularly notable because Plaintiff uses "Kellogg" to refer to both Kellanova and WK Kellogg Co, despite the fact that, in 2023, they separated into two independent companies, and they manufacture different products. Kellanova manufactures snack foods, while WK Kellogg Co only manufactures cereals and granolas. Plaintiff does not distinguish between the two separate companies and alleges collectively against both, even attributing certain brands Kellanova manufactures—but WK Kellogg Co does not—to WK Kellogg Co and vice versa. *See* Compl. ¶¶ 283, 508(i).

*Mars:* The Complaint discusses Mars[17] only a handful of times. Compl. ¶¶ 46, 141, 144, 284, 447, 508(j), 641. Besides identifying Mars and the brands at issue, *id.* ¶¶ 46, 508(j), the allegations are that Mars ran ads that Plaintiff never alleges he saw, *id.* ¶ 284, tries to make its products "taste good" and "free of any off aromas,"[18] partners in a research center that studies how basic senses work, *id.* ¶¶ 141, 144, and attended a single meeting 25 years ago that resulted in nothing, *id.* ¶¶ 447, 641. None of these allegations are remotely actionable.

*Conagra*: Conagra is an after-thought in the Complaint. Plaintiff does not allege that Conagra is a member of the alleged conspiracy that makes up the core of his liability theory, or

---

[17] Mars, Incorporated is incorrectly named as "Mars Incorporated, Inc."
[18] Mars, *The Science of Deliciousness: Dr. John Didzbalis creates flavors for a...* (May 3, 2023), https://www.mars.com/news-and-stories/articles/dr-john-didzbalis-creates-flavors-for-living; *see* Compl. ¶ 141 & n.151 (relying on the cited blog post).

that Conagra was ever affiliated with tobacco companies that allegedly used "addiction science" to develop food. *See* Compl. ¶¶ 102–103; 300; 445–46. Of the four paragraphs about Conagra, one alleges its corporate citizenship, hardly tortious conduct. *Id*. ¶ 47. Another includes a purported quote regarding "brain science" that cites to a press release from a third party, not Conagra. *Id.* ¶ 138. In any event, this paragraph does not allege anything tortious about the alleged "brain science"—whatever that is—or tie it to any Conagra product Plaintiff allegedly ingested. As for the third Conagra paragraph, it makes assertions regarding "cartoon movies" and Kid Cuisine products, but does not allege anything tortious about those, nor does it allege that Plaintiff viewed the advertising or consumed Kid Cuisine products. *Id.* ¶ 281. The fourth and final paragraph regarding Conagra asserts Plaintiff consumed unspecified Conagra foods. This paragraph likewise lacks any suggestion of wrongdoing. *Id.* ¶ 508(g).

Because Plaintiff has not plausibly asserted a cognizable claim against even a single Defendant, the Complaint should be dismissed as to all.

## VI.    EACH OF PLAINTIFF'S CLAIMS FAILS FOR ADDITIONAL REASONS.

The entire Complaint should be dismissed for the reasons above, including causation. *See supra* Section II. But each cause of action independently fails for other reasons.

### A. Plaintiff Does Not Plead Any Breach of Duty to Support His Negligence Claim (Count I).

A negligence claim under Pennsylvania law requires (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) a causal relationship between the breach and the plaintiff's injury, and (4) damages. *City of Phila. v. Beretta U.S.A. Corp.*, 277 F.3d 415, 422 n.9 (3d Cir. 2002). The Complaint fails at the first steps.

Plaintiff vaguely alleges that Defendants' "designing" and "manufacturing" of their products breached some duty of care. Compl. ¶ 517. To the extent Plaintiff is attempting to raise

a design-defect claim, however, "[c]onclusory allegations that a product was negligently designed are not, on their own, sufficient to plead a viable claim." *McGrain v. C.R. Bard, Inc.*, 551 F. Supp. 3d 529, 541 (E.D. Pa. 2021). Rather, a plaintiff's allegations must "address either the design of Defendants' product or the availability of safer, feasible alternatives" with "meaningful detail." *Id.* at 541–42. Plaintiff does not allege facts as to the design of any specific product—or even as to the 110 brands named—including the ingredients or processes actually used by these Defendants. Nor does Plaintiff allege any safer, feasible alternative to any specific product. Plaintiff thus has no valid claim under a negligent-design theory.

Similarly, to the extent that Plaintiff attempts to raise a negligent-manufacturing claim, he must plead "facts that would plausibly suggest that the manufacturer failed to exercise reasonable care during the 'manufacturing process.'" *Smith v. Howmedica Osteonics Corp.*, 251 F. Supp. 3d 844, 853 (E.D. Pa. 2017) (quoting Restatement (Second) of Torts § 395). The only allegation on this score is that "Defendants breached their duty of care by manufacturing . . . their UPF negligently[.]" Compl. ¶ 517. Such an allegation "is precisely the type of merely conclusory statement not entitled to a presumption of truth on a motion to dismiss." *Smith*, 251 F. Supp. 3d at 853. Thus, Plaintiff has no valid claim under a negligent-manufacturing theory either.[19]

### B. Plaintiff's Failure to Warn Claim Fails for Lack of Duty to Warn and Failure to Plead Causation (Count II).

Plaintiff does not clarify whether his failure-to-warn claim sounds in negligence or strict liability. But the claim fails in either event because: (1) Defendants did not have a duty to warn of the obvious risks of food consumption; and (2) the Complaint does not sufficiently plead that any "UPF"-related warning would have prevented Plaintiff's alleged injuries.

---

[19] To the extent Plaintiff's negligence claim under Count I alleges a negligent failure to warn in advertising and marketing, it should be dismissed for the reasons discussed *infra* Section VI(B).

*First*, Plaintiff has not plausibly alleged that any Defendant breached any duty to warn.  In Pennsylvania, a defendant is liable for negligent failure to warn of a "dangerous condition" only if the defendant has "no reason to believe that" consumers "will realize its dangerous condition." *Dauphin Deposit Bank & Tr. Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850–51 (Pa. Super. Ct. 1991) (quoting Restatement (Second) of Torts § 388) (emphasis omitted).  In other words, there is no duty to warn of obvious risks.  A strict-liability failure-to-warn claim similarly requires that a product was "distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product."  *Phillips v. A-Best Prods. Co.*, 665 A.2d 1167, 1171 (Pa. 1995).

Relevant here, there is no duty to warn consumers about ingredients or products that are dangerous only "when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized."  Restatement (Second) of Torts § 402A(j); *accord Hahn v. Richter*, 673 A.2d 888 (Pa. 1996) (holding that a product type called out in Restatement (Second) of Torts § 402A(j), like foods are, cannot support strict-liability failure-to-warn claims); *Zuzel v. Cardinal Health, Inc.*, 565 F. Supp. 3d 623, 639 (E.D. Pa. 2021) (Pennsylvania follows the Restatement (Second) of Torts § 402A for failure-to-warn claims).

The Restatement recognizes that "[m]any products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption."  Restatement (Second) of Torts § 402A(i).[20]  This, the Restatement makes clear, does not make a food "unreasonably dangerous."  Rather, an allegation that consumption of a product over time may have health impacts is very different from an allegation that a product is

---

[20] While section 402A specifically governs strict liability, its logic applies equally to negligent failure-to-warn claims.  *See, e.g.*, *Pelman*, 237 F. Supp. 2d at 530–33 (relying on concepts from section 402A to dismiss negligence claims based on the overconsumption of food).  Indeed, the Restatement itself addresses strict products liability within the negligence chapter, recognizing the overlapping concepts.  *See* Restatement (Second) of Torts § 402A(a).

contaminated and unsafe in any circumstance. The former requires no warning. For example, the Restatement explains, "[g]ood butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous." Restatement (Second) of Torts § 402A(i).

Courts applying this principle have barred claims like Plaintiff's that seek to impose a duty to warn of uncontaminated food products. *Gorran v. Atkins Nutritionals Inc.*, 464 F. Supp. 2d 315, 324 (S.D.N.Y. 2006) (dismissing claims because, "[c]ontrary to [plaintiff's] allegations, a food product is not defective because it increases the risk of heart disease"); *Dauphin Deposit Bank*, 596 A.2d at 850 (affirming dismissal of tort claims because "the public is well aware of the dangers of alcohol consumption without a warning"); *Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 388 (Tex. 1991) ("[B]ecause the danger of developing the disease of alcoholism from prolonged and excessive consumption of alcoholic beverages is and has been generally known and recognized, it is within the ordinary knowledge common to the community," and there is "no duty to warn"). Indeed, the D.C. Circuit cited *Pelman* for the intuitive concept that plaintiffs cannot bring tort claims based on well-known risks from well-known foods. *Mills v. Giant of Md., LLC*, 508 F.3d 11, 14 (D.C. Cir. 2007) (Kavanaugh, J.).

This principle forecloses Plaintiff's warning claim, which is premised on a duty to warn of the risk of consuming processed foods and beverages. But these products can be and are consumed safely. Even when it was drafted, the Restatement recognized that "there is today little in the way of consumer products which will reach the consumer without" some amount of "processing before sale." Restatement (Second) of Torts § 402A(e). Several of the brands in the Complaint have been enjoyed by consumers for more than 50 years, or in some cases *100 years*, without issue. Imposing a duty to warn of food processing at the scale Plaintiff is seeking would improperly

stretch the limits of Pennsylvania's duty to warn by food and beverage manufacturers.

*Second*, even if Defendants had a duty to warn, Plaintiff has failed to plausibly allege that any failure to warn *caused* his alleged harms. *Id.* § 388. Plaintiff alleges that "[i]f Defendants had warned Plaintiff that use of their UPF . . . would increase their risk of being seriously injured . . . Plaintiff would not have ingested their UPF." Compl. ¶ 538. But that conclusory allegation is not plausible in light of Plaintiff's other allegations that he proceeded to regularly consume alleged "UPFs" despite his own allegations that warnings about "UPFs" are widespread. *Id.* ¶¶ 406–45; *see, e.g.*, *id.* ¶ 423 (alleged example of a national government informing the public of "measures to reduce the consumption of" certain foods) (emphasis omitted); *see Phillips*, 665 A.2d at 1171 (affirming dismissal where plaintiff knew of a product's potential health effect and "voluntarily proceeded to expose himself to the product"). And despite acknowledging that Defendants' products contain clear nutritional labels, Compl. ¶ 60, which include ingredient lists and suggested serving sizes (as every consumer knows), Plaintiff continued to regularly consume them. In short, Plaintiff's conclusory allegations, which this Court need not accept, do not plausibly suggest that Plaintiff would have stopped consuming so-called "UPFs" if Defendants had included additional "warnings" on their products.

### C. Plaintiff's Warranty Claims Fail for Multiple Reasons (Counts III–IV).

Count III appears to allege both breach of an implied warranty of fitness for a particular purpose and breach of an implied warranty of merchantability. Count IV asserts a breach-of-express-warranty claim. All of these claims should be dismissed for multiple reasons.

#### 1. All of Plaintiff's warranty claims fail for failure to plead pre-suit notice.

As a threshold matter, Plaintiff's warranty claims should be dismissed because Plaintiff failed to provide the requisite pre-suit notice. Under Pennsylvania law, for all warranty claims, a buyer must notify the seller "within a reasonable time after he discovers or should have discovered

any breach." 13 Pa. C.S.A. § 2607(c)(1). Failure to do so "bar[s] [him] from any remedy." *Id.* Plaintiff fails to plead he gave adequate notice to Defendants prior to this litigation, which dooms his warranty claims. *Kee v. Zimmer, Inc.*, 871 F. Supp. 2d 405, 410 (E.D. Pa. 2012) (noting that "[b]ecause Plaintiff failed to plead notice with respect to her claims for breach of implied and express warranties, the Court will dismiss [those] [c]ounts").

### 2. Plaintiff fails to plead any breach of an implied warranty of fitness for a particular purpose.

To state a claim for breach of the implied warranty of fitness for a particular purpose, the seller must have had "reason to know (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods." *Williams v. Amazon, Inc.*, 573 F. Supp. 3d 971, 976 (E.D. Pa. 2021) (quoting 13 Pa. C.S.A. § 2315). "[P]articular purpose" is a term of art, referring to a use other than an "ordinary purpose"—for example, "shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains." *Kovalev v. Lidl US, LLC*, 647 F. Supp. 3d 319, 344 (E.D. Pa. 2022) (quoting 13 Pa. C.S.A. § 2315, cmt. n.2). The latter would be within the scope of an implied warranty of fitness for a particular purpose claim, while the former would not. *Id.* at 344. Here, Plaintiff does not allege that he used Defendants' products in any non-standard way, or that Defendants were aware of any unique purpose. Therefore, he cannot state a claim for breach of implied warranty of fitness for a particular purpose.

### 3. Plaintiff does not adequately plead breach of the implied warranty of merchantability.

Plaintiff's claim for breach of the implied warranty of merchantability fails because he does not adequately allege that Defendants' food and beverage products were not "fit for the ordinary purposes for which such goods are used." 13 Pa. C.S.A. § 2314(b)(3).

Plaintiff does not adequately plead that Defendants' goods were not fit for the ordinary purpose for which they were intended: i.e., to be consumed by purchasers as food. *See Shouey ex. rel. Litz v. Duck Head Apparel Co., Inc.,* 49 F. Supp. 2d 413, 429 (M.D. Pa. 1999). Food and drink are fit for their ordinary purpose so long as they are edible. *See Whitson v. Safeskin Corp.*, 313 F. Supp. 2d 473, 480 (M.D. Pa. 2004); *Andrade-Heymsfield v. NextFoods, Inc.*, 2022 WL 1772262, at *1, *7 (S.D. Cal. Apr. 27, 2022) ("Plaintiff's allegation that the juice drinks are generally harmful to health due to an increased risk of disease is too speculative to support a claim of injury or that the juice drinks are unfit for human consumption."); *see, e.g.*, *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 26–28 (D.D.C. 2007) (dismissing suit against KFC alleging breach of implied warranty of merchantability given KFC did not disclose trans fats in its food). Because Plaintiff does not—and cannot—allege that Defendants' products are unfit for their usual purpose of human consumption, he fails to state a claim for breach of implied warranty.

### 4. Plaintiff fails to plead any express warranty.

An express warranty arises from an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." *Gross v. Stryker Corp.*, 858 F. Supp. 2d 466, 501 (W.D. Pa. 2012) (quoting 13 Pa. C.S.A. § 2313(a)(1)). To establish a claim for breach of express warranty, a plaintiff must allege he "read, heard, saw or knew of the advertisement containing the affirmation of facts or promise." *Kester v. Zimmer Holdings, Inc.*, 2010 WL 2696467, at *10 (W.D. Pa. June 16, 2010).

*First,* Plaintiff does not point to any "promise or affirmative statement" made by any Defendant, or "how or by whom the promise was made." *Gross*, 858 F. Supp. 2d at 502. Instead, the Complaint vaguely alleges that Defendants, as a whole, represented that their products were "safe, wholesome, healthy, protective, child-friendly, and/or natural for frequent ingestion" through various unidentified "public statements, press releases, advertising, marketing materials

and statements." Compl. ¶¶ 563–64. Vague, nonspecific allegations like this are not enough. *See Starks v. Coloplast Corp.*, 2014 WL 617130, at *6 (E.D. Pa. Feb. 18, 2014) (dismissing express warranty claim that alleged generally that product "was advertised, marketed, represented and warranted by Defendant to be of superior quality, and to be reliable for five years" and was "dependable, reliable, and would provide satisfaction"); *Kester*, 2010 WL 2696467, at *11 (dismissing express warranty claim where plaintiff did not "specif[y] any particular promise that formed the basis of her bargain with the Defendants, who are generically and collectively named"). Plaintiff also fails to adequately allege how Defendants' products breached any unspecified warranty. *See Flanagan v. martFIVE, LLC*, 259 F. Supp. 3d 316, 319 (W.D. Pa. 2017).

*Second*, Plaintiff's express warranty claim independently fails because he does not plead reliance. Plaintiff does not allege that he viewed any Defendant's alleged misrepresentation before purchasing any product, much less that he relied on any claims prior to the purchase. *See Conley v. St. Jude Med., LLC*, 482 F. Supp. 3d 268, 278 (M.D. Pa. 2020); *infra* Section VI(D)(1).

### D. All Fraud and Deception-Based Claims Fail for Multiple Reasons (Counts V–VIII).

Plaintiff has asserted a variety of claims purportedly based on alleged misrepresentations and deceptive conduct: negligent misrepresentation (Count V), fraudulent misrepresentation (Count VI), fraudulent concealment (Count VII), and consumer fraud (Count VIII). All of these claims fail because Plaintiff does not allege any specific representation or omission at issue, let alone justifiable reliance on any representation. The fraudulent concealment claim additionally fails because Plaintiff does not plead that Defendants had any duty to disclose information or that he undertook any due diligence to discover the allegedly concealed information.

#### 1. Plaintiff does not adequately allege any false statement or reliance.

Though these four claims have different labels, they share common elements requiring both

a misrepresentation (or deceptive act) and reliance.[21]  Plaintiff has not sufficiently pled either

element under Rule 8, much less under the more stringent particularity requirements of Rule 9(b).

*First*, and crucially, Plaintiff has not identified any specific misrepresentation made by any

Defendant.  He does not point to a single specific label, commercial, or other statement for

purposes of these Counts.  Instead, the Complaint relies on boilerplate allegations that Defendants

"represent[ed] that their UPF have no serious side effects," Compl. ¶ 577 (negligent

misrepresentation), "fraudulently misrepresented the use of their UPF as safe, healthy, child-

friendly, protective, and/or natural," *id.* ¶ 594 (fraudulent misrepresentation), engaged in

unspecified "deceptive conduct," "unlawful acts," and "false and misleading representations and

omissions of material facts," *id.* ¶¶ 622, 625–26 (CPL), and portrayed their products as "cool, fun,

and safe food substances," *id.* ¶ 620 (CPL).  These allegations cannot constitute "specific

misrepresentation[s]" because they provide no notice of the actual statements that supposedly

contained false information.  *See Conquest v. WMC Mortg. Corp.*, 247 F. Supp. 3d 618, 642–43

(E.D. Pa. 2017) (granting motion to dismiss where the plaintiff did not identify the "specific

misrepresentation" challenged); *see also Foge, McKeever LLC v. Zoetis Inc.*, 565 F. Supp. 3d 647,

657 (W.D. Pa. 2021) (allegation that drug was falsely represented as being "safe and effective"

---

[21]  Under Pennsylvania law, a claim for negligent misrepresentation requires:  "(1) a misrepresentation of a material fact; (2) made under circumstances in which the actor should have known of its falsity; (3) with an intent to induce another to act on it; (4) thereby causing injury to a party who justifiably relied upon the misrepresentation."  *Gregg v. Ameriprise Fin., Inc.*, 664 Pa. 567, 581 (Pa. 2021).  The elements of intentional misrepresentation are "nearly identical" to those for negligent misrepresentation, except with a higher *mens rea* requirement.  *Wartluft v. Milton Hershey Sch.*, 354 F. Supp. 3d 584, 593 (M.D. Pa. 2018); *Hart v. Univ. of Scranton*, 838 F. Supp. 2d 324, 328–29 (M.D. Pa. 2011).  In turn, the elements of fraudulent concealment mirror the elements of fraudulent misrepresentation.  *See Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp. 3d 115, 121 (E.D. Pa. 2019).  Finally, to bring a private cause of action under the CPL, as relevant here, Plaintiff must plausibly allege a deceptive act and justifiable reliance that *caused* an ascertainable loss.  *Ahmed v. Wells Fargo Bank, NA*, 432 F. Supp. 3d 556, 564 (E.D. Pa. 2020).

"lack[s] the necessary specificity to allege a claim sounding in fraud").

To the extent the Complaint discusses any specific marketing, Plaintiff does not specify what (if anything) is false or misleading about the advertisements. For example, Plaintiff cites to a couple of YouTube videos involving OREO Cookies, asserting that Mondelēz "targets children with UPF using Super Mario characters, television ads, interactive websites, and co-branding with children's movie characters." Compl. ¶ 263. Similarly, Plaintiff pastes screenshots of videos allegedly from Kraft Heinz that Plaintiff claims "target[] children with UPF marketing including PAW Patrol games, television ads . . . and movie characters." *Id.* ¶ 262. The Complaint also includes screenshots of television ads from Post Holdings that supposedly "encourage[s] children to eat its UPF." *Id.* ¶ 264. But nowhere in the Complaint does Plaintiff specify what is allegedly false or misleading about any of this marketing, rendering it inactionable. Passing references to ads do not state a plausible or particularized claim of deception or fraud.

*Second*, Plaintiff does not allege that he justifiably relied on any statement by any Defendant. Plaintiff does not identify a single advertisement to which he was ever *exposed*, much less relied on in consuming any Defendant's food. *KDH Elec. Sys., Inc. v. Curtis Tech. Ltd.*, 826 F. Supp. 2d 782, 802 (E.D. Pa. 2011) (granting motion to dismiss because the plaintiff "neither demonstrated that the representations . . . were made falsely nor that they justifiably relied on the representations"); *Webb v. Volvo Cars of N.A., LLC*, 2018 WL 1470470, at *6 (E.D. Pa. Mar. 26, 2018) (dismissing claim because plaintiff did not "allege a single actual representation made by [defendant] that she justifiably relied upon"); *Wartluft*, 354 F. Supp. 3d at 594. In fact, in some cases, the brands in the identified advertisements (like Doritos, Cheetos, and Lunchables) do not even match the brands Plaintiff allegedly consumed. Compl. ¶¶ 262, 277, 508(e).

Moreover, despite alleging that Plaintiff was diagnosed with his health conditions while he

was a minor, Compl. ¶ 504, the Complaint alleges *nothing* about which adults were involved in his food decisions, let alone what messages and advertisements those adults viewed or allegedly relied on in purchasing foods, or what those adults told Plaintiff about foods and beverages before he consumed them. The bottom line is that there are *no* allegations to support any claim of justifiable reliance by any purchaser on any representation. *Ahmed*, 432 F. Supp. 3d at 564. Thus, Counts V through VIII must all be dismissed.

### 2. Plaintiff's concealment claim fails for additional reasons (Count VI).

The fraudulent concealment claim fails for two other independent reasons.

*First*, Plaintiff does not plead that a special relationship exists between himself and Defendants "that would give rise to a duty" to reveal any allegedly fraudulently concealed information. *Marcum*, 423 F. Supp. 3d at 121; *N. Penn Towns, LP v. Concert Golf Partners, LLC*, 554 F. Supp. 3d 665, 701 (E.D. Pa. 2021). The Complaint does not allege that the parties—or Defendants and Plaintiff's caregivers during the relevant time period—are in a fiduciary or otherwise special relationship that would trigger a duty to disclose information about Defendants' products. Instead, Plaintiff simply alleges that "Defendants owed consumers, including Plaintiff, a duty to fully and accurately disclose all material facts" regarding Defendants' products. Compl. ¶ 604. That is not the type of special relationship required for a fraudulent-concealment claim. *See Marcum*, 423 F. Supp. 3d at 122 (dismissing concealment claim because "a standard, arms-length business relationship" does not involve a duty to disclose). In any event, there is no allegation that Defendants were not in full compliance with all labeling requirements in effect during any relevant time period. In fact, Plaintiff himself acknowledges that information about Defendants' products can be easily found on their product labels, none of which is alleged to have failed to comply with the numerous regulations governing their contents. Compl. ¶ 60.

*Second*, Plaintiff fails to allege that he exercised any sort of due diligence, as required for

fraudulent-concealment claims under Pennsylvania law. *See In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 749 (E.D. Pa. 2014). Instead, Plaintiff merely repeats that he did not and could not have discovered information about safety risks of so-called "UPFs," Compl. ¶ 609, without any detail or particularity required to state a fraudulent concealment claim. *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d at 749. That is implausible given that the Complaint itself points to publicly available information about purported "UPFs," such as articles and nutrition labels.

In sum, Plaintiff's attempt to flood the Complaint with irrelevant examples of isolated advertisements—with no plausible allegations that any of the material within them was false *or* that Plaintiff himself ever saw or relied on them—cannot support the deception or fraud-based claims included in the Complaint.

### E.  Plaintiff Does Not Allege Any Defendant Was Unjustly Enriched (Count IX).

Under Pennsylvania law, unjust enrichment is "essentially an equitable doctrine" consisting of the following elements:  "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Albertson v. Wyeth Inc.*, 63 Pa. D. & C.4th 514, 536 (Pa. Ct. C.P. 2003).

Plaintiff's unjust enrichment claim fails for a simple reason:  he "received and used the product at issue," which bars such a claim under Pennsylvania law. *Drumheller v. Johnson & Johnson*, 2021 WL 1853407, at *17 (E.D. Pa. May 10, 2021); *see also In re Philips Recalled CPAP, Bi-Level PAP, & Ventilator Prods. Litig.*, 2023 WL 7019287, at *43 (W.D. Pa. Sept. 28, 2023) ("[R]ecognizing the incongruity of a claim for unjust enrichment in the context of a personal injury action, it will be recommended that the Court dismiss, with prejudice, Plaintiffs' claim for unjust enrichment."); *Mazur v. Milo's Kitchen, LLC*, 2013 WL 3245203, at *10 (W.D. Pa. June 25, 2013); *McGrain*, 551 F. Supp. 3d at 546.

Further, as multiple courts have recognized, merely alleging that a product was not safe cannot support a claim for unjust enrichment under Pennsylvania law. *See Vey v. Amazon.com*, 2024 WL 2396840, at *4 (W.D. Pa. May 23, 2024); *Tatum v. Takeda Pharms. N. Am., Inc.*, 2012 WL 5182895, at *5 (E.D. Pa. Oct. 19, 2012); *In re Avandia Mktg., Sales Prac. & Prod. Liab. Litig.*, 2011 WL 4007908, at * 2 (E.D. Pa. Sept. 7, 2011) (allegations that the product at issue was not safe failed to state a claim for unjust enrichment where the plaintiff received the product for which he paid); *Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 561 (E.D. Pa. 2010).

Pennsylvania courts also recognize that, generally, when a Plaintiff has no "viable underlying tort claim," he "cannot proceed with [a] standalone unjust enrichment claim[]." *Plumbers' Local Union No. 690 Health Plan v. Apotex Corp.*, 2017 WL 4235773, at *10–*11 (E.D. Pa. Sept. 25, 2017); *see also Liberty Mut. Grp., Inc. v. 700 Pharmacy, LLC*, 270 A.3d 537, 554 (Pa. Super. Ct. 2022). Thus, the Court should dismiss Plaintiff's claim for unjust enrichment.

## F. Plaintiff's Conspiracy (Count X) and Concerted Action (Count XI) Claims Are Not Adequately Pled.

Plaintiff's claims for conspiracy and concerted action against six of eleven Defendants are as deficient as his others.[22] "In Pennsylvania, 'to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.'" *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (affirming dismissal of conspiracy claim for failure to plead essential elements). To prevail on a claim for concerted action, a plaintiff must plead that the defendants: (1) worked together or shared a plan to commit

---

[22] As previously noted, the six Subgroup Defendants are: The Kraft Heinz Company, Mondelēz International, Inc., Post Holdings, Inc., The Coca-Cola Company, General Mills, Inc., and Mars, Incorporated.

a tortious act; (2) knew each of the other defendants was acting wrongfully and actively encouraged the other; or (3) provided significant help to each other in causing the harm. *See Burnside v. Abbott Lab'ys*, 505 A.2d 973, 982 (Pa. Super. Ct. 1985) (citing Restatement (Second) of Torts § 876)). These elements must be pled with "specificity." *See In re Orthopedic Bone Screw Prods. Liab. Litig. ("Bone Screw Litigation")*, 1996 WL 482977, at *7 (E.D. Pa. Aug. 22, 1996). Plaintiff has not pled these essential elements under any pleading standard for multiple reasons.

### 1. Plaintiff has not alleged an underlying tort.

Conspiracy and concerted action claims "cannot survive without an underlying tort." *Woodward v. Nudy*, 2025 WL 662802, at *5 (E.D. Pa. Feb. 28, 2025) (dismissing conspiracy and concerted action claims because underlying conversion and fraud claims failed as a matter of law); *see also Sarpolis v. Tereshko*, 625 F. App'x 594, 601 (3d Cir. 2016) (affirming dismissal of conspiracy claim because "the underlying claim of fraud is time-barred"). As previously discussed, Plaintiff has failed to plausibly plead that any Defendant engaged in any tortious conduct. In particular, Plaintiff has engaged in improper group pleading, has failed to tie even a single food manufactured by any Defendant to his alleged injuries, and has not identified a particular misstatement by any Defendant or reliance by Plaintiff on such a representation, let alone satisfied the heightened particularity requirement of Rule 9(b). These fundamental pleading deficiencies require dismissal of Plaintiff's claims for conspiracy and concerted action.

### 2. Plaintiff has not alleged actual malice.

Plaintiff's conspiracy and concerted action causes of action also fail because he has not adequately alleged that Defendants acted with actual malice. As this Court has recognized, "[p]roof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *WSFS Fin. Corp. v. Cobb*, 2023 WL 4552110, at *13 (E.D. Pa. July 14, 2023) (Perez, J.); *see also Burnside*, 505

A.2d at 982 (concerted action must be "founded upon some blameworthy conduct").  "'Malice requires an allegation that *the sole purpose of the conspiracy was to injure the plaintiff*,' and that this intent was without justification."  *WSFS Fin. Corp.*, 2023 WL 4552110, at *13 (emphasis added).  A plaintiff must, therefore, do more than plead that product manufacturers acted to obtain a financial gain.  *See Swartzbauer v. Lead Indus. Ass'n Inc.*, 794 F. Supp. 142, 144–45 (E.D. Pa. 1992) (dismissing conspiracy claim because allegations that defendants acted for their "economic and pecuniary benefit" foreclosed any inference that the "object of [the] . . . agreement was to injure plaintiffs"); *Corrigan v. Methodist Hosp.*, 853 F. Supp. 832, 837 (E.D. Pa. 1994) (dismissing conspiracy claim that physicians agreed to circumvent FDA restrictions on medical device use so they could realize "increased revenues," as "[t]he mere fact that the defendants derive[d] a financial benefit" did not "impute malice").

Here, the Complaint does not plead that the Defendants sued in Counts X and XI acted with any—much less the "sole"—purpose of injuring Plaintiff.  To the contrary, the Complaint explicitly pleads that they acted "to advance their financial interests[.]"  Compl. ¶ 642 (conspiracy); *see also id.* ¶ 662 (claiming the Defendants sought "to increase sales and ingestion of UPF by children") (concerted action).  These allegations belie the notion that the Subgroup Defendants acted with the specific intent to injure Plaintiff.

### 3.  Plaintiff does not plausibly allege an agreement.

Finally, Plaintiff fails to plausibly allege the most basic element of conspiracy or concerted action: an agreement.  Conspiracy and concerted action must rest on more than "[t]he mere fact that two or more persons . . . happen to do that thing at the same time."  *Petula v. Mellody*, 588 A.2d 103, 107 (Pa. Commw. Ct. 1991) (sustaining preliminary objections to conspiracy claim for failure to sufficiently plead an agreement).  Accordingly, "parallel and imitative" manufacturing or marketing by members of an industry does not rise to the level of concerted or conspiratorial

conduct. *See Burnside*, 505 A.2d at 984 (Plaintiffs "have charged the defendants merely with 'parallel and imitative' conduct" in failing to adequately test prescription drug and to provide adequate warnings). Rather, a plaintiff must allege "joint" conduct, such as "meetings, conferences, telephone calls" and the like, evincing "the manner in which a conspiratorial scheme was devised and carried out." *Id.* at 982; *see also In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1294 (3d Cir. 1994) ("follow[ing] the Superior Court's decision in *Burnside*" in holding that conspiracy and concerted action claims could not be "based solely on the alleged fact that Pfizer and the other defendants consciously engaged in parallel conduct" in selling asbestos-containing products without proper warnings).

For example, in the *Bone Screw Litigation*, the court rejected an attempt to "recover from the entire spinal fixation device industry under the theor[y] that all of its members engaged in conspiracy [and] concert of action" by engaging in parallel conduct. 1996 WL 482977, at *1. In that case, the plaintiffs alleged that the manufacturers had "acted in agreement" to misrepresent the safety and efficacy of purportedly defective pedicle screw devices "so as to create an illegal market for the [products]" and promote "their own economic gain." *Id.* at *8. The court determined that these allegations "[did] not state a conspiracy claim" even under the then-controlling "no set of facts" pleading standard. *Id.*

The same logic forecloses Plaintiff's conspiracy and concerted action claims, which are subject to the Supreme Court's more stringent pleading requirements set forth in *Iqbal* and *Twombly*. As in the *Bone Screw Litigation*, Plaintiff's conspiracy and concerted action allegations are directed at "the UPF industry" writ large. Compl. ¶ 468. Plaintiff does not identify its members, specify when the Defendants sued under these counts joined the purported "conspiracy," delineate the members' alleged conduct, or explain why competitors' "goal of driving

47

consumption, and defendants' profits" is anything more than parallel conduct.  *See id.* ¶ 12; *see also id.* ¶¶ 446–502 (similar allegations).  Instead, Plaintiff generically alleges that "UPF companies" spent money lobbying or sponsoring scientific research.  *See, e.g.*, *id.* ¶¶ 471 (political lobbying), 473 (scientific research).  Putting aside that lobbying governments and spending money on research are constitutionally protected forms of speech and not somehow nefarious, *see In re Asbestos Sch. Litig.*, 46 F.3d at 1294, there is no allegation that any alleged conspirator entered into any agreement with another to engage in this conduct.

The closest Plaintiff comes to even attempting to plead an agreement is claiming that some executives once "sat together in the same room" and "were told" of one individual's suspicions. Compl. ¶¶ 497–98.  Even if that were true, the critical point for purposes of this motion is that Plaintiff expressly acknowledges that "[n]othing was done"—i.e., the meeting did not lead to any agreement among the attendees and "the UPF industry continued" doing what unspecified companies had been doing before the meeting.  *Id.* ¶ 467.  In other words, Plaintiff does not even suggest (much less plausibly plead) that any of the attendees' companies developed, marketed, or sold products in any way other than one that followed from preexisting competition.  Simply put, the lynchpin of Plaintiff's conspiracy/concerted action theory—a 1999 meeting—forecloses the notion of any agreement among the Defendants sued under Counts X and XI.

In short, Plaintiff has done nothing more than vaguely describe competitors' participation in the ever-evolving food market, which falls far short of pleading a concrete agreement, let alone an agreement to commit a tortious act.

## CONCLUSION

Because Plaintiff's professed concerns about the broad, sweeping universe of processed foods lack any allegations that tie specific products—what he ate, when he ate them, what they contained—to his alleged health conditions, he has not plausibly pled that any product or any

Defendant caused him harm.  Plaintiff's theories underlying the Complaint are not cognizable under federal and Pennsylvania law.  The Complaint should be dismissed in its entirety with prejudice.

Dated: March 31, 2025

Respectfully submitted,

/s/ *Will W. Sachse*
Will W. Sachse
Hope S. Freiwald
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
215-994-2496
215-994-2514
will.sachse@dechert.com
hope.freiwald@dechert.com

Andrew S. Tulumello (*pro hac vice*)
Arianna M. Scavetti (*pro hac vice*)
Weil, Gotshal & Manges LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
202-682-7000
drew.tulumello@weil.com
arianna.scavetti@weil.com

Brian G. Liegel (*pro hac vice*)
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
305-577-3180
brian.liegel@weil.com

*Counsel for Defendant PepsiCo, Inc.*

/s/ *Chanda A. Miller*
Chanda A. Miller (Pa. Id. No. 206491)
Cathryn N. Ryan (Pa. Id. No. 327466)
BARNES & THORNBURG LLP
Three Logan Square
1717 Arch Street, Suite 4900
Philadelphia, PA 19103
Tel: (445) 201-8900

Fax: (445) 201-8901
Email:  chanda.miller@btlaw.com
         cathryn.ryan@btlaw.com

Michelle A. Ramirez (*admitted pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
Email:  michelle.ramirez@sidley.com

Heidi Levine (*admitted pro hac vice*)
Alan E. Rothman (*admitted pro hac vice*)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 839-5300
Fax: (212) 839-5599
Email:  hlevine@sidley.com
         arothman@sidley.com

Christopher A. Eiswerth
   (*pro hac vice application pending*)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711
Email: ceiswerth@sidley.com

*Counsel for Defendant The Kraft Heinz Company, incorrectly named as Kraft Heinz Company, Inc.*

/s/ Allison M. Brown
ALLISON M. BROWN
Alli.Brown@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4757
Facsimile: (212) 446-4900

*Counsel for Defendant Mondelēz*
*International, Inc.*

*/s/ Sarah L. Brew*
David F. Abernethy (PA Attorney ID
36666)
Benjamin R. Grossman (PA Attorney ID
329219)
FAEGRE DRINKER BIDDLE & REATH
LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
Fax: (215) 988-2757
Email: david.abernethy@faegredrinker.com
Email: ben.grossman@faegredrinker.com

Sarah L. Brew (pro hac vice)
Tyler A. Young (pro hac vice)
Rory F. Collins (pro hac vice)
FAEGRE DRINKER BIDDLE & REATH
LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Tel: (612) 766-7000
Fax: (612) 766-1600
Email: sarah.brew@faegredrinker.com
Email: tyler.young@faegredrinker.com
Email: rory.collins@faegredrinker.com

*Counsel for Defendant Post Holdings, Inc.*

*/s/ Angela M. Spivey*
Angela M. Spivey
Alston & Bird LLP
1201 West Peachtree St.
Atlanta, GA 30309
(404) 881-7857
angela.spivey@alston.com

*Counsel for Defendant The Coca-Cola*
*Company*

*/s/ Tiffany M. Alexander*
Tiffany M. Alexander (PA Atty ID 88681)

Nelson Mullins Riley & Scarborough LLP
1000 Westlakes Drive, Suite 275
Berwyn, PA 19312
Telephone:  (610) 943-5351
Tiffany.alexander@nelsonmullins.com

*/s/ S. Jamal Faleel*
Jamal Faleel (admitted pursuant to CivLR
83.5.2(b))
Norton Rose Fulbright US LLP
60 South Sixth Street, Suite 3100
Minneapolis, MN 55402
(612) 321-2271
jamal.faleel@nortonrosefulbright.com

*Counsel for Defendant General Mills, Inc.*

*/s/ Jasmeet K. Ahuja*
Jasmeet K. Ahuja (Pa Id 322093)
Hogan Lovells US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
T: (267) 675-4667
F: (267) 675-4601
jasmeet.ahuja@hoganlovells.com

*Counsel for Defendant Nestlé USA, Inc.*

*/s/ Perlette M. Jura*
Perlette M. Jura (*pro hac vice*)
Michael Holecek (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
pjura@gibsondunn.com

Elizabeth P. Papez (*pro hac vice*)
Jason R. Meltzer (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: (202) 955-8500
epapez@gibsondunn.com

Frederick P. Santarelli
ELLIOTT GREENLEAF
Union Meeting Corporate Center V
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
Telephone: 215-977-1024
FPSantarelli@elliottgreenleaf.com

*Counsel for Defendant Kellanova*

*/s/ John S. Stapleton*
John S. Stapleton
STAPLETON SEGAL COCHRAN LLC
1760 Market Street, Suite 403
Philadelphia, PA 19103
(215) 561.1500
jstapleton@stapletonsegal.com

Dean N. Panos
John F. Ward, Jr.
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654-4704
(312) 222-9359
dpanos@jenner.com
jward@jenner.com

*Counsel for Defendant WK Kellogg Co*

*/s/ Stephen J. Finley*
Stephen J. Finley (PA ID No. 200890)
GIBBONS P.C.
One Logan Square, Suite 1210
Philadelphia, PA 19103-2757
Telephone: (215) 446-6265
Email: sfinley@gibbonslaw.com

Dane H. Butswinkas
Paul E. Boehm
Williams & Connolly LLP
680 Maine Ave, S.W.
Washington, DC 20005
202-434-5110
dbutswinkas@wc.com

pboehm@wc.com

*Counsel for Defendant Mars Incorporated, Inc.*

*/s/ Stephen J. McConnell*
Stephen J. McConnell
Heather A. Ritch Rocks
Michael J. Salimbene
REED SMITH LLP
Three Logan Square, 1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Email: smcconnell@reedsmith.com
Email: hritchrocks@reedsmith.com
Email: msalimbene@reedsmith.com

Melissa A. Geist
REED SMITH LLP
506 Carnegie Center, Suite 300
Princeton, NJ 08540
Tel: (609) 987-0050
Email: mgeist@reedsmith.com

*Counsel for Defendant Conagra Brands, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2025, the foregoing was served via the Court's ECF system on all counsel of record.

<u>*/s/ Will W. Sachse*</u>
Will W. Sachse