# EXHIBIT A

**MORGAN & MORGAN**
K. Clancy Boylan, Esq.,
2005 Market Street, St. 350
L. BREWINGTON
Philadelphia, PA 19103
(215) 446-9795
(215) 446-9799 (Fax)
cboylan@forthepeople.com
www.forthepeople.com

**MORGAN & MORGAN**
T. Michael Morgan, Esq.,*
FL Bar No. 62229
20 N Orange Ave., Suite 1600
Orlando, FL 32801
(407) 418-2031
(407) 245-3384 (Fax)
mmorgan@ForThePeople.com
www.forthepeople.com

**SEEGER WEISS LLP**
Dave Buchanan, Esq.
dbuchanan@seegerweiss.com
Frazar Thomas, Esq.,
ID. No. 325478
fthomas@seegerweiss.com
325 Chestnut Street
Suite 917
Philadelphia, PA 19106
T 973-639-9100
F 973-679-8656

**MORGAN & MORGAN**
Rene F. Rocha, Esq.,*
400 Poydras Street, Suite 1515
New Orleans, LA 70130
(504) 636-6310
(504) 636-6301 (Fax)
rrocha@forthepeople.com
www.forthepeople.com

**SEEGER WEISS LLP**
Christopher A. Seeger, Esq.,*
NJ Bar No. 042631990
cseeger@seegerweiss.com
Parvin K. Aminolroaya, Esq.*
NJ Bar No.028492008
paminolroaya@seegerweiss.com
55 Challenger Road
Ridgefield Park, NJ 07660
(212) 584-0700
(212) 584-0799 (Fax)
www.seegerweiss.com

**MORGAN & MORGAN**
Frank Petosa, Esq.,*
FL Bar No. 972754
8151 Peters Road, Suite 4000
Plantation, FL 33324
(954) 318-0268
(954) 327-3018 (Fax)
fpetosa@forthepeople.com
www.forthepeople.com

*Attorneys for Plaintiff*

*\*Pending Admission Pro Hac Vice*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRYCE MARTINEZ** | CASE NO. 2:25-CV-00377 |
| *Plaintiff,* | ~~IN THE COURT OF COMMON PLEAS~~ ~~OF PHILADELPHIA COUNTY~~ |
| v. | ~~CIVIL ACTION – LAW~~ ~~JURY TRIAL DEMANDED~~ |

| | |
|---|---|
| **KRAFT HEINZ COMPANY, INC.**<br>One PPG Place,<br>Pittsburgh, Pennsylvania 15222 | ~~**DECEMBER TERM, 2024**~~<br><br>~~**CIVIL NO.**~~**Hon. Mia Roberts Perez** |

*and*

**MONDELEZ INTERNATIONAL, INC.**
905 West Fulton Market, Suite 200,
Chicago, Illinois 60607

*and*

**POST HOLDINGS, INC.**
2503 S. Hanley Road,
St. Louis, Missouri 63144

*and*

**THE COCA-COLA COMPANY**
One Coca-Cola Plaza,
Atlanta, Georgia 30313

*and*

**PEPSICO, INC.**
700 Anderson Hill Road,
Purchase, New York 10577

*and*

**GENERAL MILLS, INC.**
Number One General Mills Boulevard,
Minneapolis, Minnesota 55426

*and*

**NESTLE USA, INC.**
812 N. Moore Street,
Arlington, Virginia, 22209

*and*

**KELLANOVA**
412 N. Wells Street,
Chicago, Illinois 60654

*and*

**WK KELLOGG CO.**
One Kellog Square,
Battle Creek, Michigan 49017

*and*

**MARS INCORPORATED, INC.**
6885 Elm Street,
McLean, Virginia 22101

*and*

**CONAGRA BRANDS, INC.**
222 W. Merchandise Plaza, Suite 1300,
Chicago, Illinois 60654

*Defendants.*

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br>THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES | Le han demandado en corte. Si usted quiere defenderse contra las demandas nombradas en las páginas siguientes, tiene veinte (20) dias, a partir de recibir esta demanda y la notificatión para entablar personalmente o por un abogado una comparecencia escrita y tambien para entablar con la corte en forma escrita sus defensas y objeciones a las demandas contra usted. Sea avisado que si usted no se defiende, el caso puede continuar sin usted y la corte puede incorporar un juicio contra usted sin previo aviso para conseguir el dinero demandado en el pleito o para conseguir culquier otra demanda o alivio solicitados por el demandante. Usted puede perder dinero o propiedad u otros derechos importantes para usted.<br><br>USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARA PARGAR A UN ABOGADO), VAYA EN PERSONA O LLAME POR TELEFONO LA OFICINA NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASSISTENCIA LEGAL<br><br>ESTA OFICINA PUEDE PROPORCIONARLE LA |

| | |
|---|---|
| THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.<br><br>PHILADELPHIA BAR ASSOCIATION LAWYER REFERRAL and INFORMATION SERVICE<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-1701 | INFORMACION SOBRE CONTRATAR A UN ABOGADO. SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCIONARLE INFORMACION SOBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOS REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO.<br><br>ASSOCIACION DE LICENDIADOS DE FILADELFIA<br>SERVICO DE REFERENCA E INFORMACION LEGAL<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telefono: (215) 238-1701 |

v

vi

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................ 1

PARTIES ........................................................................................... 7

JURISDICTION & VENUE ............................................................... 9

STATEMENT OF FACTS ................................................................ 10

I.    Ultra-Processed Foods ............................................................ 10

II.   Fruits of the Poisonous Tree—Big Tobacco Infects our Food Environment ...................... 23

III.  UPF are Addictive Substances .............................................. 36

IV.   Preying on the Vulnerable: Defendants Target Children with Marketing for Dangerous UPF ...................................... 53

V.    A Banquet of Consequences—UPF Companies have Unleashed Immense Harm on American Children ....................... 71

VI.   Decades of Warnings Ignored: Defendants had Every Reason to Know that their Conduct Would Gravely Wound America's Children ...................... 79

VII.  The International Consensus: UPF are Uniquely Harmful, Require Warnings, and Should Not be Marketed to Children ........................ 96

VIII. The Meeting in Minneapolis: Defendants' Conspiracy Against American Children ......... 106

IX.   Defendants' Tortious Actions caused Plaintiff Bryce Martinez to Develop Type 2 Diabetes & Fatty Liver Disease During his Childhood ....................... 117

Kraft Heinz .................................................................................... 119

Mondelez ....................................................................................... 172

Post Holdings ................................................................................ 201

Coca-Cola ..................................................................................... 210

PepsiCo .......................................................................................... 225

General Mills ................................................................................. 263

Nestle ............................................................................................. 302

Kellogg's ....................................................................................... 337

ConAgra ......................................................................................... 372

Mars ............................................................................................... 403

COUNT I—NEGLIGENCE .......................................................... 419

COUNT II—FAILURE TO WARN ............................................... 424

COUNT III—BREACH OF IMPLIED WARRANTY .................... 428

COUNT IV—NEGLIGENT MISREPRESENTATION .................. 431

COUNT V—FRAUDULENT NON-DISCLOSURE .................................................................. 434

COUNT VI—FRAUDULENT CONCEALMENT .................................................................. 438

COUNT VII—VIOLATION OF UNFAIR TRADE PRACTICES & CONSUMER
    PROTECTION LAW .................................................................. 441

COUNT VIII—UNJUST ENRICHMENT .................................................................. 444

COUNT IX—CONSPIRACY .................................................................. 447

COUNT X—CONCERTED ACTION .................................................................. 450

ALLEGATIONS PERTAINING TO PUNITIVE DAMAGES .................................................................. 452

## ~~CIVIL ACTION~~FIRST AMENDED COMPLAINT

Now comes Plaintiff Bryce Martinez, against Defendants The Kraft Heinz Company~~, Inc.~~ ("Kraft Heinz"), Mondelez International, Inc. ("Mondelez"), Post Holdings, Inc. ("Post Holdings"), The Coca-Cola Company ("Coca-Cola"), PepsiCo, Inc. ("PepsiCo"), General Mills, Inc. ("General Mills"), Nestle USA, Inc. ("Nestle"), Kellanova, WK Kellogg Co., Mars Incorporated, Inc. ("Mars"), and ConAgra Brands, Inc. ("ConAgra") (collectively, "Defendants"), who alleges as follows:

### INTRODUCTION

1.      In the United States of America, one of the greatest threats to our health, and the health of our children, are the substances that dominate the shelves of our grocery stores: ultra-~~ultra~~processed foods.

2.      Ultra-processed foods ("UPF") are industrially produced edible substances that are imitations of food.[1] They consist of former foods that have been fractioned into substances, chemically modified, combined with additives, and then reassembled using industrial techniques such as molding, extrusion and pressurization.[2]

3.      UPF are alien to prior human experience. They are inventions of modern industrial technology and contain little to no whole food.[3] However, the prevalence of these foods exploded in the 1980s, and have come to dominate the American food environment and the American diet.

---

[1] Carlos A. Monterio et al., *Ultra-processed foods, diet quality, and health using the NOVA classification system*, Food and Agriculture Organization of the United Nations, 2019; Carlos A. Monterio et al., *Ultra-processed foods: what they are and how to identify them*, Public Health Nutr., Apr. 2019; Dr. Jean-Claude Moubarac, *Ultra Processed Food and Drink Products in Latin America: Trends, impact on obesity, policy implications*, Pan American Health Organization, at 6-8, 2015; Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 33, 155, (2023).
[2] Id.
[3] Id.

The issue is particularly pronounced in children, who now derive over 2/3 of their energy from UPF on average.[4]

4.    The explosion and ensuing rise in UPF in the 1980s was accompanied by an explosion in obesity, diabetes, and other life-changing chronic illnesses.[5]

5.    During this timeframe, diseases that had been largely confined to elderly alcoholics, such as Type II Diabetes and Fatty Liver Disease, emerged in children.[6] Although such diseases were unheard of in children 40 years ago, they are now common, and treating them constitutes a large fraction of pediatric medical practice.

6.    The human genome did not experience a catastrophic failure or paradigmatic shift during this timeframe. Similarly, the explosion of these diseases cannot be explained by a massive nationwide failure of personal responsibility that began in the 1980s. Instead, something else happened in the 1980s.

7.    In the 1980s, Big Tobacco took over the American food environment. Phillip Morris bought major US food companies, including General Foods and Kraft.[7] RJ Reynolds purchased Nabisco, Del Monte, Kentucky Fried Chicken, and others.[8]

---

[4] Lu Wang et al., *Trends in Consumption of Ultraprocessed Foods Among US Youths Aged 2-19 Years, 1999-2018*, JAMA, Aug. 2021.

[5] Regina M. Benjamin, *United States Surgeon General's Vision for a Healthy and Fit Nation*, Public Health Rep., Jul. 2010.

[6] Heather J. Dean & Elizabeth Sellers, Children have Type 2 Diabetes too, a historical perspective, Biochem Cell Biol, Oct. 2015; Ariana Eunjung Cha, *Fatty liver disease rising in U.S. kids as Ultra-Processed Diets Surge*, Washington Post, Oct. 3, 2023.

[7] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023; Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at 122-123, (2013).

[8] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System, Addiction, Sept. 2023.

2

8.      Collectively, Phillip Morris and RJ Reynolds dominated the US food system for decades.[9] During this time, they used their cigarette playbook to fill our food environment with addictive substances that are aggressively marketed to children and minorities.

9.      UPF formulation strategies were guided by the same tobacco company scientists and the same kind of brain research on sensory perceptions, physiological psychology, and chemical senses that were used to increase the addictiveness of cigarettes.

10.      Studies of how electrical messages are transmitted throughout the central nervous system are used to formulate UPF products. For example, scientists who supervised human electrode tests on nicotine's addictiveness at a secret Phillip Morris laboratory in Germany regularly consulted with Kraft and General Foods on the development of UPF.[10]

11.      In doing so, Big Tobacco companies intentionally designed UPF to hack the physiological structures of our brains.[11]

12.      These formulation strategies were quickly adopted throughout the UPF industry, with the goal of driving consumption, and Defendants' profits, at all costs. The same MRI machines used by scientific researchers to study potential cures for addiction are used by UPF companies to engineer their products to be ever more addictive.[12]

13.      At the same time, Big Tobacco repurposed marketing strategies designed to sell cigarettes to children and minorities, and aggressively marketed UPF to these groups.[13] As a Phillip

---

[9] Id.

[10] Patricia Callahan, *Where there's smoke, there might be food research, too*, Chicago Tribune, Jan. 29, 2006; Interoffice Memo, F. P Gullotta, R. D. Kisner, (Oct. 22, 1991); Interoffice Memo, F. P Gullotta, Dr. R. A Carchman, (Mar. 22, 1991); Interoffice Memo, C. S. Hayes, R. D. Kisner, (Mar. 26, 1991); Interoffice Memo, F. P. Gullota et al., C. K. Ellis, (Nov. 8, 1990).

[11] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

[12] Laura Schmidt, *Why we can't stop eating unhealthy foods*, Nov. 2015. https://www.youtube.com/watch?v=wTNlHyjip94.

[13] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.

Morris executive boasted at a UPF industry conference, "We've decided to focus our marketing on kids where we know our strength is the greatest".[14]

14. The rest of the UPF industry quickly followed suit, taking a very well-evolved marketing strategy to sell things that make people sick and applying it from one substance, cigarettes, to another: UPF.[15] The UPF industry now spends about $2 billion each year marketing UPF to children.[16]

15. These strategies have had their intended effect. UPFs meet all the scientific criteria that were used to determine that tobacco products are addictive.[17] Like industrial tobacco products, UPFs trigger compulsive use, have psychoactive effects, are highly reinforcing, and trigger strong urges and cravings.[18]

16. Meanwhile, sales have surged. UPFs have displaced traditional foods and now constitute the vast majority of children's diets.

17. While the multinational UPF companies get richer, Americans get sicker.

18. We are all living with the devastating consequences of defendants' actions. The United States is beset by concurrent epidemics of obesity, diabetes, heart disease, and other conditions.[19] Obesity has doubled among adults and tripled among children.[20] The number of

---

[14] Andrew Jacobs, *How Big Tobacco Hooked Children on Sugary Drinks*, New York Times, Mar. 14, 2019

[15] Sarah Berry, *More of us are turning away from our 'vices'. But will it make a difference?*, The Sydney Morning Herald, Nov. 11, 2023.

[16] Center for Science in the Public Interest, *Food Marketing to Children*, (2013), https://www.foodmarketing.org/wp-wp-content/uploads/2013/10/food marketing to children factsheet 2013food_marketing_to_children_factsheet_2013.pdf.

[17] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Apr. 2023.

[18] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.

[19] Regina M. Benjamin, *United States Surgeon General's Vision for a Healthy and Fit Nation*, Public Health Rep., Jul. 2010.

[20] Id.

Americans with Type 2 Diabetes has tripled since 1980.[21] Rates of colorectal cancer have doubled in younger adults.[22]

19.    For the first time ever, Type 2 Diabetes and Non-Alcoholic Fatty Liver Disease emerged in adolescents around the turn of the millennium.[23] The rates of these diseases in children are now surging, with rates of both doubling in recent years.[24] Non-Alcoholic Fatty Liver Disease is now as common in children as asthma.[25]

20.    Scores of high-quality human studies have demonstrated that UPF significantly increase the risks of obesity, Type 2 Diabetes, non-alcoholic fatty liver disease, cancers, cardiovascular disease, cerebrovascular disease, irritable bowel disease, dementia, mental health outcomes, mortality, and other serious chronic illnesses.

21.    However, these same studies demonstrate that UPF increase these risks independently of their nutritional profiles. Even after adjustment for the fat, sugar, salt, carbohydrates, and other nutrient profiles, UPF still cause significant health risks.

22.    In other words, UPF are dangerous not only because they are designed to hack our physiological nervous system and are aggressively marketed to children. The risks caused by UPF cannot be avoided simply by choosing healthier UPF with less fat, sugar, salt, carbohydrates, or different nutrient profiles. Likewise, UPF does not increase the risks of other conditions simply because it causes obesity.

---

[21] Id.

[22] Rebecca L. Siegel et al., *Colorectal Cancer Statistics*, CA Cancer J Clin., May 2023.

[23] Heather J. Dean & Elizabeth Sellers, *Children have Type 2 Diabetes too, a historical perspective*, Biochem Cell Biol, Oct. 2015; Ariana Eunjung Cha, *Fatty liver disease rising in U.S. kids as Ultra-Processed Diets Surge*, Washington Post, Oct. 3, 2023.

[24] Jean M. Lawrence, *Trends in Prevalence of Type 1 and Type 2 Diabetes in Children and Adolescents in the US, 2001-2017*, JAMA, Aug. 2021; Children's Health, *Fatty liver disease in children is on the rise*, (Last updated 2024), https://www.childrens.com/health-wellness/fatty-liver-disease-in-children-on-the-rise; Ariana Eunjung Cha, *Fatty liver disease rising in U.S. kids as Ultra-Processed Diets Surge*, Washington Post, Oct. 3, 2023.

[25] Ariana Eunjung Cha, *Fatty liver disease rising in U.S. kids as Ultra-Processed Diets Surge*, Washington Post, Oct. 3, 2023.

23.    Instead, UPF increase the risks of disease *because* they are ultra-processed, not because of how many grams of certain nutrients they contain or how much weight gain they cause. Therefore, even attempts to eat healthfully are undermined by the ultra-processed nature of UPF. One cannot evade the risks caused by UPF simply by selecting UPF with lower calories, fat, salt, sugar, carbohydrates, or other nutrients.

24.    The UPF industry is well aware of the harms they are causing and has known it for decades. But they continue to inflict massive harm on society in a reckless pursuit of profits.

25.    In April 1999, the CEOs of America's largest UPF companies attended a secret meeting in Minneapolis to discuss the devastating public health consequences of UPF and their conduct.[26] At that meeting, a Kraft executive told the other CEOs in attendance that obesity was reaching epidemic proportions, especially among children, who were "at a higher risk of developing chronic diseases such as diabetes, heart disease, hypertension and cancer".[27]

26.    This same executive informed the others that their companies were collectively driving this, costing the U.S. upwards of $100 billion a year, and inflicting a toll on public health rivaling that of tobacco.[28]

27.    He then implored the attendees to change their ways before this became a crisis for the UPF industry, asking rhetorically, "With all this, can the trial lawyers be far behind?"[29]

28.    But nothing changed as a result of that meeting, and the UPF industry has carried on inflicting massive social harm on our health and our children for the last 25 years.

---

[26] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, (2013); Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).

[27] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, (2013); Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).

[28] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, (2013); Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).

[29] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, (2013); Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999)

29.     Plaintiff Bryce Martinez is one of many casualties of defendants' predatory profiteering. Defendants targeted Plaintiff with marketing campaigns intended to increase his consumption of their UPF, which Defendants engineered to have addictive qualities.

30.     Due to Defendants' conduct, Plaintiff regularly, frequently, and chronically ingested their UPF, which caused him to contract Type 2 Diabetes and Non-Alcoholic Fatty Liver Disease at the age of 16. Plaintiff is now suffering from these devastating diseases, and will continue to suffer for the rest of his life.

31.     Plaintiff brings this action to recover the damages Defendants have inflicted upon him, as well as all additional damages available under applicable law.

**PARTIES**

32.     Plaintiff Bryce Martinez is a citizen of Pennsylvania and lives in Bucks County, Pennsylvania. As a result of Defendants' conduct, Plaintiff has been exposed to harmful levels of UPF, and has suffered the injuries alleged herein. Plaintiff was exposed to Defendants' conduct in Philadelphia County, and was diagnosed and treated for his injuries in Philadelphia County.

33.     Defendant The Kraft Heinz Company, Inc. ("Kraft Heinz") is a Delaware corporation with. Although Kraft Heinz states in SEC filings that its principal executive offices are in Pittsburgh, Pennsylvania, Kraft Heinz has alleged in this litigation that its principal place of business and headquarters are located at One PPG Place, Pittsburgh, Pennsylvania 15222in Chicago, Illinois. See ECF no. 1 at paragraphs 21-26.

34.     Kraft Heinz is a successor to Philip Morris Companies, Inc., Altria Group, Inc., Kraft General Foods Inc., Kraft Foods Group, Inc., Kraft Foods, Inc. and H.J. Heinz Company.

35.     Defendant Mondelez International, Inc. ("Mondelez") is a Virginia corporation with its principal place of business and headquarters located at 905 West Fulton Market, Suite 200, Chicago, Illinois 60607.

36.     Mondelez is a successor to R.J. Reynolds Industries Inc., RJR Nabisco Holdings Corp., Nabisco Holdings Corp., Philip Morris Companies, Inc., Altria Group, Inc., Kraft General Foods Inc., Kraft Foods Group, Inc., and Kraft Foods, Inc.

37.     Defendant Post Holdings, Inc. ("Post Holdings") is a Missouri corporation with its principal place of business and headquarters located at 2503 S. Hanley Road, St. Louis, Missouri 63144.

38.     Post Holdings is a successor to Philip Morris Companies, Inc., Altria Group, Inc., Kraft General Foods Inc., Kraft Foods Group, Inc., and Kraft Foods, Inc.

39.     Defendant The Coca-Cola Company ("Coca-Cola") is a Delaware corporation with its principal place of business and headquarters located at One Coca-Cola Plaza, Atlanta, Georgia 30313.

40.     Defendant PepsiCo, Inc. ("PepsiCo") is a North Carolina corporation with its principal place of business and headquarters located at 700 Anderson Hill Road, Purchase, New York 10577.

41.     Defendant General Mills, Inc. ("General Mills") is a Delaware corporation with its principal place of business and headquarters located at Number One General Mills Boulevard, Minneapolis, Minnesota 55426.

42.     Defendant Nestle USA, Inc. ("Nestle") is a Delaware corporation with its principal place of business and headquarters located at 812 N. Moore Street, Arlington, Virginia, 22209.

43.     Defendant Kellanova is a Delaware corporation with its principal place of business and headquarters located at 412 N. Wells Street, Chicago, Illinois 60654.

44.     Defendant WK Kellogg Co. is a Delaware corporation with its principal place of business and headquarters located at One Kellogg Square, Battle Creek, Michigan 49017.

45.     At all relevant times to this action, Defendants Kellanova and WK Kellogg Co. collectively operated as "Kellogg Company". Defendants Kellanova and WK Kellogg Co. are successors to Kellogg Company ("Kellogg's"), and were each formed on October 2, 2023 through a corporate split of the predecessor Kellogg Company. Thus, Defendants Kellanova and WK Kellogg Co. are collectively referred to herein as "Kellogg's".

46.     Defendant Mars Incorporated, Inc. ("Mars") is a Delaware corporation with its principal place of business and headquarters located at 6885 Elm Street, McLean, Virginia 22101.

47.     Defendant ConAgra Brands, Inc. ("ConAgra") is a Delaware corporation with its principal place of business and headquarters located at 222 W. Merchandise Plaza, Suite 1300, Chicago, Illinois 60654.

**JURISDICTION & VENUE**

48.     Defendants designed, manufactured, packaged, labeled, marketed, sold and/or distributed various UPF throughout the Commonwealth of Pennsylvania, and specifically in Philadelphia County.

49.     Personal jurisdiction is proper pursuant to 42 Pa. C.S. §§ 931 and 5301. Defendants are domiciled in Pennsylvania or have consented to jurisdiction in Pennsylvania. Defendants conducted and continue to conduct substantial and systematic business activities in this jurisdiction.

50. Venue is proper in Philadelphia County pursuant to Pa.R.C.P. 1006 and 2179(a)(2), as Defendants regularly conduct business in Philadelphia County and Plaintiff was exposed, diagnosed and treated in Philadelphia County.

50.     51. Plaintiff's claims in this action are brought solely under state law. Plaintiff does not herein bring, assert or allege, either expressly or impliedly, any causes of action arising under

9

any federal law, statute, regulation or provision. Thus, there is no federal jurisdiction in this action on the basis of a federal question under 28 U.S.C. §1331.

51.    52. Furthermore, like Plaintiff, Defendant Kraft Heinz is a citizen of Pennsylvania, therefore there is noalleges there to be federal jurisdiction in this action on the basis of diversity under 28 U.S.C. §1332.

52.    If that is correct, and there is federal jurisdiction over this matter, then venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §1391, as a substantial part of the events and omissions giving rise to this action occurred in Philadelphia County. Defendants regularly conduct business in Philadelphia County and Plaintiff was exposed, diagnosed and treated in Philadelphia County.

## STATEMENT OF FACTS

**I.    Ultra-Processed Foods**

*a.    What are UPF?*

53.    UPF is a categorization of food defined by the NOVA System, a scientific framework developed by epidemiologist Carlos Monteiro. The NOVA System is widely used in the international scientific community, and categorizes food based on the extensiveness of processing, without regard to nutrient composition.

54.    The key insight underlying NOVA is that food is more than just the sum of its macronutrients, and that food, not nutrients, is the fundamental unit in nutrition.

55.    Traditional diets throughout the world are healthful, even though they diverge widely in their nutrient content. For example, traditional Asian diets are high in salt, traditional Latin American diets are high in carbohydrates, and traditional Mediterranean diets are high in fat. Nevertheless, all promote healthful lives and positive health outcomes.

56.     UPF are fundamentally different than the foods that make up traditional diets.

57.     Unlike traditional foods that have dominated diets for all of human history, UPF are industrially produced edible substances that are imitations of food.[30] UPF are formulations of cheap industrial ingredients using a series of industrial processes.[31] These ultra-processed products are not modified foods, but formulations made mostly or entirely of fractionated substances that have undergone hydrolysis, hydrogenation, or other chemical modifications, and contain ingredients that have no or rare culinary use—such as fructose, high-fructose corn syrup, 'fruit juice concentrates', invert sugar, matlodextrin, dextrose, lactose, hydrogenated or interesterfied oils, hydrolysed proteins, soya protein isolate, gluten, casein, whey protein, 'mechanically separated meat'—and additives such as colors, flavors, flavor enhancers, emulsifiers, emulsifying salts, artificial sweeteners, thickeners, and foaming, anti-foaming, bulking, carbonating, gelling, and glazing agents.[32]

58.     Additives are used either to disguise unpleasant sensory properties created by ingredients, processes, or packaging used in the manufacture of ultra-processed products, or give the final product intense sensory properties especially attractive to see, taste, smell, and/or touch, or both.[33]

---

[30] Dr. Jean-Claude Moubarac et al., *Ultra-Processed Food and Drink Products in Latin America: Sales, Sources, Nutrient Profiles, and Policy Implications*, Pan American Health Organization of the World Health Organization, 2019.

[31] Carlos A. Monteiro et al., *Ultra-processed foods, diet quality and human health*, Food and Agriculture Organization of the United Nations, 2019; Carlos A. Monteiro et al., *UN Decade of Nutrition, the NOVA food classification and the trouble with ultra-processing*, Public Health Nutr. Jan. 2018.

[32] Id.

[33] Id.

59.     These substances are then assembled into end products using industrial processes such as extrusion, moulding, and pre-frying.[34] Sophisticated and attractive packaging is used, usually made of synthetic materials.[35]

60.     The practical way to identify UPF is to see if its list of ingredients contains substances that are never or rarely used in kitchens.[36] If so, the product is UPF.

61.     Processes and ingredients used for the manufacture of UPF are designed to create highly profitable products (low-cost ingredients, long shelf-life, branded products) that are hyper-palatable and owned by transnational corporations.[37]

62.     UPF are engineered to be overconsumed, addictive and irresistible.[38]

63.     These features, along with aggressive marketing—including vivid packaging, health claims, establishment of franchised outlets, campaigns using social, electronic, broadcast and print media, including to children and in schools—has caused UPF to displace real food.[39]

### b.     *UPF are Inherently, and Uniquely, Dangerous*

64.     The nature of the processes and ingredients used in their manufacture make UPF intrinsically unhealthy.[40]

---

[34] Id.

[35] Id.

[36] Id.

[37] Id.

[38] Carlos A. Monteiro et al., *Ultra-processed foods, diet quality and human health*, Food and Agriculture Organization of the United Nations, 2019; Food, Diet and Obesity Committee, *Corrected Oral Evidence: Food Diet and Obesity, Evidence Session 11, Question 147*, House of Lords, Mar. 2024; Tara Parker-Pope, *How the Food Makers Captured Our Brains*, N.Y. Times, June 22, 2009.

[39] Carlos A. Monteiro et al., *Ultra-processed foods, diet quality and human health*, Food and Agriculture Organization of the United Nations, 2019; Carlos A. Monteiro et al., *UN Decade of Nutrition, the NOVA food classification and the trouble with ultra-processing*, Public Health Nutr., Jan. 2018.

[40] Carlos A. Monteiro et al., *Ultra-processed foods, diet quality and human health*, Food and Agriculture Organization of the United Nations, 2019.

65. UPF have been extensively studied in epidemiological research. Large, rigorous, high-quality scientific studies have found that consuming UPF significantly increases risks of cancer[41], breast cancer[42], colorectal cancer[43], distal colon cancer[44], pancreatic cancer[45], adenocarcinoma of the esophagus[46], head & neck cancers[47], gastric non-cardia[48], renal cell carcinoma[49], lung cancer[50], brain cancer[51], diffuse large B-cell lymphoma[52], ovarian cancer[53],

---

[41] Thibault Fiolet et al., *Consumption of Ultra-Processed Foods and Cancer Risk*, BMJ, Feb. 2018; Kiara Chang et al., *Ultra Processed Food Consumption, Cancer Risk and Cancer Mortality: a large-scale prospective analysis within the UK Biobank*, EClinicalMedicine, Jan. 2023; Irja M. Isaksen, *Ultra-Processed Food Consumption and Cancer Risk: A systematic review and meta-analysis*, Clin., Jun. 2023.

[42] Thibault Fiolet et al., *Consumption of Ultra-Processed Foods and Cancer Risk*, BMJ, Feb. 2018; Irja M. Isaksen et al., *Ultra-Processed Food Consumption and Cancer Risk: A systematic review and meta-analysis*, Clin., Jun. 2023; Long Shu et al., *Association between ultra-processed food intake and risk of breast cancer: a systematic review and meta-analysis of observational studies*, Front Nutr., Sept. 2023.

[43] Lu Wang et al., *Association of ultra-processed food consumption with colorectal cancer risk among men and women: results from three prospective US cohort studies*, BMJ, Aug. 2022; Long Shu et al., *Association between ultra-processed food intake and risk of colorectal cancer: a systematic review and meta-analysis*, Front Nutr., Jul. 2023; Ying Lian et al., *Association between Ultra Processed Foods and Risk of Cancer: a systematic review and meta-analysis*, Front Nutr., Jun. 2023; Rocío Caceres-Matos et al., *The Influence of Ultra-Processed Food on Colorectal Cancer: A systematic review*, Gastrointest. Disord., Feb. 2024.

[44] Lu Wang et al., *Association of ultra-processed food consumption with colorectal cancer risk among men and women: results from three prospective US cohort studies*, BMJ, Aug. 2022; Nathalie Kliemann et al., *Food Processing and Cancer Risk in Europe: results from the prospective EPIC cohort study*, Lancet Planet Health, Mar. 2023.

[45] Guo-Chao Zhong et al., *Ultra-processed food consumption and the risk of pancreatic cancer in the Prostate, Lung, Colorectal and Ovarian Cancer Screening Trial*, Int J Cancer., Mar. 2023.

[46] Nathalie Kliemann et al., *Food Processing and Cancer Risk in Europe: results from the prospective EPIC cohort study*, Lancet Planet Health, Mar. 2023.

[47] Id.

[48] Id.

[49] Id.

[50] Kiara Chang et al., *Ultra Processed Food Consumption, Cancer Risk and Cancer Mortality: a large-scale prospective analysis within the UK Biobank*, EClinicalMedicine, Jan. 2023.

[51] Id.

[52] Id.

[53] Id.

cardiovascular disease[54], cerebrovascular disease[55], irritable bowel disease[56], chronic kidney disease[57], Crohn's disease[58], dementia[59], Alzheimer's disease[60], metabolic syndrome[61], Type 2 Diabetes[62], non-alcoholic fatty liver disease[63], depression[64], anxiety[65] and frailty[66].

---

[54] Bernard Srour et al., *Ultra Processed Food Intake and Cardiovascular Disease: prospective cohort study*, BMJ, May 2019; Marialaura Bonaccio et al., *Joint Association of Food Nutritional Profile by* ~~Nutri -Score~~*Nutri-Score front-of-pack label and ultra-processed food intake with mortality: Moli-Sani prospective cohort study*, BMJ, Aug. 2022; Xuanli Chen et al., *Associations of Ultra Processed Food Consumptoin with Cardiovascular Disease and All-Cause Mortality: Uk Biobank*, Eur J Public Health, Oct. 2022; Mahshid Dehghan et al., *Ultra-processed foods and mortality: analysis from the Prospective Urban and Rural Epidemiology study*, Am J Clin Nutr., Jan. 2023; Marialaura Bonaccio et al., *Ultraprocessed Food Consumption is Associated with All-Cause and CV Mortality in Type 2 Diabetes Independent of Diet Quality: a prospective observational cohort study*, Am J Clin Nutr., Sept. 2023; G. Paglia et al., *Consumption of Ultra-Processed Foods and Health Status: a systematic review and* _meta-_ ~~meta-~~ *analysis*, Br J Nutr., Feb 2021; Marialaura Bonaccio et al., *Ultra-processed Food Consumption is associated with Increased Risk of All-Cause and Cardiovascular Mortality in the Moli-Sani Study*, Am J Clin Nutr., Feb. 2021; Yang Qu et al., *Ultra-Processed Food Consumption and Risk of Cardiovascular Events: a systemic review and* _dose-_ ~~dose-~~ *response meta-analysis*, EClinicalMedicine., Feb. 2024.

[55] Bernard Srour et al., *Ultra Processed Food Intake and Cardiovascular Disease: prospective cohort study*, BMJ, May 2019; Marialaura Bonaccio et al., *Joint Association of Food Nutritional Profile by* ~~Nutri -Score~~*Nutri-Score front-of-pack label and ultra-processed food intake with mortality: Moli-Sani prospective cohort study*, BMJ, Aug. 2022; G. Paglia et al., *Consumption of Ultra-Processed Foods and Health Status: a systematic review and meta-analysis*, Br J Nutr., Feb. 2021; Marialaura Bonaccio et al., *Ultra-processed Food Consumption is associated with Increased Risk of All-Cause and Cardiovascular Mortality in the Moli-Sani Study*, Am J Clin Nutr., Feb. 2021.

[56] Neeraj Narula at al., *Association of Ultra Processed Food Intake with Risk of Inflammatory Bowel Disease: prospective cohort study*, BMJ, Jul. 2021; Laure Schnabel et al., *Association Between Ultra-Processed Food Consumption and Functional Gastrointestinal Disorders: Results From the French NutriNet-Santé Cohort*, Am J Gastroenterol., Aug. 2018; Shanshan Wu et al., *Ultra-Processed Food Consumption and Long-Term Risk of Irritable Bowel Syndrome: A Large-Scale Prospective Cohort Study*, Clin Gastroenterol Hepatol., Jul. 2024.

[57] Bingjie Xiao et al., *Ultra Processed Food Consumption and the Risk of Incident Chronic Kidney Disease: a Systematic Review & Meta-Analysis of Cohort Studies*, Ren Fail., Feb. 2024.

[58] Neeraj Narula at al., *Association of Ultra Processed Food Intake with Risk of Inflammatory Bowel Disease: prospective cohort study*, BMJ, Jul. 2021; Chun-Han Lo et al., *Ultra-processed foods and risk of Crohn*'*s Disease and Ulcerative Colitis: A Prospective Cohort Study*, Clin Gastroenterol Hepatol., Jun. 2022.

[59] Huiping Li et al., *Association of Ultra processed Food Consumption with Risk of Dementia: A Prospective Cohort Study*, Neurology, Sept. 2022

[60] Id.

[61] Scheine L. Canhada et al., *Ultra-Processed Food Consumption and Increased Metabolic Syndrome in Adults: The ELSA-Brasil*, Diabetes Care., Feb. 2023; Long Shu et al., *Ultra-processed food consumption and increased risk of metabolic syndrome: a systematic review and meta-analysis of observational studies*, Front Nutr., Jun. 2023.

[62] Sajjad Moradi et al., *Ultra Processed Food Consumption and Adult Diabetes Risk: A Systematic Review and Dose-Response Meta Analysis*, Nutrients, Dec. 2021; Felipe M. Delpino et al., *Ultra-processed food and risk of type 2 diabetes: a systematic review and meta-analysis of longitudinal studies*, Int J Epidemiol., Aug. 2022; Zhangling Chen et al., *Ultra-Processed Food Consumption and Risk of Type 2 Diabetes: Three Large Prospective U.S. Cohort Studies*, Diabetes Care., Jul. 2023; María Llavero-Valero et al., *Ultra-processed foods and type 2 diabetes risk in the SUN project: A Prospective Cohort Study* , Clin Nutr., May 2021; Claudia Gutierrez-Ortiz et al., *Impact of Ultra-Processed Foods Consumption on the Burden of Obesity and Type 2 Diabetes in Belgium*, BMC Public Health, Mar. 2025.

[63] Longgang Zhao et al., *Higher Ultra-Processed Food Intake was Positively Associated with odds of NAFLD in both US Adolescents and Adults*: *A National Study*, Heptaol Commun., Aug. 2023; Longgang Zhao et al., *Higher ultra-processed food intake is associated with adverse liver outcomes a prospective cohort study of UK Biobank*

66.     Importantly, these scientific studies control for nutrient composition of UPF. In other words, the risks caused by UPF are not solely a function of the amount of calories, fat, sugar, salt, carbohydrates, protein or other macronutrients consumed.

67.     Instead, UPF *cause unique health risks*, separate and apart from the nutrient quality of a diet. These risks are further compounded by the poor dietary quality of UPF.

68.     The unique health risks of UPF are also exacerbated by the fact that UPF are engineered to be overconsumed.

69.     A randomized-controlled trial conducted by the National Institutes of Health meticulously matched the diets of inpatient subjects by nutritional composition, with one group receiving a UPF diet and the other group receiving a nutritionally identical diet of real food.[67] The group receiving the UPF diet consumed over 500 calories more each day and gained approximately a pound each week.[68] By contrast, the group receiving real food lost weight.[69]

70.     A second randomized-controlled trial with a similar design confirmed these results, finding that individuals fed an UPF diet consumed 813.5 calories a day and gained an average of 1.2 pounds each week compared to those fed a non-UPF diet.[70]

---

*participants*, Am J Clin Nutr., Oct. 2023. Yi-Fend Zhang et al., *Association of Ultra-Processed Food Intake with Severe NAFLD*, J. Nurt., Health and Aging, Aug. 2024

[64] Melissa M. Lane et al., *Ultraprocessed Food Consumption and Mental Health: A Systematic Review and Meta-Meta Analysis of Observational Studies*, Nutrients, Jun. 2022.

[65] Id.

[66] Teresa T. Fung et al., *Ultraprocessed foods, unprocessed or minimally processed foods and risk of frailty in a cohort of United States Females*, Am J Clin Nutr., Jul. 2024.

[67] Kevin D. Hall et al., *Ultra Processed Diets Cause Excess Calorie Intake and Weigh Gain: An Inpatient Randomized Controlled Trial of Ad Libitum Food Intake*, Cell Metab., Jul. 2019.

[68] Id.

[69] Id.

[70] Shoko Hamano et al., *Ultra-processed foods cause weight gain and increased enerdy intake associated with reduced chewing frequency: a randomized, open-label, crossover study*, Diabetes Obes. Metab., Aug. 2024

71.     A third randomized-controlled trial found that UPF increased body weight and altered cholesterol ratios independently of caloric intake.[71] This randomized-controlled trial also found that UPF independently affected hormones involved in energy metabolism.[72]

72.     The authors, considering the accumulated evidence from multiple RCTs found that "calories from unprocessed or UPFs are not equally stored or metabolized even when controlled for macronutrient load".[73] They concluded that "the processed nature of food itself, independent of the caloric and macronutrient intake, impacts numerous health markers" and that "our results demonstrate that consumption of UPF itself, irrespective of excess caloric intake, is detrimental to human health".[74]

73.     71. Despite this fact, the health harms caused by UPF are not solely a function of the weight gain they cause either. Like nutrient content, the studies of UPF control for obesity and other confounders, and demonstrate that UPF causes unique risks of serious disease— independent of the weight gain they cause.

74.     72. The risk of Type 2 Diabetes is one of the most robustly studied effects of UPF. Independent researchers throughout the world have determined that the scientific evidence that UPF increase the risk of Type 2 Diabetes is "convincing" and that there is a clear link between UPF and a higher risk of Type 2 Diabetes.[71][75]

75.     73. There are multiple potentialplausible mechanisms by which UPF cause increased health riskschildhood Type 2 Diabetes and Fatty Liver Disease. These mechanisms are largely common across all UPF, as will be demonstrated in greater detail below.

---

[71] Jessica Preston et al., *Effect of Ultra-Processed Food Consumption on Male Reproductive and Metabolic Health*, Cell Metab., Oct. 7, 2025

[72] Id.

[73] Id.

[74] Id.

[71][75] Melissa M. Lane et al., *Ultra-Processed Food Exposure and Adverse Health Outcomes, Umbrella Review of Epidemiological Meta-Analyses*, BMJ, Feb. 2024.

76.    ~~74.~~ For example, UPF consumption is associated with oxidative stress, chronic inflammation, alterations of immune signaling, intestinal dysbiosis, and mitochondrial metabolism alterations.[72][76]

77.    ~~75.~~ Ultra-processing techniques have been linked to the formation of endocrine disruptors and exposure to endocrine disrupting compounds.[73][77]

78.    ~~76.~~ Additives present in UPF, such as emulsifiers, preservatives, dyes, stabilizers, thickening agents and surfactants have also been shown to cause endocrine disruption.[74][78]

---

[72][76] Edwin E. Martínez Leo, *Ultra-Processed Diet, Systemic Oxidative Stress, and Breach of Immunologic Tolerance*, Nutrition., July 2021; Carmine Stolfi et al., *Impact of Western Diet and Ultra-Processed Food on the Intestinal Mucus Barrier*, Biomedicines, Jul. 2023; Marta Asensi et al., *Low-Grade Inflammation and Ultra-Processed Foods Consumption: A Review*, Nutrients., Mar. 2023; Akihito Harusato et al., *Dietary Emulsifiers Exacerbate Food Allergy and Colonic Type 2 Immune Response through Microbiota Modulation*, Nutrients., Nov. 2022; Sabrine Naimi et al., *Direct Impact of Commonly Used Dietary Emulsifiers on Human Gut Microbiota,* Microbiome., Mar. 2021; Corbin S C Johnson et al., *Contrasting Effects of Western v. Mediterranean Diets on Monocyte Inflammatory Gene Expression and Social Behavior in a Primate Model*, eLife., Aug. 2021; Amanda Cuevas-Sierra et al., *Gut Microbiota Differences According to Ultra-Processed Food Consumption in a Spanish Population*, Nutrients., Aug. 2021; Emilie Viennois et al., *Dietary Emulsifiers Directly Impact Adherent-Invasive E. Coli Gene Expression to Drive Chronic Intestinal inflammation*, Cell Rep., Oct. 2020; Eloi Chazelas et al., *Food Additives: Distribution and Co-Occurrence in 126,00 food products of the French Market*, Sci Rep., Mar. 2020; Emilie Viennois et al., *Dietary Emulsifier-Induced Low-Grade Inflammation Promotes Colon Carcinogenesis*, Cancer Res., Jan. 2017; Sareh Edalti et al., *Higher Ultra Processed Food Intake is Associated with Higher DNA Damage in Healthy Adolescents*, Br J Nutr., Mar. 2021; Maria Magdalena Quetglas-Llabres et al., *Oxidative Stress and Inflammatory Biomarkers are related to High Intake of Ultra-Processed Food in Old Adults with Metabolic Syndrome*, Antioxidants (Basel), Jul. 2023; Lisaura Maldonados-Pereira et al., *Oxidative Status of Ultra Processed Foods in the Western Diet*, Nutrients., Nov 2023; Bernard Srour et al., *Ultra Processed Foods and Human Health, from epidemiological evidence to mechanistic insights*, Lancet Gastroenterol Hepatol., Dec. 2022; Oren Contreras-Rodriguez et al., *Consumption of Ultra-Processed Foods is associated with depression, mesocorticolimbic volume, and inflammation*, J Affect Disord., Aug. 2023; Eva Vissers et al., *Ultra Proceed Foods as a possible culprit for the rising prevalence of inflammatory bowel diseases*, Front Med (Luasanne), Nov. 2022; Filippa Juul et al., *Ultra Processed Foods and Cardiovascular Diseases: Potential Mechanisms of Action*, Adv Nutr., Oct. 2021; Serena Coppola et al., *Increased Dietary Intake of Ultraprocessed Foods and Mitochondrial Metabolism Alteration in Pediatric Obesity*, Sci Rep., Aug. 2023.

[73][77] Constanze Stiefel et al., *Endocrine Active and Endocrine Disrupting Compounds in Food*, NFS Journal, Jun. 2023; Eurídice Steele et al., *Association between Dietary Share of Ultra-Processed Foods and Urinary Concentrations of Phytoestrogens in US,* Nutrients., Feb. 2017; Nathalie Kliemann et al., *Ultra-Processed Foods and Cancer Risk: from global food systems to individual exposures and mechanisms*, BJC, Mar. 2022.

[74][78] Constanze Stiefel et al., *Endocrine Active and Endocrine Disrupting Compounds in Food*, NFS Journal, Jun. 2023; Eloi Chazelas et al., *Food Additives: Distribution and Co-Occurrence in 126,00 food products of the French Market*, Sci Rep., Mar. 2020; Hai-Tao Gao et al., *Food Emulsifier Glycerin Monostearate Increases Internal Exposure Levels of Six Priority Controlled Phthalate Esters and Exacerbates their male reproductive toxicities in rats*, PLoS One., Aug. 2016; Beatrice Dufrusine et al., *Influence on Food Emulsifiers on Cellular Function and Inflammation*, Front Nutr., Aug. 2023; Delphine Franssen & Anne-Simone Parent, *Emulsifiers during Gestation, the risks of ultra processed food revealed in mice*, PLoS Biol., Aug. 2023; Bernard Srour et al., *Ultra Processed Foods and Human Health, from epidemiological evidence to mechanistic insights*, Lancet Gastroenterol Hepatol., Dec. 2022.

17

79.    77. Exposure to endocrine disruptors in UPF has also been shown to occur as a result of leachate from food packaging materials, including chemicals such as Bisphenol A (BPA), Phthalates, PFAS, and organophosphate ethers.[75][79]

80.    78. Phosphate-containing additives can also disrupt the endocrine system and hormonal regulation of nutrients.[76][80]

81.    79. Additives can directly modulate the composition and function of intestinal microbiota, driving microbioata encroachment and chronic intestinal inflammation, thus exacerbating metabolic dysfunction.[77][81]

82.    80. Additives induce intestinal microbiota dysbiosis, which stimulates pro- pro-inflammatory signaling, and can predispose people to several diseases such as hypertension, obesity, diabetes and other cardiometabolic disorders.[78][82]

83.    81. Inflammatory signaling can induce metabolic diseases such as Type 2 Diabetes by desensitizing insulin receptor signaling.[79][83]

---

[75][79] Eurídice Martínez Steele et al., *Association between Dietary Contribution of Ultra-Processed Foods and Urinary Concentrations of Phthalates and Bisphenol in a nationally representative sample of the US population aged 6 years and older*, PLos One., Jul. 2020; Jessie P. Buckley et al., *Ultra Processed Food Consumption and Exposure to Phthalates and Bisphenols in the US National Health and Nutrition Examination Survey, 2013-2014*, Environ Int., Oct. 2019; Irfan A. Rather et al., *Sources of Chemical Contaminants in Food and Their Health Implications*, Front Pharmacol., Nov. 2017; Nathalie Kliemann et al., *Ultra-Processed Foods and Cancer Risk: from global food systems to individual exposures and mechanisms*, BJC, Mar. 2022; Ksenia J. Groh et al., *Overview of Intentionally Used Food Contact Chemicals and their Hazards*, Environ Int., May 2021; Muncke 2020. *Endocrine disrupting chemicals and other substances of concern in food contact materials: An updated review of exposure, effect and risk assessment*; Constanze Stiefel et al., *Endocrine Active and Endocrine Disrupting Compounds in Food*, NFS Journal, Jun. 2023; Hyunju Kim et al., *Urinary organophosphate ester concentrations in relation to ultra-processed food consumption in the general US population*, Environ Res., Mar. 2020; Bernard Srour et al., *Ultra Processed Foods and Human Health, from epidemiological evidence to mechanistic insights*, Lancet Gastroenterol Hepatol., Dec. 2022.

[76][80] Mona S. Calvo et al., *Industrial Use of Phosphate Food Additives: A Mechanism Linking Ultra-Processed Food Intake to Cardiorenal Disease Risk?*, Nutrients, Aug. 2023.

[77][81] Clara Salame et al., *Food Additive Emulsifiers and the Risk of Type 2 Diabetes: Analysis of data from the NutriNet-Sante prospective cohort study*, Lancet Diabetes Endocrinol., May 2024.

[78][82] Id.

[79][83] Id.

84. ~~82.~~ Dysbiosis induced by chronic exposure to additives can drive chronic intestinal as well as systemic inflammation, which can affect other organs.[80][84]

85. ~~83.~~ The presence of chronic inflammation disrupts the homeostatic balance, altering the crosstalk between immune and metabolic responses and promoting chronic metabolic inflammation.[81][85]

86. ~~84.~~ The resulting immune cell infiltration and secretion of inflammatory cytokines into the tissue environment can inhibit glucose uptake and alter lipid metabolism.[82][86] This increases the risk of noncommunicable diseases such as cancer, diabetes, and cardiovascular disease.[83][87]

87. ~~85.~~ Research has also suggested that nutrient concentrations in natural foods share universal structures rooted in the nature of biochemical processes governing nutrient synthesis and regulation.[84][88]

88. ~~86.~~ Ultra-processing disrupts this nutrient balance that humans are genetically adapted to, and the human metabolism may not be able to properly process nutrient distributions that substantially deviate from the natural range and structure observed in natural foods.[85][89] Research has indicated that the destruction of natural food structures, also known as the "food matrix", affects satiety and glycemic response.[86][90]

---

[80][84] Id.

[81][85] Marta Asensi et al., *Low-Grade Inflammation and Ultra-Processed Foods Consumption: A Review*, Nutrients., Mar. 2023.

[82][86] Id.

[83][87] Id.

[84][88] Guilia Menichetti & Albert-László Barabási, *Nutrient Concentrations in Food Display Universal Behavior*, Nature Food, May 2022.

[85][89] Id.

[86][90] Anthony Fardet, *Minimally processed foods are more satiating and less hyperglycemic than ultra-processed foods: a preliminary study with 98 ready-to-eat foods*, Food Funct., May 2016; Anthony Fardet & Edmond Rock, *Reductionist Nutrition Research has Meaning Only within the Framework of Holistic and Ethical Thinking*, Adv Nutr., Nov. 2018; Anthony Fardet et al., *Beyond nutrient-based food indices: a data mining approach to search for a quantitative holistic index reflecting the degree of food processing and including physicochemical properties*, Food Funct., Jan. 2018.

89. 87. All of these harmful effects occur as a result of ultra-processing itself, and do not rely on nutrient content to cause harm. The poor nutrient balance common in UPF further exacerbates these ill effects, but does not cause them.

### c. UPF is Inextricably Intertwined with Big Tobacco

90. 88. Early attempts at ultra-processing arose around the World Wars of the early 20th Century, in efforts to respond to war-time shortages. These projects included efforts to create artificial sweeteners from coal tar and Nazi German efforts to create butter substitutes from coal wastes.[87][91]

91. 89. While a small amount of novel UPF entered the domestic food market in the 1950's, 1960's, and 1970's, the US food environment was dominated by traditional food during that timeframe. As an indicator of this, in 1980, only 13% of U.S. homes had microwave ovens.[88][92]

92. 90. Before the 1970's, the food environment in the USA was largely supplied by smaller, local food producers and regional companies.[89][93] However, in the 1970's and 1980's, larger food companies began controlling the food environment by absorbing smaller food producers and centralizing and increasing the amount of food processing and distribution efforts.[90][94]

93. 91. The "Big Tobacco" companies RJ Reynolds and Philip Morris were leaders in this market shift.[91][95]

---

[87][91] Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 69-73, 90-92, (2023); *Butter is Made by Germans from Coal*, Eagle Valley Enterprise, September 6, 1946; *Made Butter from Coal in Germany*, Brisbane Courier-Mail, August 8, 1946; Elke Maier, *Coal—in Liquid Form*, MaxPlanckResearch, Apr. 2016.

[88][92] James E. Fay & Lana Douglas, *R.J. Reynolds Tobacco Non-Industry Marketing Learning, New Brand Task Force, Project INFINITY*, Delta Research, Jan. 1991.

[89][93] Tena L. Fazzino, *The Reinforcing Natures of Hyper Palatable Foods: Behavioral Evidence for Their Reinforcing Properties and the Role of the US Food Industry in Promoting Their Availability*, Current Addiction Rprts., May 2022.

[90][94] Id.

[91][95] Id.

94.    92. RJ Reynolds first entered the food market in the early 1960's with its acquisition of Hawaiian Punch. In a 1962 internal memo, RJ Reynold's Head of Biochemical Research encouraged the company to enter the field of artificial foods, flavors and fragrances, writing:

> "It is easy to characterize R.J. Reynolds merely as a tobacco company. In a broader and much less restricting sense however, R.J. Reynolds is in the flavor business. This flavor business will be greatly expanded by the addition of the soft drink line presently in an advanced development stage. . . .
>
> Meanwhile our interests in non-tobacco areas are developing. It is probable that many flavorants for tobacco will be useful in food, beverage and other products. If we become a basic producer of tobacco flavorants, we will have started to become a basic producer in the general flavor industry. . . .
>
> The market for synthetic flavoring agents will greatly expand during the next 20-25 years. If R.J. Reynolds were to establish a position in this field now, it would realize large financial returns from these developments."[92][96]

95.    93. Over the ensuing 15 years, RJ Reynolds acquired a number of food companies, and by 1979 was boasting of being a "major force in worldwide consumer packaged goods with strong positions in tobacco and foods".[93][97]

96.    94. In 1985, RJ Reynolds purchased Nabisco for $4.9 billion and merged it with Del Monte and the other food and beverage brands it had previously acquired throughout the 1960's and 1970's.[94][98] In order to help finance the acquisition of Nabisco, R.J. Reynolds sold Kentucky Fried Chicken to PepsiCo for $850 million.[95][99]

97.    95. This acquisition cemented RJ Reynolds as a tobacco-food behemoth. A 1988 interoffice memorandum boasted:

---

[92][96] Interoffice Memo, Eldon D. Nielson, Kenneth H. Hoover et al., (Oct. 4, 1962).

[93][97] RJR Foods, Inc. *Fact Sheet*, Mar. 1978; *R.J Reynolds Industry 1979 Annual Report*, R.J. Reynolds Tobacco Company, 1979.

[94][98] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023; Todd Purdum, *R.J. Reynolds Set to Pay $4.9 Billion in Bid for Nabisco*, N.Y. Times, June 3, 1985.

[95][99] Richard Stevenson, *PepsiCo to Acquire Kentucky Fried*, N.Y. Times, July 25, 1986. https://www.nytimes.com/1986/07/25/business/pepsico-to-acquire-kentucky-fried.html

"We process over 243,000 metric tons of tobacco leaf in the production and licensing of almost 300 billion cigarettes annually throughout the world….

Our domination of the cookie and cracker business is even more obvious….in snack crackers, we are the market."[96][100]

98. 96. A Philip Morris market intelligence report at the time noted that R.J. Reynolds had achieved "critical mass in the dry grocery business" and that "R.J. Reynolds' presence in virtually all aisles of the grocery store permits cross merchandising of brands in different sections of the store and different packaging forms".[97][101]

99. 97. In 1985, Philip Morris joined the market as well—purchasing General Foods for $5.6 Billion.[98][102] Philip Morris then purchased Kraft Inc. for $12.9 billion in 1988, making the combined tobacco-food company the world's largest food business and the world's largest consumer products company.[99][103]

100. 98. Shortly after the acquisition and merger of Kraft, a Philip Morris executive explained:

In the U.S. home market, Kraft General Foods is the largest food company overall and is #1 in all of the major retail grocery channels—dry grocery, refrigerated and frozen. It is also the second largest player in foodservice distribution.

Both companies bring strong brand franchises to the combination, and KGF will, we think, account for something like 18 of the top 50 grocery store brands.[100][104]

101. 99. Philip Morris' CEO stated that "Today, with the acquisition of Kraft, we manufacture and market more than 3000 food, beverage and tobacco products".[101][105] Around the

---

[96][100] Interoffice Memo, Huntley R. Whitacre, Edward A. Horrigan Jr. et al., (Aug. 9, 1988).

[97][101] R. D. Sherrod, *Marketing Intelligence Report*, Mar. 1985.

[98][102] *Philip Morris Agrees to Buy General Foods*, Chicago Tribune, Sept. 28, 1985.

[99][103] *It's All Over: Philip Morris is New Owner of Kraft*, Chicago Tribune, Dec. 9, 1988.

[104] Hans G. Storr & Michael A. Miles, *Consumer Analysts Presentation*, Philip Morris Companies Inc., Feb.1989.

[105] Hamish Maxwell, *Keynote Remarks by Hamish Maxwell to Philip Morris Legal Conference*, Apr. 1989.

same time, another Philip Morris executive boasted "You can now have a complete meal of Philip Morris foods and beverages, followed, of course, by one of our cigarettes". [102][106]

102.    100. The combined company dominated the market in 20 food categories, had 32 food brands that exceeded $100 million in sales. [103][107]

103.    101. Philip Morris conquered even more of the U.S. food market in 2000, when it acquired R.J. Reynolds' former food business for $18.9 billion. [104][108] It integrated and merged the R.J. Reynolds food companies with its own, creating a company with 73 brands exceeding $100 million in sales. [105][109]

104.    102. Collectively, the Big Tobacco companies dominated the U.S. food environment for decades. Defendants Kraft Heinz, Mondelez, Post Holdings are direct descendants of Philip Morris and/or R.J. Reynolds.

## II.    Fruits of the Poisonous Tree—Big Tobacco Infects our Food Environment

### A.    *Turning our Food into Cigarettes: Big Tobacco Used Cigarette Addiction Science to Develop UPF, and Hack the Human Brain*

105.    103. Big Tobacco's conquest of the U.S. food environment was much more than a coincidental by-product of diversification. Instead, as explained by Philip Morris' Director of Applied Research, the purpose of these acquisitions was for the Big Tobacco companies "to control all of the pleasure drugs that are not regulated". [106][110]

---

[106] DDr. K.S. Houghton, *State of the Union Speech*, Mar. 1989.
[107] MMarc Cohen & Nomi Ghez, *Philip Morris Companies An In-Depth Analysis of Kraft*, Goldman Sachs U.S. Research, Apr. 1995.
[108] PPhilip Morris to Acquire Nabisco, South Florida Sun Sentinel, Jun. 26, 2000.
[109] PPhilip Morris Acquires Nabisco for $55 per Share in Cash and Plans for IPO of Kraft, Newsbreak Extra!, Jun. 25, 2000.
[106][110] Patricia Callahan et al., Patricia Callahan et al., *Where there's smoke, there might be food research, too*, Chicago Tribune, Jan. 29, 2006.

23

106. 104. RJ Reynolds and Philip Morris did not operate their food companies as wholly independent entities, but instead rapidly integrated them into the pre-existing their existing businesses, bringing techniques developed on the Ttobacco companies. side over to the food side..

107. 105. As a result, there was a systematic transfer of people, knowledge, information and technologies from Big Tobacco to the Food & Beverage Industry in the 1980's, 1990's and 2000's.[107][111]

108. 106. RJ Reynolds' Biochemical & Biobehavioral R&D Group coordinated design of new cigarette and food formulations, including analyses of flavors and additives that could be used in tobacco and food products, and biological activity resulting from consuming such products.[108][112]

109. 107. Although this group became involved in the design and assessment of UPF, the original purpose of RJ Reynolds' Biochemical & Biobehavioral Group was to generate "information on the biochemical and biobehavioral aspects of tobacco use. This information creates a corporate advantage through usage in product design".[109][113]

110. 108. To put this into plainer English, the goal of RJ Reynolds' Biochemical & Biobehavioral group was to understand the addictive qualities of its cigarettes, and use this knowledge to design more addictive products.

111. 109. RJ Reynolds spent hundreds of millions of dollars a year on research and development "opportunities affecting cigarettes and food".[110][114] These included biobehavioral research into electrical responses of the trigeminal nerve in rats, the "biological bases of the

---

[107][111] Virginia Gewin, *New Archive Reveals How the Food Industry Mimics Big Tobacco to Suppress Science, Shape Public Opinion*, Nov. 28, 2018.

[108][112] *1987 Second Quarter Project Status*, Secret Biochemical/Biobehavioral R&D Report, Jun. 1987.

[109][113] F.H. Christopher Jr., *Secret Research and Development 1988-1990 Strategic Plan*, R.J. Reynolds Tobaco Company, Oct. 1987.

[114] Interoffice Memo, Huntley R. Whitacre, Edward A. Horrigan Jr. et al., (Aug. 9, 1988).

responses of humans to inhaled chemicals", the "structural requirements for the perception of both bitter and sweet", and "detailed analysis of the effects of partial removal of salivary glands on eating and drinking behavior".[~~111~~][115]

112.    ~~110.~~ Philip Morris organized the Philip Morris Companies Technical Synergy Group to disseminate formulation and marketing research to its food companies.[~~112~~][116]

113.    ~~111.~~ Research and technology was coordinated through Philip Morris' "Worldwide Operations and Technology" organization to ensure "that world class research and development, quality assurance and science are available and applied globally to Phillip Morris USA ("PM USA"), the tobacco operations of Phillip Morris International ("PMI") and the domestic and international food operations of Kraft Foods, Inc."[~~113~~][117]

114.    ~~112.~~ Philip Morris held formal synergy meetings to coordinate formulation and marketing research across subsidiaries, including brain-research on sensory perceptions and artificial intelligence models designed to drive consumer behavior.[~~114~~][118]

115.    ~~113.~~ Philip Morris scientists studying nicotine's impact on the brain regularly collaborated with Kraft and General Foods.[~~115~~][119]

116.    ~~114.~~ For example, Dr. Frank Gullotta was a Philip Morris brain scientist who supervised a secret Philip Morris addiction laboratory in Germany.[~~116~~][120] Gullotta's research included using electrodes on human scalps to understand the impact of nicotine consumption on

---

[115] ~~R~~*Research and Development 1988 Year-End Status Report*, RJR Confidential, 1988.

[116] ~~A~~*Appendix A R&D 1991 Accomplishments*, PM USA, 1991.

[117] ~~P~~Philip Morris 5 Year Plan, 1996.

[118] ~~K~~Kim H. Nguyen, *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, March 2019; Delroy Alexander et al, *Craving the cookie,* Chicago Tribune, Aug. 21, 2005; *Appendix A R&D 1991 Accomplishments*, PM USA, 1991; *The Role of Technology in Understanding the Consumer*, Philip Morris Product Development Symposium, Dec. 1990.

[119] ~~D~~Delroy Alexander et al, *Craving the cookie,* Chicago Tribune, Aug. 21, 2005.

[~~116~~][120] Patricia Callahan et al., *Where there's smoke, there might be food research, too,* Chicago Tribune, Jan. 29, 2006.

the human brain.[~~117~~121] He became integrated in the company's food operations after the acquisition of General Foods and Kraft.[~~118~~122]

(Added)



117.    ~~115.~~ Gullotta noted in 1990 that "an understanding of the chemical senses is critical in developing new products. Recently, interest in our studies has been expressed by Kraft USA and G.F. USA".[~~119~~123]

---

[~~117~~121] Delroy Alexander et al., *Craving the cookie*, Chicago Tribune, Aug. 21, 2005.

[~~118~~122] *Appendix A R&D 1991 Accomplishments*, PM USA, 1991; Patricia Callahan et al., *Where there's smoke, there might be food research, too,* Chicago Tribune, Jan. 29, 2006.

[~~119~~123] Interoffice Memo, F. P. Gullota et al., C. K. Ellis, (Nov. 8, 1990); Patricia Callahan et al., *Where there's smoke, there might be food research, too,* Chicago Tribune, Jan. 29, 2006.

(Deleted)



118. 116. Gullotta collaborated with Dr. Pamela Scott-Johnson, a physiological psychologist and Senior Research Scientist in the Taste Fundamentals program.[120][124] She studied the fundamental mechanisms involved in the perception of taste, and included using "Brain Wave computer system" on live rats to see how nerves transmit messages relating to various fats and fat substitutes.[121][125]

---

[124] IInteroffice Memo, C. S. Hayes, R. D. Kisner, (Mar. 26, 1991).
[125] IId.



119.    ~~117.~~ While this research initially focused on the electrophysiological responses of the chorda tympani nerve to various fats, Gullotta recommended this "be extended to also investigate the vagus, glossopharyngeal and trigeminal nerve responses to tastants that would be of mutual benefit to" Philip Morris and Kraft General Foods.[~~122~~126]

120.    ~~118.~~ Philip Morris and Kraft's chemical senses program collaborated on "gustatory electrophysiology" and designed collaborative studies of mutual interest to the cigarette and food operations.[~~123~~127] Gullotta also educated company food scientists on "The Use of Nasal Event-~~Event~~-Related Potentials in Flavor Evaluation".[~~124~~128]

---

[126] ~~I~~Id.
[127] ~~I~~Interoffice Memo, F. P. Gullotta, Dr. R. A Carchman, (Mar. 22, 1991).
[128] ~~I~~Interoffice Memo, F. P Gullotta, R. D. Kisner, (Oct. 22, 1991).

Case 2:25-cv-00377-MRP   Document 151-1   Filed 10/27/25   Page 38 of 472

121. 119. Dr. James Andrade was a physiological psychologist who would rise to become one of Kraft's top research executives.[125][129] He conducted research into human perception of tastes, smells, cognitive and behavioral factors, as well as how opiate receptors in the brain mediate the hunger drive.[126][130]

122. 120. Philip Morris and Kraft General Foods collaborated on research into the "molecular basis for odor/flavor recognition" and "molecular, cellular and organ-related signal transduction".

123. 121. A confidential internal memo explained the rationale: "Many consumer attributes of our products manifest themselves via response to the chemical stimuli (flavors, odors, textural components, etc.) in these products. The biological interpretation (i.e. modulation/transduction) of these stimuli (i.e. signals) share common pathways critical for normal human performance".[127][131]

124. 122. The reason for these collaborations was clear. In a meeting discussing chemosensory and electrophysiology research collaborations between cigarettes and UPF divisions, Philip Morris' Director of Consumer Research explained:

> "When we talk in terms of what we are selling the consumer we don't talk in terms of cigarettes. We talk in terms of benefits. We talk in terms of effects. What does somebody get when he smokes a cigarette? A tube that's white on one end and cork on the other in a lot of cases you set fire to. Well nobody is going to pay money for that. What they pay money for is what they get out of it. They need some satisfaction and whatever else that they do. Now that certainly doesn't limit it to cigarettes. But in order to figure out intelligently what products could be offered that may appeal to a larger group than just smokers, i.e. products that don't offer the perceived negatives to a nonsmoker of a cigarette but still provide some of the benefits that smokers can enjoy. I think we have to understand just how this works"[128][132]

---

[129] D Delroy Alexander et al, *Craving the cookie*, Chicago Tribune, Aug. 21, 2005.
[126][130] Delroy Alexander et al, *Craving the cookie*, Chicago Tribune, Aug. 21, 2005; Interoffice Memo, C. S. Hayes, R. D. Kisner, (Mar. 26, 1991).
[127][131] *Philip Morris Institute Proposal*, Philip Morris Technical Synergy Group, Apr. 1993.
[128][132] *Appendix A Chemical Senses Symposium, Meeting Minutes*, Apr. 1990.

125. 123. Philip Morris understood that "Since consumer products represent an extracellular 'stimulus' to the consumer and the objective of this research endeavor is to optimize the 'response' of our products on the consumer, the stimulus-response mechanism is an obvious area of focus. The stimulus-response area, also called signal transduction, relates to the mechanism by which extracellular stimuli elicit both transitory and lasting responses or effects".[129][133]

126. 124. But Philip Morris also understood that conscious perceptions of human senses were not the key to maximum profits for Philip Morris products.

127. 125. As Frank Gullotta explained about the senses of taste, smell and touch, "none of these matter a didley if you don't have the effects in the brain. These are only pleasurable because of the consequences" in the brain.[130][134]

128. 126. In other words, the purpose of all this research on brain waves and nerve conduction was not to determine how to make UPF more flavorful. Big Tobacco conducted this research to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[131][135]

129. 127. As a clear example of this, Philip Morris & Kraft conducted joint research into "drivers of acceptance, mood or satiety/drinkability" that "are usually not consciously perceived... ... but are perceived at the receptor level (ex. Pheromones)".[132][136] This research was identified as "of common interest to beer, food and tobacco".[133][137]

130. 128. Kraft and Philip Morris scientists applied their combined expertise in brain science and sensory transduction to develop UPF products.[134][138] Their research was used to shape

---

[129][133] *Philip Morris Institute Proposal*, Philip Morris Technical Synergy Group, Apr. 1993.

[134] A *Appendix A Chemical Senses Symposium, Meeting Minutes*, Apr. 1990.

[135] C Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023); Robert Lustig, The Hacking of the American Mind, (2017).

[136] I Interoffice Memo, Chemoreception Research, (Feb. 12, 1998).

[137] *I* Id.

[138] D Delroy Alexander et al, *Craving the cookie*, Chicago Tribune, Aug. 21, 2005.

30

people's perception of hunger and fullness, known as satiety, in order to promote overconsumption of their UPF products.[135][139]

131. 129. Kraft and Philip Morris jointly used "neuroimaging (understanding how olfaction and gustatory information is coded—identify receptor subtypes)" and technologies relating to chemoreception and transduction, genetics and molecular biology, and molecular imprinting polymers.[136][140] This research was used in UPF product formulation and in the creation of "designer odors and flavors" and the "production of novel aroma compounds".[137][141]

132. 130. These and similar technologies and research were broadly applied to product formulation in Philip Morris' UPF division, which later became defendants Kraft Heinz, Mondelez and Post Holdings. Knowledge of the brain's physiological functions was used to hack the human brain, and to formulate UPF products that could evade people's bodily mechanisms for controlling intake.

133. 131. UPF products also directly incorporated tobacco additives in their formulations. For example, RJ Reynolds used the company's tobacco flavour library to create beverage formulas "starting from our knowledge of flavours we already produce or have in our flavour library".[138][142] The stated goal "is to leave people wanting more".[139][143]

134. 132. On information and belief, Defendants Kraft Heinz, Mondelez and Post Holdings continue to engage in these formulation strategies.

---

[139] Id.
[136][140] Interoffice Memo, Arthur Anderson, Phillip Morris Technology Synergy Team, (Oct. 2, 1997).
[137][141] Id.
[138][142] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019; Charles Milton, Monthly Research Report: Technical Development Division RJ Reynolds, 1962 No. 5
[139][143] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.

### B.      Big Tobacco's Addiction Science Permeates the rest of the UPF Industry

135.     ~~133.~~ As market leaders, Big Tobacco quickly spread this research and formulation strategy throughout the UPF industry, and such strategies are now prevalent.

136.     ~~134.~~ For example, since at least the early 2000's, defendant Nestle has spent millions of dollars a year on research to understand sensory perception, i.e. "How do we smell, taste and see food".[~~140~~144] In 2007, Nestle identified "sensory evaluation" as "an increasingly important field of study" and conducted research into this with both external partners and internal research divisions such as the "Sensory Science Group".[~~141~~145]

137.     ~~135.~~ Nestle currently employs numerous sensory psychologists to study issues relating to brain activity, including the use of electroencephalography, and "taste development, perception and food preference in young children".[~~142~~146] Nestle has even begun using consumer DNA and artificial intelligence to formulate new products.[~~143~~147]

138.     ~~136.~~ Defendant PepsiCo operates one global R&D organization to develop new product formulations and conducts extensive research into human biology, sensory chemoreception and physiological responses in the brain.[~~144~~148] For example, PepsiCo utilizes functional magnetic resonance imaging (fMRI), a neuroimaging technique that measures human brain activity by detecting changes in blood flow, to guide product formulation design.[~~145~~149]

---

[144] ~~1St140~~ephen Daniells, *Nestlé teams up with EPFL for food-brain research*, Bakery & Snacks, (Last updated Jul. 2008).

[145] ~~A~~Albert Pfiffer & Hans-Jörg Renk, *Transformational Challenge 1990-2005*, 2007.

[146] ~~N~~Nestlé, *Consumers find an unfamiliar taste more enjoyable after looking at food that appeals to them*, Mar. 2012; Catherine Forestell, *Video Teaser: Taste development, Perception and Food preference in Young Children*, Nestlé Nutrition Institute, Nov. 2021.

[147] ~~G~~Gill Hyslop, *Pizza to ward off Alzheimer's? Nestle uses DNA to create personalized diets*, Bakery & Snacks, Sep. 4, 2018.

[148] ~~A~~Austin Kzoman, PepsiCo Global R&D; Stephen A. Gravina et al., *Human Biology of Taste*, ASM, May 2013.

[149] ~~J~~John Seabrook, "Snacks for a Fat Planet". The New Yorker, May 9, 2011.

PepsiCo also uses robots fitted with human taste buds that are hardwired into a computer to simulate human neurochemical responses to product formulations.[146][150]

139. 137. Defendant Coca-Cola employs "subject matter experts in the area of taste biology" and scientists studying "taste and odor perception, from detection by receptors in the oral and retronasal cavities, to signal transduction to the taste cortex in the brain where signals are processed...…to ultimately contribute to the building flavor knowledge and capability for The Company".[147][151]

140. 138. Similarly, dDefendant Conagra is "using brain science...…to grow and expand brand and portfolio offerings".[148][152]

141. 139. Defendant General Mills maintains a large technical center with numerous sensory labs, and employs sensory scientists "to guide the optimization of new products, product improvements" and product design.[149][153]

142. 140. Defendant Kellogg's utilizes "the cognitive neuroscience approach to the multisensory design (and modification) of their food products, and maintains numerous laboratories focusing on "sensory science".[150][154]

143. 141. Defendant Mars maintains an Advanced Research Institute focusing on the "combination of chemistry, biology and psychology...…to understand the complex interplay between the chemical composition of food and the sensory perceptions it generates".[151][155]

---

[146][150] Id.
[147][151] *Taste and Olfaction Research Senior Scientist-R&D*, Coca Cola, (Visited Apr. 2024).
[148][152] Jacobson/Rost, *Bringing Classic Brands into the New Economy*, (Last updated 2022), https://www.jacobsonrost.com/work/conagra#:~:text=Bringing%20classic%20brands%20into%20the,expand%20brand%20and%20portfolio%20offerings.
[149][153] *Sensory Scientist--R&D*, General Mills, (Visited Apr. 2024); Bill Zalud, *Managing in Tough Times*, Security Magazine, March 1, 2009.
[154] CCharles Spence, *Eating with Our Ears: Assessing the Importance of the Sounds of Consumption on our Perception and Enjoyment of Multisensory Flavour Experiences*, Flavour, Dec. 2015; Joanne O'Dea, *Kellogg's Food Science Lab Opens at Leuven Facility*, Science Business, Sep. 13, 2013.
[155] MMars, *The Science of Deliciousness: Dr. John Didzbalis creates flavor for a…,…* May 3, 2023.

33

144.    142. These few examples demonstrate how widespread Big Tobacco's brain hacking strategies have become in the UPF industry, but do not constitute the entirety of the UPF industry's efforts in this area. Additional details will be uncovered through discovery and presented at trial.

145.    143. In addition to the defendants' internal capacities, as demonstrated by the examples above, dDefendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have engaged third party research firms to conduct brain research to guide the development of new products.

146.    144. For example, the Monell Chemical Senses Center, which employs chemists, biochemists, physiologists and psychologists conducting stimuli/response research on human senses and "the essential mechanisms and functions of...taste and smell", has counted defendants Coca-Cola, Kraft Heinz, Mars, Nestle, and PepsiCo, as corporate partners.[152][156]

147.    145. On information and belief, all Defendants haveKraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have each utilized both internal scientists and third party research partners to assess physiological mechanisms of food reward activity.

148.    The purpose of Kraft Heinz's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[157]

---

[156] C*Corporate Partnership Program*, Monell Chemical Senses Center, (Visited Oct. 2023).
[157] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

149.    ~~146.~~ The purpose of ~~defendants'~~ Mondelez's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.~~153~~158

150.    The purpose of Post Holdings's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[159]

151.    The purpose of Coca-Cola's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[160]

152.    The purpose of PepsiCo's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[161]

153.    The purpose of General Mills's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[162]

---

[158] ~~R~~Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[159] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[160] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[161] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).
[162] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

154. The purpose of Nestle's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[163]

155. The purpose of Kellogg's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[164]

156. The purpose of Mars's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[165]

157. The purpose of Conagra's brain research is to understand how to hack the physiological structures of the human brain, and override the body's natural mechanisms for resisting UPF.[166]

158. 147. The goal of these Kraft Heinz's, Mondelez's, Post Holdings', Coca-Cola's, PepsiCo's, General Mills', Nestle's, Kellogg's, Mars' and Conagra's efforts is not to make UPF more flavorful—and certainly not to make UPF healthier. The only goal is to make UPF more profitable by driving consumption in ever increasing volumes.

159. 148. Defendants' Kraft Heinz's, Mondelez's, Post Holdings', Coca-Cola's, PepsiCo's, General Mills', Nestle's, Kellogg's, Mars' and Conagra's knowledge of the brain's physiological functions was used to hack the human brain, and formulate UPF products that could evade people's mechanisms for controlling intake.

---

[163] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

[164] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

[165] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

[166] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

160. Each of the Defendants, Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg, Mars and Conagra, utilized sophisticated scientific methodologies to ensure that their respective UPF was consumed in ever increasing speeds and volumes.

161. Each of the Defendants, Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg, Mars and Conagra, utilized sophisticated scientific methodologies to ensure that reinforcing features of their respective UPF were fine-tuned to trigger addictive responses.

## III. UPF are Addictive Substances

### A. *UPF Change Brain Chemistry and Neurocircuitry in the Same Ways as Addictive Drugs*

162. 149. The UPF industry has spent millions of dollars to figure out how to hack the human brain and the physiological hardware used to transmit messages throughout the human body.

150. Defendants' efforts have had predictable and intended consequences: UPF are addictive substances.

163. The efforts of Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have had predictable and intended consequences: UPF are addictive substances.

164. Most scientists believe that control of food intake over long periods of time is *not* a matter of willpower or conscious control.

165. Instead, our food choices are driven by signals from within our body interacting with signals from our environment. Like with breathing, one can exert temporary control over eating, but the majority of it is subconsciously controlled by human biology.

166.    Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra are each aware of this fact, and have exploited it through their research, design, and marketing efforts to drive excess consumption.

167.    151. Recent studies provide compelling evidence that UPF drive neurobiological and behavioral changes in the same ways as addictive drugs.[154][167]

168.    152. Strong biological evidence for the addictiveness of UPF comes from neuroimaging studies that show UPF trigger similar reward-related neural responses as other addictive substances such as cocaine and cigarettes.[155][168] UPF, cigarettes and cocaine all trigger dopaminergic reward signaling dysfunction, emotion dysregulation and impulsivity.[156][169]

169.    153. UPF have consistently been widely associated with elevated responses in brain regions related to desire and reward, such as the dorsal striatum, nucleus accumbens ("NAc"), and orbitofrontal cortex.[157][170]

170.    154. These patterns of neural activation occur in drug abusers and are associated with elevated cravings and overconsumption of UPF, cocaine and cigarettes.[158][171]

171.    155. UPF triggers rapid upregulation in calcium permeable AMPA receptors in the NAc, which is characteristic of addictive substances and associated with increased cue-induced craving and drug-seeking behavior.[159][172]

---

[154][167] Erica M. Schulte et al., *Advances in the Neurobiology of Food Addiction*, Curr. Behav. Neurosci. Rep., Dec. 2021.

[155][168] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., June 2024.

[156][169] Erica M. Schulte et al., *Advances in the Neurobiology of Food Addiction*, Curr. Behav. Neurosci. Rep., Dec. 2021.

[157][170] Id.

[158][171] Id.

[159][172] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., June 2024.

172.    ~~156.~~ Prolonged exposure to UPF causes reduced excitability of NAc core neurons, which is indicative of altered dopaminergic reward responses and similarly occurs with chronic cocaine exposure.[~~160~~173]

173.    ~~157.~~ Similarly, naltrexone, which is used to treat opioid use disorder, and pexacerfont, which is used to treat heroin addiction and methamphetamine addiction, are effective in reducing addiction to UPF.[~~161~~174] This suggests that UPF cravings are mediated through endogenous opioid peptide tone and the prefrontal cortex.[~~162~~175]

174.    ~~158.~~ High levels of UPF intake are associated with disrupted dopaminergic signaling (increased hedonic drive for UPFs), dysregulated hunger/satiety hormones (increased hunger, reduced satiety) and other alterations to the gut microbiome.[~~163~~176]

175.    ~~159.~~ Less processed foods are not addictive, and do not trigger these brain and physiological responses.[~~164~~177]

176.    ~~160.~~ This research provides "convincing support for the direct and unique role" that UPFs have in promoting overconsumption through their ability to alter the brain-gut microbiome axis in a manner that increases craving and motivating continued UPF intake.[~~165~~178]

---

[~~160~~173] Id.

[~~161~~174] Id.

[~~162~~175] Robert H. Lustig, *Ultraprocessed Food: Addictive, Toxic, and Ready for Regulation*, Nutrients., November 2020.

[~~163~~176] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.

[~~164~~177] Erica M. Schulte et al., *Advances in the Neurobiology of Food Addiction*, Curr. Behav. Neurosci. Rep., December 2021.

[~~165~~178] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun, 2024.

### B.     UPF are Addictive Based on the U.S. Surgeon General's Criteria for Addictiveness

177. 161. UPF are also addictive based on the criteria used by the U.S. Surgeon General to determine tobacco products are addictive.[166][179]

178. 162. Historically, the addiction label was mostly applied to substances such as alcohol and heroin that clearly caused mind-altering intoxication and adverse physical symptoms with withdrawal.[167][180]

179. 163. Tobacco presented a challenge to this conceptualization of addiction, because it results in no apparent intoxication syndrome and only mild physical withdrawal symptoms.[168][181] People can effectively go about their day fulfilling necessary obligations while having nicotine delivered rapidly to the brain through cigarettes.[169][182] Because of this, the notion that tobacco could be considered an addictive substance remained highly controversial for decades.[170][183]

180. 164. Despite the differences between tobacco and other addictive drugs, there is now scientific consensus that tobacco is a highly addictive substance, based in large part on the U.S. Surgeon General's findings.[171][184]

181. 165. In 1988, the U.S. Surgeon General issued a report identifying tobacco products as addictive based on three primary scientific criteria: their ability to (1) cause highly controlled or compulsive use; (2) cause psychoactive (i.e. mood-altering) effects via their effect on the brain; and (3) reinforce behavior.[172][185] Scientific advances have since identified the ability of tobacco

---

[166][179] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.

[167][180] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

[168][181] Id.

[169][182] Id.

[170][183] Id.

[171][184] Id.

[172][185] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.

products to (4) trigger strong urges or craving as another important indicator of addictive potential.[~~173~~186]

182.    ~~166.~~ Like tobacco, UPF do not trigger intoxication and do not cause life-threatening physical withdrawal symptoms, but people are prone to compulsively consume them even in the face of significant negative consequences.[~~174~~187] Thus, the reconceptualization of addiction triggered by tobacco is appropriate for evaluating the addictiveness of UPF.[~~175~~188]

183.    ~~167.~~ UPF meet the same criteria used by the Surgeon General, and can be labeled as addictive substances using the standards set for tobacco products.[~~176~~189]

> i.    *UPF Cause Compulsive Use*

184.    ~~168.~~ The ability of a substance to trigger compulsive use, including "drug-seeking and drug-taking behavior that is driven by strong, often irresistible urges" that can persist despite a desire or even repeated attempts to quit, is a hallmark of addictive substances.[~~177~~190]

185.    ~~169.~~ Compulsive use for tobacco in the U.S. Surgeon General's Report was demonstrated by evidence that most smokers would like to quit, but most were unable to do so.[~~178~~191] The report notes that the compulsive nature of tobacco is most clearly demonstrated in extreme cases where individuals experiencing significant smoking-related disease (e.g. cancer and cardiovascular disease) continue smoking.[~~179~~192]

---

[~~173~~186] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[~~174~~187] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[~~175~~188] Id.
[~~176~~189] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[~~177~~190] Id.
[~~178~~191] Id.
[~~179~~192] Id.

186. ~~170.~~ UPFs are capable of triggering the same kind of compulsive use. Even in the face of significant diet-related health consequences (e.g. diabetes and cardiovascular disease), the majority of patients are unable to adhere to medically recommended dietary plans that require a reduction of UPF intake.[~~180~~193] One of the most commonly cited obstacles for low dietary adherence is cravings for UPF.[~~181~~194]

187. ~~171.~~ Failure in response to gastric bypass provides an extreme case of compulsive UPF intake.[~~182~~195] Approximately 20-50% of individuals who undergo this surgery will "eat through" it, and continue to excessively ingest UPF.[~~183~~196] This intake persists despite UPFs triggering immediate aversive physical symptoms (e.g. cramping, vomiting, and diarrhea) when consumed after gastric bypass.[~~184~~197]

188. ~~172.~~ Binge eating is inversely associated with minimally processed foods, whereas UPF is positively associated with binge eating.[~~185~~198] A review of food diaries of individuals with eating disorders found that 100% of the foods consumed in binge episodes were UPF.[~~186~~199]

189. ~~173.~~ Similarly, rodents will risk aversive experiences (e.g. electric shock) to consume industrially produced sweets when other calorie sources are easily available to them.[~~187~~200] Rats even show greater resistance to electric shock when working for industrially produced sweetener than when methamphetamine is used as the reinforcer.[~~188~~201]

---

[~~180~~193] Id.

[~~181~~194] Id.

[~~182~~195] Id.

[~~183~~196] Id.

[~~184~~197] Id.

[~~185~~198] Id.

[~~186~~199] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, Psychother Psychosom., Nov. 2022.

[~~187~~200] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.

[~~188~~201] Id.

190.    174. Minimally processed foods do not elicit these responses in humans or rodents.[189][202] Therefore, UPFs, but not other foods, meet the criterion of triggering compulsive intake consistent with addictive substances.[190][203]

ii.    *UPF are Psychoactive Substances*

191.    175. Psychoactivity was defined in the U.S. Surgeon General's Report as a product that "produces transient alterations in mood that are primarily mediated by effects in the brain".[191][204]

192.    176. The ability of tobacco to alter mood is more subtle than intoxicating substances, such as opioids and alcohol.[192][205] However, tobacco products can cause detectable subjective increases in pleasure and reductions in negative affect.[193][206] These mood-altering effects are related to the ability of tobacco products to deliver high doses of nicotine rapidly to the brain.[194][207]

193.    177. The medial habenula and ventral tegmental area are key mediators of nicotine self-administration and use.[195][208] Relative to dopamine agonists such as amphetamine, which can increase stratial dopamine release by 1000%, nicotine administration causes more modest increases in dopamine efflux (150-250%), which is similar to other addictive drugs such as alcohol (also 150-200% over baseline).[196][209] However, despite this lower magnitude, nicotine is still capable of triggering compulsive intake and changing mood.[197][210]

---

[189][202] Id.
[190][203] Id.
[191][204] Id.
[192][205] Id.
[193][206] Id.
[194][207] Id.
[195][208] Id.
[196][209] Id.
[197][210] Id.

43

194.    178. There is sufficient evidence to label UPFs as psychoactive substances based on the criteria from the U.S. Surgeon General's Report.[198][211]

195.    179. UPF are capable of increasing positive affect and reducing negative affect.[199][212] For example, ultra-processed sweets are associated with similar measures of psychoactive drug effects as the administration of 1.5 mg of intravenous nicotine.[200][213] Further, UPF intake is often motivated by a desire to alter mood rather than to address homeostatic needs.[201][214]

196.    180. Regarding the brain, UPFs and their components increase dopamine in the striatum at a similar magnitude as nicotine when delivered orally (150-200%).[202][215]

197.    181. These substances increase striatal dopamine (~150%) and dopaminergic firing rates even when oral somatosensation is bypassed and UPF is delivered directly to the gut.[203][216]

198.    182. In other words, the addictive response is not dependent on tasting, smelling or touching UPF. It is a chemical reaction that occurs inside the body when it is exposed to UPFs—even when UPF is not eaten but is instead surgically inserted into the stomach.

199.    183. As with tobacco, the experience of subjective liking of UPF is less central to their tendency to maintain compulsive intake.[204][217] Instead, UPF's ability to trigger strong urges and cravings through dopamine receptors in the brain is more central to their addictive potential.[205][218]

---

[198][211] Id.
[199][212] Id.
[200][213] Id.
[201][214] Id.
[202][215] Id.
[203][216] Id.
[204][217] Id.
[205][218] Id.

### iii.  *UPF are Reinforcing Substances*

200.  ~~184.~~ The U.S. Surgeon General's Report defines reinforcing substances as those "being sufficiently rewarding to maintain self-administration".[~~206~~219] Clearly, humans will self-administer tobacco products, although not all humans find tobacco products reinforcing.[~~207~~220]

201.  ~~185.~~ Nicotine was identified as a key factor in the reinforcing nature of tobacco products, as animals would self-administer nicotine, work to gain access to nicotine, and prefer places where nicotine was administered.[~~208~~221] Research also demonstrated that conditioned cues paired with nicotine become secondary reinforcers.[~~209~~222]

202.  ~~186.~~ Compared to other addictive drugs (such as cocaine), nicotine was a relatively weak reinforcer and was only self-administered under a narrow range of conditions.[~~210~~223] However, this level of evidence was sufficient for the U.S. Surgeon General's Report to conclude that tobacco products were reinforcing due to their ability to deliver nicotine.[~~211~~224]

203.  ~~187.~~ The reinforcing nature of UPFs is high—both adults and children will self-~~self~~-administer UPF even when satiated.[~~212~~225] In contrast, the tendency to consume other foods when satiated is much lower.[~~213~~226]

204.  ~~188.~~ Daily exposure to UPF appears to sensitize the reinforcing value of these foods (as indicated by an increasing willingness to work to gain access to UPF over time) and larger

---

[~~206~~219] Id.

[~~207~~220] Id.

[~~208~~221] Id.

[~~209~~222] Id.

[~~210~~223] Id.

[~~211~~224] Id.

[~~212~~225] Id.

[~~213~~226] Id.

portions of UPF lead to greater sensitization.[214][227] In contrast, daily exposure to other foods does not sensitize reinforcement and may even reduce it.[215][228]

205. 189. Thus, UPFs have a high reinforcement value.[216][229]

206. 190. In animal models, the strength of reinforcement for UPFs relative to nicotine is very clear.[217][230] Animals will self-administer UPF in a much wider range of conditions than nicotine.[218][231]

207. 191. The ability of UPFs to rapidly deliver refined carbohydrates, fat and sweet tastes appears to play a role in their reinforcing nature, as these factors are all highly reinforcing even when studied in isolation.[219][232] Animals will self-administer sweet tastes over cocaine more than 80% of the time.[220][233] In contrast, animals choose to self-administer nicotine over cocaine less than 20% of the time.[221][234]

iv.     *UPF Cause Strong Urges & Cravings*

208. 192. Cravings in response to tobacco-associated cues are a major driver of use in humans and is a diagnostic indicator of tobacco use disorder.[222][235]

209. 193. Similarly, cravings in response to UPF cues—including marketing and promotion—drive UPF consumption and addiction.[223][236] Craving for UPF commonly occurs even when individuals are satiated.[224][237]

---

[214][227] Id.
[215][228] Id.
[216][229] Id.
[217][230] Id.
[218][231] Id.
[219][232] Id.
[220][233] Id.
[221][234] Id.
[222][235] Id.
[223][236] Id.
[224][237] Id.

210. ~~194.~~ The neural substrates underpinning cravings for UPFs and other addictive substances largely overlap.~~225~~[238] As with tobacco, stimuli paired with UPFs become salient motivational cues and cue-inducing craving for UPFs is implicated in more frequent UPF intake, loss of control over UPF intake (e.g. binge episodes), difficulty losing weight and a failure to reduce UPF intake in the face of serious health conditions.~~226~~[239]

211. ~~195.~~ Thus, UPFs, but not other foods, meet the criterion of triggering strong urges or cravings in a manner consistent with an addictive substance.~~227~~[240]

## C. A Profit-Driven Epidemic: UPFs are Engineered to Max Out Consumption, and Profits

212. ~~196.~~ There is sufficient evidence that UPFs are addictive substances, based on the physiological changes UPFs cause to brain chemistry and neurocircuitry, and the criteria used to establish the addictive nature of tobacco.~~228~~[241]

213. ~~197.~~ It has been the status quo to treat UPFs as food, and not the highly refined substances that they are.~~229~~[242] But "every addictive substance is something we take from nature and we alter it, and refine it in a way that makes it more rewarding—and that is very clearly what happened with these hyper-palatable food substances. We treat these foods like they come from nature. Instead, they come from big tobacco".~~230~~[243]

---

[238] Id.

[239] Id.

[240] Id.

[241] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024; Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.

[242] Id.

[243] Anahad O'Connor, *Many of Today's Unhealthy Foods were Brought to you by Big Tobacco*, The Washington Post, Sep. 19, 2023.

214. 198. Humans create addictive substances by processing naturally occurring substances into products with unnaturally high doses of reinforcing ingredients.[231][244] These products are typically combined with other additives that further enhance their rewarding effects (e.g. menthol in cigarettes) and addictive potential.[232][245]

215. 199. Cocaine is the extracted and ultra-processed modification of a South American shrub.[233][246] Crack is an even more ultra-processed and further addictive modification.

216. 200. Methamphetamine is the extracted and ultra-processed modification of a Chinese shrub, that can also be synthesized in laboratories.[234][247]

217. 201. UPF is the extracted and ultra-processed modification of naturally occurring components as well, stitched together with laboratory chemicals and colors and flavors developed for cigarettes. Like cocaine and methamphetamine, UPFs are addictive in ways that their unrefined predecessors are not.

218. 202. In the case of industrial tobacco products, their complexity and inclusion of thousands of chemicals made identifying a single addictive agent challenging.[235][248] A dose and rate profile of a single addictive chemical was not used to identify tobacco products as addictive.[236][249] Instead, the U.S. Surgeon General determined the addictiveness of tobacco products using criteria that also demonstrate UPF are addictive.

---

[231][244] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[232][245] Id.
[233][246] Amy Sue Biondich & Jeremy David Joslin, *Coca: The History and Midecal Medical Significance of an Ancient Andean Tradition*, Emerg Med Int., Apr. 2016.
[234][247] Sanctuary Lodge Halstead, *Origins of Methamphetamine*, (Last updated Jan. 2024), https://www.sanctuarylodge.com/blog/society/origins-of-methamphetamine/.
[235][248] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[236][249] Id.

219. ~~203.~~ Like industrial tobacco products, UPFs are complex substances that are psychoactive, highly reinforcing, strongly craved, and consumed compulsively.[~~237~~250] UPFs meet the actual scientific criteria used to determine that tobacco products are addictive.[~~238~~251]

220. ~~204.~~ Neuroimaging studies have demonstrated similar patterns of reward dysfunction and inhibitory control deficits for those with symptoms of food addiction and substance-use disorders.[~~239~~252]

221. ~~205.~~ It is clear that not all foods trigger an addictive response.[~~240~~253] The scientific literature specifically points to ultra-processed foods as being uniquely implicated in the biological (e.g. downregulation of dopamine receptors with prolonged consumption) and behavioral (e.g. binge eating, withdrawal) addictive-like responses, whereas minimally processed foods do not cause these responses.[~~241~~254]

222. ~~206.~~ Additionally, the consumption of UPF has been associated with subjective experiences of reward that have predicted the abuse liability of addictive substances, such as elevated craving, enjoyment and satisfaction.[~~242~~255]

223. ~~207.~~ As Philip Morris scientists Frank Gullotta explained to the predecessor of Defendants Kraft Heinz, Mondelez, and Post Holding in 1990, the senses of taste, smell and touch don't "matter a didley if you don't have the effects in the brain. [UPF] are only pleasurable because of the consequences" in the brain.[~~243~~256]

---

[~~237~~250] Id.
[~~238~~251] Id.
[~~239~~252] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[~~240~~253] Id.
[~~241~~254] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021; Erica M. LaFata, *Ultra- ~~Ultra~~ Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.
[~~242~~255] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[~~243~~256] *Appendix A Chemical Senses Symposium, Meeting Minutes*, Apr. 1990.

224.   208. UPF engage brain regions related to reward/motivation (e.g., dorsal striatum) in a similar manner as drugs of abuse, and are commonly linked to behavioral features of addiction, such as increased loss of control eating and binging.[244][257]

225.   209. UPF are designed with combinations of ingredients that create an artificially rewarding eating experience.[245][258] The high levels of refined ingredients in UPF trigger metabolic signals which send reinforcing signals to the brain that this item is highly rewarding.[246][259] This potent combination is further amplified by the addition of unnaturally high levels of sodium and other flavor enhancers and preservatives.[247][260]

226.   210. UPF are designed to optimize not only the magnitude of the reward signal in the brain through high doses of ingredients and additives, but also the speed with which that reward is delivered.[248][261]

227.   211. One of the most important factors in determining addictive potential is the speed with which a substance is absorbed by the body.[249][262] Delivery mechanisms that lead to rapid absorption of the addictive ingredient, like smoking a cigarette or snorting cocaine, all increase addictive potential.[250][263]

228.   212. In contrast, slowing the absorption rate of an addictive substance can transform an addictive drug into a therapeutic medication, as is the case for slow-release nicotine patches that aid attempts to quit smoking and slow-release stimulant medication used to treat ADHD.[251][264]

---

[244][257] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[245] 1.   [258] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023.
[246][259] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[247][260] Id.
[248][261] Id.
[249][262] Id.
[250][263] Id.
[251][264] Id.

229. 213. In parallel, the creation of UPF often includes the removal of ingredients such as fiber, water, or protein that slow the rate of absorption of rewarding ingredients and the addition of ingredients (like texturizers) that increase how quickly the food can be consumed.[252][265]

230. 214. This allows ultra-processed foods to be consumed more rapidly and increases the speed with which highly rewarding ingredients are absorbed into the system.[253][266]

231. 215. Thus, as with other addictive substances, the speed with which rewarding ingredients are delivered and impact the body is increased in UPF.[254][267]

232. 216. The combinations found in UPF do not occur in nature; as a result, UPF excessively activate brain reward neurocircuitry, evade systems designed to signal sufficient or excess caloric intake, and thereby facilitate excess caloric intake.[255][268]

233. 217. Repeated consumption of UPF over time can result in dysregulation of food reinforcement processes, leaving individuals highly motivated to seek out and consume UPF.[256][269] These consequences are similar to other substances of abuse, including nicotine.[257][270]

234. 218. Consuming addictive drugs is not essential for survival—if one never consumes an addictive drug, survival would be possible.[258][271] The reinforcing and compulsive nature of addictive drugs comes from their ability to activate to an unnaturally high degree the

---

[252][265] Id.

[253][266] Id.

[254][267] Id.

[255][268] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023; Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

[256][269] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023.

[257][270] Id.

[258][271] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

reward/motivation, memory, and habit systems that were optimized to enhance human survival.[259][272]

235.    219. Like other addictive substances, UPF do not exist in nature and are not necessary for survival.[260][273] Humans survived and thrived for thousands of years prior to the invention of UPF. Prior to the last the last few generations, all of human existence occurred without the presence of these substances. Every human civilization was built without UPF.

236.    220. UPF are created by combining processed ingredients and additives into novel products with unnaturally high levels or rewarding ingredients.[261][274]

237.    221. The ability of addictive drugs to potently activate neurocircuitry can shift attention away from life-sustaining behaviors and instead drive forward compulsive drug-seeking and drug-taking behavior that is detrimental to health and survival.[262][275]

238.    222. As with addictive drugs, excess consumption can be marked by compulsive UPF- UPF-seeking and taking behavior that results in poor health and preventable death.[263][276]

239.    223. And like other addictive substances, UPF are evolutionarily novel products made possible through modern technology that provide refined and rapidly delivered primary reinforcers that tap into reward and motivation systems.[264][277]

240.    224. Individual risk factors interact with the addictive potential of a substance to determine the likelihood that a specific individual will become addicted.[265][278]

---

[259][272] Id.
[260][273] Id.
[261][274] Id.
[262][275] Id.
[263][276] Id.
[264][277] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly processed foods can be considered addictive substances based on established scientific criteria*, Addiction, Nov. 2022.
[265][278] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

241.     225. Individual risk factors that increase a propensity for addiction include a family history of addiction, cognitive control difficulties, trauma exposure, and depression.[266][279]

242.     226. These same risk factors also increase the likelihood of excessive UPF intake.[267][280]

243.     227. Given that the individual risk profile for addiction does not change quickly on a population level, increases in substance use disorders are primarily attributable to the addictive potency of the substance and accessibility within the surrounding environment.[268][281]

244.     228. For the same reasons, addiction epidemics are driven not by drastic changes in individual risk factors but by changes in the environment.[269][282]

245.     229. Addiction epidemics occur because a novel and potent addictive substance is created, but its addictive potential is undetected or underestimated.[270][283] The environment changes in a manner that makes the addictive substance more accessible.[271][284]

246.     230. When addictive substances become cheap, easily accessible, heavily marketed and socially acceptable to use, the prevalence of addictive responses to that substance will increase.[272][285]

247.     231. It is clear that the same environmental factors that drive addictive drug epidemics are also contributing to excessive intake of ultra-processed foods, including low cost, high availability, and frequent marketing.[273][286]

---

[266][279] Id.

[267][280] Id.

[268][281] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, Psychother Psychosom., Nov. 2022.

[269][282] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.

[270][283] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, Psychother Psychosom., Nov. 2022.

[271][284] Id.

[272][285] Id.

[273][286] Id.

248. 232. There was not a massive, population-level failure of personal responsibility beginning in the 1980s.

249. 233. Similarly, the human genome did not undergo a radical transformation beginning in the 1980s.

250. 234. Instead, beginning in the 1980's, Big Tobacco and the Defendants took over the U.S. food environment and filled it with UPF.

251. 235. Recent systematic reviews estimate that 14-20% of adults and 12-15% of children are addicted to UPF.[274][287]

252. 236. The rate of UPF addiction in adults is highly similar to the rate of addiction in users of other addictive substances.[275][288] For example, while 90% of people consume alcohol over their lifetime, only 14% develop an alcohol use disorder.[276][289] Similarly only 18% of tobacco users develop a tobacco-use disorder, and only 20.9% of cocaine users become addicted.[277][290]

253. 237. However, the prevalence of UPF addiction in children is "striking and unprecedented".[278][291] Never in American history have so many children been hooked on an addictive substance.

254. 238. And there is a clear reason why: Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra target children with their harmful UPF.

---

[274][287] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, Psychother Psychosom., Nov. 2022.
[275][288] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.
[276][289] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021.
[277][290] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021; Erica M. LaFata, *Ultra- Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.
[278][291] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.

**IV.    Preying on the Vulnerable: Defendants Target Children with Marketing for Dangerous UPF**

255.    ~~239.~~ Big Tobacco injected its other dark arts into the U.S. food environment. It tapped one of its most ominous, and successful tactics, from the cigarette industry to increase its UPF profits: targeting children.

256.    ~~240.~~ Tobacco companies promoted their UPF using integrated marketing strategies that had been originally designed to sell cigarettes, surrounding children with consistent product messages in the home, store, school, sports stadium and theme park.[~~279~~292]

257.    ~~241.~~ Both RJ Reynolds and Phillip Morris used the techniques they developed in tobacco product development, sales and marketing to develop and market unhealthy UPF products to vulnerable populations in the USA, specifically children and racial and ethnic minority groups.[~~280~~293]

258.    ~~242.~~ Much as they did with cigarettes, the Big Tobacco companies used cartoon mascots, child sized packaging technologies, and advertising messages found to appeal to children's desire for autonomy, play and novelty to sell their UPF.[~~281~~294]

259.    ~~243.~~ Tobacco executives transferred their knowledge of marketing to young people to the UPF industry, and expanded product lines using colors and flavors, and marketing strategies originally designed to market cigarettes.[~~282~~295]

---

[~~279~~292] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.
[~~280~~293] Tena L. Fazzino, *The Reinforcing Natures of Hyper Palatable Foods: Behavioral Evidence for Their Reinforcing Properties and the Role of the US Food Industry in Promoting Their Availability*, Current Addiction Rprts., May 2022.
[~~281~~294] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.
[~~282~~295] Id.

260. 244. Through centralized marketing initiatives, Philip Morris directly transferred knowledge, expertise, personnel, resources and infrastructure from its tobacco to its UPF companies.[283][296]

261. 245. Phillip Morris' "Corporate Synergy Project" set up committees to identify shared activities across tobacco, alcohol and food subsidiaries to increase sales, consolidate media purchases, and increase advertising budgets.[284][297] Marketing and brand management were centralized at the Phillip Morris corporate level.[285][298]

262. 246. The combined Philip Morris companies used grocery scanners to collect consumer data, including demographics, lifestyle characteristics and purchasing patterns on 199 million people.[286][299] Demographics, including children's ages and household purchasing patterns, were compiled into a comprehensive consumer database used by all subsidiaries.[287][300]

263. 247. Big Tobacco's approach to UPF marketing was to maximize sales to children, who are vulnerable and not fully capable of making informed decisions. As Philip Morris' CFO bragged in 1987, "We've decided to focus our marketing on kids, where we know our strength is greatest".[288][301]

264. 248. After acquiring General Foods and Kraft, Philip Morris slashed UPF ad spending directed at mothers and increased ad spending directed to children by many multiples.[289][302]

---

[283][296] Kim H. Nguyen at al., *Transferring Racial, Ethnic Marketing Strategies from Tobacco to Food Corporations: Phillip Morris and Kraft General Foods*, Am J Public Health, Mar. 2020.

[284][297] Id.

[285][298] Id.

[286][299] Id.

[287][300] Kim H. Nguyen, *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.

[288][301] Hans Storr, Remarks to First Boston Beverage Tobacco Conference, (April 1, 1987).

[289][302] Kim H. Nguyen, *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.

265. 249. For example, in the manner of a few years after acquiring General Foods, Philip Morris boosted children's marketing budget for Kool Aid from $2.8 million to over $45 million, while cutting advertising directed to mothers in half.[290][303]

266. 250. Likewise, RJ Reynolds transformed Hawaiian Punch from an at-home cocktail mixer for adults to a children's beverage through reformulation, repackaging and kid-targeted marketing.[291][304]

267. 251. Numerous campaigns were aimed at 6-12 year olds.[292][305] Kraft maintained a "Kids Task Force" that used integrated marketing campaigns, Disney and Nickelodeon's cartoons, toys, and games to promote UPF.[293][306]

268. 252. The head of Kraft's "Kids Task Force" bragged in the late 1990s that these promotions "will reach about 95% of the kids in the target 6 to 12 age group in the U.S."[294][307] Philip Morris collaborated with Mattel and Nintendo to issue UPF branded toys, including Barbie and Hot Wheels.[295][308] Philip Morris collaborated with Marvel to issue UPF branded comic book series.[296][309]

269. 253. Philip Morris created kid-focused UPF loyalty programs, such as the Kool-Aid "Wacky Warehouse", which the director of Philip Morris' beverage division described as "our version of the Marlboro Country Store".[297][310] A Philip Morris analysis called the Kool Aid Wacky Warehouse "the most effective kid's marketing vehicle known".[298][311]

---

[290][303] Id.
[291][304] Id.
[292][305] Id.
[293][306] Duncan Hood, *Kraft to untwist toons on ABC Disney block*, Kidscreen, Jan. 1, 1999.
[294][307] Id.
[295][308] Kim H. Nguyen, *Tobacco Industry Involvement in Children's Sugary Drinks Market*, BMJ, Mar. 2019.
[296][309] Id.
[297][310] Id.
[298][311] Id.

270.    254. Philip Morris directed integrated UPF marketing campaigns to children to create a "fully integrated event across all the touch-points in a kid's world".[299][312]

271.    255. Philip Morris' Kraft and Burger King united in multi-million dollar integrated co- co-promotions on Nickelodeon in joint efforts "ratcheting up" promotion of UPF to children through TV ads, toys and cartoons.[300][313]

272.    256. Included in these efforts were racial/ethnic minority-targeted UPF marketing programs modeled on successful cigarette programs.[301][314] These programs specifically targeted children in Black and Hispanic communities.[302][315]

273.    257. By 1989, KGF had been integrated with Phillip Morris Tobacco's contracts with Black and Hispanic television, print and other media.[303][316] In 1990, KGF pledged $7 million to Hispanic media and $2 million to Black media.[304][317] Kraft maintained a database of millions of Black consumers and another database of Hispanic-dominant stores serving 1 million households.[305][318]

274.    258. Big Tobacco's marketing tactics targeting children and minorities were broadly applied in Philip Morris' UPF division, which later became Defendants Kraft Heinz, Mondelez and Post Holdings.

275.    259. In a highly confidential 1999 memo, Kraft admitted that its foods were being attacked as a major cause of disease, and that "critics are calling for remedies focusing entirely on

---

[299][312] Id.

[300][313] Corporate Affairs, *Today's Topics*, Philip Morris Companies, Inc., Jun. 1998.

[301][314] Kim H. Nguyen at al., *Transferring Racial, Ethnic Marketing Strategies from Tobacco to Food Corporations: Phillip Morris and Kraft General Foods*, Am J Public Health, Mar. 2020.

[302][315] Id.

[303][316] Id.

[304][317] Id.

[305][318] Id.

food, including taxes on 'bad' foods to control consumption and regulations to control marketing to kids".[306][319]

276.    260. Despite this, and in the very same memo, Kraft committed to "expand KFNA's One Company multi-brand scale events, such as this year's partnerships with Nickelodeon and Disney's ABC network to promote Kraft's portfolio of Kids products" and that "Post will strengthen its established Kids portfolio….…via an integrated Post Kids scale initiative including dedicated advertising, logos and packaging graphics".[307][320]

277.    261. The direct descendants of Philip Morris, Defendants Kraft Heinz, Mondelez and Post Holdings, continue to engage in these marketing strategies directing unhealthy UPF at children and minorities. These companies continue to spend millions of dollars every year marketing UPF to children and minorities.[308][321]

278.    262. For example, Kraft Heinz targets children with UPF marketing including PAW Patrol games, television ads, integrated campaigns with popular children's television and movie characters, and co-branding on children's media such as Nick Jr.[309][322]



[306][319] *Confidential Strategic Plan*, Kraft, 1999.

[307][320] Id.

[308][321] Jennifer L. Harris et al., *Rudd Report: Targeted Food and Beverage Advertising to Black and Hispanic Consumers: 2022 Update*, Rudd Center for Food Policy, Nov. 2022.

[309][322] See e.g., Nick Jr., *PAW Patrol: Mission Mac & Cheese Shapes #1 w/ Kraft! | Nick Jr.*, (Youtube Dec. 5, 2020), https://www.youtube.com/watch?v=x8E58eLWr6Q; Nick Jr., *PAW Patrol: Mission Mac & Cheese Shapes #2 w/ Kraft! | Nick Jr.*, (Youtube Dec. 12, 2020), https://www.youtube.com/watch?v=LqhFcFuUHFA; Nick Jr., *PAW Patrol: Mission Mac & Cheese Shapes #3 w/ Kraft! | Nick Jr.*, (Youtube Dec. 19, 2020), https://www.youtube.com/watch?v=FFYsf2T5e0U; Lunchables, *Lunchables TV Spot, "Mixed Up Alert: Minions"*, (iSpot Jan. 28, 2019), https://www.ispot.tv/ad/ITcX/lunchables-mixed-up-alert-minions.





279.    263. Mondelez targets children with UPF using Super Mario characters, television

ads, interactive websites, and co-branding with children's movie characters.[310][323]

---

[310][323] See e.g., OREO Cookie, *Super Mario x OREO Limited Edition Cookies*, (Youtube Jun. 26, 2023),
https://www.youtube.com/watch?v=VJrFh8rZ9pU; OREO Cookie, *Unlock your Imagination with OREO x #ifmovie*,
(Youtube May 9, 2024), https://www.youtube.com/watch?v=n_Pdpeq5qvA.





280. 264. Post Holdings airs television ads encouraging children to eat its UPF, use its UPF packaging as toys, and incorporate UPF into their science projects, as well as integrated campaigns with popular children's television and movie characters, and co-branding on children's media.311324

---

311324 See e.g., Pebbles Cereal, *Let's Do This!*, (Youtube Nov. 30, 2021), https://www.youtube.com/watch?v=5rXzi7LHYwY; Honey-Comb, *Honey-Comb TV Spot, "Made With Nickelodeon: Spongebob"*, (iSpot Jun. 5, 2019), https://www.ispot.tv/ad/ooOe/honey-comb-made-with-nickelodeon-spongebob; Honey-Comb, *Honey-Comb TV Spot, "Cannonball"*, (iSpot Oct. 2, 2017), https://www.ispot.tv/ad/wKMv/honey- honey-comb-cannonball.







281. ~~265.~~ These are but examples of the intensive and integrated strategies Kraft, Mondelez, and Post Holdings use to target children with UPF marketing and promotions. Additional details will be uncovered through discovery and presented at trial.

282. ~~266.~~ The other Defendants, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra aggressively target children with UPF marketing as well. As discussed above, smaller companies within an industry observe and model themselves on the larger ones.[~~312~~325] The UPF Industry is no exception.

283. ~~267.~~ Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra all use integrated marketing campaigns to pervasively target children with UPF marketing.

284. ~~268.~~ By 2006, UPF companies spent over $1.6 billion a year on advertising directed towards children.[~~313~~326] Of this, approximately $870 million was spent on marketing directed to children under 12.[~~314~~327]

285. ~~269.~~ To this day, the UPF industry continues to spend over $2 billion on advertising UPF to children each year.[~~315~~328] In addition to TV ads, the industry annually puts more than 3 billion ads on popular children's websites promoting UPF.[~~316~~329] Defendants Kraft Heinz,

[~~312~~325] Kim H. Nguyen at al., *Transferring Racial, Ethnic Marketing Strategies from Tobacco to Food Corporations: Phillip Morris and Kraft General Foods*, Am J Public Health, Mar. 2020; Neil Fligstein, *The Transformation of Corporate Control*, Theory and Society, Feb. 1993; Heather A. Haveman, *Follow the leader: mimetic isomorphism and entry into new markets*, Adm. Sci. Q., Dec. 1993.
[~~313~~326] Sarah Botha et al., *Marketing Food To Children and Adolescents: A Review of Industry Expenditures, Activities, and Self-Regulation*, U.S Federal Trade Commission Report To Congress, Jul. 2008.
[~~314~~327] Id.
[~~315~~328] Brett Wilkins, *NEWS: Sanders and Booker Take on Food and Beverage Industry with Legislation to Address Childhood Diabetes and Obesity Epidemics*, U.S. Senate Committee on Health, Education, Labor & Pensions, April 19, 2024; *Blumenthal, DeLauro & Booker Introduce Bicameral Bill to Curb Unhealthy Food & Beverage Marketing Targeting Kids*, U.S. Senate Office of Richard Blumenthal, Nov. 15, 2022.
[~~316~~329] A E Ustjanauskas et al., *Food and Beverage Advertising on Children's Web Sites*, Pediatr Obes., Jan. 2013.

Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra also pervasively market UPF to children through social media.[317][330]

286. 270. This advertising disproportionately targets Black and Hispanic children, who are targeted with 70% more UPF ads than their White counterparts.[318][331]

287. 271. Much of this marketing intentionally plays on the addictive nature of UPF. For example numerous cartoon mascots and spokes-characters used to target children have an addictive and unhealthy relationship with the UPF they are promoting.

288. 272. Defendant Coca-Cola specifically set out to grow individual consumption of their products, and aimed to drive individual consumption of Coca-Cola higher than individual consumption of milk and water.[319][332] As described by Todd Putman, Coca-Cola's former head of US Marketing, the goal was "How can we drive more ounces into more bodies more often?"[320][333]

289. 273. Kids were a major target of these Defendant Coca-Cola's efforts.[321][334] According to Putman, "when they would turn twelve, we'd suddenly attack them like a bunch of wolves" with marketing campaigns.[322][335]

290. 274. Defendant Coca-Cola's rationale was to prey on the vulnerable. As Coca-Cola acknowledged in a 2005 internal report on targeting children, "Teens are at a crucial stage on the learning curve of 'how to be me'".[323][336] As such, teens are a critical focus of Coca-Cola's child marketing efforts.

---

[317][330] Frances Fleming-Milici & Jennifer L. Harris, *Adolescents' engagement with unhealthy food and beverage brands through social media*, Appetite., Mar. 2020.
[318][331] Daniel P. Jones, *Food Advertising Targeted to Hispanic and Black Youth: Contributing to Health Disparities*, University of Connecticut, Rudd Center for Food Policy & Obesity. Aug. 2015.
[319][332] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at 99, 108-110, (2013). 320Id. at 110.
[320][333] Id. at 110.
[321][334] Id. at 110-116.
[322][335] Id. at 111.
[323][336] Clinkin Reasearch, *Convenience Teens Building Loyalty with the Next Generation*, Coca Cola Leadership Council, 2005.

291.    ~~275.~~ When Jeffrey Dunn, Coca-Cola President & COO of North & South America, suggested that Coke should stop marketing in public schools, he was called "an embarrassment to the company", and fired shortly thereafter.[~~324~~337]

292.    ~~276.~~ Defendant PepsiCo also aggressively markets UPF to children, and has increased such advertising since 2010.[~~325~~338]

293.    ~~277.~~ PepsiCo marketing prominently features young children in its advertisements, includes integrated promotions with popular cartoon characters such as the Minions, contests with prizes including free trips to amusement parks, and spokes-characters such as Chester Cheetah.[~~326~~339]



---

[~~324~~337] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at 116-118, (2013).
[~~325~~338] *Sugary Drink Targeted Marketing*, Wall Street Journal,
https://www.wsj.com/public/resources/documents/Targeted-marketing-sheets-Children-Teens.pdf
[~~326~~339] See e.g., Nelson Tabolt, *When Pigs Fly - Doritos Crash the Super Bowl 2015 WINNER OFFICAL*, (Youtube Nov. 9, 2014), https://www.youtube.com/watch?v=YQo0TfuueaY; Filmpop, *The New Kid | Doritos Commercial*, (Youtube Nov. 15, 2015), https://www.youtube.com/watch?v=fvyBCesuxMM; Dans Ta Pub, Cheetos Mix Ups and Despicable Me 2, (Youtube Jul. 8, 2013), https://www.youtube.com/watch?v=AhmTMN6WaKQ; Commercials Funny, *Cheetos Commercial 2018 Beluga Whale*, (Youtube Sept. 5, 2018),
https://www.youtube.com/watch?v=QwBg9mSe_IY ~~IY~~.






294. ~~278.~~ As of 2013, despite pledges to reduce advertising to children, PepsiCo was increasing its advertising to children, and Coca-Cola had placed 38 million ads for products or promotions on children's websites.[~~327~~340]

295. ~~279.~~ Collectively, defendants Coca-Cola and PepsiCo spent more than $1 billion annually marketing UPF to kids.[~~328~~341] These ads disproportionally target Black and Hispanic children.[~~329~~342]

296. ~~280.~~ Defendant Nestle markets to children using cartoon spokes-characters, marketing prominently featuring children, and integrated campaigns across multiple media platforms to target children with UPF marketing.[~~330~~343]

---

[~~327~~340] *Sugary Drink Targeted Marketing*, Wall Street Journal, https://www.wsj.com/public/resources/documents/Targeted-marketing-sheets-Children-Teens.pdf

[~~328~~341] Aurora Meadows et al., Study: *Big Soda's Ads Target Young People of Color*, EWG, August 4, 2020.

[~~329~~342] Id.

[~~330~~343] See e.g. Amazon Fresh, *Nesquik Bunny Ears*, (Youtube Jul. 12, 2013),






297.    ~~281.~~Defendant Conagra aired cartoon movies on Nickelodeon to promote children-~~focused~~ focused product lines such as "Kid's Cuisine".~~331~~344 Conagra's General Manager explained that "integrated promotions are critical for Kid Cuisine to drive kid requests for our meals and strengthen brand equity among children. When Kid Cuisine partners with strong

---

https://www.youtube.com/watch?v=xmsglZvEBLY; SN ®, *Hot Pockets Commercial 2022 - (USA) • DeliWich | Commercial Break*, (Youtube Aug. 23, 2022), https://www.youtube.com/watch?v=aNVxBTOwIXs; Sar Spary, *Nestle Causes Outrage Over Ads Promoting Unhealthy Eating To Kids*, Buzzfeed News, Dec. 2015, https://www.buzzfeed.com/saraspary/nestle-blasted-for-promoting-unhealthy-eating-to-children; Elizabeth S. Moore, *It's Child's Play: Advergaming and the Online Marketing of Food to Children — Report*, Kaiser Family Foundation 2006, Jul. 2006.

~~331~~344 Conagra News Release, *Conagra Foods' Kid Cuisine® Brand Launches Integrated Marketing Promotion with 'Planet 51(TM') Animated Movie*, Conagra Brands, Nov. 19, 2009

licensed~~-~~ properties, we've seen measurable sales increases".~~332~~346 Conagra also uses cartoons, super-hero spokes-characters, and ads prominently featuring young children.~~333~~346





298.   ~~282.~~ Defendant General Mills uses marketing featuring young children, cross promotions with popular children's movie characters, giveaways including free movie tickets to Disney cartoons, multimedia games, online quizzes and cell phone apps to market UPF to children.~~334~~347

---

~~332~~345 Id.

~~333~~346 See e.g. Kid Cuisine, *Kid Cuisine Earth's Mightiest Popcorn Chicken TV Spot, "Avengers Assemble"*, (iSpot Feb. 5, 2018), https://www.ispot.tv/ad/walC/kid-cuisine-earths-mightiest-popcorn-chicken-avengers-assemble; Kid Cuisine, *Kid Cuisine Galactic Chicken Breast Nuggets TV Spot, "Junior Jedi"*, (iSpot Sept. 13, 2016), https://www.ispot.tv/ad/ACef/kid-cuisine-galactic-chicken-breast-nuggets-junior-jedi;

~~334~~347 Matt Richtel, *In Online Games, a Path to Young Consumers*, New York Times, Apr. 20, 2011; Anneliese STREBEL, *GoGurt Commercial 2017 Guardians of the Galaxy Vol. 2*, (Youtube Jan. 12, 2018), https://www.youtube.com/watch?v=mcyncuQfFdU; Cheerios, X, (Nov. 16, 2022), https://x.com/cheerios/status/1725222885399130220; Lucky Charms, *Lucky Charms TV Spot, "Rainbow Unicorn Marshmallows"*, (iSpot Jul. 29, 2019), https://www.ispot.tv/ad/oD5I/lucky-charms-rainbow-unicorn-~~marshmallows~~-marshmallows;Go-Gurt, *GoGurt TV Spot, "Minion Jokes"*, (iSpot Jun. 15, 2015), https://www.ispot.tv/ad/7cQJ/gogurt-minion-jokes.



299.    283. Defendant Kellogg's uses marketing featuring cartoons, spokes-characters, young children, and cross promotions with popular Disney movies to target children with UPF marketing.335348

---

335348 See e.g. KelloggsUS, *Disney Frozen 2 - Kellogg's Commercial*, (Youtube Nov. 6, 2019), https://www.youtube.com/watch?v=rB4hIYwJuiY; Rice Krispies, *Rice Krispies Christmas message*, (Mar. 11, 2013), https://www.youtube.com/watch?v=drInTjUw48w&list=PLGP6FBvf5tT6DHLv5NtvXXLTTfeY97ke2&index=145; Froot Loops, *Froot Loops® | Wild Dance*, (Youtube Dec. 5, 2022) https://www.youtube.com/watch?v=6EMTMeumq_4; Rice Krispies, *Rice Krispies Vibin'- Official Lyric Video*, (Youtube Jun. 30, 2021). https://www.youtube.com/watch?v=P- mYetXky_YmYetXky Y&list=PLGP6FBvf5tT6DHLv5NtvXXLTTfeY97ke2&index=162.







300. 284. Defendant Mars uses marketing featuring cartoons, children, popular video game characters, and internet promotions to target children with UPF marketing.336349

---

336349 See e.g., Commercial Ads, *Skittles Commercials Compilation Taste The Rainbow Ads*, (Youtube Sept. 30, 2018), https://www.youtube.com/watch?v=GUVkO6ts2pA; Funny Commercials, *All Funniest Starburst Fruit Flavored Juicy Candy Commercials EVER!*, (Youtube Oct. 1, 2020), https://www.youtube.com/watch?v=wqeNn0sQAI4; Juicy Fruit, *Juicy Fruit Starburst TV Spot, '"Teens Use Zippers to Communicate'"*, (iSpot Jan 12. 2015), https://www.ispot.tv/ad/7HjH/juicy-fruit-starburst-teens-use-zippers-to-communicate.





301. ~~285.~~ These are but examples of the intensive and integrated strategies Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra use to inundate children with UPF marketing. Additional details will be uncovered through discovery and presented at trial.

302. ~~286.~~ Despite repeated promises to reduce advertising targeting children, Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra collectively target kids with billions of website advertisements every year.~~337~~350

---

~~337~~350 A E Ustjanauskas et al., *Food and Beverage Advertising on Children's Web Sites*, Pediatr Obes., Jan. 2013.

303.    287. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra continue to target children with intensive, integrated marketing campaigns designed to infiltrate multiple touchpoints of children's lives.

304.    288. And while some UPF companies claim that they restrict their child targeting to adolescents, adolescents may be even more vulnerable to UPF's harmful marketing appeals than younger children.[338][351]

305.    289. Scientists have determined that UPF promotions "continue to present a risk to young people's heath and raise ethical concerns".[339][352] UPF companies have "never had so much access to [children] and never been able to bypass parents so successfully".[340][353]

306.    Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have each weaponized this unfettered access to engage in unfair and deceptive marketing targeting children.

## V.    A Banquet of Consequences—UPF Companies have Unleashed Immense Harm on American Children

307.    290. Collectively, the Big Tobacco companies dominated the U.S. food industry from 1985 through 2007. During this time, Big Tobacco's food companies, including Defendants Kraft Heinz, Mondelez, and Post Holdings, selectively disseminated addictive UPF into the U.S. food environment. The other Defendants, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, followed the lead of the Big Tobacco companies, and our food supply has become dominated by UPF.

---

[338][351] Jennifer L. Harris et al., *Hooked on Junk: Emerging Evidence on How Food Marketing Affects Adolescents' Diets' Diets and Long-Term Health*, Curr. Addict. Rep., Nov. 2020.
[339][352] James W. Elsey & Jennifer L. Harris, *Trends in Food and Beverage Television Brand Appearances by Children and Adolescents from 2009 to 2014 in the USA*, Public Health Nutr., Nov. 2015.
[340][353] Matt Richtel, *In Online Games, a Path to Young Consumers*, New York Times, Apr. 20, 2011.

308. 291. As Oregon State professor Howard Hilleman, PhD recognized in 1958, we are "a captive population with respect to freedom in the selection of food. Such people as we are largely at the mercy of the foods of commerce and those who supply them".[341][354]

309. 292. Currently about 73% of the food in our food supply is ultra-processed and potentially addictive.[342][355] Unsurprisingly, these foods compose 67% of our children's diets on average.[343][356]

310. 293. With Americans' food options so dominated by UPF, the notion of "personal responsibility" is thoroughly undermined. People consume unhealthy UPF because it has crowded out other options. This is not a lack of personal responsibility but a deprivation of personal choice—Defendants' unhealthy UPF manufactured by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra is ubiquitous.

311. 294. UPF is engineered to hack the physiological structures of our brains.[344][357] Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra purposefully sought to introduce addictive qualities into their UPF, using the same experimental psychology research pioneered by the tobacco industry to make cigarettes more addictive.

312. 295. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra incorporated colorings, flavorants, and other additives initially created for cigarettes into their products. They selectively manufactured and sold foods that have addictive qualities. And they aggressively marketed their products to children,

---

[341][354] Howard H. Hilleman, *Chemical Additives in Our Foods*, Natural Foods and Farming, 1958.
[342][355] Jessica Taylor Price, *Has your food been chemically altered? New database of 50,000 products provides answers,* Northeastern Global News, May 25, 2022.
[343][356] Lu Wang et al., *Trends in Consumption of Ultraprocessed Foods Among US Youths Aged 2-19 Years, 1999-2018*, JAMA, Aug. 2021.
[344][357] Robert Lustig, The Hacking of the American Mind, (2017); Chris van Tulleken, Ultra-Processed People: The Science Behind the Food, at 151-171, (2023).

especially to Black and Hispanic children, using marketing tactics pioneered by the tobacco industry to sell cigarettes to children and these communities.

313.    296. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra each used sophisticated brain science to develop products that would be overconsumed, in order to generate excess profits. Each Defendant targeted children with marketing for their dangerous and addictive UPF.

314.    297. In terms of profits, Defendants' efforts the efforts of Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have been highly successful. Real food has been displaced by UPF in the American food environment, and Defendants have generated billions of dollars in profits.

315.    298. However, in more important terms—in human terms—Defendants' actions have been disastrous. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra got rich by robbing the health of American children.

316.    299. The exponential increase of UPF in our food system, beginning in the 1980s, ushered in a multitude of epidemics. The conduct of Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra has caused the displacement of real food by UPF and has caused social, cultural, economic, political and environmental disruption and crises.[345][358]

---

[345][358] Carlos A. Monteiro et al., *UN Decade of Nutrition, the NOVA food classification and the trouble with ultra-ultra-processing*, Public Health Nutr. Jan. 2018.

74

317. 300. Since Big Tobacco spread its knowledge of addiction science and child targeting through our food environment, obesity rates have exploded. Colorectal cancer has doubled in young adults.[346][359] Type 2 Diabetes rates are soaring.

318. 301. 14-20% of adults and 12-15% of children are addicted to UPF.[347][360] This rate in adult is highly similar to prior addiction epidemics, including tobacco.[348][361] However, the prevalence of UPF addiction in children is "striking and unprecedented".[349][362] Never in American history have so many children been hooked on an addictive substance.

319. 302. A similar level of U.S. children are now obese, a level that has more than tripled since the 1970's.[350][363] Obesity disproportionately affects Black and Hispanic children—the exact children the UPF industry disproportionately targets with marketing.[351][364]

320. 303. For the first time in human history, diseases of older alcoholics emerged in children.[352][365] These diseases, including Type 2 Diabetes and Fatty Liver Disease, are now common in children—and increasing.

321. 304. Childhood Type 2 Diabetes and Fatty Liver Disease are commerciogenic diseases: diseases which would not exist but for the recklessness of the companies that dominate our commercial food system, including Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

---

[346][359] Rebecca L. Siegel et al., *Colorectal Cancer Statistics*, CA Cancer J Clin., May 2023, https://health.ucdavis.edu/news/features/colon-and-rectal-cancer-on-the-rise-in-young-adults-/2024/03https://health.ucdavis.edu/news/features/colon-and-rectal-cancer-on-the-rise-in-young-adults-/2024/03.
[347][360] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, Psychother Psychosom., Nov. 2022.
[348][361] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, Annu Rev Nutr., Oct. 2021; Erica M. LaFata, *Ultra- Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.
[349][362] Erica M. LaFata, *Ultra-Processed Food Addiction, a Research Update*, Curr Obes Rep., Jun. 2024.
[350][363] Division of Population Health, National Center for Chronic Disease Prevention and Health Promotion, *Obesity*, CDC Healthy Schools, (Last updated Aug. 2022), https://www.cdc.gov/healthyschools/obesity/index.htm.
[351][364] Id.
[352][365] Robert H. Lustig, *Ultraprocessed Food: Addictive, Toxic, and Ready for Regulation*, Nutrients., Nov. 2020.

322. ~~305.~~ Prior to 1985, Type 2 Diabetes ("T2D") was only a disease of older adults.[~~353~~366] It was alternatively referred to as "adult-onset diabetes" to distinguish between type 1 diabetes, which can present at childhood.

323. ~~306.~~ But beginning in the late 1980's, doctors began seeing unusual findings in certain minority communities. Children began presenting with all of the clinical features of T2D.

324. ~~307.~~ These unfortunate children were canaries in the coal mine—the first harbingers of a public health calamity that continues to convulse through American families.

325. ~~308.~~ Throughout the early 1990's, as clinicians began to observe more pediatric T2D cases, the scientific community remained skeptical about how T2D could even exist in children.[~~354~~367]

326. ~~309.~~ However, as rates of childhood obesity and childhood T2D rose throughout the late 1990's and early 2000's, the notion that it was possible for children to get T2D gained broad acceptance.[~~355~~368]

327. ~~310.~~ Type 2 Diabetes mellitus is now one of the fastest growing pediatric chronic diseases worldwide, with rates accelerating rapidly throughout the world.[~~356~~369] In the U.S., the rates of Childhood T2D doubled between 2000 and 2017.[~~357~~370]

328. ~~311.~~ A quarter (25%) of children with T2D are not obese.[~~358~~371] This indicates that obesity is a marker of T2D in children, but is not the sole cause.

---

[~~353~~366] Heather J. Dean & Elizabeth Sellers, *Children have Type 2 Diabetes too, a historical perspective*, Biochem Cell Biol, Oct. 2015.

[~~354~~367] Id.

[~~355~~368] Id.

[~~356~~369] Id.

[~~357~~370] Centers for Disease Control and Prevention, *New Research Uncovers Concerning Increases in Youth Living with Diabetes in the U.S.,* (Last updated Aug. 2021).

[~~358~~371] Milena Cioana et al., *The Prevalence of Obesity Among Children with Type 2 Diabetes, Systematic Review and Meta-Analysis,* JAMA, Dec. 2022.

329. ~~312.~~ The very children targeted by Defendants~~'~~ Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra's marketing have fared the worst. In 2021, the Centers for Disease Control noted that, in particular, the rates of "Type 2 Diabetes skyrocket[ed] in Black and Hispanic youth".[~~359~~372] Compared to white children, the rates of T2D grew 5 times as fast among Hispanic children, and 9 times as fast among Black children.

330. ~~313.~~ This is an ongoing, and unmitigated, disaster for American children and families. The prevalence of childhood T2D is currently projected to increase 7-fold by the year 2060 if current trends continue.[~~360~~373]

331. ~~314.~~ Other previously unheard of diseases are also ravaging American kids. Non-~~Non-~~alcoholic fatty liver disease is the second leading cause of liver transplantation, and results from a buildup of fatty deposits in the liver.[~~361~~374] As described by neuroendocrinologist Robert Lustig, it is the transformation of the human liver into foie gras.[~~362~~375]

332. ~~315.~~ Like Type 2 Diabetes, fatty liver disease was formerly a disease exclusive to the elderly and alcoholics, but it now affects children in ever increasing numbers.[~~363~~376]

---

[~~359~~372] Centers for Disease Control and Prevention, *New Research Uncovers Concerning Increases in Youth Living with Diabetes in the U.S.,* (Last updated Aug. 2021).

[~~360~~373] Thaddäus Tonnies et al., *Projections of Diabetes Burden in US Population Aged under 20 years through* 2060, Diabetes Care., 2023.

[~~361~~374] Haley Bush et al., *Pediatric Non-Alcoholic Fatty Liver Disease*, Children (Basel), Jun. 2017.

[~~362~~375] Elaine Watson, *'*'Protect the liver, feed the gut~~…~~...' Dr. Robert Lustig takes fresh aim at processed food industry: 'We've literally turned ourselves into foie gras'*, Food Navigator USA, May 27, 2021.

[~~363~~376] Robert H. Lustig, *Ultraprocessed Food: Addictive, Toxic, and Ready for Regulation*, Nutrients., Nov. 2020; Ariana Eunjung Cha, *Fatty liver disease rising in U.S. kids as Ultra-Processed Diets Surge*, Washington Post, Oct. 3, 2023.

333. 316. Before 2000, there were only a handful of documented cases of pediatric fatty liver disease in the medical literature.[364][377] Today millions of children are affected, with rates nearly tripling between 2017 and 2021.[365][378]

334. 317. Liver transplants in children have increased by 25% in the past decade.[366][379] In some cases, children as young as toddlers are showing clinical signs of fatty liver disease.[367][380]

335. 318. As with childhood Type 2 Diabetes, a sizable fraction of pediatric fatty liver disease cases are non-obese.[368][381]

336. 319. This is because obesity is not the cause of childhood Type 2 Diabetes or childhood fatty liver disease, obesity is just a marker of these diseases.[369][382]

337. 320. Obesity existed in children before Defendants' conduct the conduct of Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra alleged herein,. bBut childhood Type 2 Diabetes or childhood fatty liver disease did not. This makes clear that exposure, rather than individual behavior, is at the root of these epidemics.[370][383]

338. 321. UPF is the cause of childhood Type 2 Diabetes and childhood fatty liver disease.[371] Defendants' conduct [384] The conduct of Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra is a direct and substantial cause of these diseases.

---

[364][377] Id.

[365][378] Id.

[366][379] Id.

[367][380] Id.

[368][381] Robert Lustig, The Hacking of the American Mind, at 127-128, (2017).

[369][382] Robert H. Lustig, *Ultraprocessed Food: Addictive, Toxic, and Ready for Regulation*, Nutrients., Nov. 2020.

[370][383] Id.

[371] Id.

[384] Id.

339. There are no plausible explanations for childhood Type 2 Diabetes or childhood Fatty Liver Disease *other* than UPF. Childhood Type 2 Diabetes and Fatty Liver Disease *cannot* be caused solely by a lack of exercise, genetics, non-UPF, or any combination thereof.

340. 322. The emergence of these diseases (and increase in other diseases) is the result of profound corruption in the U.S. food system.

341. 323. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra each made purposeful decisions to engineer their UPF in ways that make them harmful for human consumption, and to inundate children with marketing to increase child consumption of UPF.

342. 324. There was not a massive, population-level failure of personal responsibility beginning in the 1980's. Similarly, the human genome did not undergo a paradigmatic shift beginning in the 1980's.

343. 325. Instead, what happened in the 1980's was that Big Tobacco, and Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, took over the U.S. food environment and filled it with UPF.

344. 326. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra each targeted children, especially Black and Hispanic children, with marketing. These children now have rising levels of unprecedented diseases that are caused by Defendants' UPF.

345. 327. The ramifications of developing chronic disease during childhood reverberate throughout the rest of that child's life. Children who develop chronic diseases will have diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications.

346. ~~328.~~ Children with chronic diseases will live the rest of their lives sick, suffering, and getting sicker.

347. ~~329.~~ It can be expected that children with T2D will also develop diabetes related micro- and macro-vascular complications, including amputation, blindness, nephropathy and retinopathy.~~372~~385 Additional complications include (but are not limited to) diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, and depression.~~373~~386

348. ~~330.~~ Canadian researchers conducted a fifteen-year follow-up of children diagnosed with T2D and found an alarming number of these children suffered from blindness, amputation, kidney failure requiring dialysis, pregnancy loss, and death in *young adulthood*.~~374~~387

349. ~~331.~~ Children diagnosed with fatty liver disease will develop complications as well, including (but not limited to) hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.~~375~~388

---

[372][385] George Alberti et al., *Type 2 Diabetes in the Young: The Evolving Epidemic. Consensus Statement of the International Diabetes Federation Consensus Workshop*, Diabetes Care., Jul. 2004.

[373][386] American Diabetes Association, *Diabetes Complications What you need to know about diabetes complications*, ABOUT DIABETES, (Last viewed July 2024), https://diabetes.org/about-diabetes/complications; Mayo Clinic Staff, *Diabetes Symptoms and Causes*, Mayo Clinic, (Last updated Mar. 2024), https://www.mayoclinic.org/diseases-~~diseases~~ conditions/diabetes/symptoms-causes/syc-20371444.

[374][387] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q., Mar. 2009.

[375][388] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

## VI.    Decades of Warnings Ignored: Defendants had Every Reason to Know that their Conduct Would Gravely Wound America's Children

### A.    *The Risks of Ultra-Processing have long been clear to UPF Manufacturers*

350. 332. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra had every reason to know that their actions would unleash societal devastation and create public health crises in America's youth.

351. 333. Indeed, Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra had actual knowledge that these consequences would occur.

352. 334. Yet, Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra recklessly, and intentionally, sacrificed the health of America's children on the altar of higher profits.

353. 335. Well before Carlos Monteiro developed the NOVA classification system, Dr. W. Coda Martin expounded a similar philosophy of nutrition to the National Dietary Association in a speech titled "When is Food a Poison?". In that speech, Dr. Martin explained "Man is a living, dynamic organism. He is a three-fold being consisting of body, mind and spirit. He is not a mechanical machine. Therefore, scientists cannot produce food for living organism, plants, animals or humans by methods applicable to that used for dead or inanimate machines".[376][389]

354. 336. It has long been clear that ultra-processing serves no purpose other than to increase profits of UPF manufacturers.

355. 337. As far back as 1958, an article in *Prevention* explained that added chemicals in food

---

[376][389] W. Coda Martin, *When is a Food a Poison? Philosophy of Nutrition*, National Dietary Association, 1957.

81

-"are there to make greater profit for the food processor. They serve no other purpose. They do not improve the food in any way for the consumer. But the consumer must pay (and how many pay with their lives?) for the extra profit made by using a preservative that prolongs the 'shelf-life' of the product, by using a dye that gives the product brighter color than that of a competitive product, by using a synthetic fat in place of a natural one and thus cutting costs."377390

356.    338. There have been concerns about ultra-processing since its invention. At the dawn of industrial food processing, reasonable experts expressed grave concern about the public health consequences of introducing laboratory chemicals and novel substances into our food supply. A 1951 report noted that:

"The number of chemicals entering the food supply of the Nation has increased tremendously in the last decade. The rapidity with which substances heretofore foreign to the body are being introduced in the production, processing, storage, packaging and distribution of food is alarming. Eminent pharmacologists, toxicologists, physiologists, and nutritionists expressed fear that many of the chemicals being added to food today have not been tested sufficiently to establish their nontoxicity and suitability for use in food. These scientists are not so much concerned with the acutely toxic compounds whose harmfulness can readily be detected as they are with the small and insidious toxic effects of substances which may produce harmful effects only after being fed for months or years".378391

357.    339. Around the same time, an article warned that "hundreds of untested and unproved chemicals, in the hands of irresponsible food manufacturers, are threatening the health, and even the lives, of our families".379392 The article noted that "in general, nutritionists agree that no new chemical should be added, however, unless it is definitely proved safe, serves a useful purpose, and is not a substitution in whole or in part for a natural food element".380393

---

377390 *Cancer and Nutrition*, Prevention, Jan. 1958.
378391 James J. Delany et al., *Delaney Investigation on the Use of Chemicals in Foods*, Union Calendar, Jan. 1951.
379392 James J. Delany, *Peril on Your Shelf*, American Magazine, Jul. 1951.
380393 Id.

358. ~~340.~~ A Harvard cancer research scientist concurred, stating "It is simply not in the public interest to expose consumers to the unforeseeable risks of a host of biologically foreign food additives that provide eye appeal and advertising value but offer no nutritive benefit".[~~381~~394]

359. ~~341.~~ Similarly, in 1957, health advocate Gloria Swanson stated:

"It is horrifying to know that 99.9% of our citizens (that includes you but not me—because most of my food is organically grown and unsprayed)—that 99.9% are eating more than 276 chemicals (this was the figure in 1952, no doubt its greater now) which have never been pretested for their chronic effect on human body and mind. You may say you feel fit—but remember most of you like me, have come from healthy stock and were raised on unprocessed and unsprayed foods—so our stamina has saved us. I tremble to think what kinds of minds and bodies my grandchildren's children will have if this continues".[~~382~~395]

360. ~~342.~~ Swanson's warning was prescient. Three generations later, U.S. children are contracting severe chronic illnesses in unprecedented numbers, and growing sicker each year.

361. ~~343.~~ There are now more than 10,000 chemicals in our food supply—almost none of which have any published safety information.[~~383~~396]

362. ~~344.~~ Almost none of these chemicals have undergone long-term safety testing to determine whether they are safe to be chronically consumed, or whether there are "small and insidious toxic effects of substances which may produce harmful effects only after being fed for months or years". Many of these may exhibit toxicities at exceedingly low levels or are suspected endocrine disruptors.[~~384~~397]

363. ~~345.~~ These and other components of UPF can contribute to endocrine diseases such as diabetes and fatty liver disease. For example, a recent large high-quality epidemiological cohort

[~~381~~394] *Doctor Says we may be Eating Cancer*, Citizens Medical Reference Bureau Inc., 1957

[~~382~~395] Swanson, Remarks at Big Brother Luncheon, Advertising Club, (November 19, 1957).

[~~383~~396] Maricel V. Maffini et al., *We are what we eat: regulatory gaps in the United States that put our health at risk*, PLoS Biol., Dec. 2017; Olivia Backhaus & Melanie Benesh, *EWG analysis: Almost all new food chemicals greenlighted by industry, not the FDA*, EWG, Apr. 2022.

[~~384~~397] Maricel V. Maffini et al., *We are what we eat: regulatory gaps in the United States that put our health at risk*, PLoS Biol., Dec. 2017.

study revealed "direct associations between the risk of Type 2 Diabetes and exposures to various food additives and emulsifiers widely used in industrial foods".[385][398]

364.    346. There are no requirements for UPF companies to submit safety information or subject chemicals to independent testing and review before introducing them into our food supply.

365.    347. Neither UPF companies nor federal regulators are required to evaluate whether chronic diseases can be caused by a single chemical additive or combinations of multiple chemical additives.[386][399] There are no testing requirements to demonstrate the effects of low or cumulative exposures that occur in the diet.[387][400]

366.    348. UPF companies can introduce new chemicals, or use chemicals in new ways, without disclosing "the identity of the substance, where it was used, how much of it was used, and if it was safe".[388][401]

367.    349. Under the voluntary chemical registration system, the FDA does not have authority to limit a chemical's use in edible substances, even if there are safety concerns.[389][402] A chemical can still be marketed as "generally recognized as safe" ("GRAS") even if there are safety concerns, and no one—neither competitors nor consumers—will know that there might be safety concerns.[390][403]

368.    350. The paucity of safety and testing information disclosed by UPF manufacturers is astonishing.[391][404]

---

[385][398] Clara Salame et al., *Food Additive Emulsifiers and the Risk of Type 2 Diabetes: Analysis of data from the NutriNet-Sante prospective cohort study*, Lancet Diabetes Endocrinol., May 2024.
[386][399] Maricel V. Maffini et al., *We are what we eat: regulatory gaps in the United States that put our health at risk*, PLoS Biol., Dec. 2017.
[387][400] Id.
[388][401] Id.
[389][402] Id.
[390][403] Id.
[391][404] Id.

369. 351. Nevertheless, most consumers assume that if something is on shelves, and available for purchase at grocery stores and restaurants, it is safe, pure and does not contain hidden health harms.

370. 352. Most consumers assume that anything included in a store bought item has been studied, tested, and guaranteed to be safe—especially given the likelihood that children may ingest these items. After all, who would sell untested, harmful, and potentially addictive items to children?

371. 353. Big Tobacco companies took advantage of consumers' reasonable assumptions and dramatically increased the amount of untested chemicals in our food supply.

372. 354. Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, who are either direct descendants of Big Tobacco, or have used similar technologies and strategies as Big Tobacco, had every reason to know that creating and selling untested UPF could lead to incurable and life-changing illnesses.

373. 355. Yet, instead of adequately testing the effects of consuming their UPF, Defendants have actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

374. 356. Alternatively, Defendants' internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and Defendants had actual knowledge that their UPF would cause incurable and life-changing illnesses.

375. Defendant Kraft Heinz has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

376.    Alternatively, Defendant Kraft Heinz's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

377.    Defendant Mondelez has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

378.    Alternatively, Defendant Mondelez's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

379.    Defendant Post Holdings has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

380.    Alternatively, Defendant Post Holdings' internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

381.    Defendant Coca-Cola has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

382.    Alternatively, Defendant Coca-Cola's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

383.    Defendant PepsiCo has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

384.    Alternatively, Defendant PepsiCo's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

385. Defendant General Mills has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

386. Alternatively, Defendant General Mills' internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

387. Defendant Nestle has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

388. Alternatively, Defendant Nestle's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

389. Defendant Kellogg's has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

390. Alternatively, Defendant Kellogg's' internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

391. Defendant Mars has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

392. Alternatively, Defendant Mars' internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

393. Defendant Conagra has actively refused to conduct the kind of safety testing needed to ensure their UPF could be consumed without harm.

87

394.    Alternatively, Defendant Conagra's internal testing has revealed safety concerns that they have concealed from consumers, regulators, and the public, and had actual knowledge that their UPF would cause incurable and life-changing illnesses.

**B.    The Predatory Nature of UPF Marketing Has Been Clear from the Start**

395.    357. The predatory nature of targeting children with UPF advertisements has been clear for decades. As the creator of Sesame Street observed in the 1970s, advertising UPF to children is 'like shooting fish in a barrel….grotesquely unfair'". [405]

396.    358. Around that time, the President of the Council on Children, Media and Merchandising explained:

> "Advertising to children much resembles a tug of war between 200-pound men and 60-pound youngsters….Any communication that has a $1000-per-commercial scriptwriter, actors, lighting technicians, sound effects specialists, electronic editors, psychological analysts, focus groups and motivational researchers with a $50,000 budget on one end and the 8-year-old mind (curious, spongelike, eager, gullible) with 50 cents on the other inherently represents an unfair contest"[406]

397.    359. In an extensive 1978 report, the U.S. Federal Trade Commission ("FTC") stated that children are too naïve to "perceive the selling purpose of television advertising or otherwise comprehend or evaluate it and tend….to view commercials simply as a form of informational programming". [407]

398.    360. A British Parliamentary report at the time stated, "children are inclined to believe that what they are told in a television programme is not only true, but the whole truth….that is why the majority of us believe that children should not be exposed to the blandishments and subtle persuasiveness of advertisements". [408]

---

[405] Ellis M. Ratner et al., *FTC Staff Television Advertising to Children*, Feb. 1978.
[406] Id.
[407] Id.
[408] Id.

399.    ~~361.~~ The FTC report commented on this U.K. Parliamentary finding, noting "That view has widespread support throughout the world". ~~396~~409

400.    ~~362.~~ An advertising executive explained that the goal of marketing to kids is to take advantage of their ability to be "very successful naggers", explaining that "When you sell a woman on a product and she goes into the store and finds your brand isn't in stock, she'll probably forget about it. But when you sell a kid on your product, if he can't get it he will throw himself on the floor, stamp his feet and cry. You can't get a reaction like that out of an adult'". ~~397~~410

401.    ~~363.~~ Thus, as described by Dr. Frances Horwich, a psychologist and director of children's television programming, "the child is unwittingly turned into an assistant salesman. He sells, he nags, until he breaks down the sales resistance of his parent". ~~398~~411

402.    ~~364.~~ The FTC noted that "this takes a toll on the parent-child relationship". ~~399~~412

403.    ~~365.~~ The President of the American Academy of Child Psychiatry stated that the Academy is "deeply concerned with the exploitation of children for advertising purposes because it encourages confrontation and alienation on the part of children toward their parents and undermines the parents' child rearing responsibilities". ~~400~~413

404.    ~~366.~~ Along the same lines, when asked why parents don't shield their children from televised food advertising, NYU psychology professor Dr. Sherryl Graves said that "the matter is not so simple" and that "the unwillingness of parents to intervene often stems from profound

---

~~396~~409 Id.

~~397~~410 Id.

~~398~~411 Id.

~~399~~412 Id.

~~400~~413 Id.

feelings of helplessness, and from fear that if they deny their children so pervasive a childhood experience as children's program, the children will become social outcasts or social isolates".[401][414]

405.   367. The FTC found that "whatever the dynamics of the matter may be, it does appear that there are substantial numbers of parents who object to the advertising being addressed to children on television, but who are unwilling or unable to take the drastic step of shutting that advertising out of the home by forbidding their children to watch".[402][415]

406.   368. The FTC report warned that television advertising of foods to children does not "impress on them the risks they take by eating the advertised products", and may pose a threat to their health.[403][416]

407.   369. The American Medical Association characterized "televised food advertising to children" as 'most distressing' and as 'counter-productive to the encouragement of sound [nutritional] habits'".[404][417]

408.   370. FTC explained that "a number of prominent nutritionists, educators, other public health professionals, and parents have expressed concern that televised food advertising addressed to children is distorting nutritional habits, negating what little nutrition education takes place in the schools, and undermining the authority of parents in their own homes on matters of nutrition".[405][418]

409.   371. The FTC concluded that "advertisements for sugared products, like those for cigarettes, involve inducements to children to gamble with their health" and that

> "such advertising causes substantial injury to children to the extent that it induces them to consume products which pose health risks and interferes with their education on

---

[401][414] Id.
[402][415] Id.
[403][416] Id.
[404][417] Id.
[405][418] Id.

matters of nutrition. It injures the parent-child relationship in that it puts parents in the hard choice of allowing their children to take those health risks or enduring the strife that can accompany denial of requests induced by television advertising".[406][419]

410.    372. The FTC further found that "The advertising at issue is deceptive in that it fails to state facts which are material, either in light of the claims made in the advertising, or in light of the customary or recommended use of the advertised products…….The material but unrevealed fact is that the products can also pose health risks".[407][420]

411.    373. All of this was before tobacco companies super-charged child advertising budgets for their food companies in the late 1980s and early 1990s, and set in motion a model that the UPF industry has followed ever since.

412.    374. Despite clear warnings about the harms likely to result from targeting kids for marketing UPF, and the fundamental unfairness of targeting children with UPF marketing, Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have purposefully inundated America's children with UPF ads for decades.

413.    Defendant Kraft Heinz's conduct in this regard directly degraded the health of America's youth.

414.    Defendant Mondelez's conduct in this regard directly degraded the health of America's youth.

415.    Defendant Post Holding's conduct in this regard directly degraded the health of America's youth.

---

[406][419] Id.
[407][420] Id.

416. Defendant Coca-Cola's conduct in this regard directly degraded the health of America's youth.

417. Defendant PepsiCo's conduct in this regard directly degraded the health of America's youth.

418. 375. Defendants General Mills' conduct in this regard directly degraded the health of America's youth.

419. Defendant Nestle's conduct in this regard directly degraded the health of America's youth.

420. Defendant Kellogg's's conduct in this regard directly degraded the health of America's youth.

421. Defendant Mars' conduct in this regard directly degraded the health of America's youth.

422. Defendant Conagra's conduct in this regard directly degraded the health of America's youth.

423. 376. By 2006, the Institutes of Medicine ("IoM") found that "The dramatic rise in the number of U.S. children and youth who are obese, have Type 2 Diabetes, and are at increased risk for developing obesity and related chronic diseases in adulthood, is a matter of national concern".[408][421]

424. 377. The IoM found that "the prevailing pattern of food and beverage marketing to children in America represents…….a direct threat to the health of the next generation. Dietary patterns that begin in childhood give shape to the health profiles of Americans at all ages".[409][422]

425. 378. The IoM report noted

---

[408][421] J. Michael McGinnis et al., *Food Marketing to Children and Youth: Threat or Opportunity*, (2006).
[409][422] Id.

"Children and youth represent a primary focus of food and beverage marketing initiatives. Between 1994 and 2004, the rate of increase in the introduction of new food and beverage products targeted to children and youth substantially outpaced the rate for those targeting the total market. An estimated more than $10 billion per year is spent for all types of food and beverage marketing to children and youth in America". [410][423]

426. 379. Among the IoM's Key Findings were that "food and beverage marketing influences the preferences and purchase requests of children, influences consumption…… is a likely contributor to less healthful diets and may contribute to negative diet-related health outcomes and risks among children and youth". [411][424]

427. 380. Based on their systematic review, the IoM stated "it can be concluded that television advertising influences children to prefer and request high-calorie and low-nutrient foods and beverages". [412][425] The IoM further found that "food and beverage marketing practices geared to children and youth are out of balance with healthful diets and contribute to an environment that puts their health at risk". [413][426]

428. 381. While the 2006 IoM Report recommended changes that UPF manufacturers could take to improve their child marketing behaviors, a 2013 follow-up found that only limited progress had been made, and that "there has been a proliferation of new venues and new vehicles, particularly the rise of digital media". [414][427]

429. 382. UPF industry groups and some (but not all) Defendants have claimed to take voluntary action to "self-regulate" the ways in which they target children with marketing for UPF. However, regardless of any such pledges to "self-regulate", Defendants Kraft Heinz, Mondelez,

---

[410][423] Id.

[411][424] Id.

[412][425] Id.

[413][426] Id.

[414][427] Institute of Medicine at al., *Challenges & Opportunities for Change in Food Marketing to Children & Youth*, (2013).

Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra each continued to engage in unfair marketing to children.

430.    In 2013, the IoM found in 2013 that "Despite the lip service paid to children, actions do not match words…….Children are society's most vulnerable population, and those who care the most about them need to be mobilized".[415][428]

431.    383. Similarly, the FTC found in 2012 that

"The overall picture of how marketers reach children……did not significantly change. Companies continue to use a wide variety of techniques to reach young people, and marketing campaigns are heavily integrated, combining traditional media, Internet, digital marketing, packaging, and often using cross-promotions with popular movies or TV characters across all of these. Those techniques are highly effective. Consumer research submitted by the reporting companies confirms the "pester power" phenomenon—child- child-directed marketing and promotional activities drive children's food requests. Children, in turn, play an important role in which products their parents purchase at the store, and which restaurants they frequent".[416][429]

432.    384. The FTC noted that new media marketing was increasing, and that "viral marketing and word-of-mouth activities were increasingly used by food marketers to reach children and especially teens and were often closely integrated with Internet marketing……Food marketers also used word-of-mouth techniques—recruiting consumers as 'ambassadors' of the brand".[417][430]

433.    385. Internal company research indicated that the use of athletes and other superstar celebrities produced pronounced effects in children[418][431] Spokes-characters, including third-party characters from popular TV shows or movies were also revealed to be effective methods of targeting children.[419][432]

---

[415][428] Id.
[416][429] Sarah Botha et al., *A Review of Food Marketing to Children and Adolescents*, U.S. Federal Trade Commission Follow-Up Report, Dec. 2012.
[417][430] Id.
[418][431] Id.
[419][432] Id.

434.    386. FTC also found that "contests and promotions are another common marketing technique used to target youth".420433

435.    387. Defendants' The child targeting efforts used by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra are highly sophisticated, and highly effective. According to FTC,

"one company's research indicated that a child seeing an ad for a food product or seeing the product on the shelf was a key factor in purchase and that 75% of the purchasers surveyed bought the product for the first time because their child requested it. ….Another company submitted research showing that in-store advertising programs using child- child-targeted character-based themes outperformed those using mom-targeted campaigns. Yet another company found that children are most influential in the purchase decisions for snacks. These findings are relevant in light of other research submitted showing that for children, good commercials and websites are the key drivers of food appeal".421434

436.    388. In 2012, a group of 300 retired U.S. admirals and generals declared that in-school marketing of UPF "is not just a national health issue. It is a national security issue", and jeopardizing our ability to field an adequate military.422435

437.    389. The group found that UPF marketing in schools was degrading America's armed forces, and that 1 in 4 potential recruits could not meet military fitness standards.423436

438.    390. UPF was found to cause military challenges even for youth who could join, because they "become too heavy once they are in the military, or have weak muscles or bones from poor nutrition" that can lead to excess sprains or stress fractures.424437

439.    391. Despite these clear warnings, and knowledge that their conduct represented "a direct threat to the health of the next generation", the Defendants' conduct conduct of Defendants

---

420433 Id.

421434 Id.

422435 William Christeson et al., *Still Too Fat to Fight*, Mission: Readiness Report, Sept. 2012.

423436 Id.

424437 Id.

95

Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra did not improve over the ensuing decade.

440.    392. The numerous examples described herein further bolster these conclusions, and demonstrate that Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra continue to aggressively target children with pervasive and integrated promotional campaigns.

441.    393. The American Heart Association ("AHA") recently declared the UPF industry's attempts at self-regulating to be inadequate, finding "There are still companies that do not participate and many of the foods allowed to be marketed to children under these voluntary standards are still unhealthy". 425438

442.    394. Despite these voluntary standards, AHA found that children were still "regularly exposed to advertising and marketing through television, the internet, social media, magazines, schools, product placements, video games, cell phones, and other means... ...Young children are especially vulnerable to these marketing and advertising strategies because they are developmentally less able to comprehend their intent". 426439

443.    395. The AHA found that "Unhealthy food marketing aimed at children and teens is a significant contributor to poor diet quality and diet-related diseases worldwide" and concluded that "the American Heart Association sees no ethical, political, scientific, or social justification for marketing low-nutrient, high-calorie foods to children". 427440

---

425438 American Heart Association, *Unhealthy and Unregulated: Food Advertising and Marketing to Children*, (Last updated Apr. 2019).
426439 Id.
427440 Id.

444.    396. A 2019 review by the Center for Science in the Public Interest ("CSPI") found that ads marketing unhealthy UPF at children were growing, and that more and more ads targeting children failed to comply with the UPF industry's voluntary guidelines.[428][441]

445.    397. CSPI found that UPF marketing "plays a key role" in poor health outcomes in children, and described the environment American children live in:

> "In addition to television advertisements, children are exposed to food and beverage marketing in schools, retail stores, restaurants and movie theaters and through radio, print, websites, mobile devices, contests, events, and sponsorships. The ubiquitous, unavoidable chorus of food messaging shapes social norms, children's food preferences, and, ultimately, their health".[429][442]

446.    398. CSPI found that UPF ads "undermine parents' ability to guide their children's food and beverage choice, as parents have to counter the sophisticated psychological research and marketing techniques used by food and beverage companies. Marketing aimed at children can strain parent-child relationships as they repeatedly put parents in a position of negotiating over food".[430][443]

447.    399. A more recent review similarly found that "industry self-regulations contain numerous loopholes and have not demonstrably reduced most types of food marketing directed to children, nor substantially improved the nutrition of marketed products".[431][444]

448.    400. Despite warning after warning, unfair UPF marketing to children remains widespread.

449.    401. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have known for decades that targeting

---

[428][441] Amanda Reat et al., *Changing the Channels: How Big Media Helps Big Food Target Kids (and What to Do about it)*, Center for Science in the Public Interest, Nov. 2019.
[429][442] Id.
[430][443] Id.
[431][444] Jennifer L. Harris et al., *Hooked on Junk: Emerging Evidence on How Food Marketing Affects Adolescents' Diets and Long-Term Health*, Curr. Addict. Rep., Nov. 2020.

children with unhealthy UPF was fundamentally unfair, "a direct threat to the health" of children, and would lead to disastrous health outcomes. Nevertheless, they continue to inundate American children with unfair and deceptive marketing.

450.    402. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra continue to target children with UPF marketing for the same reason Big Tobacco targeted children with cigarette marketing: UPF companies "view young people as potential lifelong loyal customers. Marketing to hook young people on their products represents a highly profitable investment, while potential regulation of food marketing to adolescents presents a significant business risk". [432][445]

## VII.    The International Consensus: UPF are Uniquely Harmful, Require Warnings, and Should Not be Marketed to Children

451.    403. While the explosion of UPF occurred first in the US, the UPF industry eventually reached a saturation point that limited the potential for further profit growth within the United States.

452.    404. As such, the UPF industry, and Defendants specifically, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra began to use the same playbook described above in country after country throughout the globe.

453.    405. The invariable result: unprecedented increases in noncommunicable diseases including diabetes, fatty liver disease, and numerous others in populations across the world.

---

[432][445] Id.

454.    406. An international consensus has emerged that UPF is uniquely harmful, that UPF manufacturers have caused massive increases in chronic diseases and human suffering, that UPF requires warnings, and that marketing UPF to children is inherently unfair.

455.    407. Public Health Agencies and Governmental Agencies throughout the world have endorsed the appropriateness of the NOVA System, the UPF Categorization, and recognize the massive societal harms caused by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, and UPF generally.

456.    408. For example, the Public Health Association of Australia ("PHAA") found that "Action is needed across all levels of government, food industry, and the public domain to reduce the production, consumption and consequential impact of ultra-processed foods on population and planetary health".[433][446]

457.    409. PHAA explained that:

"Evidence from over 500 studies across more than 14 countries and summarized in 23 systematic reviews published to date, shows consumption of ultra-processed foods is a major contributor to global burden of disease.

Large-scale population and experimental studies demonstrate a direct association between ultra-processed food consumption, poor quality eating patterns and negative health outcomes such as weigh gain, non-communicable diseases (e.g., Type 2 Diabetes, cardiovascular disease, and impaired mental and cognitive health and increased mortality….

Poor health outcomes associated with ultra-processed food consumption result from both: a) nutrient profile of ultra-processed foods which typically include added sugars, salt and industrial fats; and b) non-nutrient mediated mechanisms such as deconstruction of the food matrix of the presence of cosmetic additives and contaminants that may impair endocrine function and gut-satiety signaling".[434][447]

---

[433][446] Public Health Association Australia, *Ultra-Processed Foods: Policy Position Statement*, PHAA, Jun. 2019.
[434][447] Id.

458.    410. PHAA recommended that restrictions on marketing UPF to children should be enacted, as well as food labeling requirements to identify the level of processing, and "fiscal policies to disincentivize the production and consumption" of UPF.[435][448]

459.    411. The World Health Organization and the Food and Agriculture Organization of the United Nations issued a joint statement that "A large and growing body of evidence suggests that consumption of highly processed foods described as "ultra-processed" foods (UPF) by the NOVA classification scheme...…is associated with negative health outcomes. These include risk of premature mortality, cancer, cardiovascular diseases, overweight, obesity, and type 2 diabetes, as well as impaired mental, respiratory and gastrointestinal health".[436][449] The joint statement found that the "evidence suggests that the associations with negative health effects go beyond their fat, sodium, and sugar content".[437][450]

460.    412. The Consumer Federation of America ("CFA") states that "an increasing body of evidence fingers UPFs as a key culprit behind our dietary woes".[438][451] The CFA explains that UPF "may effectively 'hijack' the brain and override satiety signals that prevent us from overeating less processed foods...…certain chemicals in UPFs may affect us in more complex and nefarious ways as well, degrading the gut microbiome, disrupting the endocrine system, and even stymying healthy brain development".[439][452]

461.    413. The Brazilian Health Ministry counsels people to "avoid ultra-processed foods", explaining that "as a result of their formulation and presentation, they tend to be consumed

---

[435][448] Id.

[436][449] Food & Agriculture Organization of the United Nations and World Health Organization. *What are healthy diets? Joint Statement by the Food and Agriculture Organization of the United Nations and the World Health Organization*, 2024.

[437][450] Id.

[438][451] Consumer Federation of America, *Why they Matter and What to Do About It.* CFA, 2024

[439][452] Id.

in excess, and displace natural or minimally processed foods. Their means of production, distribution, marketing, and consumption damage culture, social life, and the environment". 440453

462. 414. The Dietary Guidelines for Brazilians emphasize that UPF

"are now often reformulated and advertised as if they are healthy, being labelled as for example 'light' or 'diet', or low in fat or sugar, or free from trans fats, or high in fibre or vitamins and minerals. These adjustments may improve the products which however remain ultra-processed and unhealthy". 441454

463. 415. Ministry of Health Brazil explains that UPF "disturb mechanisms located in the digestive system and the brain that ensure that the intake and expenditure of dietary energy is balanced. These mechanisms tend to underestimate the energy contained in ultra-processed foods" and lead to "excess consumption". 442455

464. 416. The Brazilian Health Ministry found that UPF "are promoted and advertised incessantly on television and radio, newspapers and magazines, the internet, social media, at point of sale, and on packaging, and with discounts and giveaways. Much of this propaganda is aimed at children and young people". 443456

465. 417. According to the Brazilian Health Ministry, UPF advertising "often conveys incorrect or incomplete information about diet and health and mainly affects children and youngsters". 444457

466. 418. The "Dietary Guidelines for Indians" states that UPFs are "known to increase the risk of non-communicable diseases like diabetes, hypertension, cardiovascular diseases, etc."

---

440453 Ministry of Health Brazil, *Dietary Guidelines for the Brazilian Population*, Secretariat of Health Care. Primary Health Care Department., 2015.
441454 Id.
442455 Id.
443456 Id.
444457 Id.

and that UPFs should be avoided or restricted.[445][458] The Indian guidelines also emphasize that "enriching and fortifying UPFs with nutrients does not make them wholesome or healthy".[446][459]

467. 419. France's Public Health Agency recommends "avoiding the consumption of ultra- ultra-processed products".[447][460]

468. 420. The French National Assembly's Parliamentary Office for Scientific and Technological Assessment stated:

> "a number of consistent studies have found a significant association between consumption of ultra-processed foods and the risk of excess weight and obesity, Type 2 Diabetes, cardiovascular disease and associated mortality, hypertension, depression and overall mortality...….the accumulation of epidemiological studies with identical results, as well as the plausibility of the biological mechanisms detailed below, provide **strong arguments for causality**".[448][461] (emp. orig.)

469. 421. Among those biological mechanisms, the French Parliamentary Office explained that the modification of the food matrix, intensified by the use of flavourings "override the homeostatic control of food intake" and alter "our ability to assess the energy content of foods".[449][462] The Parliamentary Office continued "ultra-processed foods encourage **excessive energy intake** and are even associated with "**food addiction**".[450][463] (emp. orig.)

470. 422. The French Parliamentary Office further explained,

> "the poor nutritional composition of ultra-processed foods and their possible over- over-consumption are not sufficient to explain their effect on health. The associations identified by most of the above-mentioned epidemiological studies remain despite statistical adjustments to energy intake and the nutritional quality of the diet. It would therefore seem that other mechanisms are involved, which justifies the relevance and usefulness of this new type of classification.

---

[445][458] ICMR-NIN Expert Committee, *National Institute of Nutrition: Dietary Guidelines for Indians—2024*, ICMR-National Institute of Nutrition, (Revised May 2024).

[446][459] Id.

[447][460] Sante Publique France, *Recommendations Concerning Diet, Physical Activity and Sedentary Behaviour for Adults,* PNNS, Aug. 2019.

[448][461] Parliamentary Office for Scientific and Technological Assessment, *Briefing 35: Ultra-Processed Foods*, National Assembly of France, Jan. 2023.

[449][462] Id.

[450][463] Id.

In addition to the physical impacts on food texture, transformations in the food matrix are likely to affect the digestibility and bioavailability of ingested nutrients and the possible synergies that may exist between different compounds.

Moreover, ultra-processed foods generally contain various additives (emulsifiers, colourings, flavour enhancers, sweeteners, etc.) whose impact on health may be detrimental in the long term. Studies suggest that some additives may disrupt the gut microbiota or the endocrine system, or have carcinogenic or inflammatory effects…

In addition to these additives, which are included in the list of ingredients, other potentially harmful compounds may be food in ultra-processed foods, which may contribute to their harmful nature. During processing, especially intense processing, some molecules may be broken down to form new compounds. Heat treatments are known to generate numerous molecules (acrylamide, acrolein, etc.) with carcinogenic, cardiometabolic and diabetogenic effects. Substances contained in food packaging (such as bisphenol A and phthalates) can also contaminate these foods...These various molecules increase the risk of a cocktail effect, i.e. the effect of the interacting substances is greater than the sum of the individual effects.[464]

471.    The French Parliamentary Office concluded that "current knowledge already calls for the implementation of measures to **reduce the consumption** of these foods, an objective set by the National Nutrition and Health Programme".[465] (emp. orig.)

472.    The French Parliamentary Office also concluded that "the abolition of commercial advertising during youth programmes broadcast on French public television must be extended to all programmes, as children are exposed to advertising at all hours".[466]

473.    The Heart and Stroke Foundation of Canada advises people to "avoid ultra-processed foods".[467]

474.    The Israeli Ministry of Health counsels that "it is important to reduce the consumption of ultra-processed foods as much as possible since they come with a substantial

---

[464] Id.
[465] Id.
[466] Id.
[467] JC Moubarac, *Ultra-processed foods in Canada: consumption, impact on diet quality and policy implications*, 2017, Montréal: TRANSNUT, University of Montreal, Dec. 2017.

health cost. In recent years studies have been confirming an association between the degree of food processing and health effects".[455][468]

475.    427. In the Israeli Nutrition Recommendations, the Israeli Ministry of Health[456][469] stated that "the health implication of the consumption of ultra-processed food include: an increase in the risk of diabetes, cardiovascular disease, obesity, fatty liver, certain types of cancer, damage to the microbiome, an increase in the risk of mental illness and more".[457][470]

476.    428. The Israeli Health Ministry explained UPF encourage "subconscious eating" and "as a result of their composition and method of marketing we tend to consume exaggerated amounts of them".[458][471]

477.    429. The Israeli Health Ministry stated that while chemical additives in UPF undergo an approval process, "the effect of their long term consumption and also the cumulative effect of the consumption together is not known".[459][472]

478.    430. The Israeli Ministry of Health concluded that UPF's "manufacture, distribution, marketing and consumption are injurious to health, culture, social life and the environment" and that marketing of UPF to children should be restricted.[460][473]

479.    431. The Peruvian Ministry of Health advises people to "protect your health by avoiding ultra-processed food consumption" and that people should avoid "ultra-processed foods to prevent disease".[461][474]

---

[455][468] State of Israel Ministry of Health, *Processed Food*, Ministry of Health, (Last updated 2024).
[456][469] Israeli Ministry of Health, *Nutritional Recommendations*, Ministry of Health, 2019
[457][470] Id.
[458][471] Id.
[459][472] Id.
[460][473] Id.
[461][474] Mirko Luis Lázaro Serrano & César Hugo Domiínguez Curi, *Guías alimentarias para la población Peruana*, Ministerio de Salud. Instituto Nacional de Salud, 2019, (translation to English).

480. 432. The Uruguayan Ministry of Health explains that "ultra-processed products 'cheat' the mechanisms that regulate appetite. They have certain characteristics that make the brain and digestive system underestimate the calories we eat".462475

481. 433. Uruguay's Ministry of Health advises people to "avoid the consumption of ultra- ultra-processed products".463476

482. 434. The Malaysian Ministry of Health advises people to "limit intake of ultra-ultra-processed foods"" and to "be aware that advertising of ultra-processed products dominates commercial advertising of food; it often conveys incorrect or incomplete information about diet and health".464477

483. 435. The European Association for Study of the Liver ("EASL") found that "alcohol and ultra-processed foods represent key health challenges in the 21st century" and that UPF consumption is a "major driver of liver-related morbidity and mortality".465478

484. 436. EASL reported that "many European countries have seen a striking increase in the consumption of ultra-processed foods" and that "children in Europe are regularly exposed to marketing that promotes ultra-processed foods...….Such targeting of children and adolescents by food and beverage commercials, in particular those embedded in children's TV programmes, electronic media (e.g., video games and DVDs), and social media, has been shown to drive consumption".466479

---

462475 Miniterio de Salud de Uruguay, *Guía alimentaria para la población Uruguaya: para una alimentación saludable, compartida y placentera*, Área Progamática de Nutrición, (Last updated 2019), (translation to English).
463476 Id.
464477 Minsitry of Health of Malaysia, *Malaysian dietary guidelines 2020*, NCCFN, 2021.
465478 Tom H. Karlsen et al., *The EASL-Lancet Liver Commission, protecting the next generation against liver disease complications and premature mortality*, The Lancet Commissions, Jan. 2022.
466479 Id.

485.    437. As a result, EASL found that "sugar-sweetened beverage consumption is now one of the leading causes of childhood and adult obesity and associated NAFLD".[467][480]

486.    438. EASL concluded that given the harms caused by marketing UPF to children, "we call for attention to unregulated narrowcasting of marketing messages to mobile phones by digital and social media; experience from the tobacco industry has shown that the only effective means to protect children is through a complete ban".[468][481]

487.    439. EASL also called for "the implementation of a European-wide, mandatory, government-led, simple, informative, and uniform front-of-pack labelling approach based on the latest scientific research and guidelines" to "help encourage consumers to reduce their intake of ultra-processed foods".[469][482]

488.    440. The Ecuadorian Ministry of Public Health advises people to "avoid the consumption of ultra-processed foods", noting that many health problems, including obesity, diabetes, hypertension, metabolic syndrome, gastric and colorectal cancer, are related to UPF consumption.[470][483]

489.    441. In discussing this conclusion, the Ecuadorian Ministry of Public Health reported major increases in the sales of UPF were accompanied by significant increases in body mass, and that "One of the determinants that explain these trends is the aggressive marketing strategy used by the processed foods and sugary drinks industry, which is mainly directed at children and adolescents".[471][484]

---

[467][480] Id.

[468][481] Id.

[469][482] Id.

[470][483] Ministerio de Salud del Ecuador & Organización de las Naciones Unidas para la Alimentación y la Agricultura, *Guías alimentarias basadas en alimentos del Ecuador*, GABA, Febr. 2021, (translation to English)

[471][484] Id.

490.    442. Similarly, the Maldives Ministry of Health recommends people limit the intake of UPF.[472][485]

491.    443. The Food and Agriculture Organization of the United Nations ("FAO") found that "the significance of food processing, and in particular of ultra-processed food, is now generally recognized".[473][486] In discussing the scientific evidence of UPF's harms, FAO found that the scientific studies "show plausible, significant and graded associations between the dietary share of ultra-processed foods and the occurrence or incidence of several non-communicable diseases, including obesity and obesity-related outcomes, cardiovascular and metabolic diseases, breast and all cancers, depression, gastrointestinal disorders, frailty in the elderly, and also premature mortality".[474][487]

492.    444. Francis Collins, director of the United States National Institutes of Health ("NIH") recommended that Americans should "work to eliminate or at least reduce ultra- ultra-processed foods in your diet".[475][488]

493.    445. On December 5, 2024, Dr. Robert Califf, the Commissioner of the United States Food and Drugs Administration, testified that ultra-processed food "is probably addictive".[476][489] Commissioner Califf explained that "the food industry has figured out that there is a combination of sweet, carbohydrate, and salt that goes to our brains and I think its addictive, that's my opinion. And I think it's the same neural circuits that are involved in opioid addiction and other kinds of addiction that we have. And they've studied this, again, we don't have access

---

[472][485] Ministry of Health, Republic of Maldives. Food Based Dietary Guidelines for Maldives, 2019.

[473][486] Carlos A. Monterio et al., *Ultra-processed foods, diet quality, and health using the NOVA classification system*, Food and Agriculture Organization of the United Nations, 2019.

[474][487] Id.

[475][488] Id.

[476][489] United States Senate Committee on Health, Education, Labor & Pensions. Testimony of FDA Commissioner Dr. Robert Califf, December 5, 2024.

to their research data like we do in the human medical products arena....…There are actually three or four pathways involved here".[477][490]

## VIII. The Meeting in Minneapolis: Defendants' Conspiracy Against American Children

494. 446. Behind closed doors, Defendants acknowledge that the international consensus is true. And for decades, Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have understood the consequences of their actions.

495. 447. On April 8, 1999, the CEOs of America's largest food companies met in Minneapolis.[478][491] The leaders of Nestle, Kraft, Nabisco, General Mills, Procter & Gamble, Coca-ColaCoca- Cola, Mars, Pillsbury, Cargill and Tate & Lyle were in attendance.[479][492] Executives from Defendants Kraft Heinz, Mondelez, Post Holdings, General Mills, Coca-Cola, Mars, or their predecessors, were in attendance.

496. 448. James Behnke, CTO of Pillsbury (which was subsequently acquired by General Mills), and Michael Mudd, VP of Kraft, called the meeting to warn the CEOs that their companies had gone too far in marketing their products, and engineering UPF to maximize their consumption.[480][493]

497. 449. In the months prior, they had been engaged with a group of food science experts who were painting an increasingly grim picture of the public's ability to cope with the industry's formulations.[481][494] The scientific presentations, from the body's fragile controls on

---

[477][490] Id.
[478][491] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at xi, (2013).
[479][492] Id. at xii.
[480][493] Id. at xiv-xv.
[481][494] Id. at xiv.

overeating to the hidden power of UPF to make people feel hungrier still, convinced Behnke & Mudd that intervention was necessary.[482][495]

498.    450. Behnke & Mudd convened the unusual meeting of their competitors' CEOs to address these findings.

499.    451. Mudd led the initial presentation by saying:

"I very much appreciate this opportunity to talk to you about childhood obesity and the growing challenge it presents for us all.

Let me say right away at the start, this is not an easy subject. There are no easy answers—for what the public health community must do to bring this problem under control, or for what industry should do as others seek to hold it accountable for what has happened.

But this much is clear: For those of us who've looked hard at this issue, whether they're public health officials or staff specialists in your own companies, we feel sure that the one thing we shouldn't do is nothing.

Each of us who knows the issue might have our own thoughts on timing, or the scope of our response, or the specific tactics. But we all agree that "no action" is ultimately a path to more public health and public relations problems."[483][496] (emp. orig.)

500.    452. Mudd then explained, "in a nutshell, the food industry is being portrayed as a major cause of an epidemic of obesity and all its disease-related effects. The proposed remedies are troubling—taxes to control consumption and regulations to restrict marketing and advertising, especially to kids".[484][497]

501.    453. The presentation noted that "some of the voices are traditional critics of the food industry", including "industry's old friend, former FDA Commissioner David Kessler", but that

"more important, we're also hearing sincere concerns about obesity from many of industry's traditional allies, experts whose points of view industry has shared and respected, and who have acted as spokespeople on behalf of industry's own

---

[482][495] Id. at xiv-xv.
[483][496] Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).
[484][497] Id.

organizations. Among all these voices there is near unanimous agreement—and great frustration, I might add—that obesity is rising to epidemic proportions, with devastating public health consequences".[485][498]

502. 454. Among the "devastating public health consequences" were a then doubling in childhood obesity rates, "massive social costs they estimate at anywhere from $40 to $100 billion a year", and an estimated 300,000 deaths a year.[486][499]

503. 455. The presentation noted that obesity "changed dramatically in the late 1980s and early 1990s when obesity took a big jump upwards. And this trend appears to be continuing".[487][500]

504. 456. Mudd then explained that "experts are really worried" about children, noting that "we have the fattest and most unfit generation of children ever and it's hard to imagine that this will not translate into a generation of obese adults", and that these children would be "at a higher risk of developing chronic diseases such as diabetes, heart disease, hypertension and cancer".[488][501]

505. 457. Mudd explained that "the increase in obesity can't be caused by genetics, because genes just don't change that much in a 10 or 20 year period".

506. 458. Mudd then flashed a slide stating, "What's driving the increase? Ubiquity of inexpensive, good-tasting, super-sized, energy-dense foods" that were manufactured by the companies in attendance.[489][502]

507. 459. A quote by a public health official followed: "As a culture, we have become upset by the tobacco companies advertising to children, but we sit idly by while the food companies

---

[485][498] Id.

[486][499] Id.

[487][500] Id.

[488][501] Id.

[489][502] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at xvii-xviii, (2013).

do the very same thing. And we could make a claim that the toll taken on the public health by a poor diet rivals that taken by tobacco". [490][503]

508. 460. Mudd then asked "With all this, can the trial lawyers be far behind?", predicting a wave of mass litigation against food industries on similar public health grounds to the recent tobacco litigation. [491][504]

509. 461. He continued "If anyone in the food industry ever doubted there was a slippery slope out there, I imagine they are beginning to experience a distinct sliding sensation right now". [492][505]

510. 462. Mudd warned that the food industry may be approaching the same moment the tobacco industry encountered in 1964 with the release of the 1964 U.S. Surgeon General Report, and implored his fellow executives that "we cannot pretend food isn't part of the obesity problem….if you mapped categories of food advertising, especially advertising to kids, against the Food Guide Pyramid, it would turn the Pyramid on its head". [493][506]

511. 463. Mudd then urged the companies to create a coalition to implement a national program focused on prevention of obesity, "focused specifically on kids". [494][507] Mudd concluded his remarks by emphasizing: "we have the luxury of doing something before the problem becomes a crisis for us". [495][508]

512. 464. The presentation landed with a thud.

---

[490][503] Id. At at xviii.
[491][504] Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).
[492][505] Id.
[493][506] Id.
[494][507] Id.
[495][508] Id.

513.    465. When Mudd concluded, Stephen Sanger, CEO of General Mills, rose to speak, denigrating the fickleness of consumers' health concerns and those of their "ivory tower" advocates.[496][509]

514.    466. Sanger stated that industry always weathered these squalls, that General Mills would not pull back, that he would push his people onward, and that his peers should do the same: "Look we're not going to screw around with the company jewels here and change the formulations because a bunch of guys in white coats are worried".[497][510]

515.    467. No one spoke to counter Sanger's response—it effectively ended the meeting, and the presentation was a failure.[498][511] All of the UPF companies present spurned the idea.[499][512] Nothing was done, and the UPF industry continued headlong despite having express knowledge of the consequences of their actions.

516.    468. Despite having actual knowledge of the harm they are inflicting on America's children, Defendants and the UPF industry Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have not changed their ways. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have spent the last 25 years inundating children with targeted marketing for their UPF.

517.    469. Meanwhile, America's kids get sicker and sicker.

518.    470. Instead of improving their conduct, "the industry has responded with a ferocious campaign against regulation".[500][513]

---

[496][509] Michael Moss, Salt Sugar Fat: How the Food Giants Hooked Us, at xx, (2013).
[497][510] Id. at xx-xxi.
[498][511] Id. at xx.
[499][512] Id. at xxi.
[500][513] Madeleine Speed et al., *Deny, Denounce, Delay: the battle over the risk of ultra-processed foods*, Financial Times, May 22, 2024.

519. 471. UPF companies spent $106 million on political lobbying in the United States in 2023—almost twice as much as the tobacco and alcohol industries combined.[501][514]

520. 472. Commentors have noted that "there are striking similarities" in the way that the UPF and "tobacco industries have responded to public mistrust, damning scientific evidence, and calls for legal and legislative actions".[502][515]

521. 473. Like Big Tobacco, the UPF industry "seduces children…...infiltrates schools, buys loyalty from scientists, and pressures administration officials into accepting weak and ineffective nutrition policies".[503][516]

522. 474. The UPF industry is "organized and politically powerful".[504][517] It is "represented by lobbyists, lawyers and trade organizations" employed to protect it from changing its ways.[505][518]

523. 475. Like the tobacco industry before it, the UPF industry uses the same master playbook to deflect criticism of its actions.[506][519] Their strategy: "deny, denounce, delay".[507][520]

524. 476. The UPF industry's tactics include a focus on personal responsibility, vilification of critics, criticizing studies that hurt industry as "junk science", arguing that there are no good or bad foods and that no foods should be targeted for change, and the vast sowing of doubt.[508][521]

---

[501][514] Id.
[502][515] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q., Mar. 2009.
[503][516] Id.
[504][517] Id.
[505][518] Id.
[506][519] Id.
[507][520] Madeleine Speed et al., *Deny, Denounce, Delay: the battle over the risk of ultra-processed foods*, Financial Times, May 22, 2024.
[508][521] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q., Mar. 2009.

525.    477. The personal responsibility strategy "was first deployed by tobacco companies in 1962 as a reason to keep on smoking".[509][522] It has been widely used by the UPF industry as well to deflect blame and suggest that people should keep consuming UPF.

526.    478. Another Big Tobacco strategy utilized by the UPF industry is to bias research findings.[510][523] Research publications sponsored by the UPF industry "showed systemic bias from industry funding".[511][524] Articles sponsored exclusively by UPF companies are "four-times to eight times more likely to have conclusions favorable to the financial interests of the sponsoring company than those that were not sponsored" by UPF companies.[512][525]

527.    479. The UPF industry spends millions of dollars misinforming the public and policymakers by generating outcome driven "research" studies that undermine evidence of harm.

528.    480. The UPF industry also distributes millions of dollars each year to policy makers through direct and indirect contributions and gifts.[513][526] For example, approximately 2/3 of the members of the U.S. Congress declare funding received from the food industry.[514][527]

529.    481. Hired industry experts and front groups pressure policy makers across a number of different avenues.[515][528] These "industry actors market and generate doubt" in efforts to delay any proposed regulations or taxation.[516][529]

---

[509][522] Robert H. Lustig, *Ultraprocessed Food: Addictive, Toxic, and Ready for Regulation*, Nutrients., November 2020

[510][523] Rob Moodie et al., *Profits and Pandemics: Prevention of Harmful Effects of Tobacco, Alcohol, and Ultra- Ultra-Processed Food and Drink Industries*, Lancet., Feb. 2013.

[511][524] Id.

[512][525] Id.

[513][526] Simon Capewell & Ffion Lloyd-Williams, *The Role of the Food Industry in Healthy, Lessons from Tobacco?*, Br. Med Bull., Mar. 2018.

[514][527] Id.

[515][528] Id.

[516][529] Id.

530.    ~~482.~~ The UPF industry also affirmatively sought to rig the legal system in ways that would keep them from having to answer for the harms they were knowingly creating.

531.    ~~483.~~ For example, within a few years of Michael Mudd's presentation, Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra utilized a front group named the American Legislative Exchange Council ("ALEC") to lobby Federal and State legislative bodies to pass laws to eliminate the rights of victims to sue UPF companies for their conduct.[~~517~~530]

532.    ~~484.~~ The UPF industry seeks to "co-opt policy makers and health professionals" and to substitute "ineffective interventions such as education or 'individual choice', self-regulation or voluntary agreements".[~~518~~531]

533.    ~~485.~~ Such voluntary actions are counterfeit progress: their purpose is not to cause effective change but to prevent it. These strategies also have roots "in the tobacco arena when voluntary actions by industry appeared helpful but were not and served to stall government action for many years".[~~519~~532]

534.    ~~486.~~ Like the tobacco industry, the UPF industry exploits "the concept of inequities to defend themselves against public health policies, such as increasing taxes on harmful products or regulating their marketing. They do this by claiming that such policies would harm the poorest the most".[~~520~~533]

---

[~~517~~530] SOURCEWATCH, *ALEC Corporations*, CMD, (Revised Oct. 2023), https://www.sourcewatch.org/index.php?title=ALEC_Corporations; ALEC Board of Directors, *Common Sense Consumption Act*, ALEC, (Revised Sept. 2017), https://alec.org/model-policy/commonsense-consumption-act/.

[~~518~~531] Rob Moodie et al., *Profits and Pandemics: Prevention of Harmful Effects of Tobacco, Alcohol, and Ultra-Processed Food and Drink Industries*, Lancet., Feb. 2013; Simon Capewell & Ffion Lloyd-Williams, *The Role of the Food Industry in Healthy, Lessons from Tobacco?*, Br. Med Bull., Mar. 2018.

[~~519~~532] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q., Mar. 2009.

[~~520~~533] WHO Regional Office for Europe, *Commercial Determinants of Noncommunicable Diseases in the WHO European Region*, SNI, Jun. 2024.

535.   487. In reality, the UPF industry causes disproportionate harm in poorer communities by inundating these more vulnerable populations with marketing.

536.   488. As the Director-General of the World Health Organization explained, the tactics used by the UPF industry to prevent change are identical to those used by the Tobacco industry:

> "Efforts to prevent noncommunicable diseases go against the business interests of powerful economic operators…...It is not just Big Tobacco anymore. Public health must also contend with Big Food, Big Soda, and Big Alcohol. All of these industries fear regulation, and protect themselves using the same tactics.
>
> Research has documented these tactics well. They include front groups, lobbies, promises of self-regulation, lawsuits, and industry funded research that confuses the evidence and keeps the public in doubt.
>
> Tactics also include gifts, grants, and contributions to worthy causes that cast these industries as respectable corporate citizens in the eyes of politicians and the public. They include arguments that place the responsibility for harm to health on individuals, and portray government actions as interference in personal liberties and free choice.
>
> This is a formidable opposition. Market power readily translates into political power. Few governments prioritize health over big business. As we learned from experience with the tobacco industry, a powerful corporation can sell the public just about anything.
>
> Let me remind you. Not one single country has managed to turn around its obesity epidemic in all age groups. This is not a failure of individual will-power. This is a failure of political will to take on big business". [521][534]

537.   489. The parallel strategies used by the Tobacco and UPF industries, and the tenacity with which they are used, "are unsurprising in view of the flow of people, funds and activities across these industries, which also have histories of joint ownership". [522][535]

---

[521][534] Margaret Chan, *WHO Director-General addresses health promotion conference: Opening address at the 8th Global Conference on Health Promotion*, WHO, Jun. 10, 2013.
[522][535] Rob Moodie et al., *Profits and Pandemics: Prevention of Harmful Effects of Tobacco, Alcohol, and Ultra-Processed Food and Drink Industries*, Lancet., Feb. 2013.

538.    490. Meanwhile, Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra callously cause America's children to get sicker and sicker.

539.    491. Several commenters have noted that "the state of the food environment for US consumers bears a striking resemblance to the US environment in the 1950s during the tobacco epidemic, before the US federal government regulated the availability of tobacco products".[523][536]

540.    492. Kelly Brownell, the Director of the World Food Policy Center noted that "in December 1953, the CEOs of the Major Tobacco companies met secretly in New York City. Their purpose was to counter the damage from studies linking smoking to lung cancer".[524][537] What followed "were decades of deceit and actions that cost millions of lives".[525][538]

541.    493. Brownell compared Big Food to Big Tobacco, explaining that there are "significant similarities in the action that these industries have taken in response to concern that their products cause harm…...the world cannot afford a repeat of the tobacco history, in which industry talks about the moral high ground but does not occupy it".[526][539]

542.    494. Unfortunately that is exactly what has occurred.

543.    495. Almost 15 years after his failed presentation to major UPF company CEOs, Michael Mudd wrote "I left the industry when I finally had to acknowledge that reform would never come from within. I could no longer accept a business model that puts profits over public health—and no one else should have to, either".[527][540]

---

[523][536] Terra L. Fazzino, US Tobacco Companies Selectively Disseminated Hyper-Palatable Foods into the US Food System: Empirical evidence and current implications, Addiction, Sept. 2023.

[524][537] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q., Mar. 2009.

[525][538] Id.

[526][539] Id.

[527][540] Michael Mudd, *How to Force Ethics on the Food Industry*, The New York Times, Mar. 16, 2013.

117

544.    496. Mudd continued,

"as more is revealed about their deliberate indifference, food companies must be made to change their worst practices. After years of foot dragging and hundreds of millions of dollars in lobbying fees, it's obvious the industry won't change on its own. Quite simply, change will have to be forced—by public pressure, media attention, and litigation".[528][541]

545.    497. Defendants, and the UPF industry, had a momentous opportunity to change their ways in 1999. CEOs from the largest UPF companies met secretly, sat together in the same room, and looked squarely at the consequences of their actions.

546.    498. They were told that their conduct was directly causing "devastating public health consequences" to America's children. They knew that their actions had caused "the fattest and most unfit generation of children ever" and were killing hundreds of thousands of Americans.[529][542]

547.    499. These CEOs understood that their actions were unconscionable, and that they should expect to be sued for their conduct. They were asked rhetorically, "with all this, can the trial lawyers be far behind?"[530][543]

548.    500. These CEOs knew that they had "the luxury of doing something" before the problem became a crisis.[531][544]

549.    501. But instead, Defendants turned their back on America's children and spent the next 25 years callously grasping at profits, despite having actual knowledge of the public health crises they were causing.

---

[528][541] Id.

[529][542] Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).

[530][543] Id.

[531][544] Id.

550. ~~502.~~ Like the Tobacco industry before them, defendants knowingly disregarded unspeakable suffering they were inflicting on millions of Americans, and engaged in decades of deceit.

**IX.    Defendants' Tortious Actions caused Plaintiff Bryce Martinez to Develop Type 2 Diabetes & Fatty Liver Disease During his Childhood**

~~IX. Plaintiff Specific Allegations~~

~~503. Plaintiff is a victim of Defendants' predatory profiteering.~~

551. ~~504.~~ Plaintiff Bryce Martinez was diagnosed with Type 2 Diabetes and Non-Alcoholic Fatty Liver Disease at age 16. These diseases did not exist in children prior to ~~Defendants' conduct~~the tortious and unlawful conduct of Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra. Plaintiff is reasonably likely to develop sequalae and other complications of these diseases.

552. The conduct of each Defendant, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, is a proximate cause of Plaintiff's injuries.

553. Plaintiff Bryce Martinez regularly, frequently, and chronically ingested UPF manufactured, marketed, and sold by each Defendant, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, and was diagnosed with Type 2 Diabetes and Fatty Liver Disease during his childhood as a direct result of ingesting each Defendant's UPF.

554. Plaintiff's disease states are the result of his long-term exposure to UPF manufactured, marketed, and sold by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

555. The consistency of Plaintiff's exposure to UPF manufactured, marketed, and sold by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, over the course of his lifetime prior to his diagnoses at age 16, led to chronic metabolic dysfunction, a chronic inflammatory state, fat accumulation in the liver and pancreas and increased insulin resistance that substantially contributed to and caused his diagnosis of Type 2 Diabetes & Fatty Liver Disease.

556. There are no plausible alternative explanations for Plaintiff's injuries. Had Plaintiff not regularly, frequently, and chronically ingested UPF manufactured, marketed, and sold by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, over the course of many years, he would not have been diagnosed Type 2 Diabetes and Fatty Liver Disease at the age of 16.

557. 505. Each Defendants marketing, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, targeted children, including Plaintiff, with unfair and deceptive marketing messages regarding their UPF.

558. 506. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, also failed to warn children, including Plaintiff, that their UPF was harmful and could lead to the injuries suffered by Plaintiff. Defendants

559. Each Defendant, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, did not disclose that they had not tested the safety of chronic exposures to their UPF, that their UPF causes unique health risks independent of macronutrient content, that their UPF are potentially addictive substances, or that their UPF are engineered to be overconsumed.

560. There was no way for Plaintiff Bryce Martinez to know that Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra was deliberately and knowingly engineered the UPF he was consuming to drive excess consumption.

561. Furthermore, there was no way for Plaintiff Bryce Martinez to know that his attempts to eat more healthfully, as evidenced by his regular, frequent, and chronic ingestion of products such as Boca Burger Original Vegan Chik'n Veggie Patties, Nature Valley Oats & Honey Protein Granola, Kraft House Italian Dressing Lite, Vitamin Water Squeezed Lemonade Zero Sugar, Body Armor Lyte Peach Mango Sports Drink, Wheat Thins Reduced Fat Snacks, and Philadelphia Reduced Fat Cream Cheese Spread with a Third Less Fat, Cheez-It Reduced Fat Snack Crackers, would be undermined by the hidden toxicities inherent to the UPF manufactured by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

562. There was also no way for Plaintiff Bryce Martinez to know that the toxicities of UPF manufactured, marketed and sold by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra would work synergistically over the course of many years to cause chronic health conditions to emerge during his childhood.

**Kraft Heinz**

563. Plaintiff is a victim of Defendant Kraft Heinz's predatory profiteering.

564. ~~507.~~ As a result of Defendant~~s'~~ Kraft Heinz's conduct, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of ~~Defendants'~~Kraft Heinz's UPF.

~~508. For example, prior to Plaintiff's diagnosis, Plaintiff regularly ingested:~~

121

a. UPF from Defendant Kraft Heinz, including but not limited to those bearing the brand names Kraft, Heinz, Oscar-Meyer, Capri Sun, Jell-O, Philadelphia, Bagel Bites, Cool Whip, Crystal Light, Jet-Puffed, Stove Top, Boca Burger, Corn Nuts and A1;

b. UPF from Defendant Mondelez, including but not limited to those bearing the brand names Nabisco, Oreo, Ritz, Wheat Thins, Chips Ahoy! Sour Patch Kids, Trident, Swedish Fish, Fig Newtons, Nilla Wafers, and Teddy Grahams;

c. UPF from Defendant Post, including but not limited to those bearing the brand names Oreo O's, Honey Bunches of Oats, Honey Comb, Honey Maid, Pebbles, Raisin Bran, Waffle Crisp, and Farina;

565.    Plaintiff's long-term, chronic, and regular exposure to Defendant Kraft Heinz's UPF has resulted in severe life-changing physical infirmities. Defendant Kraft Heinz's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

566.    As a result of Defendant Kraft Heinz's actions, and Plaintiff's resulting ingestion of Kraft Heinz's UPF, Plaintiff suffers from severe chronic illness, and will live the rest of his life sick, suffering, and getting sicker.

567.    As a further result of Defendant Kraft Heinz's actions, and Plaintiff's resulting ingestion of Defendant Kraft Heinz's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's

122

disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[545]

*Kraft Singles American Cheese*

568.    Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Kraft Singles American Cheese slices.

569.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Kraft Singles American Cheese slices multiple times a week from 2009-2021.

570.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

571.    As detailed herein, consumption of UPF, including Kraft Singles American Cheese slices, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

572.    Furthermore, it is biologically plausible that the ultra-processing of Kraft Singles American Cheese slices significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

573.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Kraft Singles American Cheese slices contained additives like modified food starch and phosphate-based additives which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

---

[545] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

123

574.    Kraft Singles American Cheese slices were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

575.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Kraft Singles American Cheese slices for overconsumption.

576.    The ultra-processing of Kraft Singles American Cheese destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

577.    The ultra-processing of Kraft American Cheese also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

578.    Kraft Heinz also marketed Kraft Singles American Cheese slices to children using unfair and deceptive strategies and tactics such as those described herein.

*Kraft Original Mac & Cheese Macaroni and Cheese Dinner*

579.    Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Kraft Original Mac & Cheese Macaroni and Cheese Dinner.

124

580.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Kraft Original Mac & Cheese Macaroni and Cheese Dinner multiple times a month from 2009-2021.

581.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

582.    As detailed herein, consumption of UPF, including Kraft Original Mac & Cheese Macaroni and Cheese Dinner, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

583.    Furthermore, it is biologically plausible that the ultra-processing of Kraft Original Mac & Cheese Macaroni and Cheese Dinner significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

584.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Kraft Original Mac & Cheese Macaroni and Cheese Dinner contained additives like citric acid and phosphate-based additives which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

585.    Kraft Original Mac & Cheese Macaroni and Cheese Dinner also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

125

586.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Kraft Original Mac & Cheese Macaroni and Cheese Dinner for overconsumption.

587.    The ultra-processing of Kraft Original Mac & Cheese Macaroni and Cheese Dinner destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

588.    The ultra-processing of Kraft Original Mac & Cheese Macaroni and Cheese Dinner also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

589.    Kraft Heinz also marketed Kraft Original Mac & Cheese Macaroni and Cheese Dinner to children using unfair and deceptive strategies and tactics such as those described herein.

*Kraft Original Flavor Mac & Cheese Microwavable Cups*

590.    Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Kraft Original Flavor Mac & Cheese Microwavable Cups.

591.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Kraft Original Flavor Mac & Cheese Microwavable Cups multiple times a month from 2009-2021.

126

592.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

593.    As detailed herein, consumption of UPF, including Kraft Original Flavor Mac & Cheese Microwavable Cups, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

594.    Furthermore, it is biologically plausible that the ultra-processing of Kraft Original Flavor Mac & Cheese Microwavable Cups significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

595.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Kraft Original Flavor Mac & Cheese Microwavable Cups contained additives like modified starch, mono-glycerides, xantham gum, citric acid, guar gum and phosphate-based additives which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Kraft Original Flavor Mac & Cheese Microwavable Cups contained additives like maltodextrin which have been found to be associated with increased risks of fatty liver disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

596.    Kraft Original Flavor Mac & Cheese Microwavable Cups also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

597.    Kraft Original Flavor Mac & Cheese Microwavable Cups were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates,

127

bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

598. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Kraft Original Flavor Mac & Cheese Microwavable Cups for overconsumption.

599. The ultra-processing of Kraft Original Flavor Mac & Cheese Microwavable Cups destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

600. The ultra-processing of Kraft Original Flavor Mac & Cheese Microwavable Cups also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

601. Kraft Heinz also marketed Kraft Original Flavor Mac & Cheese Microwavable Cups to children using unfair and deceptive strategies and tactics such as those described herein.

*Oscar Mayer Bologna Sliced Lunch Meat*

602. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Oscar Mayer Bologna Sliced Lunch Meat.

128

603. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Oscar Mayer Bologna Sliced Lunch Meat multiple times a month from 2009-2021.

604. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

605. As detailed herein, consumption of UPF, including Oscar Mayer Bologna Sliced Lunch Meat, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

606. Furthermore, it is biologically plausible that the ultra-processing of Oscar Mayer Bologna Sliced Lunch Meat significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

607. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Oscar Mayer Bologna Sliced Lunch Meat contained emulsifiers, nitrites, phosphate-based additives and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

608. Oscar Mayer Bologna Sliced Lunch Meat was wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

129

609. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Oscar Mayer Bologna Sliced Lunch Meat for overconsumption.

610. The ultra-processing of Oscar Mayer Bologna Sliced Lunch Meat destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

611. The ultra-processing of Oscar Mayer Bologna Sliced Lunch Meat also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

612. Kraft Heinz also marketed Oscar Mayer Bologna Sliced Lunch Meat to children using unfair and deceptive strategies and tactics such as those described herein.

*Oscar Mayer Cheese Stuffed Hot Dogs*

613. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Oscar Mayer Cheese Stuffed Hot Dogs.

614. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Oscar Mayer Cheese Stuffed Hot Dogs multiple times a month from 2009-2021.

615. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

616. As detailed herein, consumption of UPF, including Oscar Mayer Cheese Stuffed Hot Dogs, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

617. Furthermore, it is biologically plausible that the ultra-processing of Oscar Mayer Cheese Stuffed Hot Dogs significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

618. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Oscar Mayer Cheese Stuffed Hot Dogs contained emulsifiers, nitrites, phosphate-based additives and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

619. Oscar Mayer Cheese Stuffed Hot Dogs was wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

620. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Oscar Mayer Cheese Stuffed Hot Dogs for overconsumption.

621.    The ultra-processing of Oscar Mayer Cheese Stuffed Hot Dogs destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

622.    The ultra-processing of Oscar Mayer Cheese Stuffed Hot Dogs also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

623.    Kraft Heinz also marketed Oscar Mayer Cheese Stuffed Hot Dogs to children using unfair and deceptive strategies and tactics such as those described herein.

*Oscar Mayer Deli Fresh Oven Roasted Turkey Breast*

624.    Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Oscar Mayer Deli Fresh Oven Roasted Turkey Breast.

625.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Oscar Mayer Deli Fresh Oven Roasted Turkey Breast multiple times a month from 2009-2021.

626.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

627.    As detailed herein, consumption of UPF, including Oscar Mayer Deli Fresh Oven Roasted Turkey Breast, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

628.    Furthermore, it is biologically plausible that the ultra-processing of Oscar Mayer Deli Fresh Oven Roasted Turkey Breast significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

629.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Oscar Mayer Deli Fresh Oven Roasted Turkey Breast contained modified starches, carrageenan, phosphate-based additives and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

630.    Oscar Mayer Deli Fresh Oven Roasted Turkey Breast was wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra- processing.

631.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Oscar Mayer Deli Fresh Oven Roasted Turkey Breast for overconsumption.

632.    The ultra-processing of Oscar Mayer Deli Fresh Oven Roasted Turkey Breast destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

633. The ultra-processing of Oscar Mayer Deli Fresh Oven Roasted Turkey Breast also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

634. Kraft Heinz also marketed Oscar Mayer Deli Fresh Oven Roasted Turkey Breast to children using unfair and deceptive strategies and tactics such as those described herein.

*Oscar Mayer Honey Uncured Ham Sliced Lunch Meat*

635. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Oscar Mayer Honey Uncured Ham Sliced Lunch Meat.

636. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Oscar Mayer Honey Uncured Ham Sliced Lunch Meat multiple times a month from 2009-2021.

637. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

638. As detailed herein, consumption of UPF, including Oscar Mayer Honey Uncured Ham Sliced Lunch Meat, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

639. Furthermore, it is biologically plausible that the ultra-processing of Oscar Mayer Honey Uncured Ham Sliced Lunch Meat significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

640.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Oscar Mayer Honey Uncured Ham Sliced Lunch Meat contained phosphate-based additives which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

641.    Oscar Mayer Deli Honey Uncured Ham Sliced Lunch Meat was wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

642.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Oscar Mayer Honey Uncured Ham Sliced Lunch Meat for overconsumption.

643.    The ultra-processing of Oscar Mayer Honey Uncured Ham Sliced Lunch Meat destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

644.    The ultra-processing of Oscar Mayer Honey Uncured Ham Sliced Lunch Meat also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to

135

ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

645.    Kraft Heinz also marketed Oscar Mayer Honey Uncured Ham Sliced Lunch Meat to children using unfair and deceptive strategies and tactics such as those described herein.

*Capri Sun Fruit Punch Juice Drink*

646.    Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Capri Sun Fruit Punch Juice Drink.

647.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Capri Sun Fruit Punch Juice Drink multiple times a week from 2009-2019.

648.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

649.    As detailed herein, consumption of UPF, including Capri Sun Fruit Punch Juice Drink, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

650.    Furthermore, it is biologically plausible that the ultra-processing of Capri Sun Fruit Punch Juice Drink significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

651.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Capri Sun Fruit Punch Juice Drink contained additives, such as citric acid, added flavors, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic

inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

652.    Capri Sun Fruit Punch Juice Drink was wrapped in plastic (the pouches were aluminum on the outside and plastic on the inside), which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

653.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Capri Sun Fruit Punch Juice Drink for overconsumption.

654.    The ultra-processing of Capri Sun Fruit Punch Juice Drink destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

655.    The ultra-processing of Capri Sun Fruit Punch Juice Drink also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

656.    Kraft Heinz also marketed Capri Sun Fruit Punch Juice Drink to children using unfair and deceptive strategies and tactics such as those described herein.

137

*Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters)*

657.    Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters).

658.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters) multiple times a week from 2009-2019.

659.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

660.    As detailed herein, consumption of UPF, including Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters), significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

661.    Furthermore, it is biologically plausible Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters) significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

662.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters) contained additives, such as citric acid, added flavors, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

663.    Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters) was wrapped in plastic (the pouches were aluminum on the outside and plastic on the inside),

138

which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

664. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters) for overconsumption.

665. The ultra-processing of Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters) destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

666. The ultra-processing of Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters) also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

667. Kraft Heinz also marketed Capri Sun Fruit Punch Wave Naturally Flavored Water Beverage (Roarin' Waters) to children using unfair and deceptive strategies and tactics such as those described herein.

*Capri Sun Strawberry Kiwi Juice Drink*

668.    Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Capri Sun Strawberry Kiwi Juice Drink.

669.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Capri Sun Strawberry Kiwi Juice Drink multiple times a week from 2009-2019.

670.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

671.    As detailed herein, consumption of UPF, including Capri Sun Strawberry Kiwi Juice Drink, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

672.    Furthermore, it is biologically plausible that the ultra-processing of Capri Sun Strawberry Kiwi Juice Drink significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

673.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Capri Sun Strawberry Kiwi Juice Drink contained additives, such as citric acid, added flavors, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

674.    Capri Sun Strawberry Kiwi Juice Drink was wrapped in plastic (the pouches were aluminum on the outside and plastic on the inside), which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine

disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

675.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Capri Sun Strawberry Kiwi Juice Drink for overconsumption.

676.    The ultra-processing of Capri Sun Strawberry Kiwi Juice Drink destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

677.    The ultra-processing of Capri Sun Strawberry Kiwi Juice Drink also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

678.    Kraft Heinz also marketed Capri Sun Strawberry Kiwi Juice Drink to children using unfair and deceptive strategies and tactics such as those described herein.

*Jell-O Cherry Flavor Gelatin Snack Cups*

679.    Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Jell-O Cherry Flavor Gelatin Snack Cups.

680.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Jell-O Cherry Flavor Gelatin Snack Cups multiple times a month from 2009-2021.

141

681.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

682.    As detailed herein, consumption of UPF, including Jell-O Cherry Flavor Gelatin Snack Cups, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

683.    Furthermore, it is biologically plausible that the ultra-processing of Jell-O Cherry Flavor Gelatin Snack Cups significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

684.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Jell-O Cherry Flavor Gelatin Snack Cups contained additives, such as citric acid, sodium citrate, aspartame, and acesulfame-K, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

685.    Jell-O Cherry Flavor Gelatin Snack Cups also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

686.    Jell-O Cherry Flavor Gelatin Snack Cups was wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

142

687. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Jell-O Cherry Flavor Gelatin Snack Cups for overconsumption.

688. The ultra-processing of Jell-O Cherry Flavor Gelatin Snack Cups destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

689. The ultra-processing of Jell-O Cherry Flavor Gelatin Snack Cups also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

690. Kraft Heinz also marketed Jell-O Cherry Flavor Gelatin Snack Cups to children using unfair and deceptive strategies and tactics such as those described herein.

*Jell-O Strawberry Flavor Gelatin Snack Cups*

691. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Jell-O Strawberry Flavor Gelatin Snack Cups.

692. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Jell-O Strawberry Flavor Gelatin Snack Cups multiple times a month from 2009-2021.

693. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

694.    As detailed herein, consumption of UPF, including Jell-O Strawberry Flavor Gelatin Snack Cups, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

695.    Furthermore, it is biologically plausible that the ultra-processing of Jell-O Strawberry Flavor Gelatin Snack Cups significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

696.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Jell-O Strawberry Flavor Gelatin Snack Cups contained additives, such as citric acid and sodium citrate, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

697.    Jell-O Strawberry Flavor Gelatin Snack Cups also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

698.    Jell-O Strawberry Flavor Gelatin Snack Cups was wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

699.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on

sophisticated neuroscience, to optimize Jell-O Strawberry Flavor Gelatin Snack Cups for overconsumption.

700. The ultra-processing of Jell-O Strawberry Flavor Gelatin Snack Cups destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

701. The ultra-processing of Jell-O Strawberry Flavor Gelatin Snack Cups also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

702. Kraft Heinz also marketed Jell-O Strawberry Flavor Gelatin Snack Cups to children using unfair and deceptive strategies and tactics such as those described herein.

*Jell-O Original Chocolate Instant Pudding*

703. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Jell-O Original Chocolate Instant Pudding.

704. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Jell-O Original Chocolate Instant Pudding multiple times a month from 2009-2021.

705. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

706. As detailed herein, consumption of UPF, including Jell-O Original Chocolate Instant Pudding, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These

risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

707.    Furthermore, it is biologically plausible that the ultra-processing of Jell-O Original Chocolate Instant Pudding significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

708.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Jell-O Original Chocolate Instant Pudding contained additives, such as modified food starch, mono- and diglycerides, and phosphate based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

709.    Jell-O Original Chocolate Instant Pudding also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

710.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Jell-O Original Chocolate Instant Pudding for overconsumption.

711.    The ultra-processing of Jell-O Original Chocolate Instant Pudding destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

712. The ultra-processing of Jell-O Original Chocolate Instant Pudding also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

713. Kraft Heinz also marketed Jell-O Original Chocolate Instant Pudding to children using unfair and deceptive strategies and tactics such as those described herein.

*Jell-O Original Vanilla Instant Pudding*

714. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Jell-O Original Vanilla Instant Pudding.

715. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Jell-O Original Vanilla Instant Pudding multiple times a month from 2009-2021.

716. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

717. As detailed herein, consumption of UPF, including Jell-O Original Vanilla Instant Pudding, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

718. Furthermore, it is biologically plausible that the ultra-processing of Jell-O Original Vanilla Instant Pudding significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

719. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver

147

Disease. For example, Jell-O Original Vanilla Instant Pudding contained additives, such as modified food starch, mono- and diglycerides, and phosphate based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

720. Jell-O Original Vanilla Instant Pudding also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

721. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Jell-O Original Vanilla Instant Pudding for overconsumption.

722. The ultra-processing of Jell-O Original Vanilla Instant Pudding destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

723. The ultra-processing of Jell-O Original Vanilla Instant Pudding also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

148

724. Kraft Heinz also marketed Jell-O Original Vanilla Instant Pudding to children using unfair and deceptive strategies and tactics such as those described herein.

*Philadelphia Original Cream Cheese Spread*

725. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Philadelphia Original Cream Cheese Spread.

726. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Philadelphia Original Cream Cheese Spread multiple times a month from 2009-2021.

727. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

728. As detailed herein, consumption of UPF, including Philadelphia Original Cream Cheese Spread, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

729. Furthermore, it is biologically plausible that the ultra-processing of Philadelphia Original Cream Cheese Spread significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

730. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Philadelphia Original Cream Cheese Spread contained additives, such as xantham gum, carob bean gum, and guar gum, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

731. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Philadelphia Original Cream Cheese Spread for overconsumption.

732. The ultra-processing of Philadelphia Original Cream Cheese Spread destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

733. The ultra-processing of Philadelphia Original Cream Cheese Spread also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

734. Kraft Heinz also marketed Philadelphia Original Cream Cheese Spread to children using unfair and deceptive strategies and tactics such as those described herein.

*Philadelphia Reduced Fat Cream Cheese Spread with a Third Less Fat*

735. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Philadelphia Reduced Fat Cream Cheese Spread with a Third Less Fat.

736. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Philadelphia Reduced Fat Cream Cheese Spread with a Third Less Fat multiple times a week from 2009-2021.

737. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

738.     As detailed herein, consumption of UPF, including Philadelphia Reduced Fat Cream Cheese Spread with a Third Less Fat, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

739.     Furthermore, it is biologically plausible that the ultra-processing of Philadelphia Original Cream Cheese Spread with a Third Less Fat significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

740.     There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Philadelphia Original Cream Cheese Spread with a Third Less Fat contained additives, such as carob bean gum and guar gum, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

741.     On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Philadelphia Original Cream Cheese Spread with a Third Less Fat for overconsumption.

742.     The ultra-processing of Philadelphia Original Cream Cheese Spread with a Third Less Fat destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

151

743. The ultra-processing of Philadelphia Original Cream Cheese Spread with a Third Less Fat also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

744. Kraft Heinz also marketed Philadelphia Original Cream Cheese Spread with a Third Less Fat to children using unfair and deceptive strategies and tactics such as those described herein.

*Bagel Bites Three Cheese Mini Pizza Bagel Frozen Snacks*

745. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Bagel Bites Three Cheese Mini Pizza Bagel Frozen Snacks.

746. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Bagel Bites Three Cheese Mini Pizza Bagel Frozen Snacks multiple times a month from 2009-2021.

747. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

748. As detailed herein, consumption of UPF, including Bagel Bites Three Cheese Mini Pizza Bagel Frozen Snacks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non- UPF, and are not readily apparent to any ordinary consumer.

749. Furthermore, it is biologically plausible that the ultra-processing of Bagel Bites Three Cheese Mini Pizza Bagel Frozen Snacks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

750.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Bagel Bites Three Cheese Mini Pizza Bagel Frozen Snacks contained additives, such as modified food starch, citric acid, methylcellulose, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

751.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Bagel Bites Three Cheese Mini Pizza Bagel Frozen Snacks for overconsumption.

752.    The ultra-processing of Bagel Bites Three Cheese Mini Pizza Bagel Frozen Snacks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

753.    The ultra-processing of Bagel Bites Three Cheese Mini Pizza Bagel Frozen Snacks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

153

754. Kraft Heinz also marketed Bagel Bites Three Cheese Mini Pizza Bagel Frozen Snacks to children using unfair and deceptive strategies and tactics such as those described herein.

*Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks*

755. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks.

756. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks multiple times a month from 2009-2021.

757. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

758. As detailed herein, consumption of UPF, including Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

759. Furthermore, it is biologically plausible that the ultra-processing of Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

760. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks contained additives, such as modified food starch, citric acid, nitrites and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

154

761. Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks also contained endocrine disrupting chemicals including BHA & BHT. Advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

762. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks for overconsumption.

763. The ultra-processing of Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

764. The ultra-processing of Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

765. Kraft Heinz also marketed Bagel Bites Cheese & Pepperoni Mini Pizza Bagel Frozen Snacks to children using unfair and deceptive strategies and tactics such as those described herein.

*Cool Whip Original Whipped Topping*

766. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Cool Whip Original Whipped Topping.

155

767. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Cool Whip Original Whipped Topping multiple times a month from 2018-2021.

768. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

769. As detailed herein, consumption of UPF, including Cool Whip Original Whipped Topping, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

770. Furthermore, it is biologically plausible that the ultra-processing of Cool Whip Original Whipped Topping significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

771. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Cool Whip Original Whipped Topping contained additives, such as modified food starch, xantham gum, guar gum, phosphate-based additives, polysorbates and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

772. Cool Whip Original Whipped Topping is sold in plastic containers, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

156

773. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Cool Whip Original Whipped Topping for overconsumption.

774. The ultra-processing of Cool Whip Original Whipped Topping destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

775. The ultra-processing of Cool Whip Original Whipped Topping also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

776. Kraft Heinz also marketed Cool Whip Original Whipped Topping to children using unfair and deceptive strategies and tactics such as those described herein.

*Crystal Light Lemonade*

777. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Crystal Light Lemonade.

778. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Crystal Light Lemonade multiple times a month from 2009-2021.

779. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

780.   As detailed herein, consumption of UPF, including Crystal Light Lemonade, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

781.   Furthermore, it is biologically plausible that the ultra-processing of Crystal Light Lemonade significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

782.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Crystal Light Lemonade contained additives, such as aspartame, acesulfame-K, citric acid, sodium citrate and phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Crystal Light Lemonade, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

783.   Crystal Light Lemonade also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

784.   On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Crystal Light Lemonade for overconsumption.

785.   The ultra-processing of Crystal Light Lemonade destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

158

786. The ultra-processing of Crystal Light Lemonade also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

787. Kraft Heinz also marketed Crystal Light Lemonade to children using unfair and deceptive strategies and tactics such as those described herein.

*Crystal Light Pink Lemonade*

788. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Crystal Light Pink Lemonade.

789. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Crystal Light Pink Lemonade multiple times a month from 2009-2021.

790. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

791. As detailed herein, consumption of UPF, including Crystal Light Pink Lemonade, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

792. Furthermore, it is biologically plausible that the ultra-processing of Crystal Light Pink Lemonade significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

793. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver

159

Disease. For example, Crystal Light Pink Lemonade contained additives, such as aspartame, acesulfame-K, citric acid, sodium citrate and phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Crystal Light Lemonade, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

794. Crystal Light Pink Lemonade also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

795. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Crystal Light Pink Lemonade for overconsumption.

796. The ultra-processing of Crystal Light Pink Lemonade destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

797. The ultra-processing of Crystal Light Pink Lemonade also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

798. Kraft Heinz also marketed Crystal Light Pink Lemonade to children using unfair and deceptive strategies and tactics such as those described herein.

*Crystal Light Raspberry Lemonade*

799. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Crystal Light Raspberry Lemonade.

800. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Crystal Light Raspberry Lemonade multiple times a month from 2009-2021.

801. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

802. As detailed herein, consumption of UPF, including Crystal Light Raspberry Lemonade, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

803. Furthermore, it is biologically plausible that the ultra-processing of Crystal Light Raspberry Lemonade significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

804. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Crystal Light Raspberry Lemonade contained additives, such as aspartame, acesulfame-K, citric acid, sodium citrate and phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Crystal Light Raspberry Lemonade, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

161

805. Crystal Light Raspberry Lemonade also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

806. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Crystal Light Raspberry Lemonade for overconsumption.

807. The ultra-processing of Crystal Light Raspberry Lemonade destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

808. The ultra-processing of Crystal Light Raspberry Lemonade also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

809. Kraft Heinz also marketed Crystal Light Raspberry Lemonade to children using unfair and deceptive strategies and tactics such as those described herein.

*Jet-Puffed Marshmallow*

810. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Jet-Puffed Marshmallows.

811. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Jet-Puffed Marshmallows multiple times a month from 2009-2021.

162

812.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

813.    As detailed herein, consumption of UPF, including Jet-Puffed Marshmallows, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

814.    Furthermore, it is biologically plausible that the ultra-processing of Jet-Puffed Marshmallows significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

815.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Jet-Puffed Marshmallows contained additives, such as modified starch, hidden sugars and phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

816.    Jet-Puffed Marshmallows also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

817.    Jet-Puffed Marshmallows were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

163

818.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Jet-Puffed Marshmallows for overconsumption.

819.    The ultra-processing of Jet-Puffed Marshmallows destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

820.    The ultra-processing of Jet-Puffed Marshmallows also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

821.    Kraft Heinz also marketed Jet-Puffed Marshmallows to children using unfair and deceptive strategies and tactics such as those described herein.

*Stove Top Stuffing Mix for Chicken*

822.    Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Stove Top Stuffing Mix for Chicken.

823.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Stove Top Stuffing Mix for Chicken multiple times a month from 2009-2021.

824.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

825.    As detailed herein, consumption of UPF, including Stove Top Stuffing Mix for Chicken, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are

164

significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

826.    Furthermore, it is biologically plausible that the ultra-processing of Stove Top Stuffing Mix for Chicken significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

827.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Stove Top Stuffing Mix for Chicken contained additives, such as maltodextrin and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Stove Top Stuffing Mix for Chicken, such as BHA, BHT, and MSG induce organ damage and endocrine disruption. Collectively, these additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

828.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Stove Top Stuffing Mix for Chicken for overconsumption.

829.    The ultra-processing of Stove Top Stuffing Mix for Chicken destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

830.    The ultra-processing of Stove Top Stuffing Mix for Chicken also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to

165

hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

831. Kraft Heinz also marketed Stove Top Stuffing Mix for Chicken to children using unfair and deceptive strategies and tactics such as those described herein.

*Boca Burger Original Vegan Chik'n Veggie Patties*

832. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Boca Burger Original Vegan Chik'n Veggie Patties.

833. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Boca Burger Original Vegan Chik'n Veggie Patties multiple times a month from 2018-2021.

834. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

835. As detailed herein, consumption of UPF, including Boca Burger Original Vegan Chik'n Veggie Patties, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

836. Furthermore, it is biologically plausible that the ultra-processing of Boca Burger Original Vegan Chik'n Veggie Patties significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

837. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Boca Burger Original Vegan Chik'n Veggie Patties contained additives, such as methylcellulose, maltodextrin and phosphate-based additives, which have been found to

166

be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

838. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Boca Burger Original Vegan Chik'n Veggie Patties for overconsumption.

839. The ultra-processing of Boca Burger Original Vegan Chik'n Veggie Patties destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

840. The ultra-processing of Boca Burger Original Vegan Chik'n Veggie Patties also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

841. Kraft Heinz also marketed Boca Burger Original Vegan Chik'n Veggie Patties to children using unfair and deceptive strategies and tactics such as those described herein.

*A1 Original Steak Sauce*

842. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called A1 Original Steak Sauce.

843.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested A1 Original Steak Sauce multiple times a month from 2011-2021.

844.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

845.    As detailed herein, consumption of UPF, including A1 Original Steak Sauce, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

846.    Furthermore, it is biologically plausible that the ultra-processing of A1 Original Steak Sauce significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

847.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, A1 Original Steak Sauce contained additives, such as xantham gum and potassium sorbate, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

848.    A1 Original Steak Sauce also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

849.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize A1 Original Steak Sauce for overconsumption.

168

850. The ultra-processing of A1 Original Steak Sauce destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

851. The ultra-processing of A1 Original Steak Sauce also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

852. Kraft Heinz also marketed A1 Original Steak Sauce to children using unfair and deceptive strategies and tactics such as those described herein.

*Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce*

853. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce.

854. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce multiple times a month from 2009-2021.

855. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

856. As detailed herein, consumption of UPF, including Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

169

857.    Furthermore, it is biologically plausible that the ultra-processing of Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

858.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce contained additives, such as modified starch, acetylated monoglycerides, maltodextrin, and phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

859.    Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce are sold in plastic containers, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

860.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce for overconsumption.

861.    The ultra-processing of Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce destroyed the food matrix, allowing for rapid delivery of reinforcers,

170

altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

862. The ultra-processing of Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

863. Kraft Heinz also marketed Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce to children using unfair and deceptive strategies and tactics such as those described herein.

*Velveeta Shells & Cheese Original Shell Pasta & Cheese Sauce Meal*

864. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Velveeta Shells & Cheese Original Shell Pasta & Cheese Sauce Meal.

865. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Velveeta Shells & Cheese Original Shell Pasta & Cheese Sauce Meal multiple times a month from 2009-2021.

866. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

867. As detailed herein, consumption of UPF, including Velveeta Shells & Cheese Original Shell Pasta & Cheese Sauce Meal, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

171

868. Furthermore, it is biologically plausible that the ultra-processing of Velveeta Shells & Cheese Original Shell Pasta & Cheese Sauce Meal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

869. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce contained additives, such as modified starch, acetylated monoglycerides, maltodextrin, and phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

870. Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce are sold in plastic containers, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

871. On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce for overconsumption.

872. The ultra-processing of Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce destroyed the food matrix, allowing for rapid delivery of reinforcers,

172

altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

873. The ultra-processing of Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

874. Kraft Heinz also marketed Velveeta Shells & Cheese Original Microwavable Shell Pasta & Cheese Sauce to children using unfair and deceptive strategies and tactics such as those described herein.

*Kraft House Italian Dressing Lite*

875. Defendant Kraft Heinz manufactured, marketed, and sold a UPF product called Kraft House Italian Dressing Lite.

876. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Kraft House Italian Dressing Lite multiple times a month from 2009-2021.

877. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kraft Heinz.

878. As detailed herein, consumption of UPF, including Kraft House Italian Dressing Lite, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

173

879.    Furthermore, it is biologically plausible that the ultra-processing of Kraft House Italian Dressing Lite significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

880.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Kraft House Italian Dressing Lite contained additives, such as citric acid, xantham gum, potassium sorbate, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

881.    Kraft House Italian Dressing Lite are sold in plastic containers, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

882.    On information and belief, Kraft Heinz utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Kraft House Italian Dressing Lite for overconsumption.

883.    The ultra-processing of Kraft House Italian Dressing Lite destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

884.    The ultra-processing of Kraft House Italian Dressing Lite also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra- processed foods. Such responses are the intended effect of Kraft Heinz's sophisticated efforts to hack human

174

physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

885.   Kraft House Italian Dressing Lite to children using unfair and deceptive strategies and tactics such as those described herein.

**Mondelez**

886.   Plaintiff is a victim of Defendant Mondelez's predatory profiteering.

887.   As a result of Defendant Mondelez's conduct, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of Mondelez's UPF.

888.   Plaintiff's long-term, chronic, and regular exposure to Defendant Mondelez's UPF has resulted in severe life-changing physical infirmities. Defendant Mondelez's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

889.   As a result of Defendant Mondelez's actions, and Plaintiff's resulting ingestion of Defendant Mondelez's UPF, Plaintiff suffers from severe chronic illness, and will live the rest of his life sick, suffering, and getting sicker.

890.   As a further result of Defendant Mondelez's actions, and Plaintiff's resulting ingestion of Defendant Mondelez's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.

175

*Nabisco Nilla Wafers Cookies*

891.    Defendant Mondelez manufactured, marketed, and sold a UPF product called Nabisco Nilla Wafers Cookies.

892.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Nabisco Nilla Wafers Cookies multiple times a month from 2009-2021.

893.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

894.    As detailed herein, consumption of UPF, including Nabisco Nilla Wafers Cookies, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

895.    Furthermore, it is biologically plausible that the ultra-processing of Nabisco Nilla Wafers Cookies significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

896.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Nabisco Nilla Wafers Cookies contained additives like mono- and diglycerides, phosphate-based additives and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Nabisco Nilla Wafers Cookies, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

897.    Nabisco Nilla Wafers Cookies were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and

organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

898.    On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Nabisco Nilla Wafers Cookies for overconsumption.

899.    The ultra-processing of Nabisco Nilla Wafers Cookies destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

900.    The ultra-processing of Nilla Wafer Cookies also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

901.    Mondelez also marketed Nabisco Nilla Wafers Cookies to children using unfair and deceptive strategies and tactics such as those described herein.

*Oreo Golden Sandwich Cookies*

902.    Defendant Mondelez manufactured, marketed, and sold a UPF product called Oreo Golden Sandwich Cookies.

903.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Oreo Golden Sandwich Cookies multiple times a month from 2009-2021.

904.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

177

905. As detailed herein, consumption of UPF, including Oreo Golden Sandwich Cookies, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

906. Furthermore, it is biologically plausible that the ultra-processing of Oreo Golden Sandwich Cookies significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

907. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Oreo Golden Sandwich Cookies contained additives like hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Oreo Golden Sandwich Cookies, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

908. Oreo Golden Sandwich Cookies were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

909. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Oreo Golden Sandwich for overconsumption.

910. The ultra-processing of Oreo Golden Sandwich Cookies destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

178

911.    The ultra-processing of Oreo Golden Sandwich Cookies also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

912.    Mondelez also marketed Oreo Golden Sandwich Cookies to children using unfair and deceptive strategies and tactics such as those described herein.

*Oreo Double Stuf Chocolate Sandwich Cookies*

913.    Defendant Mondelez manufactured, marketed, and sold a UPF product called Oreo Double Stuf Chocolate Sandwich Cookies.

914.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Oreo Double Stuf Chocolate Sandwich Cookies multiple times a month from 2009- 2021.

915.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

916.    As detailed herein, consumption of UPF, including Oreo Double Stuf Chocolate Sandwich Cookies, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

917.    Furthermore, it is biologically plausible that the ultra-processing of Oreo Double Stuf Chocolate Sandwich Cookies significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

179

918.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Oreo Double Stuf Chocolate Sandwich Cookies contained additives like phosphate-based additives and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin in Oreo Double Stuf Chocolate Sandwich Cookies, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

919.    Oreo Double Stuf Chocolate Sandwich Cookies were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

920.    On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Oreo Double Stuf Chocolate Sandwich for overconsumption.

921.    The ultra-processing of Oreo Double Stuf Chocolate Sandwich Cookies destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

922.    The ultra-processing of Oreo Double Stuf Chocolate Sandwich Cookies also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts

180

to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

923. Mondelez also marketed Oreo Double Stuf Chocolate Sandwich Cookies to children using unfair and deceptive strategies and tactics such as those described herein.

*Oreo Mini Sandwich Cookies*

924. Defendant Mondelez manufactured, marketed, and sold a UPF product called Oreo Double Mini Sandwich Cookies.

925. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Oreo Mini Chocolate Sandwich Cookies multiple times a month from 2009-2021.

926. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

927. As detailed herein, consumption of UPF, including Oreo Mini Chocolate Sandwich Cookies, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

928. Furthermore, it is biologically plausible that the ultra-processing of Oreo Mini Chocolate Sandwich Cookies significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

929. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Oreo Mini Chocolate Sandwich Cookies contained additives like phosphate-based additives and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy

lecithin found in Oreo Mini Chocolate Sandwich Cookies, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

930. Oreo Mini Chocolate Sandwich Cookies were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

931. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Oreo Mini Chocolate Sandwich for overconsumption.

932. The ultra-processing of Oreo Mini Chocolate Sandwich Cookies destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

933. The ultra-processing of Oreo Mini Chocolate Sandwich Cookies also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

934. Mondelez also marketed Oreo Mini Chocolate Sandwich Cookies to children using unfair and deceptive strategies and tactics such as those described herein.

182

*Ritz Original Crackers*

935.    Defendant Mondelez manufactured, marketed, and sold a UPF product called Ritz Original Crackers.

936.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Ritz Original Crackers multiple times a month from 2009-2021.

937.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

938.    As detailed herein, consumption of UPF, including Ritz Original Crackers, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

939.    Furthermore, it is biologically plausible that the ultra-processing of Ritz Original Crackers significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

940.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Ritz Original Crackers contained additives like phosphate-based additives and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Ritz Original Crackers, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

941.    Ritz Original Crackers were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

183

942. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Ritz Original Crackers for overconsumption.

943. The ultra-processing of Ritz Original Crackers destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

944. The ultra-processing of Ritz Original Crackers also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

945. Mondelez also marketed Ritz Original Crackers to children using unfair and deceptive strategies and tactics such as those described herein.

*Wheat Thins Original Snacks*

946. Defendant Mondelez manufactured, marketed, and sold a UPF product called Wheat Thins Original Snacks.

947. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Wheat Thins Original Snacks multiple times a month from 2009-2021.

948. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

949. As detailed herein, consumption of UPF, including Wheat Thins Original Snacks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are

184

significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

950. Furthermore, it is biologically plausible that the ultra-processing of Wheat Thins Original Snacks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

951. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Wheat Thins Original Snacks contained additives like phosphate- based additives and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Wheat Thins Original Snacks, such as BHT induce organ damage and endocrine disruption. Collectively, these additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

952. Wheat Thins Original Snacks were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

953. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Wheat Thins Original Snacks for overconsumption.

954. The ultra-processing of Wheat Thins Original Snacks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

955. The ultra-processing of Wheat Thins Original Snacks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

956. Mondelez also marketed Wheat Thins Original Snacks to children using unfair and deceptive strategies and tactics such as those described herein.

*Wheat Thins Reduced Fat Snacks*

957. Defendant Mondelez manufactured, marketed, and sold a UPF product called Wheat Thins Reduced Fat Snacks.

958. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Wheat Thins Reduced Fat Snacks multiple times a month from 2009-2021.

959. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

960. As detailed herein, consumption of UPF, including Wheat Thins Reduced Fat Snacks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

961. Furthermore, it is biologically plausible that the ultra-processing of Wheat Thins Reduced Fat Snacks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

962. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver

Disease. For example, Wheat Thins Reduced Fat Snacks contained additives like phosphate-based additives and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Wheat Thins Reduced Fat Snacks, such as BHT induce organ damage and endocrine disruption. Collectively, these additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

963. Wheat Thins Reduced Fat Snacks were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

964. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Wheat Thins Reduced Fat Snacks for overconsumption.

965. The ultra-processing of Wheat Thins Reduced Fat Snacks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

966. The ultra-processing of Wheat Thins Reduced Fat Snacks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra- processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

187

967.    Mondelez also marketed Wheat Thins Reduced Fat Snacks to children using unfair and deceptive strategies and tactics such as those described herein.

*Chips Ahoy! Mini Original Chocolate Chip Cookies*

968.    Defendant Mondelez manufactured, marketed, and sold a UPF product called Chips Ahoy! Mini Original Chocolate Chip Cookies.

969.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Chips Ahoy! Mini Original Chocolate Chip Cookies multiple times a month from 2011-2021.

970.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

971.    As detailed herein, consumption of UPF, including Chips Ahoy! Mini Original Chocolate Chip Cookies, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

972.    Furthermore, it is biologically plausible that the ultra-processing of Chips Ahoy! Mini Original Chocolate Chip Cookies significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

973.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Chips Ahoy! Mini Original Chocolate Chip Cookies contained additives like hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Chips Ahoy! Mini Original Chocolate Chip Cookies, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

188

974. Chips Ahoy! Mini Original Chocolate Chip Cookies were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra- processing.

975. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Chips Ahoy! Mini Original Chocolate Chip Cookies for overconsumption.

976. The ultra-processing of Chips Ahoy! Mini Original Chocolate Chip Cookies destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

977. The ultra-processing of Chips Ahoy! Mini Original Chocolate Chip Cookies also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

978. Mondelez also marketed Chips Ahoy! Mini Original Chocolate Chip Cookies to children using unfair and deceptive strategies and tactics such as those described herein.

*Sour Patch Kids Original*

979. Defendant Mondelez manufactured, marketed, and sold a UPF product called Sour Patch Kids Original.

980.     Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Sour Patch Kids Original multiple times a month from 2011-2021.

981.     Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

982.     As detailed herein, consumption of UPF, including Sour Patch Kids Original, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

983.     Furthermore, it is biologically plausible that the ultra-processing of Sour Patch Kids Original significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

984.     There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Sour Patch Kids Original contained additives like modified corn starch, tartaric acid, citric acid and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

985.     Sour Patch Kids Original also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

986.     Sour Patch Kids Original were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate

190

ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

987. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Sour Patch Kids Original for overconsumption.

988. The ultra-processing of Sour Patch Kids Original destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

989. The ultra-processing of Sour Patch Kids Original also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

990. Mondelez also marketed Sour Patch Kids Original to children using unfair and deceptive strategies and tactics such as those described herein.

*Trident Original Sugar Free Gum*

991. Defendant Mondelez manufactured, marketed, and sold a UPF product called Trident Original Sugar Free Gum.

992. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Trident Original Sugar Free Gum multiple times a month from 2009-2021.

993. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

191

994. As detailed herein, consumption of UPF, including Trident Original Sugar Free Gum, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

995. Furthermore, it is biologically plausible that the ultra-processing of Trident Original Sugar Free Gum significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

996. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Trident Original Sugar Free Gum contained additives like acesulfame-K, asparatame, and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Wheat Thins Original Snacks, such as BHT induce organ damage and endocrine disruption. These additives, along with the soy lecithin found in Trident Original Sugar Free Gum, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

997. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Trident Original Sugar Free Gum for overconsumption.

998. The ultra-processing of Trident Original Sugar Free Gum destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

999. The ultra-processing of Trident Original Sugar Free Gum also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such

as dopamine release via distinct gut-brain pathways, that are unique to ultra- processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1000. Mondelez also marketed Trident Original Sugar Free Gum to children using unfair and deceptive strategies and tactics such as those described herein.

*Swedish Fish Soft & Chewy Candy*

1001. Defendant Mondelez manufactured, marketed, and sold a UPF product called Swedish Fish Soft & Chewy Candy.

1002. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Swedish Fish Soft & Chewy Candy multiple times a month from 2011-2021.

1003. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

1004. As detailed herein, consumption of UPF, including Swedish Fish Soft & Chewy Candy, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1005. Furthermore, it is biologically plausible that the ultra-processing of Swedish Fish Soft & Chewy Candy significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1006. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Swedish Fish Soft & Chewy Candy contained additives like modified corn starch, carnauba wax, citric acid, and hidden sugars which have been found to be associated with

increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1007. Swedish Fish Soft & Chewy Candy also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1008. Swedish Fish Soft & Chewy Candy was wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

1009. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Swedish Fish Soft & Chewy Candy for overconsumption.

1010. The ultra-processing of Swedish Fish Soft & Chewy Candy destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1011. The ultra-processing of Swedish Fish Soft & Chewy Candy also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

194

1012. Mondelez also marketed Swedish Fish Soft & Chewy Candy to children using unfair and deceptive strategies and tactics such as those described herein.

*Newtons Fig Bars, Soft Fruit Chewy Cookies*

1013. Defendant Mondelez manufactured, marketed, and sold a UPF product called Newtons Fig Bars, Soft Fruit Chewy Cookies.

1014. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Newtons Fig Bars, Soft Fruit Chewy Cookies multiple times a month from 2009-2021.

1015. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

1016. As detailed herein, consumption of UPF, including Newtons Fig Bars, Soft Fruit Chewy Cookies, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1017. Furthermore, it is biologically plausible that the ultra-processing of Newtons Fig Bars, Soft Fruit Chewy Cookies significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1018. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Newtons Fig Bars, Soft Fruit Chewy Cookies contained additives like malic acid and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Newtons Fig Bars, Soft Fruit Chewy Cookies, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

195

1019. Newtons Fig Bars, Soft Fruit Chewy Cookies were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

1020. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Newtons Fig Bars, Soft Fruit Chewy Cookies for overconsumption.

1021. The ultra-processing of Newtons Fig Bars, Soft Fruit Chewy Cookies destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1022. The ultra-processing of Newtons Fig Bars, Soft Fruit Chewy Cookies also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1023. Mondelez also marketed Newtons Fig Bars, Soft Fruit Chewy Cookies to children using unfair and deceptive strategies and tactics such as those described herein.

*Teddy Grahams Honey Graham Snacks*

1024. Defendant Mondelez manufactured, marketed, and sold a UPF product called Teddy Grahams Honey Graham Snacks.

196

1025. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Teddy Grahams Honey Graham Snacks multiple times a month from 2009-2021.

1026. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

1027. As detailed herein, consumption of UPF, including Teddy Grahams Honey Graham Snacks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1028. Furthermore, it is biologically plausible that the ultra-processing of Teddy Grahams Honey Graham Snacks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1029. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Teddy Grahams Honey Graham Snacks contained additives like maltodextrin which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Teddy Grahams Honey Graham Snacks, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1030. Teddy Grahams Honey Snacks were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

1031. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on

197

sophisticated neuroscience, to optimize Teddy Grahams Honey Graham Snacks for overconsumption.

1032.    The ultra-processing of Teddy Grahams Honey Graham Snacks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1033.    The ultra-processing of Teddy Grahams Honey Graham Snacks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1034.    Mondelez also marketed Teddy Grahams Honey Graham Snacks to children using unfair and deceptive strategies and tactics such as those described herein.

*Teddy Grahams Chocolate Graham Snacks*

1035.    Defendant Mondelez manufactured, marketed, and sold a UPF product called Teddy Grahams Chocolate Graham Snacks.

1036.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Teddy Grahams Chocolate Graham Snacks multiple times a month from 2009-2021.

1037.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

1038.    As detailed herein, consumption of UPF, including Teddy Grahams Chocolate Graham Snacks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These

198

risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1039.   Furthermore, it is biologically plausible that the ultra-processing of Teddy Grahams Chocolate Graham Snacks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1040.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Teddy Grahams Chocolate Graham Snacks contained additives like maltodextrin which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Teddy Grahams Chocolate Graham Snacks, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1041.   Teddy Grahams Chocolate Graham Snacks were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

1042.   On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Teddy Grahams Chocolate Graham Snacks for overconsumption.

1043.   The ultra-processing of Teddy Grahams Chocolate Graham Snacks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

199

1044.    The ultra-processing of Teddy Grahams Chocolate Graham Snacks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1045.    Mondelez also marketed Teddy Grahams Chocolate Graham Snacks to children using unfair and deceptive strategies and tactics such as those described herein.

*Teddy Grahams Cinnamon Graham Snacks*

1046.    Defendant Mondelez manufactured, marketed, and sold a UPF product called Teddy Grahams Cinnamon Graham Snacks.

1047.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Teddy Grahams Cinnamon Graham Snacks multiple times a month from 2009-2021.

1048.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

1049.    As detailed herein, consumption of UPF, including Teddy Grahams Cinnamon Graham Snacks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1050.    Furthermore, it is biologically plausible that the ultra-processing of Teddy Grahams Cinnamon Graham Snacks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

200

1051. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Teddy Grahams Cinnamon Graham Snacks contained additives like maltodextrin which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Teddy Grahams Chocolate Graham Snacks, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1052. Teddy Grahams Cinnamon Graham Snacks were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

1053. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Teddy Grahams Chocolate Graham Snacks for overconsumption.

1054. The ultra-processing of Teddy Grahams Cinnamon Graham Snacks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1055. The ultra-processing of Teddy Grahams Cinnamon Graham Snacks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation,

increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1056. Mondelez also marketed Teddy Grahams Cinnamon Graham Snacks to children using unfair and deceptive strategies and tactics such as those described herein.

*Honey Maid Graham Crackers*

1057. Defendant Mondelez manufactured, marketed, and sold a UPF product called Honey Maid Graham Crackers.

1058. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Honey Maid Graham Crackers multiple times a month from 2009-2021.

1059. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mondelez.

1060. As detailed herein, consumption of UPF, including Honey Maid Graham Crackers, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1061. Furthermore, it is biologically plausible that the ultra-processing of Honey Maid Graham Crackers significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1062. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Honey Maid Graham Crackers contained additives like phosphate based additives which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Honey Maid Graham Crackers, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

202

1063. Honey Maid Graham Crackers were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

1064. On information and belief, Mondelez utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Honey Maid Graham Crackers for overconsumption.

1065. The ultra-processing of Honey Maid Graham Crackers destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1066. The ultra-processing of Honey Maid Graham Crackers also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mondelez's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1067. Mondelez also marketed Honey Maid Graham Crackers to children using unfair and deceptive strategies and tactics such as those described herein.

**Post Holdings**

1068. Plaintiff is a victim of Defendant Post Holdings' predatory profiteering.

1069. As a result of Defendant Post Holdings' conduct, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of Post Holdings' UPF.

1070. Plaintiff's long-term, chronic, and regular exposure to Defendant Post Holdings' UPF has resulted in severe life-changing physical infirmities. Defendant Post Holdings' conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

1071. As a result of Defendant Post Holdings' actions, and Plaintiff's resulting ingestion of Post Holdings' UPF, Plaintiff suffers from severe chronic illness, and will live the rest of his life sick, suffering, and getting sicker.

1072. As a further result of Defendant Post Holdings' actions, and Plaintiff's resulting ingestion of Defendant Post Holdings' UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment. Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.

*Oreo Os*

1073. Defendant Post Holdings manufactured, marketed, and sold a UPF product called Oreo O's.

1074. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Oreo O's multiple times a month from 2009-2021.

1075. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Post Holdings.

1076. As detailed herein, consumption of UPF, including Oreo O's, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1077. Furthermore, it is biologically plausible that the ultra-processing of Oreo O's significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1078. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Oreo O's contained additives like titanium dioxide and phosphate- based additives which have been found to be associated with Type 2 Diabetes. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. These additives, along with the soy lecithin found in Oreo O's, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Titanium dioxide is also an endocrine disrupting chemical, disrupts glucose homeostasis, and leads to insulin resistance.

1079. On information and belief, Post Holdings utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Oreo O's for overconsumption.

1080. The ultra-processing of Oreo O's destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1081. Post Holdings also marketed Oreo O's to children using unfair and deceptive strategies and tactics such as those described herein.

*Honey Bunches of Oats Honey Roasted*

1082. Defendant Post Holdings manufactured, marketed, and sold a UPF product called Honey Bunches of Oats Honey Roasted.

1083. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Honey Bunches of Oats Honey Roasted multiple times a month from 2009-2021.

1084. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Post Holdings.

1085. As detailed herein, consumption of UPF, including Honey Bunches of Oats Honey Roasted, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1086. Furthermore, it is biologically plausible that the ultra-processing of Honey Bunches of Oats Honey Roasted significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1087. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Honey Bunches of Oats Honey Roasted contained additives like BHT that drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. BHT is also an endocrine disrupting chemical.

1088. On information and belief, Post Holdings utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Honey Bunches of Oats Honey Roasted for overconsumption.

206

1089. The ultra-processing of Honey Bunches of Oats Honey Roasted destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1090. Post Holdings also marketed Honey Bunches of Oats Honey Roasted to children using unfair and deceptive strategies and tactics such as those described herein.

*Honey-Comb Cereal*

1091. Defendant Post Holdings manufactured, marketed, and sold a UPF product called Honey-Comb.

1092. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Honey-Comb multiple times a month from 2009-2021.

1093. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Post Holdings.

1094. As detailed herein, consumption of UPF, including Honey-Comb, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1095. Furthermore, it is biologically plausible that the ultra-processing of Honey-Comb significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1096. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Honey-Comb contained additives like Yellow 5 (tartrazine) and BHT which drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. BHT is also an endocrine disrupting chemical.

207

1097. Honey-Comb also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1098. On information and belief, Post Holdings utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Honey-Comb for overconsumption.

1099. The ultra-processing of Honey-Comb destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1100. Post Holdings also marketed Honey-Comb to children using unfair and deceptive strategies and tactics such as those described herein.

*Honey Maid Graham Crackers*

1101. Defendant Post Holdings manufactured, marketed, and sold a UPF product called Honey Maid Graham Crackers.

1102. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Honey Maid Graham Crackers multiple times a month from 2009-2021.

1103. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Post Holdings.

1104. As detailed herein, consumption of UPF, including Honey Maid Graham Crackers, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1105. Furthermore, it is biologically plausible that the ultra-processing of Honey Maid Graham Crackers significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

208

1106. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Honey Maid Graham Crackers contained additives like phosphate- based additives which have been found to be associated with Type 2 Diabetes. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. These additives, along with the soy lecithin found in Honey Maid Graham Crackers, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1107. On information and belief, Post Holdings utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Honey Maid Graham Crackers for overconsumption.

1108. The ultra-processing Honey Maid Graham Crackers destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1109. Post Holdings also marketed Honey Maid Graham Crackers to children using unfair and deceptive strategies and tactics such as those described herein.

*Fruity Pebbles*

1110. Defendant Post Holdings manufactured, marketed, and sold a UPF product called Fruity Pebbles.

1111. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Fruity Pebbles multiple times a month from 2009-2021.

1112. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Post Holdings.

209

1113. As detailed herein, consumption of UPF, including Fruity Pebbles, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1114. Furthermore, it is biologically plausible that the ultra-processing of Fruity Pebbles significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1115. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Fruity Pebbles contained additives like BHT which is an endocrine disruptor, and drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1116. Fruity Pebbles also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1117. On information and belief, Post Holdings utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Fruity Pebbles for overconsumption.

1118. The ultra-processing of Fruity Pebbles destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1119. Post Holdings also marketed Fruity Pebbles to children using unfair and deceptive strategies and tactics such as those described herein.

210

*Waffle Crisp Cereal*

1120.    Defendant Post Holdings manufactured, marketed, and sold a UPF product called Waffle Crisp.

1121.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Waffle Crisp multiple times a month from 2009-2021.

1122.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Post Holdings.

1123.    As detailed herein, consumption of UPF, including Waffle Crisp, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1124.    Furthermore, it is biologically plausible that the ultra-processing of Waffle Crisp significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1125.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Waffle Crisp contained additives like phosphate-based additives and BHT which have been found to be associated with Type 2 Diabetes. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. BHT is also an endocrine disrupting chemical.

1126.    Waffle Crisp also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

211

1127. On information and belief, Post Holdings utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Waffle Crisp for overconsumption.

1128. The ultra-processing of Waffle Crisp destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1129. Post Holdings also marketed Waffle Crisp to children using unfair and deceptive strategies and tactics such as those described herein.

*Farina Mills*

1130. Defendant Post Holdings manufactured, marketed, and sold a UPF product called Farina Mills.

1131. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Farina Mills multiple times a month from 2009-2021.

1132. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Post Holdings.

1133. As detailed herein, consumption of UPF, including Farina Mills, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1134. Furthermore, it is biologically plausible that the ultra-processing of Farina Mills significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1135. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Farina Mills contained additives like phosphate-based additives which have

212

been found to be associated with Type 2 Diabetes. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1136.  Farina Mills also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1137.  On information and belief, Post Holdings utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Farina for overconsumption.

1138.  The ultra-processing of Farina Mills destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1139.  Post Holdings also marketed Farina Mills to children using unfair and deceptive strategies and tactics such as those described herein.

**Coca-Cola**

1140.  Plaintiff is a victim of Defendant Coca-Cola's predatory profiteering.

1141.  As a result of Defendant Coca-Cola's conduct, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of Coca-Cola's UPF.

1142.  Plaintiff's long-term, chronic, and regular exposure to Defendant Coca-Cola's UPF has resulted in severe life-changing physical infirmities. Defendant Coca-Cola's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

1143.  As a result of Defendant Coca-Cola's actions, and Plaintiff's resulting ingestion of Defendant Coca-Cola's UPF, Plaintiff suffers from severe chronic illness, and will live the rest of his life sick, suffering, and getting sicker.

213

1144. As a further result of Defendant Coca-Cola's actions, and Plaintiff's resulting ingestion of Defendant Coca-Cola's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.

*Coca-Cola Original*

1145. Defendant Coca-Cola manufactured, marketed, and sold a UPF product called Coca-Cola Original.

1146. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Coca-Cola Original multiple times a month from 2009-2021.

1147. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Coca-Cola.

1148. As detailed herein, consumption of UPF, including Coca-Cola Original, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1149. Furthermore, it is biologically plausible that the ultra-processing of Coca-Cola Original significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1150. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Coca-Cola Original contained additives, such as phosphoric acid and hidden

214

sugars, which have been found to be associated with increased risks of Type 2 Diabetes. Such an additive drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1151. On information and belief, Coca-Cola utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Coca-Cola Original for overconsumption.

1152. The ultra-processing of Coca-Cola Original destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1153. The ultra-processing of Coca-Cola Original also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Coca-Cola's sophisticated efforts to hack human physiological hardware and to drive overconsumption.

1154. Coca-Cola also marketed Coca-Cola Original to children using unfair and deceptive strategies and tactics such as those described herein.

*Diet Coke*

1155. Defendant Coca-Cola manufactured, marketed, and sold a UPF product called Diet Coke.

1156. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Diet Coke multiple times a month from 2009-2021.

1157. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Coca-Cola.

1158. As detailed herein, consumption of UPF, including Diet Coke, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1159. Furthermore, it is biologically plausible that the ultra-processing of Diet Coke significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1160. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Diet Coke contained additives, such as aspartame, citric acid, phosphoric acid, and acesulfame K, which have been associated with increased risks of Type 2 Diabetes. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1161. On information and belief, Coca-Cola utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Diet Coke for overconsumption.

1162. The ultra-processing of Diet Coke destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1163. The ultra-processing of Diet Coke also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Coca-Cola's sophisticated efforts to hack human physiological hardware and to drive overconsumption.

1164. Coca-Cola also marketed Diet Coke to children using unfair and deceptive strategies and tactics such as those described herein.

*Sprite*

1165. Defendant Coca-Cola manufactured, marketed, and sold a UPF product called Sprite.

1166. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Sprite multiple times a month from 2009-2021.

1167. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Coca-Cola.

1168. As detailed herein, consumption of UPF, including Sprite, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1169. Furthermore, it is biologically plausible that the ultra-processing of Sprite significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1170. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Sprite contained additives, such as sodium citrate and citric acid, which have been associated with increased risks of Type 2 Diabetes. These additives, along with the sodium benzoate found in Sprite, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1171. On information and belief, Coca-Cola utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Sprite for overconsumption.

217

1172. The ultra-processing of Sprite destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1173. The ultra-processing of Sprite also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Coca-Cola's sophisticated efforts to hack human physiological hardware and to drive overconsumption.

1174. Coca-Cola also marketed Sprite to children using unfair and deceptive strategies and tactics such as those described herein.

*Barq's Root Beer*

1175. Defendant Coca-Cola manufactured, marketed, and sold a UPF product called Barq's Root Beer.

1176. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Barq's Root Beer multiple times a month from 2009-2021.

1177. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Coca-Cola.

1178. As detailed herein, consumption of UPF, including Barq's Root Beer, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1179. Furthermore, it is biologically plausible that the ultra-processing of Barq's Root Beer significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

218

1180.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Barq's Root Beer contained additives, such citric acid and hidden sugars, which have been associated with increased risks of Type 2 Diabetes. These additives, along with the sodium benzoate found in Barq's Root Beer, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1181.    On information and belief, Coca-Cola utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Barq's Root Beer for overconsumption.

1182.    The ultra-processing of Barq's Root Beer destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1183.    The ultra-processing of Barq's Root Beer also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Coca-Cola's sophisticated efforts to hack human physiological hardware and to drive overconsumption.

1184.    Coca-Cola also marketed Barq's Root Beer to children using unfair and deceptive strategies and tactics such as those described herein.

*Minute Maid Lemonade*

1185.    Defendant Coca-Cola manufactured, marketed, and sold a UPF product called Minute Maid Lemonade.

219

1186.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Minute Maid Lemonade multiple times a week from 2009-2021.

1187.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Coca-Cola.

1188.    As detailed herein, consumption of UPF, including Minute Maid Lemonade, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1189.    Furthermore, it is biologically plausible that the ultra-processing of Minute Maid Lemonade significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1190.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Minute Maid Lemonade contained additives, such as sucralose, pectin, and acesulfame-K, and hidden sugars, which have been associated with increased risks of Type 2 Diabetes. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1191.    On information and belief, Coca-Cola utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Minute Maid Lemonade for overconsumption.

1192.    The ultra-processing of Minute Maid Lemonade destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1193. The ultra-processing of Minute Maid Lemonade also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Coca-Cola's sophisticated efforts to hack human physiological hardware and to drive overconsumption.

1194. Coca-Cola also marketed Minute Maid Lemonade to children using unfair and deceptive strategies and tactics such as those described herein.

*Minute Maid Strawberry Lemonade*

1195. Defendant Coca-Cola manufactured, marketed, and sold a UPF product called Minute Maid Strawberry Lemonade.

1196. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Minute Maid Strawberry Lemonade multiple times a week from 2009-2021.

1197. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Coca-Cola.

1198. As detailed herein, consumption of UPF, including Minute Maid Strawberry Lemonade, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1199. Furthermore, it is biologically plausible that the ultra-processing of Minute Maid Strawberry Lemonade significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1200. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Minute Maid Strawberry Lemonade contained additives, such as citric acid, modified cornstarch, sucralose and hidden sugars, which have been associated with increased risks

221

of Type 2 Diabetes. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1201.    On information and belief, Coca-Cola utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Minute Maid Lemonade for overconsumption.

1202.    The ultra-processing of Minute Maid Strawberry Lemonade destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1203.    The ultra-processing of Minute Maid Strawberry Lemonade also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Coca-Cola's sophisticated efforts to hack human physiological hardware and to drive overconsumption.

1204.    Coca-Cola also marketed Minute Maid Strawberry Lemonade to children using unfair and deceptive strategies and tactics such as those described herein.

*Vitamin Water Squeezed Lemonade Zero Sugar*

1205.    Defendant Coca-Cola manufactured, marketed, and sold a UPF product called Vitamin Water Squeezed Lemonade Zero Sugar.

1206.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Vitamin Water Squeezed Lemonade Zero Sugar multiple times a month from 2018- 2021.

1207.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Coca-Cola.

1208.    As detailed herein, consumption of UPF, including Vitamin Water Squeezed Lemonade Zero Sugar, significantly increases the risk of Type 2 Diabetes and Fatty liver disease.

These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1209.   Furthermore, it is biologically plausible that the ultra-processing of Vitamin Water Squeezed Lemonade Zero Sugar significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1210.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Vitamin Water Squeezed Lemonade Zero Sugar contained additives, such as phosphoric acid and phosphate based additives, which have been associated with increased risks of Type 2 Diabetes. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1211.   On information and belief, Coca-Cola utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Vitamin Water Squeezed Lemonade Zero Sugar for overconsumption.

1212.   The ultra-processing of Vitamin Water Squeezed Lemonade Zero Sugar destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1213.   The ultra-processing of Vitamin Water Squeezed Lemonade Zero Sugar also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Coca-Cola's sophisticated efforts to hack human physiological hardware and to drive overconsumption.

223

1214. Coca-Cola also marketed Vitamin Water Squeezed Lemonade Zero Sugar to children using unfair and deceptive strategies and tactics such as those described herein.

*Body Armor Orange Mango Sports Drink*

1215. Defendant Coca-Cola manufactured, marketed, and sold a UPF product called Body Armor Orange Mango Sports Drink.

1216. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Body Armor Orange Mango Sports Drink multiple times a week from 2011-2021.

1217. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Coca-Cola.

1218. As detailed herein, consumption of UPF, including Body Armor Orange Mango Sports Drink, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1219. Furthermore, it is biologically plausible that the ultra-processing of Body Armor Orange Mango Sports Drink significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1220. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Body Armor Orange Mango Sports Drink contained additives, such as phosphate based additives, gum arabic and citric acid, which have been associated with increased risks of Type 2 Diabetes. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1221. On information and belief, Coca-Cola utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on

sophisticated neuroscience, to optimize Body Armor Orange Mango Sports Drink for overconsumption.

1222. The ultra-processing of Body Armor Orange Mango Sports Drink destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1223. The ultra-processing of Body Armor Orange Mango Sports Drink also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Coca-Cola's sophisticated efforts to hack human physiological hardware and to drive overconsumption.

1224. Coca-Cola also marketed Body Armor Orange Mango Sports Drink to children using unfair and deceptive strategies and tactics such as those described herein.

*Body Armor Strawberry Banana Sports Drink*

1225. Defendant Coca-Cola manufactured, marketed, and sold a UPF product called Body Armor Strawberry Banana Sports Drink.

1226. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Body Armor Strawberry Banana Sports Drink multiple times a week from 2011-2021.

1227. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Coca-Cola.

1228. As detailed herein, consumption of UPF, including Body Armor Strawberry Banana Sports Drink, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1229. Furthermore, it is biologically plausible that the ultra-processing of Body Armor Strawberry Banana Sports Drink significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1230. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Body Armor Strawberry Banana Sports Drink contained additives, such as phosphate based additives and gum arabic, which have been associated with increased risks of Type 2 Diabetes. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1231. On information and belief, Coca-Cola utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Body Armor Strawberry Banana Sports Drink for overconsumption.

1232. The ultra-processing of Body Armor Strawberry Banana Sports Drink destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1233. The ultra-processing of Body Armor Strawberry Banana Sports Drink also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Coca-Cola's sophisticated efforts to hack human physiological hardware and to drive overconsumption.

1234. Coca-Cola also marketed Body Armor Strawberry Banana Sports Drink to children using unfair and deceptive strategies and tactics such as those described herein.

*Body Armor Lyte Peach Mango Sports Drink*

1235.    Defendant Coca-Cola manufactured, marketed, and sold a UPF product called Body Armor Lyte Peach Mango Sports Drink.

1236.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Body Armor Lyte Peach Mango Sports Drink multiple times a week from 2011-2021.

1237.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Coca-Cola.

1238.    As detailed herein, consumption of UPF, including Body Armor Lyte Peach Mango Sports Drink, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1239.    Furthermore, it is biologically plausible that the ultra-processing of Body Armor Lyte Peach Mango Sports Drink significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1240.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Body Armor Lyte Peach Mango Sports Drink contained additives, such as phosphate based additives, guar gum, citric acid, and gum arabic, which have been associated with increased risks of Type 2 Diabetes. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1241.    On information and belief, Coca-Cola utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on

227

sophisticated neuroscience, to optimize Body Armor Lyte Peach Mango Sports Drink for overconsumption.

1242. The ultra-processing of Body Armor Strawberry Banana Sports Drink destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1243. The ultra-processing of Body Armor Lyte Peach Mango Sports Drink also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Coca-Cola's sophisticated efforts to hack human physiological hardware and to drive overconsumption.

1244. Coca-Cola also marketed Body Armor Lyte Peach Mango Sports Drink to children using unfair and deceptive strategies and tactics such as those described herein.

**PepsiCo**

1245. Plaintiff is a victim of Defendant PepsiCo's predatory profiteering.

1246. As a result of Defendant PepsiCo's conduct, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of PepsiCo's UPF.

1247. Plaintiff's long-term, chronic, and regular exposure to Defendant PepsiCo's UPF has resulted in severe life-changing physical infirmities. Defendant PepsiCo's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

1248. As a result of Defendant PepsiCo's actions, and Plaintiff's resulting ingestion of Defendant PepsiCo's UPF, Plaintiff suffers from severe chronic illness, and will live the rest of his life sick, suffering, and getting sicker.

1249. As a further result of Defendant PepsiCo's actions, and Plaintiff's resulting ingestion of Defendant PepsiCo's UPF, Plaintiff has and will suffer from diminished life

228

expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.

*Pepsi*

1250.    Defendant PepsiCo manufactured, marketed, and sold a UPF product called Pepsi.

1251.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pepsi multiple times a month from 2009-2021.

1252.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1253.    As detailed herein, consumption of UPF, including Pepsi, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1254.    Furthermore, it is biologically plausible that the ultra-processing of Pepsi significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1255.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pepsi contained additives, such as sucralose and acesulfame-K, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives in Pepsi drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

229

1256. Pepsi also contained artificial colorants and flavours that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1257. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pepsi for overconsumption.

1258. The ultra-processing of Pepsi destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1259. The ultra-processing of Pepsi also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1260. PepsiCo also marketed Pepsi to children using unfair and deceptive strategies and tactics such as those described herein.

*Diet Pepsi*

1261. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Diet Pepsi.

1262. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Diet Pepsi multiple times a month from 2009-2021.

1263. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

230

1264. As detailed herein, consumption of UPF, including Diet Pepsi, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1265. Furthermore, it is biologically plausible that the ultra-processing of Diet Pepsi significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1266. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Diet Pepsi contained additives, such as aspartame and acesulfame- K, citric acid, sodium citrate and potassium sorbate, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These artificial sweeteners and additives in Diet Pepsi drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1267. Diet Pepsi also contained artificial colorants and flavours that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1268. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Diet Pepsi for overconsumption.

1269. The ultra-processing of Diet Pepsi destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1270. The ultra-processing of Diet Pepsi also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1271. PepsiCo also marketed Diet Pepsi to children using unfair and deceptive strategies and tactics such as those described herein.

*Dr. Pepper*

1272. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Dr. Pepper.

1273. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Dr. Pepper multiple times a month from 2009-2021.

1274. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1275. As detailed herein, consumption of UPF, including Dr. Pepper, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1276. Furthermore, it is biologically plausible that the ultra-processing of Dr. Pepper significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1277. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Dr. Pepper contained phosphate-based additives, hidden sugars and added

232

artificial colorants and flavours, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives in Dr. Pepper drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, these additives have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1278.  On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Dr. Pepper for overconsumption.

1279.  The ultra-processing of Dr. Pepper destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1280.  The ultra-processing of Dr. Pepper also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1281.  PepsiCo also marketed Dr. Pepper to children using unfair and deceptive strategies and tactics such as those described herein.

*Diet Dr. Pepper*

1282.  Defendant PepsiCo manufactured, marketed, and sold a UPF product called Diet Dr. Pepper.

1283. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Diet Dr. Pepper multiple times a month from 2009-2021.

1284. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1285. As detailed herein, consumption of UPF, including Diet Dr. Pepper, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1286. Furthermore, it is biologically plausible that the ultra-processing of Diet Dr. Pepper significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1287. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Diet Dr. Pepper contained additives, such as citric acid and aspartame, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These artificial sweeteners and additives in Diet Dr. Pepper drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1288. Diet Dr. Pepper also contained artificial colorants and flavours that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1289. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Diet Dr. Pepper for overconsumption.

1290. The ultra-processing of Diet Dr. Pepper destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1291. The ultra-processing of Diet Dr. Pepper also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1292. PepsiCo also marketed Diet Dr. Pepper to children using unfair and deceptive strategies and tactics such as those described herein.

*Mug Root Beer*

1293. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Mug Root Beer.

1294. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Mug Root Beer multiple times a month from 2009-2021.

1295. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1296. As detailed herein, consumption of UPF, including Mug Root Beer, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1297. Furthermore, it is biologically plausible that the ultra-processing of Mug Root Beer significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

235

1298. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Mug Root Beer contained additives, such as citric acid, modified food starch, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives in Mug Root Beer drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1299. Mug Root Beer also contained artificial colorants and flavours that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1300. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Mug Root Beer for overconsumption.

1301. The ultra-processing of Mug Root Beer destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1302. The ultra-processing of Mug Root Beer also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

236

1303.   PepsiCo also marketed Mug Root Beer to children using unfair and deceptive strategies and tactics such as those described herein.

*Gatorade Thirst Quencher: Frost Glacier Freeze, Quencher Orange, Fruit Punch, Lemon Lime & Cool Blue*

1304.   Defendant PepsiCo manufactured, marketed, and sold a UPF product called Gatorade Thirst Quencher in various flavors, including Frost Glacier Freeze, Quencher Orange, Fruit Punch, Lemon Lime & Cool Blue.

1305.   Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Gatorade Thirst Quencher in various flavors multiple times a week from 2011-2021.

1306.   Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1307.   As detailed herein, consumption of UPF, including each Gatorade Thirst Quencher, Frost Glacier Freeze, Quencher Orange, Fruit Punch, and Lemon Lime & Cool Blue, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1308.   Furthermore, it is biologically plausible that the ultra-processing of each Gatorade Thirst Quencher, Frost Glacier Freeze, Quencher Orange, Fruit Punch, and Lemon Lime & Cool Blue, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1309.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, each flavor of Gatorade Thirst Quencher, including Frost Glacier Freeze, Quencher Orange, Fruit Punch, Lemon Lime & Cool Blue, contained additives, such as citric acid, modified food starch, sodium citrate, phosphate-based additives, and hidden sugars, which have

237

been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives in Gatorade Thirst Quencher drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1310.    Each Gatorade Thirst Quencher, including Frost Glacier Freeze, Quencher Orange, Fruit Punch, Lemon Lime & Cool Blue, also contained artificial colorants and flavours that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, elevated bilirubin levels, oxidative stress, and gut dysbiosis.

1311.    On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize each Gatorade Thirst Quencher, including Frost Glacier Freeze, Quencher Orange, Fruit Punch, Lemon Lime & Cool Blue, for overconsumption.

1312.    The ultra-processing of each Gatorade Thirst Quencher, including Frost Glacier Freeze, Quencher Orange, Fruit Punch, Lemon Lime & Cool Blue, destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1313.    The ultra-processing of each Gatorade Thirst Quencher, including Frost Glacier Freeze, Quencher Orange, Fruit Punch, Lemon Lime & Cool Blue, also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

238

1314. PepsiCo also marketed Gatorade Thirst Quenchers to children using unfair and deceptive strategies and tactics such as those described herein.

*Propel Kiwi Strawberry*

1315. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Propel Kiwi Strawberry.

1316. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Propel Kiwi Strawberry multiple times a week from 2018-2021.

1317. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1318. As detailed herein, consumption of UPF, including Propel Kiwi Strawberry, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1319. Furthermore, it is biologically plausible that the ultra-processing of Propel Kiwi Strawberry significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1320. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Propel Kiwi Strawberry contained additives, such as acesulfame-K, sodium citrate, citric acid, potassium sorbate, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives in Propel Kiwi Strawberry drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

239

1321. Propel Kiwi Strawberry also contained artificial flavours that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1322. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Propel Kiwi Strawberry for overconsumption.

1323. The ultra-processing of Propel Kiwi Strawberry destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1324. The ultra-processing of Propel Kiwi Strawberry also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1325. PepsiCo also marketed Propel Kiwi Strawberry to children using unfair and deceptive strategies and tactics such as those described herein.

*Doritos Nacho Cheese Flavored Tortilla Chips*

1326. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Doritos Nacho Cheese Flavored Tortilla Chips.

1327. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Doritos Nacho Cheese Flavored Tortilla Chips multiple times a week from 2009-2021.

240

1328. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1329. As detailed herein, consumption of UPF, including Doritos Nacho Cheese Flavored Tortilla Chips, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1330. Furthermore, it is biologically plausible that the ultra-processing of Doritos Nacho Cheese Flavored Tortilla Chips significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1331. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Doritos Nacho Cheese Flavored Tortilla Chips contained additives like citric acid and maltodextrin which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Doritos Nacho Cheese Flavored Tortilla Chips contained additives like maltodextrin which have been found to be associated with increased risks of fatty liver disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1332. Doritos Nacho Cheese Flavored Tortilla Chips also contained artificial colorants flavours and flavour enhancers that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1333. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on

241

sophisticated neuroscience, to optimize Doritos Nacho Cheese Flavored Tortilla Chips for overconsumption.

1334. The ultra-processing of Doritos Nacho Cheese Flavored Tortilla Chips destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1335. The ultra-processing of Doritos Nacho Cheese Flavored Tortilla Chips also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1336. PepsiCo also marketed Doritos Nacho Cheese Flavored Tortilla Chips to children using unfair and deceptive strategies and tactics such as those described herein.

*Cheetos Crunchy Cheese Flavored Snacks*

1337. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Cheetos Crunchy Cheese Flavored Snacks.

1338. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Cheetos Crunchy Cheese Flavored Snacks multiple times a week from 2009-2021.

1339. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1340. As detailed herein, consumption of UPF, including Cheetos Crunchy Cheese Flavored Snacks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These

242

risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1341. Furthermore, it is biologically plausible that the ultra-processing of Cheetos Crunchy Cheese Flavored Snacks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1342. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Cheetos Crunchy Cheese Flavored Snacks contained additives like citric acid and maltodextrin which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Cheetos Crunchy Cheese Flavored Snacks contained additives like maltodextrin which have been found to be associated with increased risks of fatty liver disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1343. Cheetos Crunchy Cheese Flavored Snacks also contained artificial colorants, flavours and flavour enhancers that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1344. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Cheetos Crunchy Cheese Flavored Snacks for overconsumption.

1345. The ultra-processing of Cheetos Crunchy Cheese Flavored Snacks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

243

1346.    The ultra-processing of Cheetos Crunchy Cheese Flavored Snacks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1347.    PepsiCo also marketed Cheetos Crunchy Cheese Flavored Snacks to children using unfair and deceptive strategies and tactics such as those described herein.

*Sun Chips Harvest Cheddar Flavored Whole Grain Snacks*

1348.    Defendant PepsiCo manufactured, marketed, and sold a UPF product called Sun Chips Harvest Cheddar Flavored Whole Grain Snacks.

1349.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Sun Chips Harvest Cheddar Flavored Whole Grain Snacks multiple times a week from 2009-2021.

1350.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1351.    As detailed herein, consumption of UPF, including Sun Chips Harvest Cheddar Flavored Whole Grain Snacks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1352.    Furthermore, it is biologically plausible that the ultra-processing of Sun Chips Harvest Cheddar Flavored Whole Grain Snacks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

244

1353. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Sun Chips Harvest Cheddar Flavored Whole Grain Snacks contained additives like citric acid, paprika extract and maltodextrin which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Sun Chips Harvest Cheddar Flavored Whole Grain Snacks contained additives like maltodextrin which have been found to be associated with increased risks of fatty liver disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1354. Sun Chips Harvest Cheddar Flavored Whole Grain Snacks also contained artificial flavours that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1355. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Sun Chips Harvest Cheddar Flavored Whole Grain Snacks for overconsumption.

1356. The ultra-processing of Sun Chips Harvest Cheddar Flavored Whole Grain Snacks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1357. The ultra-processing of Sun Chips Harvest Cheddar Flavored Whole Grain Snacks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to

245

ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1358.    PepsiCo also marketed Sun Chips Harvest Cheddar Flavored Whole Grain Snacks to children using unfair and deceptive strategies and tactics such as those described herein.

*Rold Gold Thins Original*

1359.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Rold Gold Thins Original multiple times a week from 2011-2021.

1360.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1361.    As detailed herein, consumption of UPF, including Rold Gold Thins Original, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1362.    Furthermore, it is biologically plausible that the ultra-processing of Rold Gold Thins Original significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1363.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Rold Gold Thins Original contained additives, such as hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1364. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Rold Gold Thins Original for overconsumption.

1365. The ultra-processing of Rold Gold Thins Original destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1366. The ultra-processing of Rold Gold Thins Original also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1367. PepsiCo also marketed Rold Gold Thins Original to children using unfair and deceptive strategies and tactics such as those described herein.

*Cap'n Crunch Original Cereal*

1368. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Cap'n Crunch Original Cereal.

1369. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Cap'n Crunch Original Cereal multiple times a month from 2009-2021.

1370. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1371. As detailed herein, consumption of UPF, including Cap'n Crunch Original Cereal, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are

247

significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1372. Furthermore, it is biologically plausible that the ultra-processing of Cap'n Crunch Original Cereal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1373. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Cap'n Crunch Original Cereal contained additives, such as artificial colorants which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with BHT found in Cap'n Crunch Original Cereal, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, such additives, colorants and dyes have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis. BHT is also an endocrine disrupting chemical.

1374. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Cap'n Crunch Original Cereal for overconsumption.

1375. The ultra-processing of Cap'n Crunch Original Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1376. The ultra-processing of Cap'n Crunch Original Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological

248

hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1377. PepsiCo also marketed Cap'n Crunch Original Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Cap'n Crunch Peanut Butter Crunch Cereal*

1378. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Cap'n Crunch Peanut Butter Crunch Cereal.

1379. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Cap'n Crunch Peanut Butter Crunch Cereal multiple times a month from 2009-2021.

1380. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1381. As detailed herein, consumption of UPF, including Cap'n Crunch Peanut Butter Crunch Cereal, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1382. Furthermore, it is biologically plausible that the ultra-processing of Cap'n Crunch Peanut Butter Crunch Cereal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1383. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Cap'n Crunch Peanut Butter Crunch Cereal contained additives, such as artificial colorants and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with BHT found in Cap'n Crunch

249

Peanut Butter Crunch Cereal, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, such additives, colorants and dyes have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis. BHT is also an endocrine disrupting chemical.

1384. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Cap'n Crunch Peanut Butter Crunch Cereal for overconsumption.

1385. The ultra-processing of Cap'n Crunch Peanut Butter Crunch Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1386. The ultra-processing of Cap'n Crunch Peanut Butter Crunch Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1387. PepsiCo also marketed Cap'n Crunch Peanut Butter Crunch Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Quaker Instant Oatmeal Maple and Brown Sugar*

1388. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Quaker Instant Oatmeal Maple and Brown Sugar.

1389.   Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Quaker Instant Oatmeal Maple and Brown Sugar multiple times a month from 2009-2021.

1390.   Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1391.   As detailed herein, consumption of UPF, including Quaker Instant Oatmeal Maple and Brown Sugar, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1392.   Furthermore, it is biologically plausible that the ultra-processing of Quaker Instant Oatmeal Maple and Brown Sugar significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1393.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Quaker Instant Oatmeal Maple and Brown Sugar contained additives, such as guar gum and flavours which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, such additives and flavours have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1394.   On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on

251

sophisticated neuroscience, to optimize Quaker Instant Oatmeal Maple and Brown Sugar for overconsumption.

1395. The ultra-processing of Quaker Instant Oatmeal Maple and Brown Sugar destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1396. The ultra-processing of Quaker Instant Oatmeal Maple and Brown Sugar also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1397. PepsiCo also marketed Quaker Instant Oatmeal Maple and Brown Sugar to children using unfair and deceptive strategies and tactics such as those described herein.

*Orange Crush*

1398. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Orange Crush.

1399. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Orange Crush several times a month from 2009-2021.

1400. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1401. As detailed herein, consumption of UPF, including Orange Crush, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased

252

over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1402.  Furthermore, it is biologically plausible that the ultra-processing of Orange Crush significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1403.  There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Orange Crush contained additives, such as modified corn starch, citric acid, flavours and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, such additives and flavours have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1404.  Orange Crush also contained artificial colorants and flavours that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1405.  On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Orange Crush for overconsumption.

1406.  The ultra-processing of Orange Crush destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

253

1407. The ultra-processing of Orange Crush also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1408. PepsiCo also marketed Orange Crush to children using unfair and deceptive strategies and tactics such as those described herein.

*Rice-A-Roni Spanish Rice*

1409. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Rice-A-Roni Spanish Rice.

1410. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Rice-A-Roni Spanish Rice several times a month from 2009-2021.

1411. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1412. As detailed herein, consumption of UPF, including Rice-A-Roni Spanish Rice, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1413. Furthermore, it is biologically plausible that the ultra-processing of Rice-A-Roni Spanish Rice significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1414. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Rice-A-Roni Spanish Rice contained additives, such as phosphate- based

254

additives and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, such additives have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1415. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Rice-A-Roni Spanish Rice for overconsumption.

1416. The ultra-processing of Rice-A-Roni Spanish Rice destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1417. The ultra-processing of Rice-A-Roni Spanish Rice also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1418. PepsiCo also marketed Rice-A-Roni Spanish Rice to children using unfair and deceptive strategies and tactics such as those described herein.

*Rice-A-Roni Chicken Flavor Rice*

1419. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Rice-A-Roni Chicken Flavor Rice.

255

1420. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Rice-A-Roni Chicken Flavor Rice several times a month from 2009-2021.

1421. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1422. As detailed herein, consumption of UPF, including Rice-A-Roni Chicken Flavor Rice, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1423. Furthermore, it is biologically plausible that the ultra-processing of Rice-A-Roni Chicken Flavor Rice significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1424. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Rice-A-Roni Chicken Flavor Rice contained additives, such as phosphate-based additives and MSG, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, such additives have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1425. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Rice-A-Roni Chicken Flavor Rice for overconsumption.

256

1426. The ultra-processing of Rice-A-Roni Chicken Flavor Rice destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1427. The ultra-processing of Rice-A-Roni Chicken Flavor Rice also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra- processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1428. PepsiCo also marketed Rice-A-Roni Chicken Flavor Rice to children using unfair and deceptive strategies and tactics such as those described herein.

*Starbucks Frappuccino Caramel, Bottled*

1429. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Starbucks Frappuccino Caramel, Bottled.

1430. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Starbucks Frappuccino Caramel, Bottled several times a month in 2021.

1431. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1432. As detailed herein, consumption of UPF, including Starbucks Frappuccino Caramel, Bottled, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1433. Furthermore, it is biologically plausible that the ultra-processing of Starbucks Frappuccino Caramel, Bottled significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1434. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Starbucks Frappuccino Caramel, Bottled contained additives, such as maltodextrin, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, such additives have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1435. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Starbucks Frappuccino Caramel, Bottled for overconsumption.

1436. The ultra-processing of Starbucks Frappuccino Caramel, Bottled destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1437. The ultra-processing of Starbucks Frappuccino Caramel, Bottled also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation,

258

increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1438. PepsiCo also marketed Starbucks Frappuccino Caramel, Bottled to children using unfair and deceptive strategies and tactics such as those described herein.

*Starbucks Frappuccino Vanilla, Bottled*

1439. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Starbucks Frappuccino Vanilla, Bottled.

1440. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Starbucks Frappuccino Vanilla, Bottled several times a month in 2021.

1441. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1442. As detailed herein, consumption of UPF, including Starbucks Frappuccino Vanilla, Bottled, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1443. Furthermore, it is biologically plausible that the ultra-processing of Starbucks Frappuccino Vanilla, Bottled significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1444. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Starbucks Frappuccino Vanilla, Bottled contained additives, such as maltodextrin, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

259

Further, such additives have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1445. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Starbucks Frappuccino Vanilla, Bottled for overconsumption.

1446. The ultra-processing of Starbucks Frappuccino Vanilla, Bottled destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1447. The ultra-processing of Starbucks Frappuccino Vanilla, Bottled also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1448. PepsiCo also marketed Starbucks Frappuccino Vanilla, Bottled to children using unfair and deceptive strategies and tactics such as those described herein.

*Pearl Milling Company Original Pancake & Waffle Mix*

1449. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Pearl Milling Company Original Pancake & Waffle Mix. This and other Pearl Milling Company UPF products were formerly branded as Aunt Jemima's.

260

1450.   Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pearl Milling Company Original Pancake & Waffle Mix multiple times a week from 2009-2021.

1451.   Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1452.   As detailed herein, consumption of UPF, including Pearl Milling Company Original Pancake & Waffle Mix, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non- UPF, and are not readily apparent to any ordinary consumer.

1453.   Furthermore, it is biologically plausible that the ultra-processing of Pearl Milling Company Original Pancake & Waffle Mix significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1454.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pearl Milling Company Original Pancake & Waffle Mix contained additives, such as phosphate-based additives, mono and diglycerides, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, such additives and flavours have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1455.   On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on

261

sophisticated neuroscience, to optimize Pearl Milling Company Original Pancake & Waffle Mix for overconsumption.

1456. The ultra-processing of Pearl Milling Company Original Pancake & Waffle Mix destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1457. The ultra-processing of Pearl Milling Company Original Pancake & Waffle Mix also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1458. PepsiCo also marketed Pearl Milling Company Original Pancake & Waffle Mix to children using unfair and deceptive strategies and tactics such as those described herein.

*Pearl Milling Company Buttermilk Pancake & Waffle Mix*

1459. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Pearl Milling Company Buttermilk Pancake & Waffle Mix. This and other Pearl Milling Company UPF products were formerly branded as Aunt Jemima's.

1460. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pearl Milling Company Buttermilk Pancake & Waffle Mix multiple times a week from 2009-2021.

1461. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1462. As detailed herein, consumption of UPF, including Pearl Milling Company Buttermilk Pancake & Waffle Mix, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1463. Furthermore, it is biologically plausible that the ultra-processing of Pearl Milling Company Buttermilk Pancake & Waffle Mix significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1464. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pearl Milling Company Buttermilk Pancake & Waffle Mix contained additives, such as phosphate-based additives, mono and diglycerides, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, such additives and flavours have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1465. On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pearl Milling Company Buttermilk Pancake & Waffle Mix for overconsumption.

1466. The ultra-processing of Pearl Milling Company Buttermilk Pancake & Waffle Mix destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic

response, promoting increased speed of consumption and promoting subconscious overconsumption.

1467. The ultra-processing of Pearl Milling Company Buttermilk Pancake & Waffle Mix also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1468. PepsiCo also marketed Pearl Milling Company Buttermilk Pancake & Waffle Mix to children using unfair and deceptive strategies and tactics such as those described herein.

*Pearl Milling Company Butter Lite Syrup*

1469. Defendant PepsiCo manufactured, marketed, and sold a UPF product called Pearl Milling Company Butter Lite Syrup. This and other Pearl Milling Company UPF products were formerly branded as Aunt Jemima's.

1470. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pearl Milling Company Butter Lite Syrup multiple times a week from 2009-2021.

1471. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to PepsiCo.

1472. As detailed herein, consumption of UPF, including Pearl Milling Company Butter Lite Syrup, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

264

1473.   Furthermore, it is biologically plausible that the ultra-processing of Pearl Milling Company Butter Lite Syrup significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1474.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pearl Milling Company Butter Lite Syrup contained additives, such as phosphate-based additives, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver. Further, such additives and flavours have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1475.   On information and belief, PepsiCo utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pearl Milling Company Butter Lite Syrup for overconsumption.

1476.   The ultra-processing of Pearl Milling Company Butter Lite Syrup destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1477.   The ultra-processing of Pearl Milling Company Butter Lite Syrup also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of PepsiCo's sophisticated efforts to hack

265

human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1478. PepsiCo also marketed Pearl Milling Company Butter Lite Syrup to children using unfair and deceptive strategies and tactics such as those described herein.

**General Mills**

1479. Plaintiff is a victim of Defendant General Mills' predatory profiteering.

1480. As a result of Defendant General Mills' conduct, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of General Mills UPF.

1481. Plaintiff's long-term, chronic, and regular exposure to Defendant General Mills' UPF has resulted in severe life-changing physical infirmities. Defendant General Mills' conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

1482. As a result of Defendant General Mills' actions, and Plaintiff's resulting ingestion of General Mills' UPF, Plaintiff suffers from severe chronic illness, and will live the rest of his life sick, suffering, and getting sicker.

1483. As a further result of Defendant General Mills' actions, and Plaintiff's resulting ingestion of Defendant General Mills' UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment. Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.

266

*Betty Crocker Favorites Super Moist Yellow Cake Mix*

1484.    Defendant General Mills manufactured, marketed, and sold a UPF product called Betty Crocker Favorites Super Moist Yellow Cake Mix.

1485.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Betty Crocker Favorites Super Moist Yellow Cake Mix multiple times a month from 2009-2021.

1486.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1487.    As detailed herein, consumption of UPF, including Betty Crocker Favorites Super Moist Yellow Cake Mix, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1488.    Furthermore, it is biologically plausible that the ultra-processing of Betty Crocker Favorites Super Moist Yellow Cake Mix significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1489.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Betty Crocker Favorites Super Moist Yellow Cake Mix contained additives, such as monglycerides, phosphate-based additives, and xantham gum, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

267

1490. Betty Crocker Favorites Super Moist Yellow Cake Mix also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1491. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Betty Crocker Favorites Super Moist Yellow Cake Mix for overconsumption.

1492. The ultra-processing of Betty Crocker Favorites Super Moist Yellow Cake Mix destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1493. The ultra-processing of Betty Crocker Favorites Super Moist Yellow Cake Mix also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1494. General Mills also marketed Betty Crocker Favorites Super Moist Yellow Cake Mix to children using unfair and deceptive strategies and tactics such as those described herein.

*Betty Crocker Vanilla Rich & Creamy Frosting*

1495. Defendant General Mills manufactured, marketed, and sold a UPF product called Betty Crocker Vanilla Rich & Creamy Frosting.

1496. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Betty Crocker Favorites Super Moist Yellow Cake Mix multiple times from 2009-2021.

1497. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1498. As detailed herein, consumption of UPF, including Betty Crocker Vanilla Rich & Creamy Frosting, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1499. Furthermore, it is biologically plausible that the ultra-processing of Betty Crocker Vanilla Rich & Creamy Frosting, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1500. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Betty Crocker Vanilla Rich & Creamy Frosting contained additives, such as monoglycerides, polysorbate 60, and phosphate-based additives, and potassium sorbate, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives may drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1501. Betty Crocker Vanilla Rich & Creamy Frosting also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1502. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on

269

sophisticated neuroscience, to optimize Betty Crocker Vanilla Rich & Creamy Frosting for overconsumption.

1503. The ultra-processing of Betty Crocker Vanilla Rich & Creamy Frosting destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1504. The ultra-processing of Betty Crocker Vanilla Rich & Creamy Frosting also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption.

1505. General Mills also marketed Betty Crocker Vanilla Rich & Creamy Frosting to children using unfair and deceptive strategies and tactics such as those described herein.

*Honey Nut Cheerios*

1506. Defendant General Mills manufactured, marketed, and sold a UPF product called Honey Nut Cheerios.

1507. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Honey Nut Cheerios multiple times a month from 2009-2021.

1508. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1509. As detailed herein, consumption of UPF, including Honey Nut Cheerios, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1510. Furthermore, it is biologically plausible that the ultra-processing of Honey Nut Cheerios significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1511. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Honey Nut Cheerios contained additives, such as modified corn starch and phosphate-based additives, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1512. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Honey Nut Cheerios for overconsumption.

1513. The ultra-processing of Honey Nut Cheerios destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1514. The ultra-processing of Honey Nut Cheerios also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1515. General Mills also marketed Honey Nut Cheerios Mix to children using unfair and deceptive strategies and tactics such as those described herein.

271

*Cheerio's Original*

1516. Defendant General Mills manufactured, marketed, and sold a UPF product called Cheerios.

1517. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Cheerios multiple times a month from 2009-2021.

1518. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1519. As detailed herein, consumption of UPF, including Cheerios, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1520. Furthermore, it is biologically plausible that the ultra-processing of Cheerios significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1521. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Cheerios contained additives, such as modified corn starch and phosphate-based additives, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1522. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Cheerios for overconsumption.

1523. The ultra-processing of Cheerios destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

272

1524. The ultra-processing of Cheerios also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1525. General Mills also marketed Cheerios to children using unfair and deceptive strategies and tactics such as those described herein.

*Chex Mix Traditional*

1526. Defendant General Mills manufactured, marketed, and sold a UPF product called Chex Mix Traditional.

1527. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Chex Mix Traditional multiple times a week from 2011-2021.

1528. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1529. As detailed herein, consumption of UPF, including Chex Mix Traditional, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1530. Furthermore, it is biologically plausible that the ultra-processing of Chex Mix Traditional significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1531. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver

273

Disease. For example, Chex Mix Traditional contained additives, such as maltodextrin, monoglycerides, and hidden sugars, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Chex Mix Original, such as BHT, induce organ damage and endocrine disruption. Collectively, such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1532. Chex Mix Traditional is wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

1533. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Chex Mix Traditional for overconsumption.

1534. The ultra-processing of Chex Mix Traditional destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1535. The ultra-processing of Chex Mix Traditional also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

274

1536. General Mills also marketed Chex Mix Traditional to children using unfair and deceptive strategies and tactics such as those described herein.

*Cinnamon Toast Crunch*

1537. Defendant General Mills manufactured, marketed, and sold a UPF product called Cinnamon Toast Crunch.

1538. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Cinnamon Toast Crunch multiple times a month from 2011-2021.

1539. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1540. As detailed herein, consumption of UPF, including Cinnamon Toast Crunch, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1541. Furthermore, it is biologically plausible that the ultra-processing of Cinnamon Toast Crunch increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1542. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Cinnamon Toast Crunch contained additives, such as maltodextrin, phosphate-based additives, mono and diglycerides, and hidden sugars, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Cinnamon Toast Crunch, such as BHT, induce organ damage and endocrine disruption. Collectively, such additives, as well as soy lecithin in Cinnamon Toast Crunch, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1543. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Cinnamon Toast Crunch for overconsumption.

1544. The ultra-processing of Cinnamon Toast Crunch destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1545. The ultra-processing of Cinnamon Toast Crunch also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1546. General Mills also marketed Cinnamon Toast Crunch to children using unfair and deceptive strategies and tactics such as those described herein.

*Cookie Crisp Cereal*

1547. Defendant General Mills manufactured, marketed, and sold a UPF product called Cookie Crisp Cereal.

1548. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Cookie Crisp Cereal multiple times a month from 2011-2021.

1549. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1550. As detailed herein, consumption of UPF, including Cookie Crisp Cereal, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are

276

significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1551. Furthermore, it is biologically plausible that the ultra-processing of Cookie Crisp Cereal increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1552. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Cookie Crisp Cereal contained additives, such as phosphate-based additives, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Cinnamon Toast Crunch, such as BHT, induce organ damage and endocrine disruption. Collectively, such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1553. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Cookie Crisp Cereal for overconsumption.

1554. The ultra-processing of Cookie Crisp Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1555. The ultra-processing of Cookie Crisp Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation,

increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1556. General Mills also marketed Cookie Crisp Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Golden Grahams Cereal*

1557. Defendant General Mills manufactured, marketed, and sold a UPF product called Golden Grahams Cereal.

1558. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Golden Grahams Cereal multiple times a month from 2018-2020.

1559. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1560. As detailed herein, consumption of UPF, including Golden Grahams Cereal, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1561. Furthermore, it is biologically plausible that the ultra-processing of Golden Grahams Cereal increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1562. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Golden Grahams Cereal contained additives, such as hidden sugars and phosphate-based additives, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

278

1563. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Golden Grahams Cereal for overconsumption.

1564. The ultra-processing of Golden Grahams Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1565. The ultra-processing of Golden Grahams Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1566. General Mills also marketed Golden Grahams Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Lucky Charms Cereal*

1567. Defendant General Mills manufactured, marketed, and sold a UPF product called Lucky Charms Cereal.

1568. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Lucky Charms Cereal multiple times a month from 2009-2021.

1569. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1570. As detailed herein, consumption of UPF, including Lucky Charms Cereal, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are

279

significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1571. Furthermore, it is biologically plausible that the ultra-processing of Lucky Charms Cereal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1572. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Lucky Charms Cereal contained additives, such as modified corn starch, hidden sugars, and phosphate-based additives, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1573. Lucky Charms Cereal also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1574. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Lucky Charms Cereal for overconsumption.

1575. The ultra-processing of Lucky Charms Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1576. The ultra-processing of Lucky Charms Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such

280

responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1577. General Mills also marketed Lucky Charms Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Nature Valley Oats & Honey Protein Granola*

1578. Defendant General Mills manufactured, marketed, and sold a UPF product called Nature Valley Oats & Honey Protein Granola.

1579. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Nature Valley Oats & Honey Protein Granola multiple times a week from 2018-2021.

1580. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1581. As detailed herein, consumption of UPF, including Nature Valley Oats & Honey Protein Granola, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1582. Furthermore, it is biologically plausible that the ultra-processing of Nature Valley Oats & Honey Protein Granola significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1583. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Nature Valley Oats & Honey Protein Granola contained additives, such as

281

soy lecithin, which drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1584. Nature Valley Oats & Honey Protein Granola is wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers.

1585. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Nature Valley Oats & Honey Protein Granola for overconsumption.

1586. The ultra-processing of Nature Valley Oats & Honey Protein Granola destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1587. The ultra-processing of Nature Valley Oats & Honey Protein Granola also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1588. General Mills also marketed Nature Valley Oats & Honey Protein Granola to children using unfair and deceptive strategies and tactics such as those described herein.

*Old El Paso Taco Dinner Kit, Crunchy*

1589. Defendant General Mills manufactured, marketed, and sold a UPF product called Old El Paso Taco Dinner Kit, Crunchy.

282

1590. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Old El Paso Taco Dinner Kit, Crunchy multiple times a month from 2009-2021.

1591. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1592. As detailed herein, consumption of UPF, including Old El Paso Taco Dinner Kit, Crunchy, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1593. Furthermore, it is biologically plausible that the ultra-processing of Old El Paso Taco Dinner Kit, Crunchy significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1594. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Old El Paso Taco Dinner Kit, Crunchy contained additives, such as modified corn starch, citric acid, and maltodextrin, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1595. Old El Paso Taco Dinner Kit, Crunchy is wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

283

1596. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Old El Paso Taco Dinner Kit, Crunchy for overconsumption.

1597. The ultra-processing of Old El Paso Taco Dinner Kit, Crunchy destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1598. The ultra-processing of Old El Paso Taco Dinner Kit, Crunchy also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1599. General Mills also marketed Old El Paso Taco Dinner Kit, Crunchy to children using unfair and deceptive strategies and tactics such as those described herein.

*Old El Paso Taco Seasoning Mix, Original Flavor*

1600. Defendant General Mills manufactured, marketed, and sold a UPF product called Old El Paso Taco Seasoning Mix, Original Flavor.

1601. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Old El Paso Taco Seasoning Mix, Original Flavor multiple times a month from 2009-2021.

1602. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

284

1603. As detailed herein, consumption of UPF, including Old El Paso Taco Seasoning Mix, Original Flavor, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1604. Furthermore, it is biologically plausible that the ultra-processing of Old El Paso Taco Seasoning Mix, Original Flavor significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1605. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Old El Paso Taco Seasoning Mix, Original Flavor contained additives, such as citric acid and maltodextrin, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1606. Old El Paso Taco Seasoning Mix, Original Flavor is wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

1607. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Old El Paso Taco Seasoning Mix, Original Flavor for overconsumption.

1608. The ultra-processing of Old El Paso Taco Seasoning Mix, Original Flavor destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1609. The ultra-processing of Old El Paso Taco Seasoning Mix, Original Flavor also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1610. General Mills also marketed Old El Paso Taco Seasoning Mix, Original Flavor to children using unfair and deceptive strategies and tactics such as those described herein.

*Pillsbury Apple Toaster Strudel*

1611. Defendant General Mills manufactured, marketed, and sold a UPF product called Pillsbury Apple Toaster Strudel.

1612. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pillsbury Apple Toaster Strudel multiple times a month from 2011-2021.

1613. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1614. As detailed herein, consumption of UPF, including Pillsbury Apple Toaster Strudel, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

286

1615. Furthermore, it is biologically plausible that the ultra-processing of Pillsbury Apple Toaster Strudel significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1616. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pillsbury Apple Toaster Strudel contained additives, such as modified corn starch, hidden sugars, mono and diglycerides, carboxymethylcellulose, sodium citrate, potassium sorbate, citric acid, xanthan gum, polysorbate 60, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1617. Pillsbury Apple Toaster Strudel also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1618. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pillsbury Apple Toaster Strudel for overconsumption.

1619. The ultra-processing of Pillsbury Apple Toaster Strudel destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1620. The ultra-processing of Pillsbury Apple Toaster Strudel also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human

287

physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1621. General Mills also marketed Pillsbury Apple Toaster Strudel to children using unfair and deceptive strategies and tactics such as those described herein.

*Pillsbury Blueberry Toaster Strudel*

1622. Defendant General Mills manufactured, marketed, and sold a UPF product called Pillsbury Blueberry Toaster Strudel.

1623. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pillsbury Blueberry Toaster Strudel multiple times a month from 2011-2021.

1624. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1625. As detailed herein, consumption of UPF, including Pillsbury Blueberry Toaster Strudel, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1626. Furthermore, it is biologically plausible that the ultra-processing of Pillsbury Blueberry Toaster Strudel significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1627. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pillsbury Blueberry Toaster Strudel contained additives, such as modified corn starch, hidden sugars, mono and diglycerides, carboxymethylcellulose, sodium citrate, potassium sorbate, citric acid, xanthan gum, polysorbate 60, which have been found to be

288

associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1628. Pillsbury Blueberry Toaster Strudel also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1629. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pillsbury Blueberry Toaster Strudel for overconsumption.

1630. The ultra-processing of Pillsbury Blueberry Toaster Strudel destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1631. The ultra-processing of Pillsbury Blueberry Toaster Strudel also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1632. General Mills also marketed Pillsbury Blueberry Toaster Strudel to children using unfair and deceptive strategies and tactics such as those described herein.

*Pillsbury Strawberry Toaster Strudel*

1633. Defendant General Mills manufactured, marketed, and sold a UPF product called Pillsbury Strawberry Toaster Strudel.

289

1634. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pillsbury Strawberry Toaster Strudel multiple times a month from 2011-2021.

1635. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1636. As detailed herein, consumption of UPF, including Pillsbury Strawberry Toaster Strudel, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1637. Furthermore, it is biologically plausible that the ultra-processing of Pillsbury Strawberry Toaster Strudel significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1638. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pillsbury Strawberry Toaster Strudel contained additives, such as modified corn starch, hidden sugars, mono and diglycerides, carboxymethylcellulose, sodium citrate, potassium sorbate, citric acid, xanthan gum, polysorbate 60, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1639. Pillsbury Strawberry Toaster Strudel also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

290

1640. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pillsbury Strawberry Toaster Strudel for overconsumption.

1641. The ultra-processing of Pillsbury Strawberry Toaster Strudel destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1642. The ultra-processing of Pillsbury Strawberry Toaster Strudel also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1643. General Mills also marketed Pillsbury Strawberry Toaster Strudel to children using unfair and deceptive strategies and tactics such as those described herein.

*Pillsbury Original Crescent Rolls*

1644. Defendant General Mills manufactured, marketed, and sold a UPF product called Pillsbury Original Crescent Rolls.

1645. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pillsbury Original Crescent Rolls multiple times a week from 2009-2021.

1646. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1647. As detailed herein, consumption of UPF, including Pillsbury Original Crescent Rolls, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are

significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1648.    Furthermore, it is biologically plausible that the ultra-processing of Pillsbury Original Crescent Rolls significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1649.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pillsbury Original Crescent Rolls contained additives, such as mono and diglycerides, citric acid, phosphate-based additives, hidden sugars, xantham gum, and potassium sorbate, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1650.    On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pillsbury Original Crescent Rolls for overconsumption.

1651.    The ultra-processing of Pillsbury Original Crescent Rolls destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1652.    The ultra-processing of Pillsbury Original Crescent Rolls also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra- processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation,

292

increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1653.  General Mills also marketed Pillsbury Original Crescent Rolls to children using unfair and deceptive strategies and tactics such as those described herein.

*Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing*

1654.  Defendant General Mills manufactured, marketed, and sold a UPF product called Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing.

1655.  Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing multiple times a month from 2009-2021.

1656.  Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1657.  As detailed herein, consumption of UPF, including Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1658.  Furthermore, it is biologically plausible that the ultra-processing of Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1659.  There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing contained additives, such as phosphate-based additives, hidden sugars, mono and diglycerides, xanthan gum, potassium sorbate, polysorbate 60, which have been found to be associated with Type 2 Diabetes

293

or Fatty Liver Disease. Such additives, along with sunflower lecithin found in Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1660. Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1661. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing olls for overconsumption.

1662. The ultra-processing of Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1663. The ultra-processing of Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

294

1664. General Mills also marketed Pillsbury Grands! Flaky Cinnamon Rolls with Original Icing to children using unfair and deceptive strategies and tactics such as those described herein.

*Pillsbury Grands! Flaky Layers Original Biscuits*

1665. Defendant General Mills manufactured, marketed, and sold a UPF product called Pillsbury Grands! Flaky Layers Original Biscuits.

1666. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pillsbury Grands! Flaky Layers Original Biscuits multiple times a month from 2009-2021.

1667. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1668. As detailed herein, consumption of UPF, including Pillsbury Grands! Flaky Layers Original Biscuits significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1669. Furthermore, it is biologically plausible that the ultra-processing of Pillsbury Grands! Flaky Layers Original Biscuits significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1670. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pillsbury Grands! Flaky Layers Original Biscuits contained additives, such as phosphate-based additives, hidden sugars, mono and diglycerides, and xanthan gum, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

295

1671. Pillsbury Grands! Flaky Layers Original Biscuits also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1672. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pillsbury Grands! Flaky Layers Original Biscuits for overconsumption.

1673. The ultra-processing of Pillsbury Grands! Flaky Layers Original Biscuits with Original Icing destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1674. The ultra-processing of Pillsbury Grands! Flaky C Layers Original Biscuits also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1675. General Mills also marketed Pillsbury Grands! Flaky Layers Original Biscuits to children using unfair and deceptive strategies and tactics such as those described herein.

*Reese's Puffs Cereal*

1676. Defendant General Mills manufactured, marketed, and sold a UPF product called Reese's Puffs Cereal.

296

1677. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Reese's Puffs Cereal multiple times a month from 2011-2021.

1678. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1679. As detailed herein, consumption of UPF, including Reese's Puffs Cereal significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1680. Furthermore, it is biologically plausible that the ultra-processing of Reese's Puffs Cereal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1681. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Reese's Puffs Cereal contained additives, such as hidden sugars and phosphate-based additives, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Reese's Puffs, such as BHT, induce organ damage and endocrine disruption. Collectively, such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1682. Reese's Puffs Cereal also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

297

1683. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Reese's Puffs Cereal for overconsumption.

1684. The ultra-processing of Reese's Puffs Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1685. The ultra-processing of Reese's Puffs Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1686. General Mills also marketed Reese's Puffs Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Totino's Cheese Pizza Rolls*

1687. Defendant General Mills manufactured, marketed, and sold a UPF product called Totino's Cheese Pizza Rolls.

1688. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Totino's Cheese Pizza Rolls multiple times a month from 2011-2021.

1689. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1690. As detailed herein, consumption of UPF, including Totino's Cheese Pizza Rolls significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are

298

significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1691. Furthermore, it is biologically plausible that the ultra-processing of Totino's Cheese Pizza Rolls significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1692. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Totino's Cheese Pizza Rolls contained additives, modified food starch, guar gum, potassium sorbate, sodium citrate, methylcellulose, and hidden sugars, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Reese's Puffs, such as BHT, induce organ damage and endocrine disruption. Collectively, such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1693. Reese's Puffs Cereal also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1694. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Reese's Puffs Cereal for overconsumption.

1695. The ultra-processing of Reese's Puffs Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1696. The ultra-processing of Reese's Puffs Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such

as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1697.    General Mills also marketed Reese's Puffs Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Fruit Roll-Ups Strawberry Blast*

1698.    Defendant General Mills manufactured, marketed, and sold a UPF product called Fruit Roll-Ups Strawberry Blast.

1699.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Fruit Roll-Ups Strawberry Blast multiple times a week from 2011-2021.

1700.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1701.    As detailed herein, consumption of UPF, including Fruit Roll-Ups Strawberry Blast significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1702.    Furthermore, it is biologically plausible that the ultra-processing of Fruit Roll-Ups Strawberry Blast significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1703.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Fruit Roll-Ups Strawberry Blast contained additives, such as hidden sugars, citric acid, sodium citrate, and mono and diglycerides, which have been found to be associated

with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1704.    Fruit Roll-Ups Strawberry Blast also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1705.    On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Fruit Roll-Ups Strawberry Blast for overconsumption.

1706.    The ultra-processing of Fruit Roll-Ups Strawberry Blast destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1707.    The ultra-processing of Fruit Roll-Ups Strawberry Blast also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1708.    General Mills also marketed Fruit Roll-Ups Strawberry Blast to children using unfair and deceptive strategies and tactics such as those described herein.

*Progresso Traditional Chicken & Wild Rice Soup*

1709.    Defendant General Mills manufactured, marketed, and sold a UPF product called Progresso Traditional Chicken & Wild Rice Soup.

1710. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Progresso Traditional Chicken & Wild Rice Soup multiple times a month from 2009-2021.

1711. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1712. As detailed herein, consumption of UPF, including Progresso Traditional Chicken & Wild Rice Soup significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1713. Furthermore, it is biologically plausible that the ultra-processing of Progresso Traditional Chicken & Wild Rice Soup significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1714. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Progresso Traditional Chicken & Wild Rice Soup contained additives, such as maltodextrin, modified starch, citric acid, and phosphate-based additives, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1715. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Progresso Traditional Chicken & Wild Rice Soup for overconsumption.

1716.    The ultra-processing of Progresso Traditional Chicken & Wild Rice Soup destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1717.    The ultra-processing of Progresso Traditional Chicken & Wild Rice Soup also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1718.    General Mills also marketed Progresso Traditional Chicken & Wild Rice Soup to children using unfair and deceptive strategies and tactics such as those described herein.

*Progresso Traditional Chicken Noodle Soup*

1719.    Defendant General Mills manufactured, marketed, and sold a UPF product called Progresso Traditional Chicken Noodle Soup.

1720.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Progresso Traditional Chicken Noodle Soup multiple times a month from 2009-2021.

1721.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to General Mills.

1722.    As detailed herein, consumption of UPF, including Progresso Traditional Chicken Noodle Soup significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

303

1723. Furthermore, it is biologically plausible that the ultra-processing of Progresso Traditional Chicken Noodle Soup significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1724. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Progresso Traditional Chicken Noodle Soup contained additives, such as maltodextrin, modified starch, citric acid, and phosphate-based additives, which have been found to be associated with Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1725. On information and belief, General Mills utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Progresso Traditional Chicken Noodle Soup for overconsumption.

1726. The ultra-processing of Progresso Traditional Chicken Noodle Soup destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1727. The ultra-processing of Progresso Traditional Chicken Noodle Soup also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of General Mills' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to

304

inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1728. General Mills also marketed Progresso Traditional Chicken Noodle Soup to children using unfair and deceptive strategies and tactics such as those described herein.

**Nestle**

1729. Plaintiff is a victim of Defendant Nestle's predatory profiteering.

1730. As a result of Defendant Nestle's conduct, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of Nestle's UPF.

1731. Plaintiff's long-term, chronic, and regular exposure to Defendant Nestle's UPF has resulted in severe life-changing physical infirmities. Defendant Nestle's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

1732. As a result of Defendant Nestle's actions, and Plaintiff's resulting ingestion of Defendant Nestle's UPF, Plaintiff suffers from severe chronic illness, and will live the rest of his life sick, suffering, and getting sicker.

1733. As a further result of Defendant Nestle's actions, and Plaintiff's resulting ingestion of Defendant Nestle's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.

*Stouffer's Deluxe French Bread Pizza*

1734. Defendant Nestle manufactured, marketed, and sold a UPF product called Stouffer's Deluxe French Bread Pizza.

1735. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Stouffer's Deluxe French Bread Pizza multiple times a month from 2009-2021.

1736. Plaintiff consumed this product in a manner and in an amount that was intended and/or reasonably foreseeable to Nestle.

1737. As detailed herein, consumption of UPF, including Stouffer's Deluxe French Bread Pizza significantly increases the risk of Type 2 Diabetes. These risks are significantly increased over time and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1738. Furthermore, it is biologically plausible that the ultra-processing of Stouffer's Deluxe French Bread Pizza significantly increases the risk of Type 2 Diabetes.

1739. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Stouffer's Deluxe French Bread Pizza contained additives, such as modified food starch, hidden sugars, nitrites, and citric acid, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Other additives, such as BHA & BHT induce organ damage and endocrine disruption. Collectively, such additives drive internal dysbiosis and systematic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1740. On information and belief, Nestle used research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Stouffer's Deluxe French Bread Pizza for overconsumption.

306

1741.    The ultra-processing of Stouffer's Deluxe French Bread Pizza destroyed the food matrix, allowing for rapid delivery of reinforcers, altering safety and glycemic response, promoting increased speed of consumption, and promoting subconscious overconsumption.

1742.    The ultra-processing of Stouffer's Deluxe French Bread Pizza also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1743.    Nestle also marketed Stouffer's Deluxe French Bread Pizza to children using unfair and deceptive strategies and tactics such as those described herein.

*Stouffer's Extra Cheese French Breach Pizza*

1744.    Defendant Nestle manufactured, marketed, and sold a UPF product called Stouffer's Extra Cheese French Bread Pizza.

1745.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Stouffer's Extra Cheese French Bread Pizza multiple times a month from 2009-2021.

1746.    Plaintiff consumed this product in a manner and in an amount that was intended and/or reasonably foreseeable to Nestle.

1747.    As detailed herein, consumption of UPF, including Stouffer's Extra Cheese French Bread Pizza significantly increases the risk of Type 2 Diabetes. These risks are significantly increased over time and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1748. Furthermore, it is biologically plausible that the ultra-processing of Stouffer's Extra Cheese French Bread Pizza significantly increases the risk of Type 2 Diabetes.

1749. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Stouffer's Extra Cheese French Bread Pizza contained additives, such as modified food starch, mono- and diglyceride, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systematic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1750. On information and belief, Nestle used research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Stouffer's Extra Cheese French Bread Pizza for overconsumption.

1751. The ultra-processing of Stouffer's Extra Cheese French Bread Pizza destroyed the food matrix, allowing for rapid delivery of reinforcers, altering safety and glycemic response, promoting increased speed of consumption, and promoting subconscious overconsumption.

1752. The ultra-processing of Stouffer's Extra Cheese French Bread Pizza also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1753.    Nestle also marketed Stouffer's Extra Cheese French Bread Pizza to children using unfair and deceptive strategies and tactics such as those described herein.

*Hot Pockets Four Meat & Four Cheese Pizza*

1754.    Defendant Nestle manufactured, marketed, and sold a UPF product called Hot Pockets Four Meat & Four Cheese Pizza.

1755.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Hot Pockets Four Meat & Four Cheese Pizza multiple times a month from 2011-2021.

1756.    Plaintiff consumed this product in a manner and in an amount that was intended and/or reasonably foreseeable to Nestle.

1757.    As detailed herein, consumption of UPF, including Hot Pockets Four Meat & Four Cheese Pizza, significantly increases the risk of Type 2 Diabetes. These risks are significantly increased over time and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1758.    Furthermore, it is biologically plausible that the ultra-processing of Hot Pockets Four Meat & Four Cheese Pizza significantly increases the risk of Type 2 Diabetes.

1759.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Hot Pockets Four Meat & Four Cheese Pizza contained additives, such as maltodextrin, citric acid, modified starch, phosphate-based additives, nitrites and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Other additives, such as BHA & BHT induce organ damage and endocrine disruption. Collectively, such additives drive internal dysbiosis and systematic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1760. On information and belief, Nestle used research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Hot Pockets Four Meat & Four Cheese Pizza for overconsumption.

1761. The ultra-processing of Hot Pockets Four Meat & Four Cheese Pizza destroyed the food matrix, allowing for rapid delivery of reinforcers, altering safety and glycemic response, promoting increased speed of consumption, and promoting subconscious overconsumption.

1762. The ultra-processing of Hot Pockets Four Meat & Four Cheese Pizza also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1763. Nestle also marketed Hot Pockets Four Meat & Four Cheese Pizza to children using unfair and deceptive strategies and tactics such as those described herein.

*Hot Pockets Hickory Ham & Cheddar*

1764. Defendant Nestle manufactured, marketed, and sold a UPF product called Hot Pockets Hickory Ham & Cheddar.

1765. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Hot Pockets Hickory Ham & Cheddar multiple times a month from 2011-2021.

1766. Plaintiff consumed this product in a manner and in an amount that was intended and/or reasonably foreseeable to Nestle.

1767. As detailed herein, consumption of UPF, including Hot Pockets Hickory Ham & Cheddar, significantly increases the risk of Type 2 Diabetes. These risks are significantly increased

310

over time and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1768. Furthermore, it is biologically plausible that the ultra-processing of Hot Pockets Hickory Ham & Cheddar significantly increases the risk of Type 2 Diabetes.

1769. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Hot Pockets Hickory Ham & Cheddar contained additives, such as maltodextrin, citric acid, methylcellulose, modified starch, carrageenan, mono and diglycerides, potassium sorbate, phosphate-based additives, nitrites and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Hot Pockets Hickory Ham & Cheddar, drive internal dysbiosis and systematic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1770. On information and belief, Nestle used research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Hot Pockets Hickory Ham & Cheddar for overconsumption.

1771. The ultra-processing of Hot Pockets Hickory Ham & Cheddar destroyed the food matrix, allowing for rapid delivery of reinforcers, altering safety and glycemic response, promoting increased speed of consumption, and promoting subconscious overconsumption.

1772. The ultra-processing of Hot Pockets Hickory Ham & Cheddar also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack

311

human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1773.   Nestle also marketed Hot Pockets Four Meat & Four Cheese Pizza to children using unfair and deceptive strategies and tactics such as those described herein.

*Hot Pockets Italian Style Meatballs & Mozzarella*

1774.   Defendant Nestle manufactured, marketed, and sold a UPF product called Hot Pockets Italian Style Meatballs & Mozzarella.

1775.   Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Hot Pockets Italian Style Meatballs & Mozzarella multiple times a month from 2011-2021.

1776.   Plaintiff consumed this product in a manner and in an amount that was intended and/or reasonably foreseeable to Nestle.

1777.   As detailed herein, consumption of UPF, including Hot Pockets Italian Style Meatballs & Mozzarella, significantly increases the risk of Type 2 Diabetes. These risks are significantly increased over time and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1778.   Furthermore, it is biologically plausible that the ultra-processing of Hot Pockets Italian Style Meatballs & Mozzarella significantly increases the risk of Type 2 Diabetes.

1779.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Hot Pockets Italian Style Meatballs & Mozzarella contained additives, such as maltodextrin, citric acid, modified starch, phosphate-based additives, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease.

312

Such additives drive internal dysbiosis and systematic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1780.   On information and belief, Nestle used research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Hot Pockets Italian Style Meatballs & Mozzarella for overconsumption.

1781.   The ultra-processing of Hot Pockets Italian Style Meatballs & Mozzarella destroyed the food matrix, allowing for rapid delivery of reinforcers, altering safety and glycemic response, promoting increased speed of consumption, and promoting subconscious overconsumption.

1782.   The ultra-processing of Hot Pockets Italian Style Meatballs & Mozzarella also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1783.   Nestle also marketed Hot Pockets Italian Style Meatballs & Mozzarella to children using unfair and deceptive strategies and tactics such as those described herein.

*Toll House Chocolate Chip Cookie Dough*

1784.   Defendant Nestle manufactured, marketed, and sold a UPF product called Toll House Chocolate Chip Cookie Dough.

1785.   Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Toll House Chocolate Chip Cookie Dough multiple times a month from 2011-2021.

313

1786. Plaintiff consumed this product in a manner and in an amount that was intended and/or reasonably foreseeable to Nestle.

1787. As detailed herein, consumption of UPF, including Toll House Chocolate Chip Cookie Dough, significantly increases the risk of Type 2 Diabetes. These risks are significantly increased over time and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1788. Furthermore, it is biologically plausible that the ultra-processing of Toll House Chocolate Chip Cookie Dough significantly increases the risk of Type 2 Diabetes.

1789. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Toll House Chocolate Chip Cookie Dough contained additives, such as phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with soy lecithin found in Toll House Chocolate Chip Cookie Dough, drive internal dysbiosis and systematic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1790. On information and belief, Nestle used research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Toll House Chocolate Chip Cookie Dough for overconsumption.

1791. The ultra-processing of Toll House Chocolate Chip Cookie Dough destroyed the food matrix, allowing for rapid delivery of reinforcers, altering safety and glycemic response, promoting increased speed of consumption, and promoting subconscious overconsumption.

1792. The ultra-processing of Toll House Chocolate Chip Cookie Dough also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate

314

responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1793. Nestle also marketed Toll House Chocolate Chip Cookie Dough to children using unfair and deceptive strategies and tactics such as those described herein.

*Gerber Banana Cookies*

1794. Defendant Nestle manufactured, marketed, and sold a UPF product called Gerber Banana Cookies.

1795. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Gerber Banana Cookies multiple times a month from 2006-2008.

1796. Plaintiff consumed this product in a manner and in an amount that was intended and/or reasonably foreseeable to Nestle.

1797. As detailed herein, consumption of UPF, including Gerber Banana Cookies, significantly increases the risk of Type 2 Diabetes. These risks are significantly increased over time and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1798. Furthermore, it is biologically plausible that the ultra-processing of Gerber Banana Cookies significantly increases the risk of Type 2 Diabetes.

1799. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Gerber Banana Cookies contained additives, such as phosphate- based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty

315

Liver Disease. Such additives, along with sunflower lecithin found in Gerber Banana Cookies, drive internal dysbiosis and systematic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1800. On information and belief, Nestle used research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Gerber Banana Cookies for overconsumption.

1801. The ultra-processing of Gerber Banana Cookies destroyed the food matrix, allowing for rapid delivery of reinforcers, altering safety and glycemic response, promoting increased speed of consumption, and promoting subconscious overconsumption.

1802. The ultra-processing of Gerber Banana Cookies also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1803. Nestle also marketed Gerber Banana Cookies to children using unfair and deceptive strategies and tactics such as those described herein.

*Gerber Lil' Crunchies*

1804. Defendant Nestle manufactured, marketed, and sold a UPF called Gerber Lil' Crunchies.

1805. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Gerber Lil' Crunchies multiple times a week from 2006-2008.

316

1806. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1807. As detailed herein, consumption of UPF, including Gerber Lil' Crunchies, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1808. Furthermore, it is biologically plausible that the ultra-processing of Gerber Lil' Crunchies significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1809. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Gerber Lil' Crunchies contained additives, such as phosphate-based additives and maltodextrin, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1810. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Gerber Lil' Crunchies for overconsumption.

1811. The ultra-processing of Gerber Lil' Crunchies destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1812. The ultra-processing of Gerber Lil' Crunchies also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such

317

as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1813.   Nestle also marketed Gerber Lil' Crunchies to children using unfair and deceptive strategies and tactics as those described herein.

*Gerber Mixed Berries Freeze-Dried Yogurt Melts*

1814.   Defendant Nestle manufactured, marketed, and sold a UPF called Gerber Mixed Berries Freeze-Dried Yogurt Melts.

1815.   Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Gerber Mixed Berries Freeze-Dried Yogurt Melts daily from 2006-2008.

1816.   Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1817.   As detailed herein, consumption of UPF, including Gerber Mixed Berries Freeze-Dried Yogurt Melts, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1818.   Furthermore, it is biologically plausible that the ultra-processing of Gerber Mixed Berries Freeze-Dried Yogurt Melts significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1819.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Gerber Mixed Berries Freeze-Dried Yogurt Melts contained additives, such

318

as mono- and diglycerides, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1820. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Gerber Mixed Berries Freeze-Dried Yogurt Melts for overconsumption.

1821. The ultra-processing of Gerber Mixed Berries Freeze-Dried Yogurt Melts destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1822. The ultra-processing of Gerber Mixed Berries Freeze-Dried Yogurt Melts also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1823. Nestle also marketed Gerber Mixed Berries Freeze-Dried Yogurt Melts to children using unfair and deceptive strategies and tactics as those described herein.

*Gerber Puffs Peach*

1824. Defendant Nestle manufactured, marketed, and sold a UPF called Gerber Puffs Peach.

1825. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Gerber Puffs Peach multiple times a week from 2006-2008.

1826. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1827. As detailed herein, consumption of UPF, including Gerber Puffs Peach, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1828. Furthermore, it is biologically plausible that the ultra-processing of Gerber Puffs Peach significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1829. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Gerber Puffs Peach contained additives, such as phosphate-based additives and citric acid, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy and/or sunflower lecithin found in Gerber Puffs Peach, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1830. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Gerber Puffs Peach for overconsumption.

1831. The ultra-processing of Gerber Puffs Peach destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1832. The ultra-processing of Gerber Puffs Peach also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine

320

release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1833.    Nestle also marketed Gerber Puffs Peach to children using unfair and deceptive strategies and tactics as those described herein.

*Gerber Puffs Strawberry Apple*

1834.    Defendant Nestle manufactured, marketed, and sold a UPF called Gerber Puffs Strawberry Apple.

1835.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Gerber Puffs Strawberry Apple multiple times a week from 2006-2008.

1836.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1837.    As detailed herein, consumption of UPF, including Gerber Puffs Strawberry Apple, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1838.    Furthermore, it is biologically plausible that the ultra-processing of Gerber Lil' Crunchies significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1839.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Gerber Puffs Strawberry Apple contained additives, such as phosphate-based additives and citric acid, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy and/or sunflower

lecithin found in Gerber Puffs Strawberry Apple, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1840. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Gerber Puffs Strawberry Apple for overconsumption.

1841. The ultra-processing of Gerber Puffs Strawberry Apple destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1842. The ultra-processing of Gerber Puffs Strawberry Apple also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1843. Nestle also marketed Gerber Puffs Strawberry Apple to children using unfair and deceptive strategies and tactics as those described herein.

*Gerber Puffs Sweet Potato*

1844. Defendant Nestle manufactured, marketed, and sold a UPF called Gerber Puffs Sweet Potato.

1845. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Gerber Puffs Sweet Potato multiple times a week from 2006-2008.

322

1846. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1847. As detailed herein, consumption of UPF, including Gerber Puffs Sweet Potato, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1848. Furthermore, it is biologically plausible that the ultra-processing of Gerber Puffs Sweet Potato significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1849. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Gerber Puffs Sweet Potato contained additives, such as such as phosphate-based additives and citric acid, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy and/or sunflower lecithin found in Gerber Puffs Sweet Potato, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1850. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Gerber Puffs Sweet Potato for overconsumption.

1851. The ultra-processing of Gerber Puffs Sweet Potato destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1852. The ultra-processing of Gerber Puffs Sweet Potato also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such

as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1853. Nestle also marketed Gerber Puffs Sweet Potato to children using unfair and deceptive strategies and tactics as those described herein.

*Edy's Slow Churned Chocolate Chip Ice Cream*

1854. Defendant Nestle manufactured, marketed, and sold a UPF called Edy's Slow Churned Chocolate Chip Ice Cream.

1855. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Edy's Ice Creams, including ones such as Edy's Slow Churned Chocolate Chip Ice Cream, multiple times a month from 2009-2021.

1856. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1857. As detailed herein, consumption of UPF, including Edy's Slow Churned Chocolate Chip Ice Cream, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1858. Furthermore, it is biologically plausible that the ultra-processing of Edy's Slow Churned Chocolate Chip Ice Cream significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1859. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver

324

Disease. For example, Edy's Slow Churned Chocolate Chip Ice Cream contained additives, such as maltodextrin, guar gum, xanthan gum, carrageenan, and monoglycerides, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy lecithin found in Edy's Slow Churned Chocolate Chip Ice Cream, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1860. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Edy's Slow Churned Chocolate Chip Ice Cream for overconsumption.

1861. The ultra-processing of Edy's Slow Churned Chocolate Chip Ice Cream destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1862. The ultra-processing of Edy's Slow Churned Chocolate Chip Ice Cream also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1863. Nestle also marketed Edy's Slow Churned Chocolate Chip Ice Cream to children using unfair and deceptive strategies and tactics as those described herein.

*Edy's Slow Churned Cookie Dough Light Ice Cream*

1864. Defendant Nestle manufactured, marketed, and sold a UPF called Edy's Slow Churned Cookie Dough Light Ice Cream.

325

1865. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Edy's Ice Creams, including ones such as Edy's Slow Churned Cookie Dough Light Ice Cream, multiple times a month from 2009-2021.

1866. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1867. As detailed herein, consumption of UPF, including Edy's Slow Churned Cookie Dough Light Ice Cream, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1868. Furthermore, it is biologically plausible that the ultra-processing of Edy's Slow Churned Cookie Dough Light Ice Cream significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1869. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Edy's Slow Churned Cookie Dough Light Ice Cream contained additives, as maltodextrin, guar gum, xanthan gum, carrageenan, and monoglycerides, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy lecithin found in Edy's Slow Churned Cookie Dough Lite Ice Cream, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1870. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated

326

neuroscience, to optimize Edy's Slow Churned Cookie Dough Light Ice Cream for overconsumption.

1871. The ultra-processing of Edy's Slow Churned Cookie Dough Light Ice Cream destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1872. The ultra-processing of Edy's Slow Churned Cookie Dough Light Ice Cream also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1873. Nestle also marketed Edy's Slow Churned Cookie Dough Light Ice Cream to children using unfair and deceptive strategies and tactics as those described herein.

*Edy's Slow Churned Cookies and Cream Light Ice Cream*

1874. Defendant Nestle manufactured, marketed, and sold a UPF called Edy's Slow Churned Cookies and Cream Light Ice Cream.

1875. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Edy's Ice Creams, including ones such as Edy's Slow Churned Cookies and Cream Light Ice Cream, multiple times a month from 2009-2021.

1876. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1877. As detailed herein, consumption of UPF, including, Edy's Slow Churned Cookies and Cream Light Ice Cream significantly increases the risk of Type 2 Diabetes and Fatty Liver

327

Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1878. Furthermore, it is biologically plausible that the ultra-processing of Edy's Slow Churned Cookies and Cream Light Ice Cream significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1879. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Edy's Slow Churned Cookies and Cream Light Ice Cream contained additives, such as maltodextrin, guar gum, xanthan gum, carrageenan, and monoglycerides, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy lecithin found in Edy's Slow Churned Cookies and Cream Light Ice Cream, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1880. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Edy's Slow Churned Cookies and Cream Light Ice Cream for overconsumption.

1881. The ultra-processing of Edy's Slow Churned Cookies and Cream Light Ice Cream destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1882. The ultra-processing of Edy's Slow Churned Cookies and Cream Light Ice Cream also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to

328

ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1883. Nestle also marketed Edy's Slow Churned Cookies and Cream Light Ice Cream to children using unfair and deceptive strategies and tactics as those described herein.

*Edy's Slow Churned Mint Chip Ice Cream*

1884. Defendant Nestle manufactured, marketed, and sold a UPF called Edy's Slow Churned Mint Chip Ice Cream.

1885. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Edy's Ice Creams, including ones such as Edy's Slow Churned Mint Chip Ice Cream, multiple times a month from 2009-2021.

1886. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1887. As detailed herein, consumption of UPF, including, Edy's Slow Churned Mint Chip Ice Cream significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1888. Furthermore, it is biologically plausible that the ultra-processing of Edy's Slow Churned Mint Chip Ice Cream significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1889. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Edy's Slow Churned Mint Chip Ice Cream contained additives, such as

maltodextrin, guar gum, xanthan gum, carrageenan, and monoglycerides, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy lecithin found in Edy's Slow Churned Mint Chip Ice Cream, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1890.    Edy's Slow Churned Mint Chip Ice Cream also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

1891.    On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Edy's Slow Churned Mint Chip Ice Cream for overconsumption.

1892.    The ultra-processing of Edy's Slow Churned Mint Chip Ice Cream destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1893.    The ultra-processing of Edy's Slow Churned Mint Chip Ice Cream also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1894.    Nestle also marketed Edy's Slow Churned Mint Chip Ice Cream to children using unfair and deceptive strategies and tactics as those described herein.

*Kit Kats*

1895.   d. UPF from Defendant Nestle, including but not limited to those bearing the brand names Stouffer's, Hot Pockets, Toll House, Gerber, Edy's and manufactured, marketed, and sold a UPF called a Kit Kats;.

e. UPF from Defendant PepsiCo, including but not limited to those bearing the brand names Pepsi, Starbucks Bottled, Gatorade, Propel, Crush, Jack's Links, Fritos, Lays, Ruffles, Pop Corners, Tostitos, Cracker Jack, Rold Gold, Sun Chips, Cap'n Crunch, Rice-A-Roni, Ocean Spray and Quaker;

f. UPF from Defendant Coca-Cola, including but not limited to those bearing the brand names Coca-Cola, Diet Coke, Barq's, Minute Maid, Vitamin Water, and Body Armor;

g. UPF from Defendant ConAgra, including but not limited to those bearing the brand names Slim Jim, Healthy Choice, Duncan Hines, Hebrew National, Reddi Whip, Orville Redenbacher's, Act II, Chef Boyardee, Manwich, Mrs. Butterworth's, PAM and Wishbone;

h. UPF from Defendant General Mills, including but not limited to those bearing the brand names Betty Crocker, Cheerios, Chex, Chex Mix, Cinnamon Toast Crunch, Cookie Crisp, Golden Grahams, Haagen-Dazs, Lucky Charms, Nature Valley, Old El Paso, Pillsbury, Reese's Puffs, and Yoplait;

i. UPF from Defendant Kellogg's, including but not limited to those bearing the brand names CheezIt, Club Crackers, Graham Crackers, Kellogg's Waffles, NutriGrain, Pop Tarts, Rice Krispies Treats, Froot Loops, Frosted

331

Mini Wheats, Rasin Bran, Corn Flakes, Corn Pops, Apple Jacks, and Krave;

1896. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Kit Kats multiple times a month from 2009-2021.

1897. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1898. As detailed herein, consumption of UPF, including Kit Kats, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1899. Furthermore, it is biologically plausible that the ultra-processing of Kit Kats significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1900. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Kit Kats contained additives, such as PGPR which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy lecithin found in Kit Kats, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1901. Kit Kats are wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic hydrocarbons may also be formed during ultra-processing.

1902. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Kit Kats for overconsumption.

1903. The ultra-processing of Kit Kats destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1904. The ultra-processing of Kit Kats also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1905. Nestle also marketed Kit Kats to children using unfair and deceptive strategies and tactics as those described herein.

*Drumstick Crunch Dipped Sundae Cones Variety Pack*

1906. Defendant Nestle manufactured, marketed, and sold a UPF called Drumstick Crunch Dipped Sundae Cones Variety Pack.

1907. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Drumstick Crunch Dipped Sundae Cones Variety Pack multiple times a month from 2009-2021.

1908. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1909. As detailed herein, consumption of UPF, including Drumstick Crunch Dipped Sundae Cones Variety Pack, significantly increases the risk of Type 2 Diabetes and Fatty Liver

333

Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1910. Furthermore, it is biologically plausible that the ultra-processing of Drumstick Crunch Dipped Sundae Cones Variety Pack significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1911. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Drumstick Crunch Dipped Sundae Cones Variety Pack contained additives, such as guar gum, monoglycerides, and carob bean gum, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy lecithin found in Drumstick Crunch Dipped Sundae Cones Variety Pack, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1912. Drumstick Crunch Dipped Sundae Cones Variety Pack are wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic hydrocarbons may also be formed during ultra-processing.

1913. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Drumstick Crunch Dipped Sundae Cones Variety Pack for overconsumption.

1914. The ultra-processing of Drumstick Crunch Dipped Sundae Cones Variety Pack destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1915. The ultra-processing of Drumstick Crunch Dipped Sundae Cones Variety Pack also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1916. Nestle also marketed Drumstick Crunch Dipped Sundae Cones Variety Pack to children using unfair and deceptive strategies and tactics as those described herein.

*Drumstick Simply Dipped Sundae Cones Variety Pack*

1917. Defendant Nestle manufactured, marketed, and sold a UPF called Drumstick Simply Dipped Sundae Cones Variety Pack.

1918. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Drumstick Simply Dipped Sundae Cones Variety Pack multiple times a month from 2009-2021.

1919. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1920. As detailed herein, consumption of UPF, including Drumstick Simply Dipped Sundae Cones Variety Pack, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

335

1921. Furthermore, it is biologically plausible that the ultra-processing of Drumstick Simply Dipped Sundae Cones Variety Pack significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1922. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Drumstick Simply Dipped Sundae Cones Variety Pack contained additives, such as guar gum, monoglycerides, and carob bean gum, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy lecithin found in Drumstick Simply Dipped Sundae Cones Variety Pack, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1923. Drumstick Simply Dipped Sundae Cones Variety Pack are wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic hydrocarbons may also be formed during ultra-processing.

1924. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Drumstick Simply Dipped Sundae Cones Variety Pack for overconsumption.

1925. The ultra-processing of Drumstick Simply Dipped Sundae Cones Variety Pack destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

336

1926.    The ultra-processing of Drumstick Simply Dipped Sundae Cones Variety Pack also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1927.    Nestle also marketed Drumstick Simply Dipped Sundae Cones Variety Pack to children using unfair and deceptive strategies and tactics as those described herein.

*Drumstick Mini Drums Vanilla Sundae Cones*

1928.    Defendant Nestle manufactured, marketed, and sold a UPF called Drumstick Mini Drums Vanilla Sundae Cones.

1929.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Drumstick Mini Drums Vanilla Sundae Cones multiple times a month from 2009-2021.

1930.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1931.    As detailed herein, consumption of UPF, including Drumstick Mini Drums Vanilla Sundae Cones, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1932.    Furthermore, it is biologically plausible that the ultra-processing of Drumstick Mini Drums Vanilla Sundae Cones significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

337

1933. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Drumstick Mini Drums Vanilla Sundae Cones contained additives, such as guar gum, mono and diglycerides, and carob bean gum, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Such additives, along with the soy lecithin and sunflower lecithin found in Drumstick Mini Drums Vanilla Sundae Cones, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1934. Drumstick Mini Drums Vanilla Sundae Cones are wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic hydrocarbons may also be formed during ultra-processing.

1935. On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Drumstick Mini Drums Vanilla Sundae Cones for overconsumption.

1936. The ultra-processing of Drumstick Mini Drums Vanilla Sundae Cones destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1937. The ultra-processing of Drumstick Mini Drums Vanilla Sundae Cones also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation,

338

increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1938.    Nestle also marketed Drumstick Mini Drums Vanilla Sundae Cones to children using unfair and deceptive strategies and tactics as those described herein.

*Red Baron Classic Crust Pepperoni Pizza*

1939.    Defendant Nestle manufactured, marketed, and sold a UPF called Red Baron Classic Crust Pepperoni Pizza.

1940.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Red Baron Classic Crust Pepperoni Pizza multiple times a month from 2009-2021.

1941.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Nestle.

1942.    As detailed herein, consumption of UPF, including Red Baron Classic Crust Pepperoni Pizza, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1943.    Furthermore, it is biologically plausible that the ultra-processing of Red Baron Classic Crust Pepperoni Pizza significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1944.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Red Baron Classic Crust Pepperoni Pizza contained additives, such as citric acid, hidden sugars, nitrites, maltodextrin, modified food starch, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Red Baron Classic Crust Pepperoni Pizza, such as BHA & BHT induce organ damage

339

and endocrine disruption. Collectively, such additives, along with the soy lecithin found in Red Baron Classic Crust Pepperoni Pizza, drive internal dysbiosis and systemic inflation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1945.    Red Baron Classic Crust Pepperoni Pizza are wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic hydrocarbons may also be formed during ultra-processing.

1946.    On information and belief, Nestle utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Red Baron Classic Crust Pepperoni Pizza for overconsumption.

1947.    The ultra-processing of Red Baron Classic Crust Pepperoni Pizza destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting subconscious overconsumption.

1948.    The ultra-processing of Red Baron Classic Crust Pepperoni Pizza also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Nestle's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1949.    Nestle also marketed Red Baron Classic Crust Pepperoni Pizza to children using unfair and deceptive strategies and tactics as those described herein.

**Kellogg's**

1950.    Plaintiff is a victim of Defendant Kellogg's predatory profiteering.

1951.    As a result of Defendant Kellogg's conduct, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of Kellogg's UPF.

1952.    Plaintiff's long-term, chronic, and regular exposure to Defendant Kellogg's UPF has resulted in severe life-changing physical infirmities. Defendant Kellogg's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

1953.    As a result of Defendant Kellogg's actions, and Plaintiff's resulting ingestion of Defendant Kellogg's UPF, Plaintiff suffers from severe chronic illness, and will live the rest of his life sick, suffering, and getting sicker.

1954.    As a further result of Defendant Kellogg's actions, and Plaintiff's resulting ingestion of Defendant Kellogg's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.

*Cheez-It Original Snack Crackers*

1955.    Defendant Kellogg's manufactured, marketed, and sold a UPF product called Cheez-It Original Snack Crackers.

1956.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Cheez-It Original Snack Crackers multiple times a week from 2009-2021.

1957.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

341

1958. As detailed herein, consumption of UPF, including Cheez-It Original Snack Crackers, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1959. Furthermore, it is biologically plausible that the ultra-processing of Cheez-It Original Snack Crackers significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1960. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Cheez-It Original Snack Crackers contained additives, such as paprika extract, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin in Cheez-It Original Snack Crackers, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1961. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Cheez-It Original Snack Crackers for overconsumption.

1962. The ultra-processing of Cheez-It Original Snack Crackers destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1963. The ultra-processing of Cheez-It Original Snack Crackers also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra- processed foods. Such

responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1964. Kellogg's also marketed Cheez-It Original Snack Crackers to children using unfair and deceptive strategies and tactics such as those described herein.

*Cheez-It Reduced Fat Snack Crackers*

1965. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Cheez-It Reduced Fat Snack Crackers.

1966. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Cheez-It Reduced Fat Snack Crackers multiple times a month from 2009-2021.

1967. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

1968. As detailed herein, consumption of UPF, including Cheez-It Reduced Fat Snack Crackers, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1969. Furthermore, it is biologically plausible that the ultra-processing of Cheez-It Reduced Fat Snack Crackers significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1970. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Cheez-It Reduced Fat Snack Crackers contained additives, such as paprika extract, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty

343

Liver Disease. These additives, along with soy lecithin in Cheez-It Reduced Fat Snack Crackers, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1971.    On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Cheez-It Reduced Fat Snack Crackers for overconsumption.

1972.    The ultra-processing of Cheez-It Reduced Fat Snack Crackers destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1973.    The ultra-processing of Cheez-It Reduced Fat Snack Crackers also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1974.    Kellogg's also marketed Cheez-It Reduced Fat Snack Crackers to children using unfair and deceptive strategies and tactics such as those described herein.

*Kellogg's Grahams Originals*

1975.    Defendant Kellogg's manufactured, marketed, and sold a UPF product called Kellogg's Grahams Originals.

1976.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Kellogg's Grahams Originals multiple times a month from 2009-2021.

1977. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

1978. As detailed herein, consumption of UPF, including Kellogg's Grahams Originals, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1979. Furthermore, it is biologically plausible that the ultra-processing of Kellogg's Grahams Originals significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1980. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Kellogg's Grahams Originals contained additives, such as phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin in Kellogg's Grahams Originals, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1981. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Kellogg's Grahams Originals for overconsumption.

1982. The ultra-processing of Kellogg's Grahams Originals destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1983. The ultra-processing of Kellogg's Grahams Originals also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such

345

as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1984. Kellogg's also marketed Kellogg's Grahams Originals to children using unfair and deceptive strategies and tactics such as those described herein.

*Kellogg's Eggo Buttermilk Waffles*

1985. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Eggo Buttermilk Waffles.

1986. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Eggo Buttermilk Waffles multiple times a month from 2009-2021.

1987. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

1988. As detailed herein, consumption of UPF, including Eggo Buttermilk Waffles, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1989. Furthermore, it is biologically plausible that the ultra-processing of Eggo Buttermilk Waffles significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

1990. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Eggo Buttermilk Waffles contained additives, such as phosphate- based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty

346

Liver Disease. These additives, along with soy lecithin found in Eggo Buttermilk Waffles, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

1991. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Eggo Buttermilk Waffles for overconsumption.

1992. The ultra-processing of Eggo Buttermilk Waffles destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

1993. The ultra-processing of Eggo Buttermilk Waffles also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

1994. Kellogg's also marketed Eggo Buttermilk Waffles to children using unfair and deceptive strategies and tactics such as those described herein.

*Kellogg's Eggo Homestyle Waffles*

1995. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Eggo Homestyle Waffles.

1996. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Eggo Homestyle Waffles multiple times a month from 2009-2021.

347

1997.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

1998.    As detailed herein, consumption of UPF, including Eggo Homestyle Waffles, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

1999.    Furthermore, it is biologically plausible that the ultra-processing of Eggo Homestyle Waffles significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2000.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Eggo Homestyle Waffles contained additives, such as phosphate-based additives and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin found in Eggo Homestyle Waffles, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2001.    On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Eggo Homestyle Waffles for overconsumption.

2002.    The ultra-processing of Eggo Homestyle Waffles destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2003.    The ultra-processing of Eggo Homestyle Waffles also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such

348

as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2004. Kellogg's also marketed Eggo Homestyle Waffles to children using unfair and deceptive strategies and tactics such as those described herein.

*Kellogg's Eggo Minis Pancakes*

2005. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Eggo Minis Pancakes.

2006. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Eggo Minis Pancakes multiple times a month from 2009-2021.

2007. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2008. As detailed herein, consumption of UPF, including Eggo Minis Pancakes, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2009. Furthermore, it is biologically plausible that the ultra-processing of Eggo Minis Pancakes significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2010. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Eggo Minis Pancakes contained additives, such as phosphate-based additives and hidden sugars, which have been found to be associated with increased risks of Type

349

2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin in Eggo Minis Pancakes, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2011. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Eggo Minis Pancakes for overconsumption.

2012. The ultra-processing of Eggo Minis Pancakes destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2013. The ultra-processing of Eggo Minis Pancakes also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2014. Kellogg's also marketed Eggo Minis Pancakes to children using unfair and deceptive strategies and tactics such as those described herein.

*Kellogg's Eggo French Toaster Sticks Cinnamon*

2015. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Eggo French Toaster Sticks Cinnamon.

2016. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Eggo French Toaster Sticks Cinnamon multiple times a month from 2009-2021.

2017. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2018. As detailed herein, consumption of UPF, including Eggo French Toaster Sticks Cinnamon, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2019. Furthermore, it is biologically plausible that the ultra-processing of Eggo French Toaster Sticks Cinnamon significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2020. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Eggo French Toaster Sticks Cinnamon contained additives, such as phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin in Eggo French Toaster Sticks Cinnamon, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2021. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Eggo French Toaster Sticks Cinnamon for overconsumption.

2022. The ultra-processing of Eggo French Toaster Sticks Cinnamon destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

351

2023. The ultra-processing of Eggo French Toaster Sticks Cinnamon also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2024. Kellogg's also marketed Eggo French Toaster Sticks Cinnamon to children using unfair and deceptive strategies and tactics such as those described herein.

*Nutri-Grain Blueberry Breakfast Bars*

2025. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Nutri-Grain Blueberry Breakfast Bars.

2026. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Nutri-Grain Blueberry Breakfast Bars multiple times a week from 2009-2021.

2027. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2028. As detailed herein, consumption of UPF, including Nutri-Grain Blueberry Breakfast Bars, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2029. Furthermore, it is biologically plausible that the ultra-processing of Nutri-Grain Blueberry Breakfast Bars significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

352

2030.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Nutri-Grain Blueberry Breakfast Bars contained additives, such as mono- & diglycerides, carrageenan, guar gum, sodium citrate, citric acid, cellulose, methylcellulose, carrageenan, phosphate-based additives, and wheat gluten, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin in Nutri-Grain Blueberry Breakfast Bars, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2031.    On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Nutri-Grain Blueberry Breakfast Bars for overconsumption.

2032.    The ultra-processing of Nutri-Grain Blueberry Breakfast Bars destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2033.    The ultra-processing of Nutri-Grain Blueberry Breakfast Bars also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

353

2034. Kellogg's also marketed Nutri-Grain Blueberry Breakfast Bars to children using unfair and deceptive strategies and tactics such as those described herein.

*Nutri-Grain Strawberry Breakfast Bars*

2035. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Nutri-Grain Strawberry Breakfast Bars.

2036. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Nutri-Grain Strawberry Breakfast Bars multiple times a month from 2009-2021.

2037. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2038. As detailed herein, consumption of UPF, including Nutri-Grain Strawberry Breakfast Bars, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2039. Furthermore, it is biologically plausible that the ultra-processing of Nutri-Grain Strawberry Breakfast Bars significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2040. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Nutri-Grain Strawberry Breakfast Bars contained additives, such as mono- & diglycerides, carrageenan, guar gum, sodium citrate, citric acid, cellulose, methylcellulose, carrageenan, phosphate-based additives, and wheat gluten, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin in Nutri-Grain Strawberry Breakfast Bars, drive internal dysbiosis and systemic

354

inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2041. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Nutri-Grain Strawberry Breakfast Bars for overconsumption.

2042. The ultra-processing of Nutri-Grain Strawberry Breakfast Bars destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2043. The ultra-processing of Nutri-Grain Strawberry Breakfast Bars also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2044. Kellogg's also marketed Nutri-Grain Strawberry Breakfast Bars to children using unfair and deceptive strategies and tactics such as those described herein.

*Frosted Blueberry Pop-Tarts*

2045. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Frosted Blueberry Pop-Tarts.

2046. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Frosted Blueberry Pop-Tarts multiple times a week from 2009-2021.

355

2047. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2048. As detailed herein, consumption of UPF, including Frosted Blueberry Pop-Tarts, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2049. Furthermore, it is biologically plausible that the ultra-processing of Frosted Blueberry Pop-Tarts significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2050. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Frosted Blueberry Pop-Tarts contained additives, such as xanthan gum, modified wheat starch, citric acid, and phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin in Frosted Blueberry Pop-Tarts, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2051. Frosted Blueberry Pop-Tarts also contained artificial colorants that have been linked to elevated liver enzymes and liver dysfunction oxidative stress.

2052. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Frosted Blueberry Pop-Tarts for overconsumption.

2053.    The ultra-processing of Frosted Blueberry Pop-Tarts destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2054.    The ultra-processing of Frosted Blueberry Pop-Tarts also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2055.    Kellogg's also marketed Frosted Blueberry Pop-Tarts to children using unfair and deceptive strategies and tactics such as those described herein.

*Frosted Strawberry Pop-Tarts*

2056.    Defendant Kellogg's manufactured, marketed, and sold a UPF product called Frosted Strawberry Pop-Tarts.

2057.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Frosted Strawberry Pop-Tarts multiple times a week from 2009-2021.

2058.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2059.    As detailed herein, consumption of UPF, including Frosted Strawberry Pop-Tarts, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

357

2060.    Furthermore, it is biologically plausible that the ultra-processing of Frosted Strawberry Pop-Tarts significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2061.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Frosted Strawberry Pop-Tarts contained additives, such as xanthan gum, modified wheat starch, citric acid, and phosphate-based additives, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin in Frosted Strawberry Pop-Tarts, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2062.    Frosted Strawberry Pop-Tarts also contained artificial colorants that have been linked to elevated liver enzymes and liver dysfunction oxidative stress.

2063.    On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Frosted Strawberry Pop-Tarts for overconsumption.

2064.    The ultra-processing of Frosted Strawberry Pop-Tarts destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2065.    The ultra-processing of Frosted Strawberry Pop-Tarts also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased

358

accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2066. Kellogg's also marketed Frosted Strawberry Pop-Tarts to children using unfair and deceptive strategies and tactics such as those described herein.

*Rice Krispies Treats Original Bars*

2067. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Rice Krispies Treats Original Bars.

2068. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Rice Krispies Treats Original Bars multiple times a week from 2009-2021.

2069. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2070. As detailed herein, consumption of UPF, including Rice Krispies Treats Original Bars, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2071. Furthermore, it is biologically plausible that the ultra-processing of Rice Krispies Treats Original Bars significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2072. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Rice Krispies Treats Original Bars contained additives, such as mono- and diglycerides and hidden sugars and DATEM, which have been associated with increased risks of Type 2 Diabetes. Other additives contained in Rice Krispies Treats Original Bars, such as BHT, induce organ damage and endocrine disruption. Collectively, these additives, along with soy lecithin in Rice Krispies Treats Original Bars, drive internal dysbiosis and systemic inflammation,

359

thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2073. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Rice Krispies Treats Original Bars for overconsumption.

2074. The ultra-processing of Rice Krispies Treats Original Bars destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2075. The ultra-processing of Rice Krispies Treats Original Bars also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2076. Kellogg's also marketed Rice Krispies Treats Original Bars to children using unfair and deceptive strategies and tactics such as those described herein.

*Rice Krispies Treats Original Homestyle Bars*

2077. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Rice Krispies Treats Original Homestyle Bars.

2078. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Rice Krispies Treats Original Homestyle Bars multiple times a week from 2020-2021.

2079. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

360

2080. As detailed herein, consumption of UPF, including Rice Krispies Treats Original Homestyle Bars, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2081. Furthermore, it is biologically plausible that the ultra-processing of Rice Krispies Treats Original Homestyle Bars significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2082. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Rice Krispies Treats Original Homestyle Bars contained additives, such as mono- and diglycerides and hidden sugars and DATEM, which have been associated with increased risks of Type 2 Diabetes. Other additives contained in Rice Krispies Treats Original Bars, such as BHT, induce organ damage and endocrine disruption. Collectively, these additives, along with soy lecithin in Rice Krispies Treats Original Homestyle Bars, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2083. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Rice Krispies Treats Original Homestyle Bars for overconsumption.

2084. The ultra-processing of Rice Krispies Treats Original Homestyle Bars destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2085. The ultra-processing of Rice Krispies Treats Original Homestyle Bars also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2086. Kellogg's also marketed Rice Krispies Treats Original Homestyle Bars to children using unfair and deceptive strategies and tactics such as those described herein.

*Rice Krispies Cereal*

2087. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Rice Krispies Cereal.

2088. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Rice Krispies Cereal multiple times a month from 2009-2021.

2089. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2090. As detailed herein, consumption of UPF, including Rice Krispies Cereal, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2091. Furthermore, it is biologically plausible that the ultra-processing of Rice Krispies Cereal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2092. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver

362

Disease. For example, Rice Krispies contained additives, such as BHT, which induce organ damage and endocrine disruption. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2093. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Rice Krispies Cereal for overconsumption.

2094. The ultra-processing of Rice Krispies Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2095. The ultra-processing of Rice Krispies Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2096. Kellogg's also marketed Rice Krispies Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Froot Loops Cereal*

2097. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Rice Froot Loops Cereal.

2098. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Froot Loops Cereal multiple times a month from 2009-2021.

363

2099. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2100. As detailed herein, consumption of UPF, including Froot Loops Cereal, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2101. Furthermore, it is biologically plausible that the ultra-processing of Froot Loops Cereal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2102. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Froot Loops Cereal contained additives, such as BHT, which induce organ damage and endocrine disruption. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2103. Froot Loops Cereal also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

2104. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Froot Loops Cereal for overconsumption.

2105. The ultra-processing of Froot Loops Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2106. The ultra-processing of Froot Loops Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2107. Kellogg's also marketed Froot Loops Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Frosted Mini-Wheats Bite Size Cereal*

2108. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Frosted Mini-Wheats Bite Size Cereal.

2109. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Frosted Mini-Wheats Bite Size Cereal multiple times a month from 2009-2021.

2110. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2111. As detailed herein, consumption of UPF, including Frosted Mini-Wheats Bite Size Cereal, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2112. Furthermore, it is biologically plausible that the ultra-processing of Frosted Mini-Wheats Bite Size Cereal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2113. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver

365

Disease. For example, Frosted Mini-Wheats Bite Size Cereal contained additives, such as BHT, which induce organ damage and endocrine disruption. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2114. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Frosted Mini-Wheats Bite Size Cereal for overconsumption.

2115. The ultra-processing of Frosted Mini-Wheats Bite Size Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2116. The ultra-processing of Frosted Mini-Wheats Bite Size Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2117. Kellogg's also marketed Frosted Mini-Wheats Bite Size Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Corn Pops Cereal*

2118. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Corn Pops Cereal.

2119. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Corn Pops Cereal multiple times a month from 2009-2021.

2120. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2121. As detailed herein, consumption of UPF, including Corn Pops Cereal, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2122. Furthermore, it is biologically plausible that the ultra-processing of Corn Pops Cereal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2123. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Corn Pops contained additives, such as BHT, which induce organ damage and endocrine disruption. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2124. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Corn Pops Cereal for overconsumption.

2125. The ultra-processing of Corn Pops Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2126. The ultra-processing of Corn Pops Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine

367

release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2127.    Kellogg's also marketed Corn Pops Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Apple Jacks Cereal*

2128.    Defendant Kellogg's manufactured, marketed, and sold a UPF product called Apple Jacks Cereal.

2129.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Apple Jacks Cereal multiple times a month from 2009-2021.

2130.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2131.    As detailed herein, consumption of UPF, including Apple Jacks Cereal, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2132.    Furthermore, it is biologically plausible that the ultra-processing of Apple Jacks Cereal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2133.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Apple Jacks Cereal contained additives, such as modified wheat, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. Other additives contained in Apple Jacks Cereal, such as BHT, induce organ damage and endocrine

disruption. Collectively, these additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2134. Apple Jacks Cereal contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

2135. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Apple Jacks Cereal for overconsumption.

2136. The ultra-processing of Apple Jacks Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2137. The ultra-processing of Apple Jacks Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2138. Kellogg's also marketed Apple Jacks Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Krave Chocolate Cereal*

2139. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Krave Chocolate Cereal.

2140. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Krave Chocolate Cereal multiple times a month from 2020-2021.

369

2141. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2142. As detailed herein, consumption of UPF, including Krave Chocolate Cereal, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2143. Furthermore, it is biologically plausible that the ultra-processing of Krave Chocolate Cereal significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2144. Krave Chocolate Cereal contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

2145. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Krave Chocolate Cereal for overconsumption.

2146. The ultra-processing of Krave Chocolate Cereal destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2147. The ultra-processing of Krave Chocolate Cereal also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased

370

accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2148. Kellogg's also marketed Krave Chocolate Cereal to children using unfair and deceptive strategies and tactics such as those described herein.

*Keebler Fudge Stripes Original*

2149. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Keebler Fudge Stripes Original.

2150. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Keebler Fudge Stripes Original multiple times a month from 2011-2021.

2151. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2152. As detailed herein, consumption of UPF, including Keebler Fudge Stripes Original, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2153. Furthermore, it is biologically plausible that the ultra-processing of Keebler Fudge Stripes Original significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2154. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Keebler Fudge Stripes Original contained additives, such as phosphate-based additives which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin in Keebler Fudge Stripes Original, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

371

2155. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Keebler Fudge Stripes Original for overconsumption.

2156. The ultra-processing of Keebler Fudge Stripes Original destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2157. The ultra-processing of Keebler Fudge Stripes Original also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2158. Kellogg's also marketed Keebler Fudge Stripes Original to children using unfair and deceptive strategies and tactics such as those described herein.

*Pringles Original Crisps*

2159. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Pringles Original Crisps.

2160. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pringles Original Crisps multiple times a week from 2009-2021.

2161. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2162. As detailed herein, consumption of UPF, including Pringles Original Crisps, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are

372

significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2163. Furthermore, it is biologically plausible that the ultra-processing of Pringles Original Crisps significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2164. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pringles Original Crisps contained additives, such as mono-and diglycerides, and maltodextrin, which have been associated with increased risks of Type 2 Diabetes. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2165. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pringles Original Crisps for overconsumption.

2166. The ultra-processing of Pringles Original Crisps destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2167. The ultra-processing of Pringles Original Crisps also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

373

2168. Kellogg's also marketed Pringles Original Crisps to children using unfair and deceptive strategies and tactics such as those described herein.

*Club Original Crackers*

2169. Defendant Kellogg's manufactured, marketed, and sold a UPF product called Club Original Crackers.

2170. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Club Original Crackers multiple times a month from 2009-2021.

2171. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Kellogg's.

2172. As detailed herein, consumption of UPF, including Club Original Crackers, significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2173. Furthermore, it is biologically plausible that the ultra-processing of Club Original Crackers significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2174. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Club Original Crackers contained additives, such as phosphate-based additives and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with soy lecithin in Club Original Crackers, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

374

2175. On information and belief, Kellogg's utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Club Original Crackers for overconsumption.

2176. The ultra-processing of Club Original Crackers destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2177. The ultra-processing of Club Original Crackers also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Kellog's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2178. Kellogg's also marketed Club Original Crackers to children using unfair and deceptive strategies and tactics such as those described herein.

**ConAgra**

2179. Plaintiff is a victim of Defendant ConAgra's predatory profiteering.

2180. As a result of Defendant ConAgra's conduct, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of ConAgra's UPF.

2181. Plaintiff's long-term, chronic, and regular exposure to Defendant ConAgra's UPF has resulted in severe life-changing physical infirmities. Defendant ConAgra's conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

375

2182. As a result of Defendant ConAgra's actions, and Plaintiff's resulting ingestion of Defendant ConAgra's UPF, Plaintiff suffers from severe chronic illness, and will live the rest of his life sick, suffering, and getting sicker.

2183. As a further result of Defendant ConAgra's actions, and Plaintiff's resulting ingestion of Defendant ConAgra's UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.

*Slim Jim Original Meat Sticks*

2184. Defendant ConAgra manufactured, marketed, and sold a UPF product called Slim Jim Original Meat Sticks.

2185. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Slim Jim Original Meat Sticks multiple times a month from 2009-2021.

2186. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2187. As detailed herein, consumption of UPF, including Slim Jim Original Meat Sticks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2188. Furthermore, it is biologically plausible that the ultra-processing of Slim Jim Original Meat Sticks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2189.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Slim Jim Original Meat Sticks contained additives like citric acid, maltodextrin, nitrites, and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Slim Jim Original Meat Sticks, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2190.    Slim Jim Original Meat Sticks were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2191.    On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Slim Jim Original Meat Sticks for overconsumption.

2192.    The ultra-processing of Slim Jim Original Meat Sticks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2193.    The ultra-processing of Slim Jim Original Meat Sticks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased

377

accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2194. ConAgra also marketed Slim Jim Original Meat Sticks to children using unfair and deceptive strategies and tactics such as those described herein.

*Healthy Choice Beef and Broccoli*

2195. Defendant ConAgra manufactured, marketed, and sold a UPF product called Healthy Choice Beef and Broccoli.

2196. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Healthy Choice Beef and Broccoli multiple times a month from 2009-2021.

2197. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2198. As detailed herein, consumption of UPF, including Healthy Choice Beef and Broccoli, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2199. Furthermore, it is biologically plausible that the ultra-processing of Healthy Choice Beef and Broccoli significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2200. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Healthy Choice Beef and Broccoli contained additives like sunflower lecithin found in Healthy Choice Beef and Broccoli, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

378

2201.    Healthy Choice Beef and Broccoli was wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2202.    On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Healthy Choice Beef and Broccoli for overconsumption.

2203.    The ultra-processing of Healthy Choice Beef and Broccoli also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra- processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

*Duncan Hines Chewy Fudge Brownie Mix*

2204.    Defendant ConAgra manufactured, marketed, and sold a UPF product called Duncan Hines Chewy Fudge Brownie Mix.

2205.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Duncan Hines Chewy Fudge Brownie Mix multiple times a month from 2009-2021.

2206.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2207.    As detailed herein, consumption of UPF, including Duncan Hines Chewy Fudge Brownie Mix, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These

379

risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2208. Furthermore, it is biologically plausible that the ultra-processing of Duncan Hines Chewy Fudge Brownie Mix significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2209. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Duncan Hines Chewy Fudge Brownie Mix contained additives like carrageenan and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2210. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Duncan Hines Chewy Fudge Brownie Mix for overconsumption.

2211. The ultra-processing of Duncan Hines Chewy Fudge Brownie Mix destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2212. The ultra-processing of Duncan Hines Chewy Fudge Brownie Mix also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack

380

human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2213. ConAgra also marketed Duncan Hines Chewy Fudge Brownie Mix to children using unfair and deceptive strategies and tactics such as those described herein.

*Hebrew National Beef Franks*

2214. Defendant ConAgra manufactured, marketed, and sold a UPF product called Hebrew National Beef Franks.

2215. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Hebrew National Beef Franks multiple times a month from 2009-2021.

2216. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2217. As detailed herein, consumption of UPF, including Hebrew National Beef Franks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2218. Furthermore, it is biologically plausible that the ultra-processing of Hebrew National Beef Franks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2219. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Hebrew National Beef Franks contained additives like nitrites which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

381

2220. Hebrew National Beef Franks were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2221. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Hebrew National Beef Franks for overconsumption.

2222. The ultra-processing of Hebrew National Beef Franks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2223. The ultra-processing of Hebrew National Beef Franks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2224. ConAgra also marketed Hebrew National Beef Franks to children using unfair and deceptive strategies and tactics such as those described herein.

*Reddi-Whip Original*

2225. Defendant ConAgra manufactured, marketed, and sold a UPF product called Reddi-Whip Original.

2226. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Reddi-Whip Original multiple times a month from 2009-2021.

382

2227. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2228. As detailed herein, consumption of UPF, including Reddi-Whip Original, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2229. Furthermore, it is biologically plausible that the ultra-processing of Reddi-Whip Original significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2230. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Reddi-Whip Original contained additives like maltodextrin, mono- and diglycerides, and carrageenan, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2231. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Reddi-Whip Original for overconsumption.

2232. The ultra-processing of Reddi-Whip Original destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2233. The ultra-processing of Reddi-Whip Original also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such

383

as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2234. ConAgra also marketed Reddi-Whip Original to children using unfair and deceptive strategies and tactics such as those described herein.

*Orville Redenbacher's Butter Popcorn*

2235. Defendant ConAgra manufactured, marketed, and sold a UPF product called Orville Redenbacher's Butter Popcorn.

2236. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Orville Redenbacher's Butter Popcorn multiple times a month from 2009-2021.

2237. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2238. As detailed herein, consumption of UPF, including Orville Redenbacher's Butter Popcorn, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2239. Furthermore, it is biologically plausible that the ultra-processing of Orville Redenbacher's Butter Popcorn significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2240. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Orville Redenbacher's Butter Popcorn contained additives like citric acid

384

which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2241. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Orville Redenbacher's Butter Popcorn for overconsumption.

2242. The ultra-processing of Orville Redenbacher's Butter Popcorn destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2243. The ultra-processing of Orville Redenbacher's Butter Popcorn also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2244. ConAgra also marketed Orville Redenbacher's Butter Popcorn to children using unfair and deceptive strategies and tactics such as those described herein.

*Act II Butter Popcorn*

2245. Defendant ConAgra manufactured, marketed, and sold a UPF product called Act II Butter Popcorn.

2246. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Act II Butter Popcorn multiple times a month from 2009-2021.

385

2247.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2248.    As detailed herein, consumption of UPF, including Act II Butter Popcorn, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2249.    Furthermore, it is biologically plausible that the ultra-processing of Act II Butter Popcorn significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2250.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Act II Butter Popcorn contained additives like citric acid which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2251.    On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Act II Butter Popcorn for overconsumption.

2252.    The ultra-processing of Act II Butter Popcorn destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2253.    The ultra-processing of Act II Butter Popcorn also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such

386

responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2254.    ConAgra also marketed Act II Butter Popcorn to children using unfair and deceptive strategies and tactics such as those described herein.

*Chef Boyardee Beef Ravioli Can*

2255.    Defendant ConAgra manufactured, marketed, and sold a UPF product called Chef Boyardee Beef Ravioli Can.

2256.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Chef Boyardee Beef Ravioli Can multiple times a month from 2009-2021.

2257.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2258.    As detailed herein, consumption of UPF, including Chef Boyardee Beef Ravioli Can, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2259.    Furthermore, it is biologically plausible that the ultra-processing of Chef Boyardee Beef Ravioli Can significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2260.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Chef Boyardee Beef Ravioli Can contained additives like modified starch, guar gum, xantham gum, citric acid, hidden sugars and phosphate-based additives which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These

387

additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2261. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Chef Boyardee Beef Ravioli Can for overconsumption.

2262. The ultra-processing of Chef Boyardee Beef Ravioli Can destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2263. The ultra-processing of Chef Boyardee Beef Ravioli Can also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra- processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2264. ConAgra also marketed Chef Boyardee Beef Ravioli Can to children using unfair and deceptive strategies and tactics such as those described herein.

*Chef Boyardee Beef Ravioli Microwavable Cup*

2265. Defendant ConAgra manufactured, marketed, and sold a UPF product called Chef Boyardee Beef Ravioli Microwavable Cup.

2266. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Chef Boyardee Beef Ravioli Microwavable Cup multiple times a month from 2009- 2021.

2267. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

388

2268. As detailed herein, consumption of UPF, including Chef Boyardee Beef Ravioli Microwavable Cup, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2269. Furthermore, it is biologically plausible that the ultra-processing of Chef Boyardee Beef Ravioli Microwavable Cup significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2270. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Chef Boyardee Beef Ravioli Microwavable Cup contained additives like modified starch, guar gum, xantham gum, citric acid, hidden sugars and phosphate-based additives which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2271. Chef Boyardee Beef Ravioli Microwavable Cup was wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing

2272. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Chef Boyardee Beef Ravioli Microwavable Cup for overconsumption.

389

2273. The ultra-processing of Chef Boyardee Beef Ravioli Microwavable Cup destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2274. The ultra-processing of Chef Boyardee Beef Ravioli Microwavable Cup also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2275. ConAgra also marketed Chef Boyardee Beef Ravioli Microwavable Cup to children using unfair and deceptive strategies and tactics such as those described herein.

*Chef Boyardee Beefaroni Can*

2276. Defendant ConAgra manufactured, marketed, and sold a UPF product called Chef Boyardee Beefaroni Can.

2277. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Chef Boyardee Beefaroni Can multiple times a month from 2009-2021.

2278. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2279. As detailed herein, consumption of UPF, including Chef Boyardee Beefaroni Can, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

390

2280.    Furthermore, it is biologically plausible that the ultra-processing of Chef Boyardee Beefaroni Can significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2281.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Chef Boyardee Beefaroni Can contained additives like modified starch, guar gum, xantham gum, citric acid, hidden sugars and phosphate-based additives which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2282.    On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Chef Boyardee Beefaroni Can for overconsumption.

2283.    The ultra-processing of Chef Boyardee Beefaroni Can destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2284.    The ultra-processing of Chef Boyardee Beefaroni Can also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2285.   ConAgra also marketed Chef Boyardee Beefaroni Can to children using unfair and deceptive strategies and tactics such as those described herein.

*Chef Boyardee Beefaroni Microwavable Cup*

2286.   Defendant ConAgra manufactured, marketed, and sold a UPF product called Chef Boyardee Beefaroni Microwavable Cup.

2287.   Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Chef Boyardee Beefaroni Microwavable Cup multiple times a month from 2009-2021.

2288.   Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2289.   As detailed herein, consumption of UPF, including Chef Boyardee Beefaroni Microwavable Cup, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2290.   Furthermore, it is biologically plausible that the ultra-processing of Chef Boyardee Beefaroni Microwavable Cup significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2291.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Chef Boyardee Beefaroni Microwavable Cup contained additives like modified starch, guar gum, xantham gum, citric acid, hidden sugars and phosphate-based additives which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

392

2292. Chef Boyardee Beefaroni Microwavable Cup was wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing

2293. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Chef Boyardee Beefaroni Microwavable Cup for overconsumption.

2294. The ultra-processing of Chef Boyardee Beefaroni Microwavable Cup destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2295. The ultra-processing of Chef Boyardee Beefaroni Microwavable Cup also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2296. ConAgra also marketed Chef Boyardee Beefaroni Microwavable Cup to children using unfair and deceptive strategies and tactics such as those described herein.

*Manwich Original Sloppy Joe Sauce, Canned*

2297. Defendant ConAgra manufactured, marketed, and sold a UPF product called Manwich Original Sloppy Joe Sauce, Canned.

393

2298. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Manwich Original Sloppy Joe Sauce, Canned multiple times a month from 2009-2021.

2299. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2300. As detailed herein, consumption of UPF, including Manwich Original Sloppy Joe Sauce, Canned, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2301. Furthermore, it is biologically plausible that the ultra-processing of Manwich Original Sloppy Joe Sauce, Canned significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2302. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Manwich Original Sloppy Joe Sauce, Canned contained additives like guar gum, xantham gum, citric acid and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2303. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Manwich Original Sloppy Joe Sauce, Canned for overconsumption.

2304. The ultra-processing of Manwich Original Sloppy Joe Sauce, Canned destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2305. The ultra-processing Manwich Original Sloppy Joe Sauce, Canned also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2306. ConAgra also marketed Manwich Original Sloppy Joe Sauce, Canned to children using unfair and deceptive strategies and tactics such as those described herein.

*Mrs. Butterworth's Original Syrup*

2307. Defendant ConAgra manufactured, marketed, and sold a UPF product called Mrs. Butterworth's Original Syrup.

2308. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Mrs. Butterworth's Original Syrup multiple times a month from 2009-2021.

2309. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2310. As detailed herein, consumption of UPF, including Mrs. Butterworth's Original Syrup, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2311. Furthermore, it is biologically plausible that the ultra-processing of Mrs. Butterworth's Original Syrup significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2312. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Mrs. Butterworth's Original Syrup contained additives like potassium sorbate, mono- and diglycerides, citric acid, and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2313. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Mrs. Butterworth's Original Syrup for overconsumption.

2314. The ultra-processing of Mrs. Butterworth's Original Syrup destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2315. The ultra-processing Mrs. Butterworth's Original Syrup also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2316. ConAgra also marketed Mrs. Butterworth's Original Syrup to children using unfair and deceptive strategies and tactics such as those described herein.

*Pam Butter*

2317. Defendant ConAgra manufactured, marketed, and sold a UPF product Pam Butter.

2318. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pam Butter multiple times a month from 2009-2021.

2319. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2320. As detailed herein, consumption of UPF, including Pam Butter, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2321. Furthermore, it is biologically plausible that the ultra-processing of Pam Butter significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2322. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pam Butter contained additives like soy lecithin which drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2323. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pam Butter for overconsumption.

2324. The ultra-processing of Pam Butter destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

*Pam Olive Oil*

2325. Defendant ConAgra manufactured, marketed, and sold a UPF product Pam Olive Oil.

2326. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pam Olive Oil multiple times a month from 2009-2021.

2327. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2328. As detailed herein, consumption of UPF, including Pam Olive Oil, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2329. Furthermore, it is biologically plausible that the ultra-processing of Pam Olive Oil significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2330. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pam Olive Oil contained additives like soy lecithin which drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2331. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pam Olive Oil for overconsumption.

398

2332. The ultra-processing of Pam Olive Oil destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

*Pam Original*

2333. Defendant ConAgra manufactured, marketed, and sold a UPF product Pam Original.

2334. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Pam Original multiple times a month from 2009-2021.

2335. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2336. As detailed herein, consumption of UPF, including Pam Original, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2337. Furthermore, it is biologically plausible that the ultra-processing of Pam Original significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2338. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Pam Original contained additives like soy lecithin which drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2339. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Pam Original for overconsumption.

2340.    The ultra-processing of Pam Original destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

*Wish-Bone Italian Salad Dressing*

2341.    Defendant ConAgra manufactured, marketed, and sold a UPF product called Wish-Bone Italian Salad Dressing.

2342.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Wish-Bone Italian Salad Dressing multiple times a month from 2009-2021.

2343.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2344.    As detailed herein, consumption of UPF, including Wish-Bone Italian Salad Dressing, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2345.    Furthermore, it is biologically plausible that the ultra-processing of Wish-Bone Italian Salad Dressing significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2346.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Wish-Bone Italian Salad Dressing contained additives like xantham gum, maltodextrin, and modified corn starch which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2347. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Wish-Bone Italian Salad Dressing for overconsumption.

2348. The ultra-processing of Wish-Bone Italian Salad Dressing destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2349. The ultra-processing Wish-Bone Italian Salad Dressing also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2350. ConAgra also marketed Wish-Bone Italian Salad Dressing to children using unfair and deceptive strategies and tactics such as those described herein.

*Swiss Miss Marshmallow Hot Cocoa Mix (Milk Chocolate with Marshmallow)*

2351. Defendant ConAgra manufactured, marketed, and sold a UPF product called Swiss Miss Marshmallow Hot Cocoa Mix (Milk Chocolate with Marshmallow).

2352. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Swiss Miss Marshmallow Hot Cocoa Mix (Milk Chocolate with Marshmallow) multiple times a month from 2009-2021.

2353. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

401

2354.   As detailed herein, consumption of UPF, including Swiss Miss Marshmallow Hot Cocoa Mix (Milk Chocolate with Marshmallow), significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2355.   Furthermore, it is biologically plausible that the ultra-processing of Swiss Miss Marshmallow Hot Cocoa Mix (Milk Chocolate with Marshmallow) significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2356.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Swiss Miss Marshmallow Hot Cocoa Mix (Milk Chocolate with Marshmallow) contained additives like mono- and diglycerides, phosphate-based additives, and modified corn starch which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2357.   On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Swiss Miss Marshmallow Hot Cocoa Mix (Milk Chocolate with Marshmallow) for overconsumption.

2358.   The ultra-processing of Swiss Miss Marshmallow Hot Cocoa Mix (Milk Chocolate with Marshmallow) destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2359. The ultra-processing Swiss Miss Marshmallow Hot Cocoa Mix (Milk Chocolate with Marshmallow) also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2360. ConAgra also marketed Swiss Miss Marshmallow Hot Cocoa Mix (Milk Chocolate with Marshmallow) to children using unfair and deceptive strategies and tactics such as those described herein.

*Mrs. Paul's Crispy Battered Fillets*

2361. Defendant ConAgra manufactured, marketed, and sold a UPF product called Mrs. Paul's Crispy Battered Fillets.

2362. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Mrs. Paul's Crispy Battered Fillets multiple times a month from 2009-2021.

2363. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2364. As detailed herein, consumption of UPF, including Mrs. Paul's Crispy Battered Fillets, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2365. Furthermore, it is biologically plausible that the ultra-processing of Mrs. Paul's Crispy Battered Fillets significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

403

2366.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Mrs. Paul's Crispy Battered Fillets contained additives like phosphate-based additives, modified corn starch, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2367.    On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Mrs. Paul's Crispy Battered Fillets, for overconsumption.

2368.    The ultra-processing of Mrs. Paul's Crispy Battered Fillets destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2369.    The ultra-processing Mrs. Paul's Crispy Battered Fillets also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2370.    ConAgra also marketed Mrs. Paul's Crispy Battered Fillets to children using unfair and deceptive strategies and tactics such as those described herein.

*Mrs. Paul's Breaded Fish Sticks*

2371. Defendant ConAgra manufactured, marketed, and sold a UPF product called Mrs. Paul's Breaded Fish Sticks.

2372. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Mrs. Paul's Breaded Fish Sticks multiple times a month from 2009-2021.

2373. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to ConAgra.

2374. As detailed herein, consumption of UPF, including Mrs. Paul's Breaded Fish Sticks, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2375. Furthermore, it is biologically plausible that the ultra-processing of Mrs. Paul's Breaded Fish Sticks significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2376. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Mrs. Paul's Breaded Fish Sticks contained additives like phosphate- based additives, modified corn starch, and hidden sugars, which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2377. On information and belief, ConAgra utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Mrs. Paul's Breaded Fish Sticks, for overconsumption.

405

2378. The ultra-processing of Mrs. Paul's Breaded Fish Sticks destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2379. The ultra-processing Mrs. Paul's Breaded Fish Sticks also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of ConAgra's sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2380. ConAgra also marketed Mrs. Paul's Breaded Fish Sticks to children using unfair and deceptive strategies and tactics such as those described herein.

**Mars**

2381. Plaintiff is a victim of Defendant Mars' predatory profiteering.

2382. j. UPF fromAs a result of Defendant Mars, including but not limited to those bearing the brand names Kind, M&M's, Skittles, Snickers, Starburst, Twix, and Ben's;' conduct, Plaintiff was regularly, frequently, and chronically exposed to harmful levels of Mars' UPF.

2383. 509. Plaintiff's long-term, chronic, and regular exposure to Defendants Mars' UPF has resulted in severe life-changing physical infirmities. Defendants Mars' conduct caused and/or contributed to the incurable injuries suffered by the Plaintiff.

2384. 510. As a result of Defendants Mars' actions, and Plaintiff's resulting ingestion of Defendants Mars' UPF, Plaintiff suffers from severe chronic illness, and will live the rest of his life sick, suffering, and getting sicker.

2385. 511. As a further result of Defendants Mars' actions, and Plaintiff's resulting ingestion of Defendants Mars' UPF, Plaintiff has and will suffer from diminished life expectancy, reduced social and economic prospects, decreased happiness, greater suffering and greater risks of complications. These complications may include amputation, blindness, nephropathy and retinopathy, diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, depression, hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, heart disease and cardiovascular mortality.[532]

*Milk Chocolate M&M's*

2386. Defendant Mars manufactured, marketed, and sold a UPF product called Milk Chocolate M&M's.

2387. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Milk Chocolate M&M's multiple times a month from 2009-2021.

2388. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mars.

2389. As detailed herein, consumption of UPF, including Milk Chocolate M&M's, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2390. Furthermore, it is biologically plausible that the ultra-processing of Milk Chocolate M&M's significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

---

[532] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

2391. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Milk Chocolate M&M's contained additives like carnauba way, gum acacia and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Milk Chocolate M&M's, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2392. Milk Chocolate M&M's also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

2393. Milk Chocolate M&M's were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2394. On information and belief, Mars utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Milk Chocolate M&M's for overconsumption.

2395. The ultra-processing of Milk Chocolate M&M's destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2396. The ultra-processing of Milk Chocolate M&M's also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such

408

responses are the intended effect of Mars' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2397. Mars also marketed Milk Chocolate M&M's to children using unfair and deceptive strategies and tactics such as those described herein.

*Milk Chocolate M&M's Minis*

2398. Defendant Mars manufactured, marketed, and sold a UPF product called Milk Chocolate M&M's Minis.

2399. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Milk Chocolate M&M's Minis multiple times a month from 2009-2021.

2400. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mars.

2401. As detailed herein, consumption of UPF, including Milk Chocolate M&M's Minis, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2402. Furthermore, it is biologically plausible that the ultra-processing of Milk Chocolate M&M's Minis significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2403. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Milk Chocolate M&M's Minis contained additives like carnauba way, gum acacia and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Milk

409

Chocolate M&M's Minis, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2404.    Milk Chocolate M&M's Minis also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

2405.    Milk Chocolate M&M's Minis were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2406.    On information and belief, Mars utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Milk Chocolate M&M's Minis for overconsumption.

2407.    The ultra-processing of Milk Chocolate M&M's Minis destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2408.    The ultra-processing of Milk Chocolate M&M's Minis also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mars' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

410

2409.    Mars also marketed Milk Chocolate M&M's Minis to children using unfair and deceptive strategies and tactics such as those described herein.

*Peanut Butter M&M's*

2410.    Defendant Mars manufactured, marketed, and sold a UPF product called Peanut Butter M&M's.

2411.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Peanut Butter M&M's multiple times a month from 2009-2021.

2412.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mars.

2413.    As detailed herein, consumption of UPF, including Peanut Butter M&M's, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2414.    Furthermore, it is biologically plausible that the ultra-processing of Peanut Butter M&M's significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2415.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Peanut Butter M&M's contained additives like carnauba way, gum acacia and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Peanut Butter M&M's, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

411

2416. Peanut Butter M&M's also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

2417. Peanut Butter M&M's were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2418. On information and belief, Mars utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Peanut Butter M&M's for overconsumption.

2419. The ultra-processing of Peanut Butter M&M's destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2420. The ultra-processing of Peanut Butter M&M's also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mars' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2421. Mars also marketed Peanut Butter M&M's to children using unfair and deceptive strategies and tactics such as those described herein.

*Skittles Original*

2422.    Defendant Mars manufactured, marketed, and sold a UPF product called Skittles Original.

2423.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Skittles Original multiple times a month from 2009-2021.

2424.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mars.

2425.    As detailed herein, consumption of UPF, including Skittles Original, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2426.    Furthermore, it is biologically plausible that the ultra-processing of Skittles Original significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2427.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Skittles Original contained additives like modified starch, citric acid carnauba wax, sodium citrate and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2428.    Skittles Original also contained artificial colorants that have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis.

413

2429. Skittles Original were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2430. On information and belief, Mars utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Skittles Original for overconsumption.

2431. The ultra-processing of Skittles Original destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2432. The ultra-processing of Skittles Original also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mars' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2433. Mars also marketed Skittles Original to children using unfair and deceptive strategies and tactics such as those described herein.

*Snickers Fun Size*

2434. Defendant Mars manufactured, marketed, and sold a UPF product called Snickers Fun Size.

2435. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Snickers Fun Size multiple times a month from 2009-2021.

2436.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mars.

2437.    As detailed herein, consumption of UPF, including Snickers Fun Size, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2438.    Furthermore, it is biologically plausible that the ultra-processing of Snickers Fun Size significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2439.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Snickers Fun Size contained additives like hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Snickers Fun Size, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2440.    Snickers Fun Size were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2441.    On information and belief, Mars utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Snickers Fun Size for overconsumption.

415

2442. The ultra-processing of Snickers Fun Size destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2443. The ultra-processing of Snickers Fun Size also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mars' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2444. Mars also marketed Snickers Fun Size to children using unfair and deceptive strategies and tactics such as those described herein.

*Starburst Original Fruit Chews*

2445. Defendant Mars manufactured, marketed, and sold a UPF product called Starburst Original Fruit Chews.

2446. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Starburst Original Fruit Chews multiple times a month from 2009-2021.

2447. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mars.

2448. As detailed herein, consumption of UPF, including Starburst Original Fruit Chews, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2449. Furthermore, it is biologically plausible that the ultra-processing of Starburst Original Fruit Chews significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

416

2450.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Starburst Original Fruit Chews contained additives like hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Starburst Original Fruit Chews, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2451.    Starburst Original Fruit Chews were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2452.    On information and belief, Mars utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Starburst Original Fruit Chews for overconsumption.

2453.    The ultra-processing of Starburst Original Fruit Chews destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2454.    The ultra-processing of Starburst Original Fruit Chews also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mars' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased

417

accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2455.    Mars also marketed Starburst Original Fruit Chews to children using unfair and deceptive strategies and tactics such as those described herein.

*Twix Bars*

2456.    Defendant Mars manufactured, marketed, and sold a UPF product called Twix Bars.

2457.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Twix Bars multiple times a month from 2009-2021.

2458.    Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mars.

2459.    As detailed herein, consumption of UPF, including Twix Bars, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2460.    Furthermore, it is biologically plausible that the ultra-processing of Twix Bars significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2461.    There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Twix Bars contained additives like modified corn starch, PGPR and hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Twix Bars, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

418

2462.    Twix Bars were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2463.    On information and belief, Mars utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Twix Bars for overconsumption.

2464.    The ultra-processing of Twix Bars destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2465.    The ultra-processing of Twix Bars also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mars' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2466.    Mars also marketed Twix Bars to children using unfair and deceptive strategies and tactics such as those described herein.

*Kind Dark Chocolate Nuts & Sea Salt*

2467.    Defendant Mars manufactured, marketed, and sold a UPF product called Kind Dark Chocolate Nuts & Sea Salt.

2468.    Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Plaintiff ingested Kind Dark Chocolate Nuts & Sea Salt multiple times a month from 2009-2021.

419

2469. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mars.

2470. As detailed herein, consumption of UPF, including Kind Dark Chocolate Nuts & Sea Salt, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2471. Furthermore, it is biologically plausible that the ultra-processing of Kind Dark Chocolate Nuts & Sea Salt significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2472. There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Kind Dark Chocolate Nuts & Sea Salt contained additives like hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Kind Dark Chocolate Nuts & Sea Salt, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2473. Kind Dark Chocolate Nuts & Sea Salt were wrapped in plastic, which may cause contamination with endocrine disrupting chemicals such as phthalates, bisphenols, PFAS and organophosphate ethers. Endocrine disrupting chemicals such as advanced glycation end products or polycyclic aromatic hydrocarbons may also be formed during ultra-processing.

2474. On information and belief, Mars utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Kind Dark Chocolate Nuts & Sea Salt for overconsumption.

420

2475. The ultra-processing of Kind Dark Chocolate Nuts & Sea Salt destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2476. The ultra-processing of Kind Dark Chocolate Nuts & Sea Salt also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mars' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2477. Mars also marketed Kind Dark Chocolate Nuts & Sea Salt to children using unfair and deceptive strategies and tactics such as those described herein.

*Ben's Original Ready Rice Garden Vegetable*

2478. Defendant Mars manufactured, marketed, and sold a UPF product called Ben's Original Ready Rice Garden Vegetable.

2479. Prior to his diagnosis with Type 2 Diabetes and Fatty Liver Disease, Ben's Original Ready Rice Garden Vegetable multiple times a month from 2009-2021.

2480. Plaintiff consumed this product in a manner and an amount that was intended and/or reasonably foreseeable to Mars.

2481. As detailed herein, consumption of UPF, including Ben's Original Ready Rice Garden Vegetable, significantly increases the risk of Type 2 Diabetes and Fatty liver disease. These risks are significantly increased over and above any risks observed in non-UPF, and are not readily apparent to any ordinary consumer.

2482.   Furthermore, it is biologically plausible that the ultra-processing of Ben's Original Ready Rice Garden Vegetable significantly increases the risk of Type 2 Diabetes and Fatty Liver Disease.

2483.   There is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of Type 2 Diabetes and Fatty Liver Disease. For example, Ben's Original Ready Rice Garden Vegetable contained additives like maltodextrin, phosphate-based additives, citric acid, hidden sugars which have been found to be associated with increased risks of Type 2 Diabetes or Fatty Liver Disease. These additives, along with the soy lecithin found in Ben's Original Ready Rice Garden Vegetable, drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver.

2484.   On information and belief, Mars utilized research and design strategies described herein, including those originating in the tobacco industry and those relying on sophisticated neuroscience, to optimize Ben's Original Ready Rice Garden Vegetable for overconsumption.

2485.   The ultra-processing of Ben's Original Ready Rice Garden Vegetable destroyed the food matrix, allowing for rapid delivery of reinforcers, altering satiety and glycemic response, promoting increased speed of consumption and promoting subconscious overconsumption.

2486.   The ultra-processing of Ben's Original Ready Rice Garden Vegetable also resulted in unnatural combinations and concentrations of drivers of addictive response. These stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. Such responses are the intended effect of Mars' sophisticated efforts to hack human physiological hardware and to drive overconsumption. This in turn leads to inflammation,

422

increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation.

2487.    Mars also marketed Ben's Original Ready Rice Garden Vegetable to children using unfair and deceptive strategies and tactics such as those described herein.

## COUNT I—NEGLIGENCE

2488.    512. Plaintiff incorporates by reference paragraphs 1 through 5112487 as if fully set forth herein and further allege as follows.

2489.    513. At all relevant times, each Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, had a duty to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling and distribution of their UPF.

2490.    514. Each Ddefendants' duty, including Kraft Heinz, Mondelez, Post Holdings, Coca- Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, to exercise reasonable care in the advertising and sale of their UPF included a duty to warn Plaintiff and other consumers of the risks and dangers associated with their UPF.

2491.    515. At all relevant times, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew or should have known through the exercise of reasonable care of the dangers associated with the normal and/or intended use of their UPF. In particular, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew or should have known that their UPF were engineered to be addictive, were engineered to promote overconsumption, contained dangerous and unnatural combinations of nutrients, contained dangerous chemical additives and contaminants, caused unique health hazards independent of nutrient content, that ultra-processing causes human health risks, and that UPF significantly

423

increases the risk of metabolic diseases such as Type 2 Diabetes, Fatty Liver Disease, and other life changing chronic diseases.

2492.    ~~516.~~ At all relevant times, each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew, or should have known through the exercise of reasonable care, that ordinary consumers such as Plaintiff would not realize the potential risks and dangers of their UPF.

2493.    ~~517.~~ Each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, breached their duty of care by manufacturing, designing, researching, testing, producing, supplying, marketing, selling, and/or distributing their UPF negligently, recklessly, and/or with extreme carelessness and by failing to adequately warn of the risks and dangers of their UPF as described in the allegations above. Such breaches include but are not limited to:

> ~~a.~~ a.    Failing to warn Plaintiff and other consumers of the risks and dangers associated with the ingestion of their UPF;
>
> ~~b.~~ b.    Failing to properly test their UPF to determine the increased risk of harm to the endocrine and metabolic systems including Type 2 Diabetes and Fatty Liver Disease caused by the normal and/or intended use of their UPF;
>
> ~~c.~~ c.    Failing to inform Plaintiff that their UPF are potentially addictive substances;
>
> ~~d.~~ d.    Failing to inform Plaintiff that their UPF and are engineered to be overconsumed;

424

e. e.    Failing to inform Plaintiff that their UPF contain dangerous and unnatural combinations of nutrients;

f. f. Failing to inform Plaintiff that their UPF contain dangerous chemical additives and contaminants;

g. g.    Failing to inform Plaintiff that their UPF cause unique health risks independent of nutrient content;

h. h.    Failing to inform Plaintiff that ultra-processing causes human health risks;

i. i. Failing to warn Plaintiff that their UPF significantly increases the risk of Type 2 Diabetes, Fatty Liver Disease, and other life-changing chronic illnesses;

j. j. Marketing and labeling their UPF as safe when Defendants knew or should have known their UPF were defective and dangerous; and

k. k.    Failing to act like a reasonably prudent company under similar circumstances.

2494.    518. Each of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Plaintiff.

2495.    519. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew or should have known that consumers such as Plaintiff would foreseeably suffer injuries as a result of Defendants' failure to exercise ordinary care as described above.

2496.    520. Due to each Defendants' failure to exercise ordinary care or comply with their duties, Plaintiff was not able to discover the dangers of ingesting each Defendants' UPF.

425

2497. 521. Defendants'The acts and/or omissions of each Defendant, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff and other consumers

2498. 522. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff and other consumers. Each Defendants' acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

2499. 523. Based on their strategic and intentional promotion, advertising and marketing history, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, reasonably should have foreseen that children would ingest their UPF and suffer lifelong chronic illness. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, reasonably should have foreseen the physical and emotional distress this would place on the children and their families.

2500. 524. Plaintiff was injured as a direct and proximate result of each Defendants' negligence and/or gross negligence.

2501. 525. Each Defendants' negligence and/or gross negligence was a direct and proximate cause of the injuries, harm, and economic losses that Plaintiff has suffered, and will continue to suffer.

426

2502. 526. Each Defendants' negligence and/or gross negligence were a substantial factor in causing and/or contributing to Plaintiff's harms.

2503. 527. As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, , Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses for the rest of his life.

2504. 528. Each Defendants' conduct with respect to their design, promotion and sale of their UPF, including their negligent marketing, to Plaintiff and the public, was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

**WHEREFORE**, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra in an amount greater than $50,000.00 (exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

## COUNT II—FAILURE TO WARN

2505. 529. Plaintiff incorporates by reference paragraphs 1 through 5112487 as if fully set forth herein and further allege as follows.

427

2506. 530. Each Defendants were, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, was in the business of selling UPF, and each Defendants designed, manufactured, marketed and sold UPF that were ingested by Plaintiff.

2507. 531. Each Defendants' UPF, Kraft Heinz's, Mondelez's, Post Holdings', Coca-Cola's, PepsiCo's, General Mills', Nestle's, Kellogg's', Mars' and Conagra's, were in an unsafe, defective, and unreasonably dangerous condition at the time they left each Defendants' possession because they were not accompanied by adequate warnings.

2508. 532. In particular, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew or should have known that their UPF could cause serious injuries, addiction and chronic illness when used in the intended or reasonably foreseeable manner, including but not limited to Type 2 Diabetes and fatty liver disease in children. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, failed to give appropriate and adequate warning of such risks. In fact, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, continues to this day to market and sell their products to consumers without adequate warnings of the risks associated with their use.

2509. 533. Each Defendants were, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, was aware that UPF posed risks that were known to each Defendants and knowable to each Defendants in light of scientific and medical knowledge that was generally accepted in the scientific community at the time each Defendants designed, manufactured, distributed and sold their UPF.

2510. 534. Each Defendants' UPF, including Kraft Heinz's, Mondelez's, Post Holdings', Coca-Cola's, PepsiCo's, General Mills', Nestle's, Kellogg's', Mars' and Conagra's, are defective because, among other reasons described herein, each Defendants failed to warn consumers including Plaintiff, in the labeling, packaging, marketing, promotion and advertising of their UPF that:

a. l. Their UPF are ultra-processed;

b. m. Ultra-processing causes human health risks that other foods do not;

c. n. Their UPF are potentially addictive substances;

d. o. Their UPF and are engineered to be overconsumed;

e. p. Their UPF contain dangerous and unnatural combinations of nutrients;

f. q. Their UPF contain dangerous chemical additives and contaminants;

g. r. Their UPF cause unique health risks independent of nutrient content; and

h. s. Their UPF significantly increases the risk of Type 2 Diabetes, Fatty Liver Disease, and other life-changing chronic illnesses.

2511. 535. Through aggressive mass marketing campaigns, Defendants targeted children with UPF marketing. The failure of each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, to adequately warn about its defective UPF and to misleadingly advertise through a variety of marketing campaigns created a danger of injuries that were reasonably foreseeable at the time of labeling, design, manufacture, distribution and sale of their UPF.

429

2512. 536. Ordinary consumers would not have recognized the potential risks of UPF when used in the manner reasonably foreseeable to each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

2513. 537. At all relevant times, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sale, and on the product labels.

2514. 538. If any Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars or Conagra, had warned Plaintiff that use of their UPF in an intended or reasonably foreseeable manner would increase their risk of being seriously injured, including but not limited to developing Type 2 Diabetes or fatty liver disease in childhood, Plaintiff would not have ingested their UPF.

2515. 539. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, caused their UPF to enter the stream of commerce and to be sold to consumers, including Plaintiff, through a variety of channels, including through grocery stores, convenience stores, other retail locations, drive-through locations, and home delivery services.

2516. 540. Plaintiff used Defendants' UPF the UPF of each Defendant, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, for the purposes and in a manner normally intended, recommended, promoted and marketed by Defendants.

2517. 541. As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages, and losses for the rest of his life.

2518. 542. Each Defendants', Kraft Heinz's, Mondelez's, Post Holdings', Coca-Cola's, PepsiCo's, General Mills', Nestle's, Kellogg's', Mars' and Conagra's, lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising was a substantial contributing factor in causing the harm to Plaintiff.

2519. 543. Each Defendants' conduct, that of Kraft Heinz, Mondelez, Post Holdings, Coca- Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

**WHEREFORE**, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra in an amount greater than $50,000.00

(exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

## COUNT III—BREACH OF IMPLIED WARRANTY

*(13 Pa. Stat. Ann. §§2314 et seq.)*

2520. 544. Plaintiff incorporates by reference paragraphs 1 through 5112487 as if fully set forth herein and further allege as follows.

2521. 545. Each Defendants are, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, is in the business of manufacturing, supplying, marketing, advertising, warranting, and/or selling UPF.

2522. 546. Prior to the time that the Plaintiff purchased and ingested each Defendants' UPF, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew of the uses for which their UPF were intended and impliedly warranted to Plaintiff that their UPF were of merchantable quality and safe and fit for such intended and ordinary uses. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, also impliedly warranted to Plaintiff that their UPF were of a certain quality and could be ingested safely.

2523. 547. Each Defendants' warranties, those of Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, included but are not limited to the warranties that their UPF were safe, were not addictive substances, were not engineered to be overconsumed, and did not pose health risks when ingested.

2524. 548. Each Defendants' UPF were neither safe for their intended use nor of merchantable quality, as warranted by each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra,, because their UPF are

432

unreasonably harmful, cause health risks when used as intended, and cause severe injuries to users including Plaintiff.

2525. 549. When used as intended or reasonably foreseeable, each Defendants' UPF cause increased risks of Type 2 Diabetes, fatty liver disease, and other chronic illnesses.

2526. 550. Each Defendants' UPF, those of Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, were unfit for their ordinary use, were not of merchantable quality, did not conform to the representations made by each Defendants, and/or were unfit for their particular purpose when they left each Defendants' control.

2527. 551. Due to these and other features, each Defendants' UPF are not fit for their ordinary, intended use as safe food substances but are instead defective and fail to conform to Defendants' the implied warranties of each Defendant, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

2528. 552. Each Defendants have, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, breached their implied warranties of merchantability because their UPF were not in merchantable condition when sold, and were defective when sold.

2529. 553. Despite having received notice of these defects, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, continue to misrepresent the nature of their UPF and breach their implied warranties.

2530. 554. At the time Plaintiff purchased and used each Defendants' UPF, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew or should have known that Plaintiff would detrimentally rely on each Defendants' misrepresentations regarding safety.

433

2531. 555. Plaintiff purchased or used each Defendants' UPF reasonably relying on Defendants'the warranties of each Defendant, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

2532. Plaintiff used each Defendants' UPF for the purpose and in the manner intended by each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

2533. 556. Plaintiff would not have purchased or ingested each Defendants' UPF, or would not have purchased the products on the same terms, had they known the truth about the misrepresentations described above, the facts each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, failed to disclose, or that each Defendants' UPF were unfit for ordinary use or their particular purpose.

2534. 557. Each Defendants' breach of these warranties, including the breaches of Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, was a substantial factor in causing Plaintiff's injuries.

2535. 558. Plaintiff was injured as a direct and proximate result of each Defendants' breach of implied warranties of merchantability. Plaintiff has been harmed by each Defendants' failure to deliver merchantable products and have contracted life changing chronic illness as a result. Plaintiff suffered serious injury, harm, damages, economic and non-economic loss, and will continue to suffer such harm, damages, and losses for the rest of his life.

559. Defendants' conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

~~WHEREFORE, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Defendants, in an amount greater than $50,000.00 (exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.~~

### ~~COUNT IV—BREACH OF EXPRESS WARRANTY~~

*~~(13 Pa. Stat. Ann. §§2313 et seq.)~~*

~~560. Plaintiff incorporates by reference paragraphs 1 through 511 as if fully set forth herein and further allege as follows.~~

~~561. Defendants are in the business of manufacturing, supplying, marketing, advertising, warranting, and selling UPF.~~

~~562. Defendants expressly represented and warranted to Plaintiff, through public statements, press releases, advertising, marketing materials and statements made by Defendants or their authorized agents in direct-to-consumer marketing, advertisements, and labels that their UPF was safe for its reasonably expected and intended use—regular and chronic ingestion.~~

~~563. Defendants' warranties included but are not limited to the warranties that their UPF are safe, wholesome, healthy, protective, child-friendly, and/or natural for frequent ingestion.~~

~~564. These and other misrepresentations were made directly by Defendants to consumers and end users of Defendants' UPF, constitute express warranties, and became part of the basis of the bargain between the parties and created a collective express warranty that their UPF would conform to Defendants' affirmations and promises.~~

~~565. Defendants breached their express warranties about their UPF and their qualities because Defendants' statements about the safety of their UPF were false and their UPF did not~~

435

conform to those affirmations and promises. Defendants' UPF were not safe, but rather exposed Plaintiff and other consumers to unreasonable risks of adverse health effects including Type 2 Diabetes, fatty liver disease, and other life-changing chronic illnesses.

566. At the time Plaintiff purchased or ingested Defendants' UPF, Defendants knew or should have known that Plaintiff would detrimentally rely on Defendants' misrepresentations regarding safety.

567. Plaintiff used Defendants' UPF for the purpose and in the manner intended by Defendants.

568. Plaintiff could not have discovered the breached warranties or realized the dangers of Defendants' UPF through the use of reasonable care.

569. Plaintiff would not have purchased or ingested Defendants' UPF if they had known the truth about the misrepresentations described above, or that Defendants' UPF were unfit for ordinary use or their particular purpose.

570. The breach of the warranties was a substantial factor in bringing about Plaintiff's injuries.

571. As a direct and proximate result of Plaintiff's reasonably anticipated use of Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages, and losses for the rest of his life.

2536. 572. Each Defendants' conduct, that of Kraft Heinz, Mondelez, Post Holdings, Coca- Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious,

oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

**WHEREFORE**, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra in an amount greater than $50,000.00 (exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

## COUNT ~~V~~IV—NEGLIGENT MISREPRESENTATION

2537. ~~573.~~ Plaintiff incorporates by reference paragraphs 1 through ~~511~~2487 as if fully set forth herein and further allege as follows.

2538. ~~574.~~ At all relevant times, each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, had a duty to provide Plaintiff and other consumers with true and accurate information about their UPF, including warnings of any risks they knew of or should have known of related to the ingestion of their UPF.

2539. ~~575.~~ Each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew or should have known, based on evolving scientific studies and research, of the safety risks associated with their UPF. Each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew or should have known that their representations about the

437

safety of their UPF were false, and that they had a duty to both learn and disclose the dangers associated with their UPF.

2540. 576. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, breached their duty in representing that their UPF have no serious side effects when they knew or should have known that their products did cause serious side effects as described herein.

2541. 577. From the time each Defendants' UPF were first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and/or distributed, and up to the present, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, failed to disclose material facts regarding the health risks of their UPF to Plaintiff or the public.

2542. 578. At all relevant times, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, conducted sales and marketing campaigns to promote the sale and ingestion of their UPF and willfully deceived Plaintiff and the general public about the health risks and adverse consequences of their UPF.

2543. 579. Each Defendants' misrepresentations, those of Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, included but are not limited to messages in labels and marketing that their UPF are safe, healthy, and should be ingested by children.

2544. 580. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, failed to exercise ordinary care in their representations concerning their UPF by negligently misrepresenting their UPF's high risk of

unreasonable, dangerous, and devastating health conditions, including but not limited to Type 2 Diabetes and Fatty Liver Disease in children.

2545. 581. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, made such representations and failed to disclose such material facts with the intent to induce consumers, including Plaintiff, into purchasing and ingesting their UPF.

2546. 582. Plaintiff and other consumers justifiably relied on each Defendants' misrepresentations and nondisclosures to their detriment. Specifically, Plaintiff relied on representations from each Defendant, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, that their UPF were safe to use as expected, when they were not.

2547. 583. In reliance on the misrepresentations by theeach Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, Plaintiff was induced to purchase and ingest each Defendants' UPF. If Plaintiff had known the true facts and the facts concealed by each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, Plaintiff would not have purchased or ingested each Defendants' UPF.

2548. 584. As a direct and proximate result of the foregoing negligent misrepresentations by each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, Plaintiff suffered injuries and damages as alleged herein.

2549. 585. As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola,

PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

2550. 586. Each Defendants' conduct, that of Kraft Heinz, Mondelez, Post Holdings, Coca- Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

2551. 587. Due to the above, each Defendants are, Kraft Heinz, Mondelez, Post Holdings, Coca- Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, is liable to Plaintiff for compensatory and punitive damages to the extent available, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**WHEREFORE**, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra in an amount greater than $50,000.00 (exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

**COUNT ~~VI~~V—FRAUDULENT ~~MISREPRESENTATION~~ NON-DISCLOSURE**

2552. ~~588.~~ Plaintiff incorporates by reference paragraphs 1 through ~~511~~2487 as if fully set forth herein and further allege as follows.

2553. ~~589.~~ Each Defendant~~s, who engaged in the development, manufacture, marketing, sale and/or distribution of UPF~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, owed a duty to Plaintiff and other consumers to provide accurate and complete information regarding their UPF.

2554. ~~590.~~ Each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew or should have known that their UPF significantly increase~~s~~ the risk of Type 2 Diabetes and fatty liver disease in children, along with a range of other life-changing chronic illnesses. These risks were known to each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, or should have been known by each Defendant~~s~~, based on several decades of scientific literature and research. Nevertheless, each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, willfully deceived Plaintiff by concealing these facts from them, which Defendants had a duty to disclose.

2555. ~~591.~~ In addition to monitoring the evolving scientific literature, each Defendant~~s were~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, did or should have been testing their UPF to ensure they were not harmful to Plaintiff when used in their intended manner.

2556. ~~592.~~ At all relevant times, each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, conducted sales and marketing campaigns that willfully deceived Plaintiff and other consumers as to the benefits, health risks and consequences of using each Defendants' UPF.

441

2557. 593. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, fraudulently misrepresented the use of their UPF as safe, healthy, child-friendly, protective, and/or natural, including but not limited to the marketing assertions cited above. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, willfully and intentionally failed to disclose and concealed material facts, and made false representations regarding the dangers and safety concerns of the UPF.

2558. 594. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, concealed and suppressed the true facts concerning their UPF.

2559. 595. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew that these misrepresentations and/or omissions were material, and that they were false, incomplete, misleading, deceptive and/or deceitful when they were made.

2560. 596. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, made the misrepresentations and/or omissions for the purpose of deceiving and defrauding consumers, including Plaintiff, with the intention of having them act and rely on such misrepresentations and/or omissions.

2561. 597. Plaintiff relied, with reasonable justification, on the misrepresentations by each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, which induced them to purchase and use each Defendants' UPF on a regular and chronic basis. Plaintiff did not know about safety concerns with each Defendants' UPF at the time each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola,

442

PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, made their misrepresentations and/or omissions, and Plaintiff did not discover the true facts until after purchasing and using each Defendants' UPF, nor could they have done so with reasonable diligence. Had Plaintiff known the true facts, they would not have purchased or ingested each Defendants' UPF.

2562.    598. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, profited significantly from their unlawful conduct that fraudulently induced Plaintiff and other consumers to purchase dangerous and defective UPF.

2563.    599. Consumers, including Plaintiff, required, and should have been provided with, truthful, accurate, and correct information concerning the safety of each Defendants' UPF.

2564.    600. As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses for the rest of his life.

2565.    601. Each Defendants' conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

punitive or exemplary damages.

**WHEREFORE**, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive

damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra in an amount greater than $50,000.00 (exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

### COUNT VII—FRAUDULENT CONCEALMENT

2566. 602. Plaintiff incorporates by reference paragraphs 1 through 5112487 as if fully set forth herein and further allege as follows.

2567. 603. Each Defendants owed, including Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, owed its consumers, including Plaintiff, a duty to fully and accurately disclose all material facts regarding their UPF, not to conceal material defects in their UPF, not to place these defective UPF into the stream of commerce, and to fully and accurately label packaging of their UPF. To the contrary, each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, explicitly and/or implicitly represented that their UPF were safe for chronic ingestion.

2568. 604. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, fraudulently and deceptively concealed that theirits UPF were engineered to be addictive, engineered to be over-consumed, and cause increased risks of severe physical injuries in children, such as Type 2 Diabetes and fatty liver disease, in addition to other serious chronic illnesses.

2569. 605. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, had unique and private access to the

444

ingredients, manufacturing, development, design, production, research and/or testing of ~~their~~its UPF, and thus unique access to material facts regarding the safety of ~~their~~its UPF.

2570. ~~606.~~ Each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, fraudulently and deceptively concealed that they had not adequately researched or tested their UPF to assess their safety before placing their UPF on the market and promoting their UPF to children.

2571. ~~607.~~ At all relevant times, each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, committed a continuing fraud in obfuscating and failing to disclose such material facts, in whole or in part, to induce consumers, including Plaintiff, to purchase and use ~~Defendants'~~its UPF.

2572. ~~608.~~ Plaintiff did not and could not have discovered with reasonable diligence the true facts relating to the unsafe nature of each Defendant's~~'~~ UPF.

2573. ~~609.~~ Plaintiff reasonably relied on the facts revealed and representations made by each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, who negligently, recklessly, fraudulently, and/or purposefully concealed material facts about the dangers of ~~their~~its UPF.

2574. ~~610.~~ Each Defendant~~s~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, made these misrepresentations and/or omissions, including but not limited to those described in this Complaint, for the purpose of deceiving and defrauding Plaintiff with the intention of having Plaintiff act and rely on such misrepresentations and/or omissions.

2575. ~~611.~~ Each Defendant~~s knew that their~~, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, knew that its

445

concealments, misrepresentations, and/or omissions were material, and that they were false, incomplete, misleading, deceptive, and deceitful when they were made, and/or made the representations or concealment with such reckless disregard for the truth that knowledge of the falsity can be imputed to them.

2576. 612. Each Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, profited significantly from their unethical and illegal conduct that caused Plaintiff to purchase and ingest dangerous and defective UPF.

2577. 613. Each Defendant's concealment and misrepresentations, including those of Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, and Plaintiff justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

2578. 614. As a direct and proximate result of Plaintiff's reasonably anticipated use of each Defendant's UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages, and losses for the rest of his life.

2579. 615. Each Defendant's conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

**WHEREFORE**, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra in an amount greater than $50,000.00 (exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

<u>**COUNT VIII—VIOLATION OF UNFAIR TRADE PRACTICES & CONSUMER PROTECTION LAW**</u>

*(73 Pa. Stat. Ann. §§201-1 et seq.)*

2580. 616. Plaintiff incorporates by reference paragraphs 1 through 5112487 as if fully set forth herein and further allege as follows.

2581. 617. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra each engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of 73 Pa. Stat. Ann §§201-1 et seq. when they misled consumers regarding the safety risks associated with use of their UPF. As a direct result of each Defendant's deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff suffered and will continue to suffer economic loss, pecuniary loss, personal injury, loss of companionship and society, mental anguish, and other compensable injuries.

2582. 618. Each Defendants' deceptive, unfair, unlawful, and unconscionable practices included but were not limited to the following practices, done knowingly:

> a. t. representing that goods have characteristics, ingredients, uses or benefits that they do not have;
>
> b. u. advertising goods with the intent not to sell them as advertised;

447

c. v. representing that goods are of a particular standard, quality or grade if they are of another; and

d. w. engaging in fraudulent or deceptive conduct that creates a likelihood of confusion.

2583. 619. Plaintiff was injured by each Defendant's unlawful conduct, which was intended to through a pervasive pattern of false and misleading statements and omissions by targeting children and portraying their UPF as cool, fun, and safe food substances while misrepresenting or omitting concerns about their addictiveness, safety, and composition.

2584. 620. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra each have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion and sale of their UPF. Each Defendant's deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes.

2585. 621. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra actions and failure to act, including the false and misleading representations and omissions of material facts regarding the safety and potential risks of their UPF and the above described course of fraudulent conduct and fraudulent concealment constitute acts, uses or employment by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts with the intent that Plaintiff and other rely upon such concealment, suppression or omission of material facts in connection

with the sale of merchandise of Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra in violation of the consumer protection statutes listed above.

2586. 622. Each Defendant's' unfair and deceptive trade practices have caused injuries to consumers, and the public will benefit from a cessation of these unlawful actions through this litigation.

2587. 623. Plaintiff purchased and ingested Defendants' UPF and suffered injuries as a result of each Defendant's actions in violation of these consumer protection laws, including those of Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

2588. 624. Had Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra not engaged in the deceptive conduct described herein, Plaintiff would not have purchased or ingested Defendants' UPF sold by Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, and thereby would have avoided the injuries they suffered as a result of ingesting each Defendant's' UPF.

2589. 625. By reason of the unlawful acts engaged in by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, Plaintiff has suffered ascertainable loss and damages.

2590. 626. As a direct and proximate result of Plaintiff's reasonably anticipated use of Defendants' UPF as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra, Plaintiff suffered serious injury, harm,

449

damages, economic and non-economic loss and will continue to suffer such harm, damages and losses for the rest of his life.

2591. 627. Each Defendant's' conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages against Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

2592. 628. Due to the above, Defendants are liable to Plaintiff for compensatory, as well as exemplary, multiple, and/or punitive damages to the extent available and as applicable, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**WHEREFORE**, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra in an amount greater than $50,000.00 (exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

**COUNT IXVIII—UNJUST ENRICHMENT**

2593. 629. Plaintiff incorporates by reference paragraphs 1 through 5112487 as if fully set forth herein and further allege as follows.

2594. 630. At all relevant times, Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra designed, manufactured, assembled, inspected, labeled, marketed, advertised, promoted, supplied, distributed, sold, and/or

450

otherwise placed UPF into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiff.

2595. 631. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra created and implemented a plan to create a market for their UPF and substantially increase sales of their UPF through a pervasive pattern of false and misleading statements and omissions. Defendants' planThe plan of Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra was intended to portray their UPF as fun, cool and safe ingestible substances, with a particular emphasis on appealing to children, while misrepresenting or omitting key facts concerning the design, addictiveness, and safety of their UPF.

2596. 632. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra were unjustly enriched as a result of their wrongful conduct, including through the false and misleading marketing, promotions and advertisements that included the following non-exhaustive list of omissions regarding: (i) their UPF are engineered to be overconsumed; (ii) their UPF are engineered to have addictive qualities; (iii) ingesting their UPF poses unreasonable risks of substantial bodily injury; (iv) their UPF causes health risks independent of their labeled nutrient contents; (v) their UPF contains harmful and/or untested chemical additives and contaminants; (vi) their UPF contain dangerous and unnatural combinations of nutrients; (vii) ultra-processing causes human health risks.

2597. 633. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra by relying on

451

each Defendant's fraudulent representations, could not and did not know the effect that using UPF would have on Plaintiff's health.

2598. 634. As an intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra have profited and benefitted from payments Plaintiff and other consumers made for their UPF.

2599. 635. In exchange for the payments made for Defendants' UPF, at the time payments were made, Plaintiff expected that Defendants' UPF were safe to be ingested in the ways Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra represented and for the purposes Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra advertised their UPF. In exchange for their payments, Plaintiff believed they were receiving safe substances that could be ingested without risks of serious adverse health effects.

2600. 636. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra voluntarily accepted and retained these payments with full knowledge and awareness that, as a result of their wrongdoing, and awareness that, as a result of their wrongdoing, Plaintiff paid for each Defendant's UPF when they otherwise would not have done so. The failure of Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra to provide Plaintiff with the remuneration expected enriched Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra unjustly.

2601. 637. It is unjust to allow Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra to earn and retain revenues,

452

profits and benefits from their UPF while Plaintiff suffered and are suffering serious illnesses, including but not limited to Type 2 Diabetes, fatty liver disease, and other chronic illnesses.

2602. 638. Plaintiff are entitled to equity to seek restitution of Defendants' wrongful revenues, profits and benefits to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

**WHEREFORE**, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Defendants, Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra in an amount greater than $50,000.00 (exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

## COUNT XIX—CONSPIRACY

*(Against Defendants Kraft Heinz, Mondelez, Post Holdings, General Mills, Coca-Cola, & Mars)*

2603. 639. Plaintiff incorporates by reference paragraphs 1 through 6392602 as if fully set forth herein and further allege as follows.

2604. 640. This claim is brought by Plaintiff against Defendants Kraft Heinz, Mondelez, Post Holdings, General Mills, Coca-Cola, and Mars ("Conspiracy Defendants").

2605. 641. All Conspiracy Defendants entered into an agreement and/or combined to advance their financial interests by injuring Plaintiff. Specifically, the Conspiracy Defendants worked in concert to maintain and expand the UPF market and to ensure a steady and growing customer base. This included protecting and expanding their massive, ill-gotten share of the food market.

2606. 642. The Conspiracy Defendants sought to accomplish this objective by (1) engineering UPF that would be overconsumed; (2) engineering UPF that would have addictive qualities; (3) deceptively marketing, advertising, promoting and misbranding their UPF to consumers, including vulnerable children; (4) downplaying scientific and public concern that their UPF were harmful and causing health epidemics affecting Plaintiff and other vulnerable children; and (5) defrauding regulators and the public to advance their interests.

2607. 643. Plaintiff's ingestion of UPF was a primary objective of the Conspiracy. Conspiracy Defendants orchestrated efforts with a unity of purpose to drive UPF into children by way of unlawful conduct in marketing, promotion, manufacturing, designing and selling UPF that substantially contributed to the Plaintiff's injuries as alleged herein.

2608. 644. Conspiracy Defendants further conspired with one another by setting out to entice and lure children to consume increasing amounts of UPF as a wrongful, unlawful and tortious means to make a profit.

2609. 645. Despite having actual and constructive knowledge that their conduct was causing severe and incurable injuries in children, Conspiracy Defendants engaged in this Conspiracy with callous disregard for the health, safety and livelihood of Plaintiff and other children.

2610. 646. Despite this actual and constructive knowledge that each of the Conspiracy Defendants' actions were causing severe and incurable injuries in children, each Conspiracy Defendant withheld the truth about the consequences of their and their co-conspirators' actions, and concealed the harms caused by their and their co-conspirators' UPF.

2611. 647. Instead, Conspiracy Defendants established an ongoing relationship to actively conceal and obfuscate the truth about their and their co-conspirators' actions by, among

454

other things, denying and denouncing scientific and public concern about the harms of their UPF, delaying appropriate regulatory action to reduce the harms of their UPF, blaming their victims for the harms of their UPF, otherwise deflecting blame for the harms of their UPF, polluting the scientific literature with biased research to confuse the public about the harms of their UPF, utilizing biased experts and industry front groups to generate doubt about the harms of their UPF, seeking to enact laws shielding themselves and their co-conspirators from legal liability for the harms of their UPF, and attempting to fraudulently assuage concerns about their conduct by entering into illusory "self-regulation" or similar arrangements.

2612. 648. These and Conspiracy Defendants' other actions constitute a collaborative scheme to defraud and injure. As described above, the Conspiracy Defendants shared and acted on a common purpose of maintaining and expanding the amount of their UPF consumed by children in order to ensure a steady and growing customer base, including by maintaining and expanding Conspiracy Defendants' massive and ill-gotten share of the food market.

2613. 649. This conspiracy has been in existence for at least 25 years and continues to operate to this day.

2614. 650. During this time period, each Conspiracy Defendant transmitted deceptive, false and misleading marketing, promotions, and advertising to children through numerous channels. Despite having knowledge about deceptive, false and misleading nature of their and their co- conspirators' communications, and the harms caused by their UPF and their co-conspirator's UPF, each Conspiracy Defendant concealed these truths.

2615. 651. The Conspiracy Defendants devised and knowingly carried out material schemes and/or artifices to defraud the public, including Plaintiff, and regulators

455

2616. ~~652.~~ The Conspiracy Defendants intended the public and regulators to rely on these false transmissions and this scheme was therefore reasonably calculated to deceive individuals and deprive them of ordinary prudence and comprehension.

2617. ~~653.~~ Plaintiff was injured by the conspiracy, and their injuries would not have occurred but for the predicate acts of the Conspiracy Defendants. The combined effect of the Conspiracy Defendants' fraudulent acts included inducing Plaintiff to purchase and ingest UPF that they would not have purchased or ingested had they known that these UPF were addictive and toxic. As a result, Plaintiff suffered incurable life-long injuries, have suffered damages, and will continue to suffer damages for their rest of his life.

2618. ~~654.~~ Defendants' conduct was unlawful and was a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of Defendants' unlawful conspiracy.

2619. ~~655.~~ Defendants' conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

**WHEREFORE**, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Conspiracy Defendants, in an amount greater than $50,000.00 (exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

## COUNT ~~XIX~~—CONCERTED ACTION

*(Against Defendants Kraft Heinz, Mondelez, Post Holdings, General Mills, Coca-Cola, & Mars)*

2620. ~~656.~~ Plaintiff incorporates by reference paragraphs 1 through ~~656~~2619 as if fully set forth herein and further allege as follows.

2621. ~~657.~~ Conspiracy Defendants had actual and constructive knowledge that each co-~~co-~~conspirator's actions were unlawful, and violated the rights of children, including Plaintiff.

2622. ~~658.~~ Conspiracy Defendants had actual and constructive knowledge that their conduct was causing severe and incurable injuries in children,

2623. ~~659.~~ Nevertheless, each Conspiracy Defendant acted in concert with each other pursuant to a common design to conceal the truth about their and their co-conspirators' actions, and to conceal the harms caused by their and their co-conspirators' UPF.

2624. ~~660.~~ Additionally, each Conspiracy Defendant gave substantial assistance and encouragement to each other co-conspirator's unlawful conduct by, among other things, denying and denouncing scientific and public concern about the harms of their UPF, delaying appropriate regulatory action to reduce the harms of their UPF, blaming their victims for the harms of their UPF, otherwise deflecting blame for the harms of their UPF, polluting the scientific literature with biased research to confuse the public about the harms of their UPF, utilizing biased experts and industry front groups to generate doubt about the harms of their UPF, seeking to enact laws shielding themselves and their co-conspirators from legal liability for the harms of their UPF, and attempting to fraudulently assuage concerns about their conduct by entering into illusory "self-~~self-~~regulation" or similar arrangements.

2625. ~~661.~~ In so doing, Conspiracy Defendants each gave substantial assistance to each other Conspiracy Defendant in order to increase sales and ingestion of UPF by children.

457

Conspiracy Defendants did this despite having actual and constructive knowledge that such sales and exposures would cause serious and incurable injuries to children, including Plaintiff.

2626. 662. Plaintiff was injured by these Concerted Actions, and their injuries would not have occurred but for the predicate acts of the Conspiracy Defendants. The combined effect of the Conspiracy Defendants' fraudulent acts included inducing Plaintiff to purchase and ingest UPF that they would not have purchased or ingested had they known that these UPF were addictive and toxic. As a result, Plaintiff suffered incurable life-long injuries, have suffered damages, and will continue to suffer damages for their rest of his life.

2627. 663. Defendants' concerted conduct was unlawful and was a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of Defendants' unlawful concerted action.

2628. 664. Defendants' conduct with respect to their design, promotion and sale of their UPF to Plaintiff and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

**WHEREFORE**, Plaintiff hereby seeks all damages allowed under the laws of the Commonwealth of Pennsylvania, including compensatory damages, economic damages, punitive damages, statutory damages, fees and costs, interest, and all other relief that this Court deems just and proper, from the Conspiracy Defendants, in an amount greater than $50,000.00 (exclusive of fees and costs), under the applicable statutes of the Commonwealth of Pennsylvania and the Local Rules of Court.

## ALLEGATIONS PERTAINING TO PUNITIVE DAMAGES

2629. 665. Plaintiff incorporates by reference paragraphs 1 through 6652628 as if fully set forth herein and further allege as follows.

2630. 666. The acts and omissions of Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra as alleged throughout this Complaint were willful, wanton and malicious. Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra committed these acts with a conscious disregard for the rights, health and safety of Plaintiff and other consumers/users of Defendants' UPF, for the primary purpose of increasing Defendants' profits from the sale and distribution of their UPF. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra in an amount appropriate to punish and make an example of Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra.

2631. 667. Each Defendant's willful, wanton, malicious, and/or reckless acts include the foregoing allegations, including but not limited to:

       a. a.   Failing to disclose, or warn of, concealing, and/or suppressing material facts regarding the dangers and serious safety concerns of Defendants' UPF to Plaintiff, consumers, and the public;

       b. b.   Making false and deceptive representations that Defendants' UPF could be used safely for their ordinary and intended purposes, including frequent and chronic ingestion by children, for the purpose of deceiving and lulling Plaintiff and other consumers into purchasing and ingesting Defendants' UPF without knowledge of their risks;

       c. c.   Falsely representing the qualities and characteristics of Defendants' UPF and their safety to Plaintiff, other consumers, and the public;

459

d. d.   Knowingly subjecting Plaintiff and all purchasers and users of Defendants' UPF to a substantial and unreasonable risk of serious lifelong illness, for the purpose of enhancing Defendants' profits; and

e. e.   Intentionally targeting children, including black and Hispanic children, with deceptive, unfair, and fraudulent promotion and marketing campaigns to induce them to purchase and ingest their UPF without warning of their dangers;

**WHEREFORE**, Plaintiff demands judgment against Defendants Kraft Heinz, Mondelez, Post Holdings, Coca-Cola, PepsiCo, General Mills, Nestle, Kellogg's, Mars and Conagra on each of the above-referenced.

A.   Awarding compensatory damages, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

B.   Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, lost earning capacity and other economic damages in an amount to be determined at trial of this action;

C.   Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff in an amount sufficient to punish Defendants and deter similar conduct;

D.   Statutory damages including treble damages;

E.   Pre-judgement interest;

F.   Post judgement interest;

G.   Awarding Plaintiff reasonable attorney's fees;

H.   Awarding Plaintiff the costs of these proceedings; and

I.   Such other and further relief as this Court deems just and proper.

**FILED:** Dated December 10September 22, 20245

**Respectfully submitted, MORGAN & MORGAN**

Respectfully submitted,

MORGAN & MORGAN

By: _____

K. Clancy Boylan, Esq.
ID No. 314117
cboylan@forthepeople.com
**MORGAN & MORGAN**
2005 Market Street, St. 350
Philadelphia, PA 19103
(215) 446-9795
(215) 446-9799 (Fax)

T. MICHAEL MORGAN*
FL Bar No. 62229
mmorgan@ForThePeople.com
**MORGAN & MORGAN, P.A.**
20 N Orange Ave., Suite 1600
Orlando, FL 32801
P: (407) 418-2031
F: (407) 245-3384

RENE F. ROCHA*
LA Bar No. 34411
**MORGAN & MORGAN, COMPLEX
LITIGATION GROUP**
400 Poydras Street, Suite 1515
New Orleans, LA 70130
rrocha@ForThePeople.com
P: (954) 318-0268
F: (954) 327-3018

CHRISTOPHER A. SEEGER*
NJ Bar No. 042631990
PARVIN K. AMINOLROAYA*
NJ Bar No. 028492008
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, NJ 07660
212-584-0700
212-584-0799 (fax)
cseeger@seegerweiss.com

461

dbuchanan@seegerweiss.com
paminolroaya@seegerweiss.com

FRAZAR THOMAS
ID No. 325478
DAVE BUCHANAN
ID No. 320392
**SEEGER WEISS LLP**
325 Chestnut Street
Suite 917
Philadelphia, PA 19106
fthomas@seegerweiss.com
T 973-639-9100
F 973-679-8656

FRANK PETOSA*
FL Bar No. 972754
**MORGAN & MORGAN, COMPLEX
LITIGATION GROUP**
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P: (954) 318-0268
F: (954) 327-3018

*Attorneys for Plaintiff*

*\*Pending Admission Pro Hac Vice*

By:    */s/ K. Clancy Boylan, Esq.*
K. Clancy Boylan, Esq.
ID No. 314117
cboylan@forthepeople.com

**MORGAN & MORGAN**
2005 Market Street, St. 350
Philadelphia, PA 19103
(215) 446-9795
(215) 446-9799 (Fax)
T. MICHAEL MORGAN* FL Bar No. 62229
mmorgan@ForThePeople.com

**MORGAN & MORGAN, P.A.**
20 N Orange Ave., Suite 1600
Orlando, FL 32801

462

P: (407) 418-2031
F: (407) 245-3384
RENE F. ROCHA* LA Bar No. 34411

**MORGAN & MORGAN, COMPLEX LITIGATION GROUP**
400 Poydras Street, Suite 1515 New Orleans, LA 70130 rrocha@ForThePeople.com
P: (954) 318-0268
F: (954) 327-3018
CHRISTOPHER A. SEEGER* NJ Bar No. 042631990
PARVIN K. AMINOLROAYA* NJ Bar No. 028492008

**SEEGER WEISS LLP**
55 Challenger Road Ridgefield Park, NJ 07660
212-584-0700
212-584-0799 (fax)
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
paminolroaya@seegerweiss.com
FRAZAR THOMAS ID No. 325478 DAVE BUCHANAN ID No. 320392

**SEEGER WEISS LLP**
325 Chestnut Street
Suite 917
Philadelphia, PA 19106
fthomas@seegerweiss.com T 973-639-9100
F 973-679-8656
FRANK PETOSA* FL Bar No. 972754

**MORGAN & MORGAN, COMPLEX LITIGATION GROUP**
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com P: (954) 318-0268
F: (954) 327-3018
*Attorneys for Plaintiff*
*\*Admitted Pro Hac Vice*

463