## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRYCE MARTINEZ,** | : | **CIVIL ACTION** |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **NO. 2:25-cv-00377** |
| **KRAFT HEINZ COMPANY, INC.,** | : | |
| **MONDELEZ INTERNATIONAL, INC.,** | : | |
| **POST HOLDINGS, INC., THE COCO-** | : | |
| **COLA COMPANY, PEPSICO, INC.,** | : | |
| **GENERAL MILLS, INC., NESTLE USA,** | : | |
| **INC., KELLANOVA, WK KELLOGG CO,** | : | |
| **MARS INCORPORATED, INC.,** | : | |
| **CONAGRA BRANDS, INC.** | : | |
| | : | |
| Defendants. | : | |
| | : | |

**Perez, J.**                                                                      **June 30, 2026**

### <u>MEMORANDUM</u>

Bryce Martinez brought this suit alleging eleven producers of Ultra Processed Foods (UPFs) caused him to develop Type 2 Diabetes (T2D) and Non-Alcoholic Fatty Liver Disease (NAFLD) at sixteen years old. In short, he alleges Defendants The Kraft Heinz Company, Mondelēz International, Inc., Post Holdings, Inc. ("Post Holdings"), The Coca-Cola Company ("Coca-Cola"), PepsiCo, Inc. ("PepsiCo"), General Mills, Inc. ("General Mills"), Nestlé USA, Inc. ("Nestlé"), Kellanova, WK Kellogg Co. ("Kellogg"), Mars, Incorporated ("Mars"), and ConAgra Brands, Inc. ("Conagra") produced unreasonably dangerous food products and failed to warn customers of known risks associated with UPFs.

This Court previously dismissed Martinez's Complaint because it failed to establish how consumption of Defendants' UPFs caused Martinez's specific injuries. Following dismissal,

1

Martinez moved to amend his complaint, attaching a proposed First Amended Complaint (FAC). Mot. Amend, ECF No. 148.

The FAC brings eight counts against all defendants: negligence (Count I), failure to warn (Count II), breach of implied warranty (Count III), negligent misrepresentation (Count IV), fraudulent non-disclosure (Count V), fraudulent concealment (Count VI), unfair trade practices (Count VII), and unjust enrichment (Count VIII). Martinez brings two claims against only certain defendants: conspiracy (Count IX), and concerted action in furthering the conspiracy (Count X). FAC, ECF No. 148-2.

Martinez alleges a correlation between increasing rates of childhood T2D and NAFLD and rates of UPF consumption. Historically, diseases like T2D and NAFLD were only found in adult patients,[1] and he alleges the rise of the UPF industry since the 1980s to be responsible for the corresponding rise of pediatric diagnoses in that time. ECF No. 148-2, ¶¶ 4-6. The FAC shows a concerning correlation between the rise of the UPF industry and pediatric illness.[2] However, Pennsylvania law requires more than correlation—it requires causation. The correlation between the rise in UPFs and the rise in childhood T2D and NAFLD does not amount to causation attributable to each of the 179 products Martinez consumed.

Martinez's FAC again fails to establish that each of the 179 products named necessarily contributed to his injuries, as is required to establish causation at the pleading stage. The Court must therefore deny Martinez's Motion for Leave to Amend.

---

[1] *E.g.*, ECF No. 148-2 ¶ 5 (citing Heather J. Dean & Elizabeth Sellers, *Children Have Type 2 Diabetes Too: An Historical Perspective*, Biochem. & Cell Biology (2015); and Ariana Eunjung Cha, *Fatty Liver Disease Rising in U.S. Kids as Ultra-Processed Diets Surge*, Washington Post, Oct. 3, 2023).

[2] *See id.* ¶¶ 16–23 (describing surges in sales of UPFs which correlate to large increases in certain diseases like diabetes, heart disease, and NAFLD and stating that UPFs increase the risks of each, not only because of their nutrient profiles but also because of the fact that they are ultra-processed), ¶ 65 (listing diseases for which UPFs significantly increase risks as shown by scientific studies).

I.      **Factual Background**[3]

Bryce Martinez, now approximately twenty years old,[4] was first diagnosed with T2D and NAFLD at 16 years old after having regularly consumed 179 UPFs made by Defendants between 2009 and 2021. ECF No. 148-2 ¶¶ 568–2487. Martinez further alleges that UPFs are inherently defective and dangerous and identifies varying harmful substances within each of the products. For each product, the FAC contains a series of identical or near-identical allegations purporting to establish causation.

For example, Martinez allegedly consumed Kraft Singles American Cheese slices multiple times per week between 2009 and 2021. *Id.* ¶ 569. As is the case for all of the 179 products listed, the FAC alleges that "consumption of UPF, including Kraft Singles . . . , significantly increases the risk of [T2D] and [NAFLD]." *Id.* ¶ 571. The next paragraph states that "it is biologically plausible that the ultra-processing of Kraft Singles . . . significantly increases the risk of [T2D] and [NAFLD]" *Id.* ¶ 572. The FAC then identifies ingredients in Kraft Singles which "have been found to be associated with increased risks" of T2D and NAFLD, such as modified food starch and phosphate-based additives. *Id.* ¶ 573. For different products, the FAC lists different ingredients that are allegedly harmful. *E.g., id.* ¶¶ 607 (Oscar Mayer Bologna Sliced Lunch Meat contains emulsifiers, nitrites, phosphate-based additives and hidden sugars), 651 (Capri Sun Fruit Punch Juice Drink contains citric acid, added flavors, and hidden sugars), 730 (Philadelphia Original Cream Cheese Spread contains xanthan gum, carob bean gum, and guar gum). Regardless of which ingredient is named, they all allegedly "drive internal dysbiosis and systemic inflammation, thus

---

[3] This Memorandum accepts the FAC's well-pled factual allegations as true.

[4] The FAC provides little biographical information about Martinez. The Court has inferred that Martinez was born around 2006 from statements made by Plaintiff's counsel during Oral Argument on August 1, 2025. ECF No. 144 at 33:6-7.

desensitizing insulin receptor signaling and affecting numerous organ systems including the liver." *See, e.g.*, *id.* ¶¶ 573, 584, 595, 1180, 1594, 1615. Some products include a further note on findings more related to the specific harmful ingredients named. *See, e.g.*, *id.* ¶¶ 1434 (noting that "additives [such as maltodextrin in Starbucks Frappuccino Caramel, Bottled] have been linked to histopathological and cellular changes in the liver, liver dysfunction, elevated liver enzymes, oxidative stress, and gut dysbiosis"), 1087 (adding that the BHT found in Honey Bunches of Oats cereal, "is also an endocrine disrupting chemical").

Products that are packaged in plastic wrapping hold the additional potential for "contamination with endocrine disrupting chemicals," which may also be formed during ultra processing. *Id.* ¶ 574. Finally, Martinez contends that Defendants intentionally created products that "promot[e] subconscious overconsumption" by way of both the biological response to UPF consumption and the explicit marketing strategies implemented by Defendants. *E.g.*, *id.* ¶¶ 575–578, 1436–38.

Within the FAC's almost 2,000 paragraphs that are intended to establish cause, there are very few distinctions made between each of the products consumed. Of the 179 products named, 144 were consumed multiple times per month, 34 were consumed multiple times per week, and one was consumed daily. *See* Chart of UPF Consumed by Martinez, Ex. 1 to Pl.'s Reply Supp. Mot. Amend, ECF No. 152-1. While the harmful component in each product differs, the purported harm is the same. In other words, regardless of whether the FAC identifies citric acid, nitrates, or hidden sugars as the harmful component of a product, they all "drive internal dysbiosis and systemic inflammation, thus desensitizing insulin receptor signaling and affecting numerous organ systems including the liver." *See* ECF No. 148-2 ¶¶ 584 (Kraft Original Mac & Cheese Macaroni

and Cheese Dinner), 607 (Oscar Mayer Bologna Sliced Lunch Meat), and 815 (Jet-Puffed Marshmallows).

The FAC also suggests that, in addition to the additives or ingredients, the processing techniques used to produce UPFs are dangerous. *See id.* ¶ 77. For example, ultra-processing disrupts nutrient balance in a way that human metabolism cannot properly process. *Id.* ¶ 88. Yet the FAC provides no product-specific information with respect to preparation—*e.g.*, whether the processes are the same across products or defendants or how the processes for each may differ.

## II.    Procedural History

Martinez initiated this case in the Court of Common Pleas of Philadelphia County on December 10, 2024. ECF No. 1 ¶ 1. On January 22, 2025, Defendant Kraft Heinz removed the case to federal court. Not. Removal, ECF No. 1. On March 31, 2025, Defendants jointly moved to dismiss the Complaint for improper group pleading and failure to state a claim. ECF No. 117. The Court heard oral arguments on the first motion to dismiss on August 1, 2025. ECF No. 144.

On August 25, 2025, this Court dismissed the Complaint for lack of cause, explaining that it failed to identify any specific products consumed by Martinez, when or how they were consumed, or how that consumption relates to Martinez's diagnoses. ECF No. 146 at 3. The Court found that Martinez had taken a "shotgun approach" which unduly burdened Defendants, failed to identify "who is responsible for what," and ran "contrary to Rule 8's basic pleading requirements." ECF No. 146 at 6–7. This Court declined to address additional arguments about the viability of individual claims, as lack of causation required dismissal of all claims. ECF 146 at 7.

On September 22, 2025, Martinez filed the instant motion, along with the proposed FAC. ECF No. 148. Defendants responded in opposition on October 27, 2025, arguing that the motion was unduly delayed and that the FAC failed to cure the causal deficiencies previously identified

5

by the Court. ECF No. 151. On November 13, 2025, Martinez responded in support of the Motion to Amend. ECF No. 152. Martinez's Motion is now ripe for review.

### III.    Legal Standard

Under Rule 15 of the Federal Rules of Civil Procedure, a party may amend its pleading with the court's leave, which should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). To determine whether to grant leave to amend, courts consider the following factors: "undue delay, bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; prejudice to the opposing party; and futility." *Mullin v. Balicki*, 875 F.3d 140, 149 (3d Cir. 2017); *see also Foman v. Davis*, 371 U.S. 178, 230 (1962). Of these, "prejudice to the non-moving party is the touchstone for the denial of an amendment." *Mullin*, 875 F.3d at 150. These factors are not limiting, and courts may consider other circumstances, including the burden placed on the court. *Id.* at 149-50.

Undue delay is implicated when the court has reason to believe that a movant could have acted sooner but delayed. *Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 225 (E.D. Pa. 2012). There is no specific time frame for assessing undue delay, but courts look to the "movant's reasons for not amending sooner," and whether they may have been acting in bad faith or attempting a tactical move. *Id.* Meanwhile, amendment is futile if the amended complaint cannot withstand a renewed motion to dismiss. *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000). Additionally, "[l]eave to amend has been denied when the moving party knew about the facts on which the proposed amendment was based but omitted the necessary allegations from the original pleading." 6 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1488 (3d ed. 2025); *see also Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006).

6

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires dismissal of a complaint that fails to state a claim. A complaint must contain sufficient factual material that, when accepted as true and considered in the light most favorable to the plaintiff, states a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Lewis v. Atlas Van Lines,* 542 F.3d 403, 405 (3d Cir. 2008). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] formulaic recitation of the elements of a cause of action will not do . . . [A] complaint's factual allegations must be enough to raise a right to relief above the speculative level." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231–32 (3d Cir. 2008) (citation modified).

## IV.    Discussion

UPFs have become pantry and refrigerator staples for families across the country, for reasons as varied as the products themselves. They are often more affordable than non-processed foods, widely available across vendors, quick to prepare, and their consistency and predictability can be appealing. Additionally, Plaintiff alleges Defendants intentionally engineer UPFs to be overconsumed, addictive and irresistible and "to hack the physiological structures of our brains." More concerning, the FAC states, Defendants have followed the blueprint established by Big Tobacco companies, specifically marketing their products to children. Cumulatively, these features have normalized UPFs in the American diet and make them difficult for the average consumer to avoid. In today's modern and commercialized food industry, these products occupy a central place in everyday life, particularly for consumers with limited options for groceries.

Despite federal educational efforts to advocate for healthful living over the decades[5] and alleged bountiful research evidencing the harmful effects of processing foods,[6] UPFs are not, themselves, a regulated class of products within the law. In other words, UPFs and their producers are held to the same legal standards as any other food products, processed or not. Accordingly, a plaintiff seeking to hold producers of food liable in tort must show the products they consumed caused the harm they suffered. This creates a unique challenge for plaintiffs, like Martinez, who consume a large number of products over a lengthy period of time. Martinez casts a wide net in seeking to hold numerous food producers liable for illnesses resulting from his consumption of nearly two hundred products over the course of multiple years. Pennsylvania courts have not recognized industry-wide liability for plaintiffs in these circumstances. Such liability is severely limited to "when an injury is caused by one of several known manufacturers, where the precise manufacturer is unidentified and where the manufacturers together adhere to an unreasonable safety standard regarding their product." *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 970 (Pa. Super. Ct. 1985). Those principles do not apply here.

### A.    The Motion to Amend is Not Unduly Delayed.

Delay "becomes 'undue,' and thereby creates grounds for the district court to refuse leave, when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend." *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008). However, this standard is typically applied in far more extreme circumstances than those before the Court today. In *Bjorgung,* for example, the plaintiff waited over three years between being put

---

[5] *See* History of the Council, Office of Disease Prevention & Health Promotion, History of the Council | odphp.health.gov (last updated May 29, 2026).

[6] *See* ECF No. 148-2 ¶¶ 64–89 (citing scientific studies).

on notice of the pleading deficiencies and attempting to amend, at which point the discovery window had opened and closed and the court was prepared to issue a final decision. *Id.* at 266–67. There, amendment was unduly delayed because reopening the discovery period would have heavily burdened the defendants, and retrying the case from the discovery stage far exceeded the limits of judicial leniency. *Id.* at 267. By contrast, in *Mullin v. Balicki*—where an attorney realized that her previously dismissed complaint lacked crucial information as the result of a clerical error—the court explained that in cases where amendment would not "put the defendants back at square one or perpetuate an infinite cycle," it may be appropriate to grant leave. 875 F.3d 140, 157 (3d Cir. 2017).[7]

The FAC was filed in accordance with Fed. R. Civ. P. 59(e), which allows 28 days to file a motion to alter or amend a judgment after it is issued. Defendants argue the FAC is unduly delayed because Martinez knew of the newly alleged facts when the Complaint was filed and when Defendants put him on notice of the Complaint's deficiencies in the first motion to dismiss. ECF No. 151 at 6. The Third Circuit agrees that the lack of newly available information is one factor to consider. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir. 2004). Alone, however, this is not a determinative factor. *Synthes*, 281 F.R.D. at 225–26. *Synthes* emphasized that two questions are relevant to determining undue delay: (1) *why* Martinez waited to amend his complaint, and (2) whether allowing leave to amend would prejudice or unduly burden Defendants. *Id.* at 226. The Third Circuit declines to reward "wait-and-see" gamesmanship where a plaintiff expresses a willingness and ability to amend but waits to see the outcome of a motion to dismiss first. *Jang v.*

---

[7] The nature of *Mullin* as a civil rights case distinguishes it from the present case, as the court "must offer amendment [in civil rights cases]—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Id.* (citing *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007)). However, this distinction is immaterial because the Court need not allow amendment, even under the civil rights standard, when amendment would be futile.

*Boston Sci. Scimed, Inc.*, 729 F.3d 357, 368 (3d Cir. 2013). This rule, however, is generally limited to cases where there is observable gamesmanship behavior. *See id.*; *see also* <u>United States ex rel. Sirls v. Kindred Healthcare, Inc.</u>, 536 F. Supp. 3d 1 (E.D. Pa. 2021) 1, 6 (E.D. Pa. 2021) (denying motion for leave to file *third* amended complaint where plaintiff had a history of demonstrably using a "wait and see" approach).

Nonetheless, waiting for a ruling on the first motion to dismiss before moving to amend in this case does not weigh heavily enough to defeat Rule 15's "freely give leave" command. Although Martinez offers no explanation for the delay, the Court declines to rule on this basis. First, this is Martinez's first request for amendment, and he moves for leave to amend before the start of discovery or trial. *Cf. Bjorgung*, 550 F.3d at 267 (denying leave to amend after discovery was substantially completed); *James v. Watt*, 716 F.2d 71, 77 (1st Cir. 1983) (denying leave to amend after trial). In doing so, the scope of any additional burden extends only to the point of ruling on this particular issue. Martinez has also exhibited no gamesmanship in moving for leave to amend for the first time after this Court's ruling on the motion to dismiss.

Additionally, even if Martinez had moved to amend before this Court ruled on the motion to dismiss, Defendants would have taken the same steps to oppose it or move for dismissal. The burden on Defendants is not increased by Martinez's timing.

## B. Amendment Would Be Futile.

Amendment would be futile because the FAC would not withstand a motion to dismiss. *See Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000). In dismissing the original complaint, this Court asked Martinez to "show that it was his consumption of these brands . . . that led to his disease." ECF No. 147 at 3. Even while accepting all non-conclusory statements in the FAC as

true, Martinez still fails to establish that each or all Defendants independently contributed to his diagnosis.

Tort claims like Martinez's require a showing of both general and specific causation. *Hoefling v. U.S. Smokeless Tobacco Co., LLC*, 576 F. Supp. 3d 262, 270 (E.D. Pa. 2021). This means that it must be possible, generally, for the product to cause the kind of harm that is being discussed (general causation), and that the product actually, specifically caused the plaintiff's harm (specific causation). *Id.* Either way, the plaintiff must show that but for the defendant's wrongful conduct, he would not have been harmed.

### 1. The FAC Fails to Establish Specific (But-For) Causation.

But-for causation is established when the harm would not have happened "but for" the cause in question. *Bostock v. Clayton Cty.,* 590 U.S. 644, 656 (2020). Courts examine this element by asking, if by changing one thing at a time, does the outcome change? *Id*. "If it does, we have found a but-for cause." *Id.* A "kitchen-sink pleading asserting every defect theory imaginable" is insufficient because it establishes only the possibility of cause. *Heckman v. Samsung Electronics America, Inc*., 803 F. Supp. 3d 312, 319 (E.D. Pa. 2025).

Martinez contends that each named product "significantly increases the risks" of T2D and NAFLD, stating that "it is biologically plausible that the ultra-processing of [PRODUCT NAME] significantly increases the risks." *E.g.*, ECF No. 148-2 ¶¶ 571–72, 582–83, 593–94. These statements are each followed by allegations that "there is extensive experimental evidence that the ultra-processing of this product results in a product with many properties that increase the risk of [T2D and NAFLD]. For example, [PRODUCT NAME] contained additives like [FOOD ADDITIVES], which have been found to be associated with increased risks of [T2D and NAFLD]" *E.g.*, *id.* ¶¶ 573, 584, 595. Accepting those allegations as true, the FAC may plausibly allege that

UPFs, or certain ingredients within them, are generally capable of increasing the risk of T2D and NAFLD. However, allegations of increased risk, biological plausibility, and association do not show that any particular product—or any particular Defendant's product—actually caused Martinez's diagnoses.

This is so because if the Court removes one or more Defendants or one or more products, it cannot be said that Martinez would not have developed T2D or NAFLD. *See Bostock*, 590 U.S. at 656. Notably, Martinez does not argue otherwise. He instead speaks in generalities of "unique" and "increased" "risks." ECF No. 148-2 ¶¶ 571, 2493(a)-(i). This is insufficient to survive the but-for test.

Martinez's additional argument, grounded in the fact that childhood T2D and NAFLD began appearing in recorded history around the same time that UPFs hit the market, fares no better. These allegations certainly show correlation, but it is well established that correlation is not causation. *See City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 710 (3d Cir. 2022). That childhood T2D and NAFLD diagnoses have increased with the prevalence of UPFs says nothing of Martinez's own path to diagnosis.

Martinez's reliance on *Gray v. Abbott Laboratories* is misplaced. There, an infant became ill immediately after consuming baby formula, which had already been recalled due to insect contamination. *Gray v. Abbott Lab'ys*, No. 10 cv 6377, 2011 WL 3022274 (N.D. Ill. July 22, 2011). The "immediate" temporal connection between the infant's consumption of the recalled formula satisfied the court of the plausibility of the claim that the contaminated formula caused his illness. *Id.* at *3. By contrast, Martinez alleges he consumed UPFs over twelve years before developing T2D and NAFLD. Additionally, in *Gray*, the infant had consumed one (or possibly several) defective products all produced by the same defendant in the same location around the same time,

12

*id.* at *2, whereas Martinez consumed 179 products produced by multiple defendants over a period of more than a decade.

Specific cause is a necessary element to establish a right to relief in product liability actions, regardless of whether they're brought under a theory of negligence, strict liability, or misrepresentation. *Heckman,* 803 F. Supp. 3d at 324. Martinez's failure to establish but-for causation constrains the Court to deny leave to amend unless a theory of industry-wide liability applies.

### 2.    There Is No Applicable Theory of Liability.

Martinez asks the court to apply the alternative joint liability doctrine, which allows for recovery in cases where it is impossible to determine which defendant was ultimately the cause of harm. No. 148-1 at 4. This argument fails for two reasons: first, the Third Circuit has consistently rejected this theory in cases like the present, and second, because Martinez misapplies the doctrine.

Alternative liability applies when multiple defendants acted tortiously and "it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one." *City of Phila. v. Lead Indus. Ass'n*, 994 F.2d 112, 127–28 (3d Cir. 1993) (quoting Restatement (Second) of Torts § 433B(3)(1965)). This theory of liability was established in the foundational case, *Summers v. Tice,* where a plaintiff was struck in the eye by the pellet from the gun of one of two negligent defendants, but could not identify which. 199 P.2d 1, 1–2 (Cal. 1948). The plaintiff was able to demonstrate that each of the defendants was acting negligently, regardless of whether he was actually the shooter. *Id* at 2–3. The court found that to disallow the plaintiff access to a judicial remedy would have been a clear miscarriage of justice because it would exonerate both defendants from liability, despite the fact that both acted negligently. *Id.* at 4. The court's solution

was to shift the burden onto the defendants. *Id.* Rather than requiring the plaintiff to identify a specific shooter, it required each defendant to show that it was not he who shot the bullet. *Id.*

The doctrine applies only where multiple actors have engaged in tortious behavior and it is proven that the harm was caused *by only one* but there is uncertainty as to which. *Swartzbauer v. Lead Indus. Ass'n*, 794 F. Supp. 142, 146 (E.D. Pa. 1992) (quoting Restatement (Second) of Torts § 433B(3)). In other words, this doctrine exists to redress harms caused by *one* defendant from within a comprehensive, but otherwise limited, pool of potential harm-doers, only when determining fault is otherwise impossible.

The Pennsylvania Supreme Court first adopted the Second Restatement of Torts' definition of alternative liability in 1970, in a case where a plaintiff was struck in the eye by a rock when she and fellow children were playing at a construction site. *Snoparsky v. Baer*, 266 A.2d 707, 708–09 (Pa. 1970). The court held that the plaintiff could establish the requisite circumstances to invoke the alternative liability doctrine merely by alleging the tortious behavior of each child, regardless of whether the rock they personally threw struck the plaintiff. *Id.* at 709.

Martinez's harm is quite different than that in *Summers* or *Snoparsky*. When an individual is struck by a projectile, there is no question as to the cause or extent of the resulting harm. This is not the case in injuries like those experienced by Martinez, where the harm is cumulative and slow to be identified. Unlike plaintiffs who can identify the exact moment the harm occurred, Martinez provides only an estimated time frame in which the UPFs consumed are believed to have contributed to his diagnoses. Additionally, while those plaintiffs could affirmatively state that their injuries were not exacerbated by any non-party entity, Martinez cannot.

*Klein v. Council of Chemical Associations* is more akin to the instant case. 587 F. Supp. 213 (E.D. Pa. 1984). There, the plaintiffs sued eleven defendants who had produced or sold

14

chemical products used in the print industry, which they contended caused them to contract bladder cancer after exposure to air-borne carcinogens over a fifty-year period. *Id.* at 216. The court dismissed the complaint because it found that the plaintiff was unable to identify which specific products caused his injury. *Id.* at 221. Though he could name the products he'd used during his career, those products did not come labelled with specific ingredients, so the specificity of his allegations was limited to his ability to identify general trends within the print industry. *Id.* at 222. Like the plaintiffs in *Klein*, Martinez alleges that his consumption of a class of products is the cause of his illness, and neither Klein nor Martinez can draw a direct line between the presence of a harmful ingredient and their diagnosis. Martinez's ability to identify 179 of those products does not change this analysis. Alternative liability does not apply where actual cause has not or cannot be established, so the burden does *not* shift to Defendants to disprove their liability. *Klein*, 587 F. Supp. at 221.

Martinez cannot invoke the alternative joint liability doctrine for the additional reason that Defendants' products each contain different harmful chemicals, and nowhere does Martinez allege each Defendant was equally responsible for his diagnoses. Alternative liability is appropriate when four factors are present: (1) the plaintiff, through no fault of his own, cannot identify which defendant manufactured the harmful substance; (2) the plaintiff joins manufacturers representing "substantially all" of the market; (3) all of the defendants allegedly engaged in the same wrongful conduct; and (4) all of the defendants' harmful products are identical and share the same defective qualities. *Erlich v. Abbott Laboratories,* 5 Phila. 249, 251 (Phila. Ct. Com. Pls. 1981).

In *Erlich*, for example, the plaintiff developed cancer as an adult after her mother consumed Diethylstilbestrol (DES) while she was pregnant. *Id.* at 252–53. The plaintiff could not identify the specific producer of the DES through no fault of her own, but she joined DES manufacturers

15

representing substantially all of the market and each manufacturer produced the same harmful product, thereby engaging in the same wrongful conduct. *Id.* at 254–55. Unlike the instant case, there was no confusion as to what product caused Erlich's harm (the DES pills consumed by her mother while pregnant), nor was there any reasonable possibility that any outside force might have exacerbated the harm. *Id.* at 253–54. The unknown factor there was which of the several specific manufacturers produced the pill actually consumed by Erlich's mother. *Id.* at 254–55. By contrast, Martinez knows which manufacturers created the products he has consumed and has supplied a detailed account to that effect. However, nowhere does the FAC suggest that each of the 179 named products are equally as harmful as the others,[8] and the allegations imply varying quantities and types of harmful ingredients, indicating varying levels of danger. To believe that each could be identically harmful without any additional information would require a significant logical leap on the part of the Court that it is not able to make, given Pennsylvania's hesitance to expand the alternative liability doctrine beyond those involving identical products.

Martinez's claims fail under a market share theory of liability for the same reasons. Market share liability was developed to address cases involving fungible products where the plaintiff cannot determine which manufacturer specifically caused his harm, but all named defendants are potential tortfeasors and cumulatively manufactured "a substantial percentage" of the defective products in the marketplace. *Sindell v. Abbott Labs.*, 607 P.2d 924, 937 (1980). "Under this approach, each manufacturer's liability would approximate its responsibility for the injuries caused

---

[8] The FAC does use identical language to describe danger in some paragraphs, but those dangers are vague and not directly related to T2D or NAFLD except through additional inference. For example, the "unnatural combinations and concentrations of drivers of addictive responses" in all named products, including Kraft American Cheese, "stimulate responses, such as dopamine release via distinct gut-brain pathways, that are unique to ultra-processed foods. . . . This in turn leads to inflammation, increased accumulation of fat in the liver, increased insulin secretion, increased insulin resistance, and metabolic dysregulation." ECF No. 148-2 ¶ 577. Regardless of similar or identical language, the standard for liability that products be fungible is not met.

16

by its own products." *Id.* For market share liability to apply, a plaintiff must: (1) establish a prima facie case on every element of the underlying tort claim, except for the identification of the actual tortfeasor; (2) demonstrate that the product at issue is fungible or chemically identical across manufacturers; and (3) join defendants whose combined sales represent a substantial share of the relative market at the time and place of the injury. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 375 (S.D.N.Y. 2005) (finding that the Pennsylvania Supreme Court would allow the application of market share or alternative liability theory in the context of contaminated groundwater as a result of gasoline manufacturing and supply where the harmful product created by multiple defendants was fungible).

Martinez has not met the second or third elements. Each of Defendants' products is different from the other in multiple ways, including that they contain different allegedly harmful chemicals. Additionally, Martinez has not pled or argued that the named Defendants represent a substantial share of the UPF-producing market. For these reasons, the Court cannot apply market share liability to save his claims.

### V.    Conclusion

The FAC raises serious concerns about the UPF industry and its effects on children's health. However, the law does not allow Martinez to hold liable an entire industry for these allegations. The FAC fails to establish but-for causation because it lacks sufficient facts showing each Defendant or product individually caused or contributed to his harm. Removing one Defendant or one product illustrates the deficiencies—the outcome would not change. Alternative liability and market share liability cannot save Martinez's claims because Defendants' products and the dangerous chemicals contained therein are not the same. For those reasons, leave to amend must be denied.